UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BIENVENIDO I. LUGO MARCHANT,
        Plaintiff,

v.

PETER TSICKRITZIS, KEVIN
KINGSTON and UNITED LIQUORS
LIMITED,
        Defendants.

Civil Action No. 05 11317 NMG

## AFFIDAVIT OF JOAN ACKERSTEIN IN SUPPORT OF DEFENDANTS' MOTION FOR A PROTECTIVE ORDER PURSUANT TO FED. R. CIV. P. 26(c)

I, Joan Ackerstein, on oath, depose and say as follows:

1.      I am a partner of Jackson Lewis LLP, a firm with an office at 75 Park Plaza, Boston, Massachusetts, 02116. I have been involved in the defense of this action since its inception.

2.      On January 6, 2006, Defendants initiated their discovery by serving Plaintiff with interrogatories and a document request. When responses were not received, on March 3, 2006, Defendants filed a motion to compel discovery. Before the Court acted on the motion, Plaintiff served discovery responses but they were incomplete. Accordingly, on April 3, 2006, Defendants served a motion to compel proper and substantive responses to discovery.

3.      By the original scheduling order entered in this case, discovery was due to close on June 30, 2006. Defendants moved to extend the period of discovery by motions filed on June 29, 2006, October 16, 2006 and December 1, 2006. The Court's final ruling on the date for the closure of discovery was on December 6, 2006, when the Court ordered that discovery would close on December 22, 2006. By that same order, the Court ruled that a motion for summary judgment was due to be filed on January 31, 2007.

4.    On January 9, 2007, we received from Plaintiff the mailing attached hereto as Exhibit A. The mailing consists of copies of letters sent to six recipients, advising them that a subpoena for documents was enclosed.

5.    On January 10, 2007, we received an additional mailing from Plaintiff. That mailing is attached as Exhibit B. The mailing consists of a cover letter which indicates that Plaintiff sent letters to 13 additional recipients, advising them that a subpoena for documents was enclosed.

6.    On January 10 and 11, 2007, on behalf of defendants, I sent a letter to each of the 13 recipients, advising them that the Defendants would be seeking an order precluding Plaintiff from proceeding with this discovery. Each of the letters was identical. A sample of the letters is attached hereto as Exhibit C.

7.    By letter dated December 22, 2006, Plaintiff sent a mailing to Defendants which is attached hereto as Exhibit D. The mailing consisted of copies of documents from the Registry of Deeds relating to real estate owned by one of the individual defendants. It also consisted of International Religious Freedom Reports 2006 issued by the Bureau of Democracy, Human Rights, and Labor, relating to Greece and Turkey. The documents contain Plaintiff's handwritten notes and drawings.

8.    On January 12, 2007, I received a telephone call from the Department of Industrial Accidents, inquiring about the letter sent by Plaintiff looking for records. A search had been made for records relating to the two individual defendants, none had been found and the caller wanted to know why the request was sent and whether the Department "would get in trouble" if it did not respond.

9.     On January 12, 2007, we also received a telephone call from an attorney with WilmerHale (formerly Hale & Dorr, LLP), inquiring about whether Defendants would be taking any action with regard to Plaintiff's request for documents and requesting a copy of a motion for a protective order if they did so.  I also received a message from Horizon Beverages, providing me with the name of their attorney, to whom the request for documents had been referred.  On January 16, 2007, I had telephone calls from the attorney for Horizon Beverages and from the Enterprise and the Department of Employment & Training regarding Plaintiff's mailings.

Signed under the pains and penalties of perjury this 17th day of January, 2007.


/s/ Joan Ackerstein
Joan Ackerstein


### CERTIFICATE OF SERVICE

I hereby certify that on January 17, 2007, this document was served upon Plaintiff, Bienvenido I. Lugo Marchant, 19 Grove Street, Brockton, MA  02301, by first class mail, postage prepaid.

/s/ Heather L. Stepler
Jackson Lewis LLP

# **EXHIBIT A**

Bienvenido I. Lugo-Marchant
Plaintiff, *pro se*


**RETURN RECEIPT REQUESTED**

The Patriot Ledger
400 Crown Colony Drive
Quincy, MA 02269


      RE: **Lugo Marchant v. Tsickritzis, Kingston, United Liquors Ltd., et al**
            **Civil Action No. 05 11 317- NMG**

Dear Keeper of Records:

      Enclosed please find a subpoena *duces tecum* in connection with the above listed matter. The subpoena requires production of complete copies of any and all records related to the persons listed in the **SCHEDULE A**. Please include, if possible, a great article by Kelli Gavant on or about June 17, 2006.

      This subpoena is not limited as to time or scope. Please forward a copy of all records, by January 16, 2007.

      Thank you for your prompt attention and cooperation in this matter. Should you have any question, please feel free to contact me.

                            Very truly yours,

                            Bienvenido I Lugo Marchant,
                            Plaintiff, *pro se*

                            Jan 8-2007


Bienvenido I. Lugo-Marchant
19 Grove Street
Brockton, MA 02301

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

Bienvenido I. Lugo Marchant                        Civil Action No. 05 11317 NMG
    Plaintiff

        V.

Peter Tsickritzis, Kevin Kingston, United Liquors Limited et al.
    Defendants

**To:** The Patriot Ledger
    400 Crown Colony Drive
    Quincy, MA 02269

    **YOU ARE COMMANDED** to produce and permit inspection and copying of the following documents at the place, date, and time specified below (list documents or objects):

### PLEASE SEE ATTACHED SCHEDULE A

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

    This subpoena is not limited as to time or scope. Please forward a copy of all records according the **SCHEDULE A** by January 16, 2007.

    Thank you for your prompt attention and cooperation in this matter. Should you have any question, please feel free to contact me.

                    Very truly yours,

                    Bienvenido I Lugo Marchant,
                    Plaintiff, *pro se*

                    Jan 8-2007

Bienvenido I. Lugo-Marchant
Plaintiff, *pro se*

**RETURN RECEIPT REQUESTED**

Fox & Foner LLP
430 Hunnewell Street
Needham, MA 02494

      RE: **Lugo Marchant v. Tsickritzis, Kingston, United Liquors Ltd., et al**
          **Civil Action No. 05 11 317- NMG**

Dear Keeper of Records:

      Enclosed please find a subpoena *duces tecum* in connection with the above listed matter. The subpoena requires production of complete copies of any and all records related to the persons listed in the **SCHEDULE A.**

      This subpoena is not limited as to time or scope. Please forward a copy of all records, by January 16 , 2007.

      Thank you for your prompt attention and cooperation in this matter. Should you have any question, please feel free to contact me.

                        Very truly yours,

                        Bienvenido I Lugo Marchant
                        Plaintiff, *pro se*

                                Jan 8 -2007

Bienvenido I. Lugo-Marchant
19 Grove Street
Brockton, MA 02301

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

Bienvenido I. Lugo Marchant                      Civil Action No. 05 11317 NMG
     Plaintiff

           **v.**

Peter Tsickritzis, Kevin Kingston, United Liquors Limited et al.
           Defendants

---

**To:** Fox & Foner LLP
      430 Hunnewell Street
      Needham, MA 02494

     **YOU ARE COMMANDED** to produce and permit inspection and copying of the following documents at the place, date, and time specified below (list documents or objects):

## PLEASE SEE ATTACHED SCHEDULE A

     Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

     This subpoena is not limited as to time or scope. Please forward a copy of all records according the **SCHEDULE A** by January 16, 2007.

     Thank you for your prompt attention and cooperation in this matter. Should you have any question, please feel free to contact me.

                         Very truly yours,

                     Bienvenido I Lugo Marchant,
                     Plaintiff, *pro se*

                     Jan 8-2007

Bienvenido I. Lugo-Marchant
Plaintiff, *pro se*

**RETURN RECEIPT REQUESTED**

RBMG Inc./ NETBANK
9710 Two Notch Road
Columbia, SC 29223

      RE: **Lugo Marchant v. Tsickritzis, Kingston, United Liquors Ltd., et al**
              **Civil Action No. 05 11 317- NMG**

Dear Keeper of Records:

      Enclosed please find a subpoena *duces tecum* in connection with the above listed
matter. The subpoena requires production of complete copies of any and all records
related to the persons listed in the **SCHEDULE A.**

    This subpoena is not limited as to time or scope. Please forward a copy of all records,
by January 16, 2007.

      Thank you for your prompt attention and cooperation in this matter. Should you
have any question, please feel free to contact me.

                          Very truly yours,

                          Bienvenido I Lugo Marchant
                          Plaintiff, *pro se*

                                    Jan 8-2007

Bienvenido I Lugo-Marchant
19 Grove Street
Brockton, MA 02301

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Bienvenido I. Lugo Marchant<br>Plaintiff | Civil Action No. 05 11317 NMG |
| **V.** | |
| Peter Tsickritzis, Kevin Kingston, United Liquors Limited et al.<br>Defendants | |

**To:** RBMG Inc./ NETBANK
9710 Two Notch Road
Columbia, SC 29223

**YOU ARE COMMANDED** to produce and permit inspection and copying of the following documents at the place, date, and time specified below (list documents or objects):

### PLEASE SEE ATTACHED SCHEDULE A

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

This subpoena is not limited as to time or scope. Please forward a copy of all records according the **SCHEDULE A** by January 16, 2007.

Thank you for your prompt attention and cooperation in this matter. Should you have any question, please feel free to contact me.

Very truly yours,

Bienvenido I Lugo Marchant,
Plaintiff, *pro se*

Jan 8-2007

Bienvenido I. Lugo-Marchant
Plaintiff, *pro se*

**RETURN RECEIPT REQUESTED**

Omega Financial Inc.
10 Mazzeo Drive
Randolph, MA 02368

      RE: **Lugo Marchant v. Tsickritzis, Kingston, United Liquors Ltd., et al
            Civil Action No. 05 11 317- NMG**

Dear Keeper of Records:

       Enclosed please find a subpoena *duces tecum* in connection with the above listed

matter. The subpoena requires production of complete copies of any and all records

related to the persons listed in the **SCHEDULE A**.

    This subpoena is not limited as to time or scope. Please forward a copy of all records,

by January 16, 2007.

     Thank you for your prompt attention and cooperation in this matter. Should you

have any question, please feel free to contact me.

                     Very truly yours,

                     Bienvenido I Lugo Marchant,
                     Plaintiff, *pro se*

                               Jan 8-2007

Bienvenido I. Lugo-Marchant
19 Grove Street
Brockton, MA 02301

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **Bienvenido I. Lugo Marchant** | **Civil Action No. 05 11317 NMG** |
| Plaintiff | |
| **v.** | |
| **Peter Tsickritzis, Kevin Kingston, United Liquors Limited et al.** | |
| Defendants | |

**To:** Omega Financial Inc.
    10 Mazzeo Drive
    Randolph, MA 02368

      **YOU ARE COMMANDED** to produce and permit inspection and copying of the following documents at the place, date, and time specified below (list documents or objects):

### PLEASE SEE ATTACHED SCHEDULE A

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

    This subpoena is not limited as to time or scope. Please forward a copy of all records according the **SCHEDULE A** by January *16*, 2007.

    Thank you for your prompt attention and cooperation in this matter. Should you have any question, please feel free to contact me.

              Very truly yours,

              Bienvenido I Lugo Marchant,
                    Plaintiff, *pro se*

                    Jan 8-2007

Bienvenido I. Lugo-Marchant
Plaintiff, *pro se*


**RETURN RECEIPT REQUESTED**

Martignetti
975 University Avenue
Norwood, MA 02062


      RE:  **Lugo Marchant v. Tsickritzis, Kingston, United Liquors Ltd., et al**
            **Civil Action No. 05 11 317- NMG**

Dear Keeper of Records:

      Enclosed please find a subpoena *duces tecum* in connection with the above listed matter. The subpoena requires production of complete copies of any and all records related to the persons listed in the **SCHEDULE A**.

    This subpoena is not limited as to time or scope. Please forward a copy of all records, by January 16, 2007.

    Thank you for your prompt attention and cooperation in this matter. Should you have any question, please feel free to contact me.


                          Very truly yours,

                          Bienvenido I Lugo Marchant,
                          Plaintiff, *pro se*

                          Jan 8-2007


Bienvenido I. Lugo-Marchant
19 Grove Street
Brockton, MA 02301

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Bienvenido I. Lugo Marchant<br>    Plaintiff | Civil Action No. 05 11317 NMG |
| **V.** | |
| Peter Tsickritzis, Kevin Kingston, United Liquors Limited et al.<br>    Defendants | |

**To:** Martignetti
    975 University Avenue
    Norwood, MA 02062

      **YOU ARE COMMANDED** to produce and permit inspection and copying of the following documents at the place, date, and time specified below (list documents or objects):

### PLEASE SEE ATTACHED SCHEDULE A

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

    This subpoena is not limited as to time or scope. Please forward a copy of all records according the **SCHEDULE A** by January /6 , 2007.

    Thank you for your prompt attention and cooperation in this matter. Should you have any question, please feel free to contact me.

                      Very truly yours,

              Bienvenido I Lugo Marchant,
                    Plaintiff, *pro se*

                    Jan 8-2007

Bienvenido I. Lugo-Marchant
Plaintiff, *pro se*


**RETURN RECEIPT REQUESTED**

Horizon Beverages Co.
80 Stockwell Drive
Avon, MA 02322


      RE:  **Lugo Marchant v. Tsickritzis, Kingston, United Liquors Ltd., et al**
                 **Civil Action No. 05 11 317- NMG**

Dear Keeper of Records:

     Enclosed please find a subpoena *duces tecum* in connection with the above listed

matter.  The subpoena requires production of complete copies of any and all records

related to the persons listed in the **SCHEDULE A**.

   This subpoena is not limited as to time or scope. Please forward a copy of all records,

by January 16, 2007.

   Thank you for your prompt attention and cooperation in this matter.  Should you

have any question, please feel free to contact me.


                         Very truly yours,

                         Bienvenido I Lugo Marchant,
                         Plaintiff, *pro se*

                         Jan 8-2007


Bienvenido I. Lugo-Marchant
19 Grove Street
Brockton, MA 02301

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Bienvenido I. Lugo Marchant<br>Plaintiff | Civil Action No. 05 11317 NMG |
| **V.** | |
| Peter Tsickritzis, Kevin Kingston, United Liquors Limited et al.<br>Defendants | |

**To:** Horizon Beverages Co.
    80 Stockwell Drive
    Avon, MA 02322

**YOU ARE COMMANDED** to produce and permit inspection and copying of the following documents at the place, date, and time specified below (list documents or objects):

### PLEASE SEE ATTACHED SCHEDULE A

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

This subpoena is not limited as to time or scope. Please forward a copy of all records according the **SCHEDULE A** by January 16, 2007.

Thank you for your prompt attention and cooperation in this matter. Should you have any question, please feel free to contact me.

Very truly yours,

Bienvenido I Lugo Marchant,
Plaintiff, *pro se*

Jan 8-2007

## **SCHEDULE A**

You are hereby required to produce at the time and place indicated on the previous page the following documents:

Any and all records referring to **PETER TSICKRITZIS** (a.k.a. **PETER N. TSICKRITZIS** or **PETER N TSICKRITZIS**) of Massachusetts; **KEVIN KINGSTON** (a.k.a. **KEVIN M KINGSTON** or **KEVIN M. KINGSTON**) of Wareham, Massachusetts; or **UNITED LIQUORS LIMITED** (a.k.a. **UNITED LIQUORS LTD.**) of Massachusetts, including but not limited to, complaints, evaluations and administrative hearings. This subpoena is focused on all records, entire files and reports relating to the aforementioned persons that are in your possession, custody, or control. This subpoena is NOT limited as to time and scope.

**COMPLIANCE CAN BE MADE WITHOUT ATTENDANCE BY MAILING FIRST CLASS MAIL A CERTIFIED COPY OF THE RECORDS TO THE ATTENTION OF BIENVENIDO I LUGO MARCHANT 19 GROVE SREET BROCKTON, MA 02301 ON OR BEFORE** Jan 16-2007

Rule 45, Federal Rules of Civil Procedure, Parts C & D

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

# **EXHIBIT B**

To: Joan Ackerstein, Esq.
   **Jackson Lewis LLP**

From: Bienvenido I Lugo-Marchant

Re: **Civil Action No. 05 11317 NMG**
   Conference

Dear Ms. Ackerstein, Esq:

I hope this letter finds you well. I would like to know when are you going to send some records you should have in your possession. I believe you failed to provide and follow instructions according the Local Rules. You should have in you files, as of yesterday, a copy of a **Motion to Compel...** and a **Motion in Limine**. I am also enclosing copies of some *duces tecum* I sent yesterday to the following:

1. Patriot Ledger
2. Fox & Foner LLP
3. NETBANK/
4. OMEGA
5. Martignetti
6. Horizon Beverages

Today you are going to receive copies of *duces tecum* to the following:

1. MCAD
2. Hale & Dorr LLP
3. The Enterprise
4. DIA
5. OSHA
6. Braintree FD
7. EEOC
8. WAUSAU
9. HEALTHSOUTH
10. US Dept' of Labor (Public Affairs)
11. DET
12. Labor Relations Commission
13. LILY

I would like to meet with you to see what is next. Please, let me know if we have a court appearance soon. I will make time for you, if necessary. I hope you have time on your schedule, thanks for your cooperation on this matter.

Sincerely

B. Lugo-Marchant

Tuesday, January 09, 2007

Bienvenido I. Lugo-Marchant
Plaintiff, *pro se*

**RETURN RECEIPT REQUESTED**

Keeper of Records
Massachusetts Commission Against Discrimination
One Ashburton Place Room 601
Boston, MA 02108

      RE:  Lugo Marchant v. Tsickritzis, Kingston, United Liquors Ltd., et al
            Civil Action No. 05 11 317- NMG

Dear Keeper of Records:

      Enclosed please find a subpoena *duces tecum* in connection with the above listed matter.  The subpoena requires production of complete copies of any and all records related to the persons listed in the **SCHEDULE A**.
      This subpoena is not limited as to time or scope. Please forward a copy of all records by January 17, 2007.
      Thank you for your prompt attention and cooperation in this matter.  Should you have any question, please feel free to contact me.

                  Very truly yours,

             Bienvenido I Lugo Marchant, Plaintiff

             Jan 9 - 2007

Bienvenido I. Lugo-Marchant
19 Grove Street
Brockton, MA 02301
Plaintiff, *pro se*

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **Bienvenido I. Lugo Marchant** <br> Plaintiff | **Civil Action No. 05 11317 NMG** |
| **V.** | |
| **Peter Tsickritzis, Kevin Kingston, United Liquors Limited et al.** <br> Defendants | |

To: Keeper of Records
    Massachusetts Commission Against Discrimination
    One Ashburton Place Room 601
    Boston, MA 02108

    YOU ARE COMMANDED to produce and permit inspection and copying of the following documents at the place, date, and time specified below (list documents or objects):

### PLEASE SEE ATTACHED SCHEDULE A

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6). This subpoena is not limited as to time or scope.

    Please forward a copy of all records to the address mentioned in the **Schedule A** by January 17, 2007.

    Thank you for your prompt attention and cooperation in this matter. Should you have any question, please feel free to contact me.

Very truly yours,

Bienvenido I Lugo Marchant,
Plaintiff, *pro se*

Jan 9 - 2007

Bienvenido I. Lugo-Marchant
Plaintiff, *pro se*

**RETURN RECEIPT REQUESTED**

Julie Murphy Clinton, Esq.
Hale and Dorr, LLP
60 State Street
Boston, MA 02109

      RE:  Lugo Marchant v. Tsickritzis, Kingston, United Liquors Ltd., et al
           Civil Action No. 05 11 317- NMG

Dear Keeper of Records:

      Enclosed please find a subpoena *duces tecum* in connection with the above listed matter.  The subpoena requires production of complete copies of any and all records related to the persons listed in the **SCHEDULE A.**
      This subpoena is not limited as to time or scope. Please forward a copy of all records by January 17, 2007.
      Thank you for your prompt attention and cooperation in this matter.  Should you have any question, please feel free to contact me.

                          Very truly yours,

                Bienvenido I Lugo Marchant, Plaintiff

                    Jan 9-2007

Bienvenido I. Lugo-Marchant
19 Grove Street
Brockton, MA 02301
Plaintiff, *pro se*

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **Bienvenido I. Lugo Marchant**<br>Plaintiff<br><br>**v.**<br><br>**Peter Tsickritzis, Kevin Kingston, United Liquors Limited et al.**<br>Defendants | **Civil Action No. 05 11317 NMG** |

To: Julie Murphy Clinton, Esq.
    Hale and Dorr, LLP
    60 State Street
    Boston, MA 02109

    YOU ARE COMMANDED to produce and permit inspection and copying of the following documents at the place, date, and time specified below (list documents or objects):

### PLEASE SEE ATTACHED SCHEDULE A

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

    This subpoena is not limited as to time or scope. Please forward a copy of all records to the address mentioned in the **SCHEDULE A** by January 17, 2007.

    Thank you for your prompt attention and cooperation in this matter.  Should you have any question, please feel free to contact me.

                   Very truly yours,

                   Bienvenido I Lugo Marchant,
                   Plaintiff, *pro se*

                   Jan 9 - 2007

Bienvenido I. Lugo-Marchant
Plaintiff, *pro se*

**RETURN RECEIPT REQUESTED**

Keeper of Records
The Enterprise
60 Main Street
P.O. Box 1450
Brockton, MA 02303-1450

      RE:  Lugo Marchant v. Tsickritzis, Kingston, United Liquors Ltd., et al
           Civil Action NO. 05 11 317- NMG

Dear Keeper of Records:

      Enclosed please find a subpoena *duces tecum* in connection with the above listed matter.  The subpoena requires production of complete copies of any and all records related to the persons listed in the **SCHEDULE A**.
      This subpoena is not limited as to time or scope. Please forward a copy of all records by January 1, 2007.
      Thank you for your prompt attention and cooperation in this matter.  Should you have any question, please feel free to contact me.

                    Very truly yours,

                Bienvenido I Lugo Marchant, Plaintiff

                Jan 9 - 2007

Bienvenido I. Lugo-Marchant
19 Grove Street
Brockton, MA 02301
Plaintiff, *pro se*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **Bienvenido I. Lugo Marchant**<br>Plaintiff | **Civil Action No. 05 11317 NMG** |
| **V.** | |
| **Peter Tsickritzis, Kevin Kingston, United Liquors Limited et al.**<br>Defendants | |

To: The Enterprise
   60 Main Street
   Brockton, MA 02303

YOU ARE COMMANDED to produce and permit inspection and copying of the following documents at the place, date, and time specified below (list documents or objects):

**PLEASE SEE ATTACHED SCHEDULE A**

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6). This subpoena is not limited as to time or scope.

Please forward a copy of all records to the address mentioned below by January (7, 2007.

Thank you for your prompt attention and cooperation in this matter. Should you have any question, please feel free to contact me.

Very truly yours,

Bienvenido I Lugo Marchant,
Plaintiff, *pro se*

Jan 4-2007

Bienvenido I. Lugo-Marchant
19 Grove Street
Brockton, MA 02301

Bienvenido I. Lugo-Marchant
Plaintiff, *pro se*

## RETURN RECEIPT REQUESTED

Keeper of Records
Division of Industrial Accidents
600 Washington Street 7th Floor
Boston, MA 02111

       RE:  Lugo Marchant v. Tsickritzis, Kingston, United Liquors Ltd., et al
           Civil Action No. 05 11 317- NMG

Dear Keeper of Records:

      Enclosed please find a subpoena *duces tecum* in connection with the above listed matter.  The subpoena requires production of complete copies of any and all records related to the persons listed in the **SCHEDULE A.**
     This subpoena is not limited as to time or scope. Please forward a copy of all records by January 7 2007.
     Thank you for your prompt attention and cooperation in this matter.  Should you have any question, please feel free to contact me.

                          Very truly yours,

                    Bienvenido I Lugo Marchant, Plaintiff

                    Jan 9 - 2007

Bienvenido I. Lugo-Marchant
19 Grove Street
Brockton, MA 02301
Plaintiff, *pro se*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

**Bienvenido I. Lugo Marchant**
    Plaintiff

      **V.**

**Peter Tsickritzis, Kevin Kingston, United Liquors Limited et al.**
    Defendants

**Civil Action No. 05 11317 NMG**

---

To: Keeper of Records
    Division of Industrial Accidents
    600 Washington Street 7th Floor
    Boston, MA  02111

    YOU ARE COMMANDED to produce and permit inspection and copying of the following documents at the place, date, and time specified below (list documents or objects):

### PLEASE SEE ATTACHED SCHEDULE A

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6). This subpoena is not limited as to time or scope.

    Please forward a copy of all records to the address mentioned in the **SCHEDULE A** by January 17, 2007.

    Thank you for your prompt attention and cooperation in this matter.  Should you have any question, please feel free to contact me.

Very truly yours,

Bienvenido I Lugo Marchant,
Plaintiff, *pro se*

Jan 9 - 2007

Bienvenido I. Lugo Marchant
19 Grove Street
Brockton, MA 02301

Bienvenido I. Lugo-Marchant
Plaintiff, *pro se*

## RETURN RECEIPT REQUESTED

Keeper of Records
OSHA Regional Office
JFK Federal Building, Room E340
Boston, MA 02203

RE: Lugo Marchant v. Tsickritzis, Kingston, United Liquors Ltd., et al
Civil Action No. 05 11 317- NMG

Dear Keeper of Records:

Enclosed please find a subpoena *duces tecum* in connection with the above listed matter. The subpoena requires production of complete copies of any and all records related to the persons listed in the **SCHEDULE A**.

This subpoena is not limited as to time or scope. Please forward a copy of all records by January 17, 2007.

Thank you for your prompt attention and cooperation in this matter. Should you have any question, please feel free to contact me.

Very truly yours,

Bienvenido I Lugo Marchant, Plaintiff

*[signature]*

Jan 9 - 2007

Bienvenido I. Lugo-Marchant
19 Grove Street
Brockton, MA 02301
Plaintiff, *pro se*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **Bienvenido I. Lugo Marchant** <br> Plaintiff <br><br> **v.** <br><br> **Peter Tsickritzis, Kevin Kingston, United Liquors Limited et al.** <br> Defendants | **Civil Action No. 05 11317 NMG** |

To: Keeper of Records
 OSHA Regional Office
 JFK Federal Building, Room E340
 Boston, MA 02203


 YOU ARE COMMANDED to produce and permit inspection and copying of the following documents at the place, date, and time specified below (list documents or objects):

**PLEASE SEE ATTACHED SCHEDULE A**

 Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).This subpoena is not limited as to time or scope.

 Please forward a copy of all records to the address mentioned in the **SCHEDULE A** by January 17, 2007.

 Thank you for your prompt attention and cooperation in this matter. Should you have any question, please feel free to contact me.


 Very truly yours,

 Bienvenido I Lugo Marchant,
 Plaintiff, *pro se*

 Jan 9-2007

Bienvenido I. Lugo-Marchant
Plaintiff, *pro se*

**RETURN RECEIPT REQUESTED**

Keeper of Records
Braintree Fire Department
1 Union Place
Braintree, MA 02184

      RE:  Lugo Marchant v. Tsickritzis, Kingston, United Liquors Ltd., et al
          Civil Action NO. 05 11 317- NMG

Dear Keeper of Records:

      Enclosed please find a subpoena *duces tecum* in connection with the above listed matter.  The subpoena requires production of complete copies of any and all records related to the persons listed in the **SCHEDULE A**.
      This subpoena is not limited as to time or scope. Please forward a copy of all records by January 17, 2007.
      Thank you for your prompt attention and cooperation in this matter.  Should you have any question, please feel free to contact me.

                  Very truly yours,

                  Bienvenido I Lugo Marchant, Plaintiff

                  Jan 4 - 2007

Bienvenido I. Lugo-Marchant
19 Grove Street
Brockton, MA 02301
Plaintiff, *pro se*

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **Bienvenido I. Lugo Marchant**<br>     Plaintiff | **Civil Action No. 05 11317 NMG** |
| **V.** | |
| **Peter Tsickritzis, Kevin Kingston, United Liquors Limited et al.**<br>          Defendants | |

To:  Keeper of Records
      Braintree Fire Department
      1 Union Place
      Braintree, MA 02184


      YOU ARE COMMANDED to produce and permit inspection and copying of the following documents at the place, date, and time specified below (list documents or objects):

### PLEASE SEE ATTACHED SCHEDULE A

      Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).This subpoena is not limited as to time or scope.

      Please forward a copy of all records to the address mentioned in the **SCHEDULE A** by January 19, 2007.

      Thank you for your prompt attention and cooperation in this matter.  Should you have any question, please feel free to contact me.


                    Very truly yours,

                    Bienvenido I Lugo Marchant,
                    Plaintiff, *pro se*

                         Jan 9 - 2007

Bienvenido I. Lugo-Marchant
Plaintiff, *pro se*


**RETURN RECEIPT REQUESTED**

Keeper of Records
EEOC
16 Congress Street, 10th Floor
Boston, MA 02114

      RE:  Lugo Marchant v. Tsickritzis, Kingston, United Liquors Ltd., et al
            Civil Action No. 05 11 317- NMG

Dear Keeper of Records:

      Enclosed please find a subpoena *duces tecum* in connection with the above listed matter.  The subpoena requires production of complete copies of any and all records related to the persons listed in the **SCHEDULE A**.
   This subpoena is not limited as to time or scope. Please forward a copy of all records by January 17, 2007.
    Thank you for your prompt attention and cooperation in this matter.  Should you have any question, please feel free to contact me.

                  Very truly yours,

               Bienvenido I Lugo Marchant, Plaintiff

                    Jan 9-2007

Bienvenido I. Lugo-Marchant
19 Grove Street
Brockton, MA 02301
Plaintiff, *pro se*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

Bienvenido I. Lugo Marchant                    Civil Action No. 05 11317 NMG
        Plaintiff

                v.

Peter Tsickritzis, Kevin Kingston, United Liquors Limited et al.
              Defendants

---

To: Keeper of Records
    EEOC
    16 Congress Street, 10th Floor
    Boston, MA 02114

YOU ARE COMMANDED to produce and permit inspection and copying of the following documents at the place, date, and time specified below (list documents or objects):

### PLEASE SEE ATTACHED SCHEDULE A

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

This subpoena is not limited as to time or scope. Please forward a copy of all records to the address mentioned in the **SCHEDULE A** by January 17, 2007.

Thank you for your prompt attention and cooperation in this matter. Should you have any question, please feel free to contact me.

Very truly yours,

Bienvenido I Lugo Marchant,
Plaintiff, *pro se*

Jan 9 - 2007

Bienvenido I. Lugo-Marchant
Plaintiff, *pro se*

**RETURN RECEIPT REQUESTED**

Keeper of Records
WAUSAU 251
Salina Meadows Pkwy., Suite 260
North Syracuse, NY 13212

      RE:  Lugo Marchant v. Tsickritzis, Kingston, United Liquors Ltd., et al
            Civil Action No. 05 11 317- NMG

Dear Keeper of Records:

      Enclosed please find a subpoena *duces tecum* in connection with the above listed
matter.  The subpoena requires production of complete copies of any and all records
related to the persons listed in the **SCHEDULE A**.
    This subpoena is not limited as to time or scope. Please forward a copy of all records
by January 17, 2007.
     Thank you for your prompt attention and cooperation in this matter.  Should you
have any question, please feel free to contact me.

                   Very truly yours,

              Bienvenido I Lugo Marchant, Plaintiff

                         Jan 9- 2007

Bienvenido I. Lugo-Marchant
19 Grove Street
Brockton, MA 02301
Plaintiff, *pro se*

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

---

**Bienvenido I. Lugo Marchant**                           **Civil Action No. 05 11317 NMG**
    Plaintiff

        **V.**

**Peter Tsickritzis, Kevin Kingston, United Liquors Limited et al.**
        Defendants

---

To: Keeper of Records
    WAUSAU
    251 Salina Meadows Pkwy., Suite 260
    North Syracuse, NY 13212


YOU ARE COMMANDED to produce and permit inspection and copying of the following documents at the place, date, and time specified below (list documents or objects):

### PLEASE SEE ATTACHED SCHEDULE A

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

This subpoena is not limited as to time or scope. Please forward a copy of all records according the **SCHEDULE A** by January 17, 2007.

Thank you for your prompt attention and cooperation in this matter. Should you have any question, please feel free to contact me.


        Very truly yours,

        Bienvenido I Lugo Marchant,
        Plaintiff, *pro se*

        Jan 9-2007

Bienvenido I. Lugo-Marchant
Plaintiff, *pro se*

**RETURN RECEIPT REQUESTED**

Keeper of Records
HEALTHSOUTH
Center for Occupational Rehabilitation
100 Baystate Drive
Braintree, MA 02184

      RE:  Lugo Marchant v. Tsickritzis, Kingston, United Liquors Ltd., et al
           Civil Action No. 05 11 317- NMG

Dear Keeper of Records:

      Enclosed please find a subpoena *duces tecum* in connection with the above listed matter.  The subpoena requires production of complete copies of any  and all records related to the persons listed in the **SCHEDULE A.**
      This subpoena is not limited as to time or scope. Please forward a copy of all records by January 17, 2007.
      Thank you for your prompt attention and cooperation in this matter.  Should you have any question, please feel free to contact me.

                Very truly yours,

                Bienvenido I Lugo Marchant, Plaintiff

                Jan 4 -2007

Bienvenido I. Lugo-Marchant
19 Grove Street
Brockton, MA 02301
Plaintiff, *pro se*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Bienvenido I. Lugo Marchant<br>          Plaintiff | Civil Action No. 05 11317 NMG |
|          **V.** | |
| Peter Tsickritzis, Kevin Kingston, United Liquors Limited et al.<br>          Defendants | |

To:  Keeper of Records
      HEALTHSOUTH
      Center for Occupational Rehabilitation
      100 Baystate Drive
      Braintree, MA 02184

YOU ARE COMMANDED to produce and permit inspection and copying of the following documents at the place, date, and time specified below (list documents or objects):

**PLEASE SEE ATTACHED SCHEDULE A**

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

This subpoena is not limited as to time or scope. Please forward a copy of all records according the **SCHEDULE A** by January 19, 2007.

Thank you for your prompt attention and cooperation in this matter.  Should you have any question, please feel free to contact me.

Very truly yours,

Bienvenido I Lugo Marchant,
Plaintiff, *pro se*

Jan 9-2007

Bienvenido I. Lugo-Marchant
Plaintiff, *pro se*

**RETURN RECEIPT REQUESTED**

Keeper of Records
US Department of Labor
Office of Public Affairs
JFK Federal Building Room E-120
Boston, MA 02203

       RE: Lugo Marchant v. Tsickritzis, Kingston, United Liquors Ltd., et al
          Civil Action No. 05 11 317- NMG

Dear Keeper of Records:

      Enclosed please find a subpoena *duces tecum* in connection with the above listed matter. The subpoena requires production of complete copies of any and all records related to the persons listed in the **SCHEDULE A**.

    This subpoena is not limited as to time or scope. Please forward a copy of all records by January 7, 2007.

    Thank you for your prompt attention and cooperation in this matter. Should you have any question, please feel free to contact me.

                Very truly yours,

                Bienvenido I Lugo Marchant, Plaintiff

                Jan 4-2007

Bienvenido I. Lugo-Marchant
19 Grove Street
Brockton, MA 02301
Plaintiff, *pro se*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Bienvenido I. Lugo Marchant<br>          Plaintiff | Civil Action No. 05 11317 NMG |
|          **V.** | |
| Peter Tsickritzis, Kevin Kingston, United Liquors Limited et al.<br>          Defendants | |

To: Keeper of Records
     US Department of Labor
     Office of Public Affairs
     JFK Federal Building Room E-120
     Boston, MA 02203


YOU ARE COMMANDED to produce and permit inspection and copying of the following documents at the place, date, and time specified below (list documents or objects):

### PLEASE SEE ATTACHED SCHEDULE A

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

This subpoena is not limited as to time or scope. Please forward a copy of all records according the **SCHEDULE A** by January 17, 2007.

Thank you for your prompt attention and cooperation in this matter. Should you have any question, please feel free to contact me.


Very truly yours,

Bienvenido I Lugo Marchant,
Plaintiff, *pro se*

Jan 9-2007

Bienvenido I. Lugo-Marchant
Plaintiff, *pro se*


**RETURN RECEIPT REQUESTED**

Keeper of Records
Division of Employment and Training
19 Staniford Street 3rd Floor Hurley Building
Boston, MA 02114

   RE: Lugo Marchant v. Tsickritzis, Kingston, United Liquors Ltd., et al
     Civil Action No. 05 11 317- NMG

Dear Keeper of Records:

   Enclosed please find a subpoena *duces tecum* in connection with the above listed matter. The subpoena requires production of complete copies of any and all records related to the persons listed in the **SCHEDULE A.**
 This subpoena is not limited as to time or scope. Please forward a copy of all records by January 17, 2007.
  Thank you for your prompt attention and cooperation in this matter. Should you have any question, please feel free to contact me.

      Very truly yours,

      Bienvenido I Lugo Marchant, Plaintiff

      Jan 9- 2007

Bienvenido I. Lugo-Marchant
19 Grove Street
Brockton, MA 02301
Plaintiff, *pro se*

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **Bienvenido I. Lugo Marchant** | **Civil Action No. 05 11317 NMG** |
| Plaintiff | |
| **V.** | |
| **Peter Tsickritzis, Kevin Kingston, United Liquors Limited et al.** | |
| Defendants | |

To: Keeper of Records
   Division Of Employment and Training
   19 Staniford Street  3rd Floor Hurley Building
   Boston, MA 02114

YOU ARE COMMANDED to produce and permit inspection and copying of the following documents at the place, date, and time specified below (list documents or objects):

## PLEASE SEE ATTACHED SCHEDULE A

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

This subpoena is not limited as to time or scope. Please forward a copy of all records according the **SCHEDULE A** by January 17 2007.

Thank you for your prompt attention and cooperation in this matter.  Should you have any question, please feel free to contact me.

Very truly yours,

Bienvenido I Lugo Marchant,
Plaintiff, *pro se*

JAn 9 - 2007

Bienvenido I. Lugo-Marchant
Plaintiff, *pro se*


**RETURN RECEIPT REQUESTED**

Keeper of Records
Labor Relations Commission
339 Washington Street 4ᵗʰ Floor
Boston, MA 02108

      RE: Lugo Marchant v. Tsickritzis, Kingston, United Liquors Ltd., et al
         Civil Action No. 05 11 317- NMG

Dear Keeper of Records:

    Enclosed please find a subpoena *duces tecum* in connection with the above listed matter. The subpoena requires production of complete copies of any and all records related to the persons listed in the **SCHEDULE A**.
    This subpoena is not limited as to time or scope. Please forward a copy of all records by January 17 2007.
    Thank you for your prompt attention and cooperation in this matter. Should you have any question, please feel free to contact me.

               Very truly yours,

               Bienvenido I Lugo Marchant, Plaintiff

               Jan 9 - 2007

Bienvenido I. Lugo-Marchant
19 Grove Street
Brockton, MA 02301
Plaintiff, *pro se*

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

---

**Bienvenido I. Lugo Marchant**                     **Civil Action No. 05 11317 NMG**
    Plaintiff

        **V.**

**Peter Tsickritzis, Kevin Kingston, United Liquors Limited et al.**
      Defendants

---

To: Keeper of Records
    Labor Relations Commission
    339 Washington Street 4th Floor
    Boston, MA 02108


    YOU ARE COMMANDED to produce and permit inspection and copying of the following documents at the place, date, and time specified below (list documents or objects):

### PLEASE SEE ATTACHED SCHEDULE A

    Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

    This subpoena is not limited as to time or scope. Please forward a copy of all records according the **SCHEDULE A** by January (7, 2007.

    Thank you for your prompt attention and cooperation in this matter. Should you have any question, please feel free to contact me.


                Very truly yours,


            Bienvenido I Lugo Marchant,
            Plaintiff, *pro se*

                  Jan 9 - 2007

Bienvenido I. Lugo-Marchant
Plaintiff, *pro se*


**RETURN RECEIPT REQUESTED**


Keeper of Records
LILY TRANSPORTATION CORP
Field Support Center
145 Rosemary Street
Needham, MA 02494


      RE:  Lugo Marchant v. Tsickritzis, Kingston, United Liquors Ltd., et al
           Civil Action No. 05 11 317- NMG

Dear Keeper of Records:

      Enclosed please find a subpoena *duces tecum* in connection with the above listed matter.  The subpoena requires production of complete copies of any and all records related to the persons listed in the **SCHEDULE A**.
   This subpoena is not limited as to time or scope. Please forward a copy of all records by January 17 2007.
    Thank you for your prompt attention and cooperation in this matter.  Should you have any question, please feel free to contact me.

                 Very truly yours,

                 Bienvenido I Lugo Marchant, Plaintiff

                 Jan 9 - 2007

Bienvenido I. Lugo-Marchant
19 Grove Street
Brockton, MA 02301
Plaintiff, *pro se*

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **Bienvenido I. Lugo Marchant** <br> Plaintiff <br><br> V. <br><br> **Peter Tsickritzis, Kevin Kingston, United Liquors Limited et al.** <br> Defendants | **Civil Action No. 05 11317 NMG** |

**To:** Keeper of Records
    LILY TRANSPORTATION CORP
    Field Support Center
    145 Rosemary Street
    Needham, MA 02494

   YOU ARE COMMANDED to produce and permit inspection and copying of the following documents at the place, date, and time specified below (list documents or objects):

### PLEASE SEE ATTACHED SCHEDULE A

   Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).
   This subpoena is not limited as to time or scope. Please forward a copy of all records to the address mentioned below by January 17, 2007.
   Thank you for your prompt attention and cooperation in this matter. Should you have any question, please feel free to contact me.

                    Very truly yours,

                    Bienvenido I Lugo Marchant,
                    Plaintiff, *pro se*

                    Jan 9-2007

# **SCHEDULE A**

You are hereby required to produce at the time and place indicated on the previous page the following documents:

Any and all records referring to **PETER TSICKRITZIS** (a.k.a. **PETER N. TSICKRITZIS** or **PETER N TSICKRITZIS**) of Massachusetts; **KEVIN KINGSTON** (a.k.a. **KEVIN M KINGSTON** or **KEVIN M. KINGSTON**) of Wareham, Massachusetts; or **UNITED LIQUORS LIMITED** (a.k.a. **UNITED LIQUORS LTD.**) of Massachusetts, including but not limited to, complaints, evaluations and administrative hearings. This subpoena is focused on all records, entire files and reports relating to the aforementioned persons that are in your possession, custody, or control. This subpoena is NOT limited as to time and scope.

**COMPLIANCE CAN BE MADE WITHOUT ATTENDANCE BY MAILING FIRST CLASS MAIL A CERTIFIED COPY OF THE RECORDS TO THE ATTENTION OF BIENVENIDO I LUGO MARCHANT 19 GROVE SREET BROCKTON, MA 02301 ON OR BEFORE** Jan 17—2007

Rule 45, Federal Rules of Civil Procedure, Parts C & D

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

# **EXHIBIT C**

January 11, 2006

Julie Murphy Clinton, Esq.
Hale & Dorr, LLP
60 State Street
Boston, MA 02109

> **RE:** ***Lugo Marchant v. United Liquors, Ltd., et al.***
> ***Civil Action No. 05-11317-NMG***

Dear Ms. Murphy Clinton:

I am writing concerning correspondence dated January 9, 2007, which was directed to you by Bienvenido I. Lugo-Marchant of Brockton, Massachusetts. The correspondence from Mr. Lugo-Marchant relates to a law suit filed by him in the United States District Court for the District of Massachusetts pending as Civil Action No. 05 11317-NMG. This firm represents the defendants in that action, United Liquors Ltd, Peter Tsickritzis and Kevin Kingston.

Mr. Lugo-Marchant stated that a subpoena duces tecum was enclosed with the correspondence and he is requesting that you provide certain documents to him by January 16, 2007. This letter is to advise that Defendants are objecting to the request and are asking that you not provide documents until such time as the Court rules on this matter.

We assume you may be conferring with your own counsel about this matter. If you do, you can advise your counsel that Defendants will be objecting to Mr. Lugo-Marchant's effort to obtain documents from you, at a minimum, for the reasons that discovery in the above action has already closed and that Defendants believe the documents he requests are beyond the scope of appropriate discovery.

I trust you will not hesitate to give me a call if you have any questions about this matter.

Very truly yours,

JACKSON LEWIS LLP

Joan Ackerstein

JA:cac
cc:     Bienvenido Lugo Marchant
        Heather L. Stepler

# EXHIBIT D

To: Joan Ackerstein, Esq.
    Jackson Lewis

From: Bienvenido I Lugo-Marchant

Re: **Civil Action No. 05 11317 NMG**
    Conference

Dear Ms. Ackerstein, Esq:

    I hope this letter finds you well. I'd like to know when are you going to send me the answers to some of the questions the Defendants failed to provide and to follow instructions on the case according local rules.

    Also, I am enclosing documents from the Department of State and Registry of Deeds.

    I hope you have time on your schedule to answer these, thanks for your cooperation on this matter.

Sincerely

B. Lugo-Marchant

Friday, December 22, 2006

**Barnstable County Registry of Deeds   John F. Meade**

**Land Records List by Name**

| | |
|---|---|
| Search name: | TSICKRITZIS |
| Gtors/Gtees: | All Parties |
| Town: | *All |
| Document types: | *ALL |
| Database searched: | Land Document Index from Jan 1,1704 thru Dec 22, 2006 #80067 @ 01:39 |

| « Previous | Next » | Show Print Cart | Tax Liens | Curr Year | Print Listing | Land Court | Rec Lnd Plans |
|---|---|---|---|---|---|---|---|

| Full Name<br>Reverse Party | Document Desc<br>Document Type | Town<br>Date Recvd | Book-Page | |
|---|---|---|---|---|
| **TSICKRITZIS, ELLEN (&H) (Gtee)**<br>HYNES, DANIEL E (&O) | UNIT H-4<br>Deed | Bourne<br>06-28-2002 | 15314-318 | |
| TSICKRITZIS, ELLEN (&O) (Gtor)<br>OMEGA FINANCIAL INC | UNIT H-4<br>Mortgage | Bourne | | |
| **TSICKRITZIS, ELLEN (&H) (Gtor)**<br>MORTGAGE ELECTRONIC RE | UNIT H-4<br>Mortgage | Bourne<br>12-10-2004 | 19332-86 | |
| TSICKRITZIS, ELLEN (&O) (Gtee)<br>(&O) | UNIT H-4<br>Discharge | Bourne | | |
| **TSICKRITZIS, ELLEN (&O) (Gtor)**<br>MORTGAGE ELECTRONIC RE | UNIT H-4<br>Mortgage | Bourne<br>06-15-2006 | 21102-169 | |
| TSICKRITZIS, PETER N (&W)<br>(Gtee)<br>HYNES, DANIEL E (&O) | UNIT H-4<br>Deed | Bourne | | |
| **TSICKRITZIS, PETER N (&O)**<br>**(Gtor)**<br>OMEGA FINANCIAL INC | UNIT H-4<br>Mortgage | Bourne<br>06-28-2002 | 15314-319 | |
| TSICKRITZIS, PETER N (Gtor)<br>DOGWOOD 51 (Declaration of Homestead) | UNIT H-4<br>Discharge | Bourne<br>06-28-2002 | | |
| **TSICKRITZIS, PETER N (&W)**<br>**(Gtor)**<br>MORTGAGE ELECTRONIC RE | UNIT H-4<br>Mortgage | Bourne<br>12-10-2004 | 19332-86 | |
| TSICKRITZIS, PETER N (&O)<br>(Gtee)<br>DEFAULT | UNIT H-4<br>Discharge | Bourne | | |

**More names may be available**

[handwritten notes at bottom:]
64 Coronation Dr
Dedham  02026
51 Dogwood Rd  02532
Bourne
26 Shore Dr  02360

1C MR
10 Robinwood Rd
Wareham

BROWNtech Document Management Systems

| Barnstable County Registry of Deeds    John F. Meade |
|---|
| Land Records Abstract by Book - Page |

**Search Document ID:** 15314-319
**Database searched:** Land Document Index from Jan 1,1704 thru Dec 22, 2006 #80067 @ 01:39

< Previous    Next >    Show Print Cart

## DOCUMENT ABSTRACT

Bk-Pg:15314-319    Recorded: 06-28-2002 @ 1:46:59pm  Inst #: 56826  Chg: N  Vfy: N  Sec: N

Pages in document: 19
Grp: 1
Type: Mortgage  Doc$: 120,000.00
Desc: UNIT H-4

Town: BOURNE  Addr: 4 DOGWOOD ROAD

Gtor: **TSICKRITZIS, PETER N (&O) (Gtor)**
Gtor: **TSICKRITZIS, ELLEN (&O) (Gtor)**
Gtee: **OMEGA FINANCIAL INC (Gtee)**

Ref By: 06-28-2002 Assignment In book: **15314-338**
Ref By: 07-05-2005 Discharge In book: **20014-90**

Return addr: RBMG INC
              9710 TWO NOTCH ROAD
              COLUMBIA SC 29223

Recording Fee: 35.00 State excise: .00 Surcharge: 20.00

< Previous    Next >    Show Print Cart

## HOW TO USE THIS PAGE

To see an abstract of the next sequential instrument, click on Next>.
To see the previous panel displayed, click on <Previous.
To view an image, click on the document icon with "DOC".
To view an abstract of a referenced document, click it's hyperlink.

Most images you will view and/or print will not have marginal reference notations on the image. If you are interested in marginal reference information for a particular instrument/document, check and optionally print the abstract for it. There is no fee for printing abstracts. To print the abstract, right click on the abstract side (not the left side) and, for Internet Explorer, select "Print".

BROWNtech Document Management Systems                                    Page 1 of 1

| Barnstable County Registry of Deeds    John F. Meade |
| --- |
| Land Records Abstract by Book - Page |
| **Search Document ID:** 15314-318 |
| **Database searched:** Land Document Index from Jan 1,1704 thru Dec 22, 2006 #80067 @ 01:39 |

« Previous    Next »    Show Print Cart

## DOCUMENT ABSTRACT

Bk-Pg:15314-318    Recorded: 06-28-2002 @ 1:46:59pm  Inst #: 56825  Chg: N  Vfy: N  Sec: N

Pages in document: 1
Grp: 1
Type: Deed  Doc$: 395,000.00
Desc: UNIT H-4

Town: BOURNE  Addr: 4 DOGWOOD ROAD

Gtor: **HYNES, DANIEL E (&O) (Gtor)**
Gtor: **HYNES, CAROL A (&O) (Gtor)**
Gtee: **TSICKRITZIS, PETER N (&W) (Gtee)**
Gtee: **TSICKRITZIS, ELLEN (&H) (Gtee)**

Return addr: FOX & FONER LLP
             430 HUNNEWELL STREET
             NEEDHAM MA 02494

Recording Fee: 25.00 State excise: 2,251.50 Surcharge: 20.00

« Previous    Next »    Show Print Cart

## HOW TO USE THIS PAGE

To see an abstract of the next sequential instrument, click on Next>.
To see the previous panel displayed, click on <Previous.
To view an image, click on the document icon with "DOC".
To view an abstract of a referenced document, click it's hyperlink.

Most images you will view and/or print will not have marginal reference notations on the image. If you are interested in marginal reference information for a particular instrument/document, check and optionally print the abstract for it. There is no fee for printing abstracts. To print the abstract, right click on the abstract side (not the left side) and, for Internet Explorer, select "Print".

BROWNtech Document Management Systems                                   Page 1 of 1

---

**Barnstable County Registry of Deeds    John F. Meade**
**Land Records Abstract by Book - Page**

**Search Document ID:** 19332-86
**Database searched:** Land Document Index from Jan 1,1704 thru Dec 22, 2006 #80067 @ 01:39

---

[< Previous]  [Next >]  [Show Print Cart]

---

### DOCUMENT ABSTRACT

Bk-Pg:19332-86  [icons]  Recorded: 12-10-2004 @ 1:40:16pm  Inst #: 95268  Chg: N  Vfy: N  Sec: N

Pages in document: 11
Grp: 1
Type: Mortgage  Doc$: 130,000.00
Desc: UNIT H-4

Town: BOURNE  Addr: 4 DOGWOOD ROAD

Gtor: **TSICKRITZIS, PETER N (&W) (Gtor)**
Gtor: **TSICKRITZIS, ELLEN (&H) (Gtor)**
Gtee: **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC (Gtee)**

Return addr: OMEGA FINANCIAL INC
            10 MAZZEO DRIVE
            RANDOLPH, MA 02368

Recording Fee: 150.00 State excise: .00 Surcharge: 25.00

[< Previous]  [Next >]  [Show Print Cart]

---

### HOW TO USE THIS PAGE

To see an abstract of the next sequential instrument, click on Next>.
To see the previous panel displayed, click on <Previous.
To view an image, click on the document icon with "DOC".
To view an abstract of a referenced document, click it's hyperlink.

Most images you will view and/or print will not have marginal reference notations on the image. If you are interested in marginal reference information for a particular instrument/document, check and optionally print the abstract for it. There is no fee for printing abstracts. To print the abstract, right click on the abstract side (not the left side) and, for Internet Explorer, select "Print".

BROWNtech Document Management Systems                                      Page 1 of 1

| Barnstable County Registry of Deeds    John F. Meade |
| :---: |
| Land Records Abstract by Book - Page |

**Search Document ID:** 20014-90
**Database searched:** Land Document Index from Jan 1,1704 thru Dec 22, 2006 #80071 @ 01:41

< Previous    Next >    Show Print Cart

## DOCUMENT ABSTRACT

Bk-Pg:20014-90    [icons]    Recorded: 07-05-2005 @ 3:27:35pm  Inst #: 45946  Chg: N  Vfy: N  Sec: N

Pages in document: 1
Grp: 1
Type: Discharge
Refers to Book: **15314-319**

Town: BOURNE  Addr: 4 DOGWOOD ROAD

Gtor: **NETBANK (Gtor)**
Gtee: **TSICKRITZIS, PETER N (&O) (Gtee)**
Gtee: **TSICKRITZIS, ELLEN (&O) (Gtee)**

Return addr: NETBANK
            9710 TWO NOTCH ROAD
            COLUMBIA SC 29223

Recording Fee: 50.00 State excise: .00 Surcharge: 25.00

< Previous    Next >    Show Print Cart

## HOW TO USE THIS PAGE

To see an abstract of the next sequential instrument, click on Next>.
To see the previous panel displayed, click on <Previous.
To view an image, click on the document icon with "DOC".
To view an abstract of a referenced document, click it's hyperlink.

Most images you will view and/or print will not have marginal reference notations on the image. If you are interested in marginal reference information for a particular instrument/document, check and optionally print the abstract for it. There is no fee for printing abstracts. To print the abstract, right click on the abstract side (not the left side) and, for Internet Explorer, select "Print".

| Barnstable County Registry of Deeds    John F. Meade |
|---|
| Land Records Abstract by Book - Page |

**Search Document ID:** 15314-339
**Database searched:** Land Document Index from Jan 1,1704 thru Dec 22, 2006 #80071 @ 01:41

< Previous | Next > | Show Print Cart

### DOCUMENT ABSTRACT

Bk-Pg:15314-339 [icons]  Recorded: 06-28-2002 @ 1:46:59pm  Inst #: 56828  Chg: N  Vfy: N  Sec: N

Pages in document: 1
Grp: 1
Type: Declaration Of Homestead
Desc: DOGWOOD RD

Town: BOURNE  Addr: 4 DOGWOOD ROAD

**Gtor: TSICKRITZIS, PETER N (Gtor)**

Return addr: FOX & FONER
             430 HUNNEWELL STREET
             NEEDHAM MA 02494

Recording Fee: 10.00 State excise: .00 Surcharge: .00

< Previous | Next > | Show Print Cart

### HOW TO USE THIS PAGE
To see an abstract of the next sequential instrument, click on Next>.
To see the previous panel displayed, click on <Previous.
To view an image, click on the document icon with "DOC".
To view an abstract of a referenced document, click it's hyperlink.

Most images you will view and/or print will not have marginal reference notations on the image. If you are interested in marginal reference information for a particular instrument/document, check and optionally print the abstract for it. There is no fee for printing abstracts. To print the abstract, right click on the abstract side (not the left side) and, for Internet Explorer, select "Print".

BROWNtech Document Management Systems

**Barnstable County Registry of Deeds    John F. Meade**
**Land Records Abstract by Book - Page**

**Search Document ID:** 19332-86
**Database searched:** Land Document Index from Jan 1,1704 thru Dec 22, 2006 #80071 @ 01:41

< Previous | Next > | Show Print Cart |

### DOCUMENT ABSTRACT

Bk-Pg:19332-86    Recorded: 12-10-2004 @ 1:40:16pm  Inst #: 95268  Chg: N  Vfy: N  Sec: N

Pages in document: 11
Grp: 1
Type: Mortgage  Doc$: 130,000.00
Desc: UNIT H-4

Town: BOURNE  Addr: 4 DOGWOOD ROAD

Gtor: **TSICKRITZIS, PETER N (&W) (Gtor)**
Gtor: **TSICKRITZIS, ELLEN (&H) (Gtor)**
Gtee: **MORTGAGE ELECTRONIC REGISTRATION SYSTEMS INC (Gtee)**

Return addr: OMEGA FINANCIAL INC
             10 MAZZEO DRIVE
             RANDOLPH, MA 02368

Recording Fee: 150.00 State excise: .00 Surcharge: 25.00

< Previous | Next > | Show Print Cart |

### HOW TO USE THIS PAGE

To see an abstract of the next sequential instrument, click on Next>.
To see the previous panel displayed, click on <Previous.
To view an image, click on the document icon with "DOC".
To view an abstract of a referenced document, click it's hyperlink.

Most images you will view and/or print will not have marginal reference notations on the image. If you are interested in marginal reference information for a particular instrument/document, check and optionally print the abstract for it. There is no fee for printing abstracts. To print the abstract, right click on the abstract side (not the left side) and, for Internet Explorer, select "Print".

BROWNtech Document Management Systems

| Barnstable County Registry of Deeds    John F. Meade |
| :--: |
| Land Records Abstract by Book - Page |

**Search Document ID:** 20014-90
**Database searched:** Land Document Index from Jan 1,1704 thru Dec 22, 2006 #80071 @ 01:41

---

< Previous    Next >    Show Print Cart

| DOCUMENT ABSTRACT |
| :--: |

Bk-Pg:20014-90    🔲📧🛒    Recorded: 07-05-2005 @ 3:27:35pm  Inst #: 45946  Chg: N  Vfy: N  Sec: N

Pages in document: 1
Grp: 1
Type: Discharge
Refers to Book: **15314-319**

Town: BOURNE  Addr: 4 DOGWOOD ROAD

Gtor: **NETBANK (Gtor)**
Gtee: **TSICKRITZIS, PETER N (&O) (Gtee)**
Gtee: **TSICKRITZIS, ELLEN (&O) (Gtee)**

Return addr: NETBANK
         9710 TWO NOTCH ROAD
         COLUMBIA SC 29223

Recording Fee: 50.00 State excise: .00 Surcharge: 25.00

< Previous    Next >    Show Print Cart

| HOW TO USE THIS PAGE |
| :--: |

To see an abstract of the next sequential instrument, click on Next>.
To see the previous panel displayed, click on <Previous.
To view an image, click on the document icon with "DOC".
To view an abstract of a referenced document, click it's hyperlink.

Most images you will view and/or print will not have marginal reference notations on the image. If you are interested in marginal reference information for a particular instrument/document, check and optionally print the abstract for it. There is no fee for printing abstracts. To print the abstract, right click on the abstract side (not the left side) and, for Internet Explorer, select "Print".

*[handwritten left margin: U.S. Dept of State]*

Under Secretary for Democracy and Global Affairs > Bureau of Democracy, Human Rights, and Labor > Releases > International Religious Freedom > 2006 > Europe and Eurasia



**Greece**

International Religious Freedom Report 2006
Released by the Bureau of Democracy, Human Rights, and Labor

*[handwritten left margin: 1st Amm?]*

The constitution establishes the Eastern Orthodox Church of Christ as the prevailing religion, but also provides for the right of all citizens to practice the religion of their choice. However, while the Government generally respected this right, non-Orthodox groups sometimes faced administrative obstacles or encountered legal restrictions on religious practice. The constitution and law prohibit proselytizing and stipulate that no rite of worship may disturb public order or offend moral principles.

*[handwritten note right margin: should any 1 request KMK a permit "to go and pray"]*

There were some improvements in the status of respect for religious freedom during the period covered by this report; the Government passed a law allowing cremation and amended a law abolishing the requirement to consult local Greek Orthodox bishops before granting house of prayer permits.

*[handwritten left margin: pt?]*

The generally amicable relationship among religious groups in society contributed to religious freedom. Some non-Orthodox citizens complained of being treated with suspicion by fellow citizens or told that they were not truly Greek when they revealed their religious affiliation.



*[handwritten note right margin: increased surveillance on others]*

The U.S. government discusses religious freedom issues with the Government as part of its overall policy to promote human rights.

Section 1. Religious Demography

The country has an area of 81,935 square miles and a population of approximately 10.9 million. An estimated 97 percent of Greek citizens identified themselves as Greek Orthodox. There were approximately 500,000 to 800,000 Old Calendarist Orthodox who used the Julian calendar and adhered to traditional Greek Orthodox practice throughout the country. The Government did not keep statistics on religious groups; the census did not ask for religious affiliation. Officials estimated the size of the Thrace Muslim community at 98,000, although unofficial estimates ranged up to 140,000. The Jehovah's Witnesses reported having approximately 30,000 active members and 50,000 people affiliated with the faith; members of the Roman Catholic faith were estimated at 50,000; Protestants, including evangelicals, at 30,000; and the Church of Jesus Christ of Latter-day Saints (Mormons) at 420. Scientologists reported 500 active registered members. The longstanding Jewish community, which prior to the World War II occupation of Greece and deportation of thousands of Jews to Nazi death camps had numbered some 76,000, was estimated at approximately 5,500. There were approximately 300 members of the Baha'i Faith. Followers of the ancient polytheistic Hellenic religions reported 2,000 members. There was no official or unofficial estimate of atheists.

*[handwritten left margin: Hitler 76,000 -5,500 70,500]*

The majority of non-citizen residents and immigrants were not Greek Orthodox. The largest group was Albanian (approximately 700,000, including legal and illegal residents); most Albanians were secular in orientation. Despite such secularism, Albanians traditionally associated themselves with the Muslim, Orthodox, or Roman Catholic faiths. Aside from the indigenous Muslim minority in Thrace, the Muslim immigrant population in the rest of the country was estimated at 200,000 to 300,000.

Roman Catholics resided primarily in Athens and on the islands of Syros, Tinos, Naxos, and Corfu, as well as in the cities of Thessaloniki and Patras. Immigrants from the Philippines, Poland, and Iraq also practiced Roman Catholicism. The Roman Catholic immigrant population was estimated to be 200,000. The bishop of Athens headed the Roman Catholic Holy Synod.

Some religious groups, such as evangelicals and Jehovah's Witnesses, consisted almost entirely of ethnic Greeks and some immigrants from former Soviet republics and Albania. Other groups, such as Mormons



and Anglicans, consisted of an approximately equal number of ethnic Greeks and non-Greeks.

The indigenous Muslim minority, concentrated in Thrace with small communities in Rhodes, Kos, and Athens, was composed mainly of Turcophones but also included Roma and Pomaks, a Slav-origin linguistic minority. A growing number of Muslim immigrants lived in Athens and in rural areas.

Scientologists and followers of the ancient polytheistic Hellenic religions practiced their faith through registered nonprofit civil law organizations.

Foreign missionary groups in the country, including Protestants and Mormons, were active; Mormons reported that there were approximately sixty missionaries in the country during the year.

Section II. Status of Religious Freedom

Legal/Policy Framework

The constitution establishes the Eastern Orthodox Church of Christ (Greek Orthodoxy) as the prevailing religion and provides for freedom of religion. However, while the Government generally respected this right in practice, non-Orthodox groups sometimes faced administrative obstacles or encounter legal restrictions on religious practice. The constitution and law prohibit proselytizing and stipulate that no rite of worship may disturb public order or offend moral principles. The Orthodox Church exercises significant political and economic influence. The Government financially supports the Greek Orthodox Church; for example, the Government pays for the salaries and religious training of clergy and finances the maintenance of Orthodox Church buildings. The Government also pays the salaries and some expenses of the two official Muslim religious leaders (muftis) in Thrace, and provides a small monthly allowance to imams in Thrace. In May 2006, representatives of the Central Board of the Jewish Communities of Greece formally objected in public statements, press releases, and in appeals to the Government to the fact that the Government pays the salaries of religious officials from the Greek Orthodox and Muslim faiths, but not to Jewish rabbis. The Jewish Community reported it has requested equal treatment on this issue from the Government. Government officials stated they have received no formal request on the issue.

The Orthodox Church, Judaism, and Islam are the only religious groups considered to be "legal persons of public law." Other religions are considered "legal persons of private law." In practice, the primary distinction is that the Civil Code's provisions pertaining to corporations regulate the establishment of "houses of prayer" for religions other than the Orthodox Church, Judaism, or Islam. For example, other religions cannot own property as religious entities; the property must belong to a specifically created legal entity rather than to the religious body itself. Other religious communities also face additional legal and administrative burdens because they cannot function as legal entities. The Baha'i and other faiths have expressed their desire to operate within a legal framework as legally recognized religions, rather than as "associations." Members of religious groups that are classified as private entities cannot be represented in court as religious entities and cannot bequeath or inherit property as a religious entity. The law extended legal recognition as a private entity to Roman Catholic churches and related entities established prior to 1946. By virtue of the Orthodox Church's status as the prevailing religion, the Government recognizes the Orthodox Church's canon law, both within the Church and in such areas of civil law as marriage. The Catholic Church unsuccessfully has sought government recognition of its canon law since 1999. In April 2006, the Ministry of Education and Religion established a committee to study the issue and propose a legislative arrangement.

No formal mechanism exists to gain recognition as a "known religion." Recognition is granted indirectly by applying for and receiving a "house of prayer" permit to open houses of worship from the Ministry of Education and Religion.

Scientologists have not been able to register or build a house of prayer. Groups that follow the ancient polytheistic Hellenic tradition also applied for house of prayer permits, which the ministry announced in May 2006 were not approved despite advice from the ombudsman to the ministry to respond positively to the requests. The Jehovah's Witnesses have several pending house-of-prayer permit requests, but they have not taken the cases to the ombudsman because they received a verbal commitment from the Ministry of

The G. Constitution contradicts the US 1st Am'

Is a collective agreement that contradicts the US 1st Am' legal and

so is it enforceable?

illegal aliens or legal religions

Isaiah 56:6-7

Do you want to ... so you can go and pray?
KMK



Education and Religion that it would approve their applications.

Leaders of some non-Orthodox religious groups claimed that all taxes on religious organizations are discriminatory because the Government subsidizes the Orthodox Church, while other groups are self-supporting. In 2004, the Government passed taxation legislation that gradually abolishes, by 2007, tax on property revenues received by Greek Orthodox churches and institutions. While such laws can be applied to all religions upon judicial examination, this practice presents administrative obstacles for non-Orthodox religions.

Muslim religious leaders stated there were approximately 375 mosques in Thrace. The 1923 Treaty of Lausanne gives Muslims in Thrace the right to maintain social and charitable organizations called wakfs and allows muftis to render religious judicial services (under Shari'a) in the area of family law.

The Lausanne Treaty provides the Muslim minority in Thrace the right to Turkish-language education and provides a reciprocal entitlement for the Greek minority in Istanbul (estimated at fewer than 2,500 persons). Western Thrace has secular Turkish-language bilingual schools and two Qur'anic schools funded by the state. In 2005, approximately 6,800 Muslim students were enrolled in Turkish bilingual grammar schools, and 1,290 attended minority high schools. Another 350 students attended the Islamic schools. The majority of Muslim minority students, approximately 4,110, attended public Greek-language secondary schools, which were deemed better preparation for Greek-language universities.

Special consideration is given to Muslim minority students from Thrace for admission to technical institutes and universities that set aside 0.5 percent of the total number of places for them annually. Approximately 900 Muslim minority students took advantage of this affirmative action program; a small number chose to attend university in Turkey. In April 2005, the minister of education announced that ten full scholarships for the academic year 2005-2006 would be offered to Muslim minority students for postgraduate studies at universities. Only two students eventually benefited from the program; the other eight who were nominated did not qualify to receive the scholarships. Two students who did not qualify for the scholarships, because they had already exceeded the time permitted by the program for the conclusion of their postgraduate studies, filed complaints with the ombudsman's office. The Government planned to offer the scholarships again for the next school year.

The Government maintains that Muslims outside Thrace are not covered by the Treaty of Lausanne and therefore do not enjoy those rights provided by the Treaty. Muslim parents complained that hundreds of Turkish speaking children in the Athens area did not receive remedial Greek instruction other than in one multicultural elementary education "pilot school."



Restrictions on Religious Freedom

In 2000, the Ministry of Education and Religion rejected the application of the Scientologists for recognition and a house of prayer permit on the grounds that Scientology "is not a religion." The Church of Scientology appealed the decision to the Council of State, and then withdrew the appeal in 2003. The Scientologists were registered as a nonprofit organization because the group's legal counsel advised that the Government would not recognize Scientology as a religion.

Minority religious groups have requested that the Government abolish laws regulating house of prayer permits, which are required to open houses of worship. Local police have the authority to bring to court minority churches that operate or build places of worship without a permit. In practice, this happens rarely.

In May 2004, Nikodim Tsarknias, a former Greek Orthodox priest who is now a priest of the Macedonian Orthodox Church, was sentenced to three months in prison, a sentence which was suspended by the Aridea Criminal Court of First Instance, on charges of establishing and operating a church without authorization after he held Macedonian language religious services without a house of prayer permit. Tsarknias's sentence could not be appealed in the country; he intended to appeal to the European Court of Human Rights.

Several religious denominations reported difficulties in dealing with the authorities on a variety of



administrative matters. Privileges and legal prerogatives granted to the Greek Orthodox Church are not extended routinely to other recognized religions. Non-Orthodox religious organizations must provide separate and lengthy applications to government authorities on such matters as gaining permission to move places of worship to larger facilities. In contrast, Greek Orthodox officials have an institutionalized link between the church hierarchy and the Ministry of Education and Religion to handle administrative matters.

Although Jehovah's Witnesses are recognized as a "known" religion, members continued to face some harassment and administrative problems during the period covered by this report. This usually took the form of arbitrary identity checks (although this problem has abated) and local officials' resistance to construction of places of worship. A decision on an appeal by the Jehovah's Witnesses regarding a property dispute over taxation rates involving their officially recognized headquarters was scheduled to be heard at the Supreme Administrative Court in September 2006.

New legislation providing for religious worker visas was passed in 2005, remedying the difficulty reported in the past by some religious denominations in renewing the visas of non-EU citizen religious officials.

Non-Orthodox citizens have claimed that they face career limits within the military, police, fire-fighting forces, and the civil service because of their religions. In the military, generally only members of the Orthodox faith become officers, leading some members of other faiths to declare themselves Orthodox. Few Muslim military personnel have advanced to the rank of reserve officer. There were reports of pressure exerted on Greek Orthodox military personnel, such as being passed over for promotion if they chose to marry in the religious ceremony of non-Orthodox partners.



Muslim citizens in Thrace were underrepresented in public sector employment and in state-owned industries and corporations. While the under-representation was partly due to lower education level and Greek language ability of the available applicant pool, minority activists blamed lack of transparency in the civil service hiring process and endemic discrimination. Muslims claimed they were generally hired for lower level positions. One Muslim minority member from Thrace held a seat in Parliament. In Xanthi and Komotini, Muslims held seats on the prefectural and town councils and served as local mayors. Thrace municipalities hired Muslims as public liaisons in citizen service centers and provided Turkish lessons for other civil servants.

Unlike in Thrace, the growing Muslim community in Athens (estimated by local press and experts to be between 200,000 and 300,000 mainly economic migrants from South Asia, the Middle East, and a small percentage of Muslims from Thrace) did not have an official mosque or any official cleric to officiate at religious functions, including funerals. Press reports in 2006 stated that the number of unofficial prayer rooms in Athens ranged from twenty-five to seventy. Members of the Muslim community used the official Muslim clerics in Thrace for official religious rites. Muslims in Athens and other cities traveled to Thrace or abroad for wedding ceremonies and some transported their deceased to Thrace or abroad for religious burials; those who could afford to travel to Thrace had congregized religious rites performed. Remains buried in Greek cemeteries were subject to exhumation after three years, a practice overseen by municipalities because of limited space in Greek cemeteries, especially in Attika. This practice has presented a problem for Muslims, as Islamic law does not permit exhumation of remains.

Although Parliament approved a bill in 2000 allowing construction of the first Islamic cultural center and mosque in an Athens suburb, construction had not started by the end of the period covered by this report. In April 2006, the Government decided to fund a mosque in central Athens rather than an outlying suburb, but no decisions on location were made.

Greek Orthodox Church leaders have publicly supported the building of a mosque in Athens, although they have stated their opposition to the cultural center. The Orthodox Church reportedly offered the Muslim community in Athens a piece of land for the creation of a Muslim cemetery.

Differences remained within the Muslim minority community and between segments of the community and the Government regarding the means of selecting muftis. Under existing law, the Government appoints two muftis and one assistant mufti, all resident in Thrace. The Government maintained that it must appoint the muftis, as is the practice in Muslim countries, because, in addition to religious duties, they perform judicial functions under Muslim religious law for which the state pays them. The Government consults a committee



of Muslim minority notables, which recommends candidates for the ten-year terms of office. Members of the Muslim minority objected to the fact that the Government was not legally obligated to follow the recommendation of the committee on the selection of the muftis.

Additionally, while some Muslims have accepted the authority of the two government-appointed muftis, other Muslims have "elected" two muftis to serve their communities since they maintain that the government of a non-Muslim country cannot appoint muftis. There was no established procedure or practice for these nongovernmental elections, and the Government did not recognize the "elected" muftis. A portion of the Muslim minority continued to lobby the Government to allow for the direct election of muftis. In May 2006, the appointed Mufti of Komotini expressed his view that "nowhere in the history of Islam has there been an elected mufti."

The Government recognizes Shari'a (the Muslim religious law) as the law regulating family and civic issues of the Muslim minority in Thrace. The First Instance Courts in Thrace routinely ratify decisions of the muftis who have judicial powers on civic and domestic matters. The National Human Rights Committee, an autonomous human rights body that is the Government's advisory organ on protection of human rights, has stated that the Government should limit the powers of the muftis to religious duties and should stop recognizing Shari'a, because it can restrict the civic rights of citizens it is applied to. There are arranged marriages among underage Roma and Muslims, although Greek civil law forbids marriages of children under age eighteen. A parent or legal guardian, however, may apply for a judicial permit for the marriage of an underage person from a First Instance Court in cases of "extraordinary circumstances," such as pregnancy.

In November 2005, the appointed mufti of Komotini instructed all imams under his jurisdiction not to conduct underage marriages. In November 2005, the mufti refused permission for two minors (a twelve-year-old girl and a fourteen-year-old boy) to marry. In January 2006, he advised the guardians of a thirteen-year-old girl, who insisted on marrying despite his prohibition, to turn to the First Instance Court. The court granted her permission to marry.

Controversy between the Muslim community and the Government also continued over the management and self-government of the wakfs. This involved the Government's appointment of officials to serve on administrative boards that govern each wakf and the degree and type of administrative control, which prior to the 1960s was exercised by the Muslim community. In response to objections from some Muslims that the Government's appointment of these officials weakened the financial autonomy of the wakfs and violated the terms of the 1923 Treaty of Lausanne, a 1996 presidential decree placed the wakfs under the administration of an oversight committee appointed by the Government for three years as an interim measure pending resolution of outstanding problems. The interim period has been extended every two years by presidential decree.

In the past, Muslim activists have complained that the Government regularly lodges tax liens against the wakfs, although they were tax-free foundations in theory. Under a national land and property registry law that entered into full effect in 1999, the wakfs, along with all property holders, must register all of their property with the Government. The law permits the Government to seize any property that the owners are not able to document; there are built-in reporting and appeals procedures. The wakfs were established in 1560; however, because of the destruction of files during the two world wars, the wakfs are unable to document ownership of much of their property. Because they have not registered the property, they cannot pay assessed taxes. The Government had not sought to enforce either the assessments or the registration requirement by the end of the period covered by this report.

Members of missionary faiths reported having difficulties with harassment and police detention because of anti-proselytizing laws, but continued to note an improvement during the reporting period because of increased training and instruction given to police officers. Church officials from missionary faiths expressed concern that anti-proselytizing laws remained on the books, although such laws did not seriously hinder their activities.

A law on alternative forms of mandatory national service for religious and ideological conscientious objectors was enacted in 1998 and amended in 2004. In 2001, the Government added a conscientious objector provision in the constitution. The law provides that conscientious objectors may, in lieu of mandatory military service, work in state hospitals, or municipal and public services for two times the length of military service

minus one month, typically twenty-three months. Conscientious objector groups and Amnesty International generally characterized the legislation as a positive step, but criticized the longer service term as punitive. They also reported that uneven administration of the civilian service in some cases led to poor working conditions and noted that it would be preferable for the civilian service to be under civilian administration rather than under the Ministry of Defense. Parents of three or more children are exempt from military service.

Mandatory military service is three months for "repatriated" citizens, those who emigrated from the former Eastern bloc and are of Greek origin, and five months for repatriated conscientious objectors. Repatriated conscientious objectors who have in the past completed military service in their country of origin and became conscientious objectors later in their life are ineligible for alternative service and have taken their cases to the courts. For example, on August 26, 2005, a military court in Xanthi sentenced Boris Sotiriadis, a Georgian national of Greek origin, to three and a half years in prison for refusing military service because of his religious beliefs. Sotiriadis had served previously in the Soviet army before becoming a Jehovah's Witness and immigrating to Greece.

Problems also existed for those who became conscientious objectors after they performed their military service and were placed on reservist lists. These conscientious objectors are not recognized, as there is no legal provision covering those who change their status after having completed military service. Several cases involving such conscientious objectors were pending before the Council of State.

Orthodox religious instruction in public, primary, and secondary schools is mandatory for all Orthodox students. Non-Orthodox students are exempt from this requirement. However, schools offer no alternative supervision for these children during the period of religious instruction; they sometimes attended Orthodox religious instruction. Members of the Muslim community in Athens were lobbying for Islamic religious instruction for their children.

Some schoolbooks continued to carry negative references to Roman Catholicism, Judaism, Jehovah's Witnesses, and the ancient polytheistic Hellenic tradition.

The intra-Orthodox doctrinal dispute between Esphigmenou monastery on Mt. Athos and the Ecumenical Patriarchate that administers the region under the 1924 Charter of Mt. Athos continued. Esphigmenou is an Old Calendarist monastery that does not recognize the authority of the Patriarchate. In March 2005, the Council of State declined to rule on the appeal of a 2002 eviction request by the Ecumenical Patriarchate against the abbot of Esphigmenou on the grounds that it was not competent, under the constitution, to judge the ecclesiastic and administrative jurisdiction of the Patriarchate over Mt. Athos, but the Government had not enforced the expulsion order. Approximately ninety similar appeals by other Esphigmenou monks were pending. In late 2005, the Holy Community governing Mt. Athos appointed a new Esphigmenou monastic order, recognized by the Patriarchate, to replace the existing order. An open dispute between the two monastic orders ensued in December. The Esphigmenou monastery complained about restrictions on access to supplies and medical care that it claimed threatened the survival of the monastery. Government and ecclesiastic representatives claimed they preferred to settle this dispute without eviction.

The leader of the Greek Rumi faith, which teaches the theology of the thirteenth- century Persian poet Rumi, founder of the Mevlevi order or "Whirling Dervishes," was sentenced on July 1, 2005, to twenty-five months' imprisonment for defamatory actions related to his "controlling the consciousness" of his followers. The Orthodox Church considers the Greek Rumi community a "sect" whose heresies "threaten to corrupt Greece's religious and national identity." Local and international NGOs condemned the conviction, and the Greek Rumi leader was acquitted on appeal in March 2006.

There were no reports of religious prisoners or detainees, apart from the problems of temporary police detention experienced by Mormons.

Abuses of Religious Freedom

Most non-Orthodox religious leaders reported that their members (non-missionaries) did not encounter discriminatory treatment. However, police regularly detained Mormon missionaries (primarily from outside





the EU who were undergoing the protracted residence permit process), on average once every three months, usually after receiving complaints that the individuals engaged in proselytizing. In most cases, these individuals were held for several hours at a police station and then released with no charges filed. Mormons and Jehovah's Witnesses reported that their interaction with the police improved during the reporting period because of increased training and instruction given to police officers. Two Jehovah's Witnesses were tried and acquitted in 2004 on proselytism charges.

Forced Religious Conversion

There were no reports of forced religious conversion, including of minor U.S. citizens who had been abducted or illegally removed from the United States, or of the refusal to allow such citizens to be returned to the United States.

Anti-Semitism

There were no reports of anti-Semitic articles or cartoons in the media, contrary to previous years. The European Commission against Racism and Intolerance (ECRI), the Wiesenthal Center, the Anti-Defamation League, and the Greek Helsinki Monitor had denounced the Greek press for anti-Semitic articles and cartoons on several occasions in 2004.

*turn the blind.*

There were no reports of vandalism of Jewish monuments or cemeteries during the reporting period, which had been a problem in previous years. Police remained unable to find perpetrators in the 2004 cases of desecrations of Jewish memorials and plaques in Drama and Komotini.

Anti-Semitic graffiti were repeatedly spray-painted at several spots along the busy Athens-Corinth and Athens-Tripoli highway during 2005 and 2006. Anti-Semitic slogans also reportedly appeared close to the Athens Court complex in November 2005 and on the island of Keffalonia in September 2005. The Wiesenthal Center and a local NGO protested anti-Semitic graffiti on the country's highways and on other public buildings. The extreme right-wing group "Golden Dawn" regularly spray-painted anti-Semitic graffiti on bridges and other structures. In February 2006, the prosecutor filed a lawsuit against "Golden Dawn" for defacing public property and painting anti-Semitic graffiti the last several years on the basis of allegations submitted by a local NGO, the Greek Helsinki Monitor. The Central Board of Jewish Communities of Greece and the Greek Helsinki Monitor submitted testimony. The preliminary investigation was underway.

*?*

In April 2006, the Central Board of the Jewish Communities of Greece continued to protest the Easter tradition of the burning of a life-size effigy of Judas, sometimes referred to as the "burning of the Jew," which they maintained propagated hatred and fanaticism against Jews. One Greek Orthodox bishop, a local NGO, and the Wiesenthal Center wrote formal objections to this tradition. The Jewish Community also protested anti-Semitic passages in the Holy Week liturgy. The Jewish community reported that it remained in dialogue with the Orthodox Church about the removal of these passages.

The June 2004 ECRI report recommended that the Greek authorities closely monitor the situation regarding anti-Semitic acts and statements and take all necessary awareness-raising and punitive measures to put a stop to these acts. The report pointed out that Greek public opinion sometimes reflected the prejudices and stereotypes expressed against the Jewish Communities of Greece by the media or public figures. The report continued that, while in some cases judicial authorities took measures to counter expressions of anti-Semitism, in other cases the criminal law provisions against hate speech were not applied.

*memories R considered "holy" around "*

There was no progress on negotiations between the Jewish community of Thessaloniki and the Government to find acceptable restitution for the community's cemetery, expropriated after its destruction during the Holocaust in 1944. Aristotle University, a public institution, was built on top of the expropriated cemetery.

*~ shame!!!*

The Government co-sponsored commemorative events in Athens and Thessaloniki in January 2006 for Holocaust Remembrance Day, followed two weeks later by the visit of Israel's President Moshe Katsav, the first official visit of an Israeli head of state to Greece. The Ministry of Education distributed materials to schools on the history of the Holocaust to be read in all schools on Holocaust Remembrance Day, and teacher training seminars on the Holocaust were held in 2005. In 2005, the country became a full member of

*was this the 1st Remembrance Day after the Holocaust?*

*1944 — 2006 = ?*

*76,000*
*5,500*

*(7)*

*see page 8?*

the Task Force for International Cooperation on Holocaust Education.

Improvements and Positive Developments in Respect for Religious Freedom

On March 1, 2006, the Government passed a law allowing cremation. The Greek Orthodox Church forbids cremation of the Greek Orthodox believers (the vast majority of the population), and cremation facilities had not been established in the country by the end of the period covered by this report. Remains of those who wish to be cremated must be shipped at significant cost to countries where cremation is available. Buddhist citizens have claimed that the lack of cremation as an available means of burial infringes on their religious rights.

*[handwritten margin notes: "Kings 18.38", "2 practice religion?", "burdensome de minus..."]*

In June 2006, an amendment to an existing law was accepted by Parliament abolishing the practice by which the ministry sought the opinion of the local Greek Orthodox bishop on whether to grant house of prayer permits for faiths other than Greek Orthodox. Non-Orthodox faiths had objected to this practice.

Section III. Societal Abuses and Discrimination

Religious affiliation was very closely linked to ethnicity. Many attributed the preservation of national identity to the actions of the Greek Orthodox Church during approximately 400 years of Ottoman rule and the subsequent nation-building period. The Church exercised significant social, political, and economic influence, and it owned a considerable, although undetermined, amount of property.

Many Greeks assumed that any ethnic Greek was also an Orthodox Christian. Some non-Orthodox citizens complained of being treated with suspicion or told that they were not truly Greek when they revealed their religious affiliation.

Members of minority faiths reported incidents of societal discrimination, such as local Orthodox bishops warning parishioners not to visit clergy or members of minority faiths and requesting that the police arrest missionaries for proselytizing. However, with the exception of the burgeoning Muslim population, most members of minority faiths considered themselves satisfactorily integrated into society. Organized official interaction between religious communities was infrequent.

*[handwritten margin notes: "religious profiling?", "stick wit your gang"]*

Some non-Orthodox religious communities encountered difficulty in communicating with officials of the Orthodox Church and claimed that the attitude of the Orthodox Church toward their faiths increased social intolerance toward their religions. The Orthodox Church maintained a list of practices and religious groups, including the Jehovah's Witnesses, evangelical Protestants, Scientologists, Mormons, Baha'is, and others, which it believed to be sacrilegious. Officials of the Orthodox Church have acknowledged that they refused to enter into dialogue with religious groups considered harmful to Orthodox worshipers; church leaders instructed Orthodox Greeks to shun members of these faiths.

*[handwritten margin note: "ooops!"]*

Section IV. U.S. Government Policy

The U.S. government discusses religious freedom issues with the Government as part of its overall policy to promote human rights. Embassy officers meet with working-level officials responsible for religious affairs in the Ministries of Foreign Affairs and Education and Religion. The ambassador and other mission representatives discussed religious freedom with senior government officials and religious leaders. The U.S. Mission also regularly discusses religious freedom issues in contacts with other government officials, including mayors, regional leaders, and members of Parliament. Officers from the embassy and the consulate general in Thessaloniki meet regularly with representatives of various religious groups and solicit their participation in embassy social events. Embassy and consulate general officials investigated complaints of religious discrimination brought to their attention.

The ambassador attended Holocaust commemorations in Athens and the consul general represented him at Thessaloniki events. He and other mission officers participated along with the Ministry of Education and the Jewish Museum of Greece in teacher-training conferences on the Holocaust in 2004 and 2005. Mission

*[handwritten note in speech bubble: "Haha!, I didn't know..."]*

officers continued to monitor the issue of restitution of Jewish properties in Thessaloniki.

The consular section actively followed issues relating to religious workers' visas and property taxes.

The embassy and consulate general promoted and supported initiatives related to religious freedom. The embassy and consulate general used the International Visitor program to introduce Muslim community leaders to the United States and American counterparts.

The ambassador and mission officials regularly visited religious sites and conducted outreach throughout the country.

Released on September 15, 2006

how does this report relates → moderation
                                abuses

                              US Laws — US Constitution
                              Pote...

4

U.S. Government Reports and Documents on Cyprus

**Latest Release:**

**INTERNATIONAL RELIGIOUS FREEDOM** Released Sept. 15, 2006

**2006 International Religious Freedom Report**
**2006 International Religious Freedom Report on Cyprus**

*→ religion* (handwritten)

**HUMAN RIGHTS**

**2005 Human Rights Report** *[Ελληνικά] [Türkçe]*
**2005 Human Rights Report on Cyprus**

**2004 Human Rights Report [Ελληνικά] [Türkçe]**
**2004 Cyprus Human Rights Report 2004 [Ελληνικά] [Türkçe]**

**TRAFFICKING IN PERSONS**

**2005 Trafficking in Persons Report [Ελληνικά] [Türkçe]**
**2005 Trafficking in Persons Report on Cyprus [Ελληνικά] [Türkçe]**

*→ trafficking people?* (handwritten)

**Trafficking in Persons Report 2004**

**INTERNATIONAL RELIGIOUS FREEDOM**

Released Sept. 15, 2006
**2006 International Religious Freedom Report**
**2006 International Religious Freedom Report on Cyprus**

**2005 International Religious Freedom Report**
**2005 Religious Freedom Report on Cyprus [Ελληνικά] [Türkçe]**

**OTHER REPORTS**

**2005 Country Reports on Terrorism [pdf]**
This annual report replaces *Patterns of Global Terrorism*

*terros* (handwritten)

**Patterns of Global Terrorism 2003**

**International Narcotics Control Strategy Report**

**The Fight Against Money Laundering**
Fighting Global Corruption: Business

**Cyprus Backgound Notes**

**Country Commercial Guide** *UPDATED*

1-3

**U.S. Government documents on the Cyprus Issue**

**Turkey's EU Aspirations Can Inspire Muslims, State's Byrza Says**
**[More] [Audio of the meeting - mp3]**

**Secretary Powell's interviews on <u>Antenna TV</u> , <u>ATV Turkey</u>, <u>CNN Turk</u>, and <u>MEGA TV</u>. (April 16-17, 2004)**

**Ambassador Weston: "The Annan Plan: Myths And Realities"**
(Remarks by U.S. Special Cyprus Coordinator at the TUSIAD Conference,
Istanbul, July 17, 2003)

**The European Union: Issues and briefs for Cyprus**
Collection of statements and documents by the US Mission to the
European Union

**International Peace Research Institute, Oslo (PRIO)**
Page dedicated to Conflict Resolution and Peace Building in Cyprus

**Cyprus Decides**
a non-partisan information and facilitation service coordinated by the
Cyprus Office of the International Peace Research Institute, Oslo (PRIO)
(Turkish, Greek and English versions available)

**Remarks at Seeds of Peace Event**
August 10, 2004

**Under Secretary Grossman's Q&A Session with Greek Cypriot and Turkish Cypriot**
**journalists**

**Department of State press release on the Presentation of Cyprus Settlement**
**Proposal**

**U.S. Disappointed at Failure to Agree in UN Cyprus Talks, Mar. 11, 2003**

**U.S. Supports Annan's Revised Plan for Cyprus Settlement, Feb. 28, 2003**

**Powell, EU Officials Discuss Cyprus at Ministerial, Feb. 27, 2003**

**Grossman: Cyprus Settlement Can Be Reached by Feb. 28, Jan. 24, 2003**

**Boucher: U.S. Supports EU Donors Conference for Cyprus, Jan. 23, 2003**

**Boucher: U.S. Agrees with Turkish Cypriots Favoring U.N. Plan, Jan. 14, 2003**

**<u>Bush Sends Congress Letter on Situation in Cyprus, Jan. 7, 2003</u>**

**U.S. Welcomes Revised UN Proposal for Cyprus, Dec. 10, 2002**

7-3

Grossman: Historic Opportunity Awaits Greek, Turkish Cypriots, Dec. 4, 2002

Powell Sees "Historic Opportunity" to Solve Cyprus Problem, Nov. 27, 2002

U.S. Sees Now as Great Time to Solve Cyprus Problem, Nov. 14, 2002

U.S. Calls for Urgent Response to UN Proposal on Cyprus, Nov. 11, 2002

Grossman Urges Cyprus Settlement, Turkey EU Accession, Nov. 4, 2002

State's Grossman on U.S.-Greek Ties, Iraq, Cyprus, Sept. 25, 2002

State's Grossman Talks in Turkey on Cyprus' EU Accession, July 19, 2002

**CIA World Handbook**
Cyprus page
Reference Information
Reference Maps
Notes and Definitions
History of The World Factbook
Contributors and Copyright InformationPurchasing Information
Flags of the World

**OTHER ISSUES**

**AGRICULTURAL BIOTECHNOLOGY** *An Electronic Journal*

**Global Issues: Biotechnology**
Biotechnology Questions and Answers
Official Texts
Fact Sheets
Reports
Government Agencies

**Information on Severe Acute Respiratory Syndrome (SARS)**

**TERRORISM**

**Remembering September 11**

**Response to Terrorism**

**The Bush Administration**
US National Security Team
Secretary of State Explains Iraq Sanctions
National Security Strategy of the United States
President Bush's State of the Union Address
The National Security Strategy of the United States of America
(Sept. 20, 2002)
E-Journal: U.S. NATIONAL SECURITY STRATEGY: A NEW ERA

*U.S. Dept of State* (handwritten)

## Turkey 

## International Religious Freedom Report 2006
### Released by the Bureau of Democracy, Human Rights, and Labor

The constitution provides for freedom of religion, and the Government generally respected this right in practice; however, the Government imposes some restrictions on Muslim and other religious groups and on Muslim religious expression in government offices and state-run institutions, including universities.

There was no change in the status of respect for religious freedom during the period covered by this report, and government policy continued to contribute to the generally free practice of religion.

The generally tolerant relationship among religions in society contributed to religious freedom; however, a sharp debate continued over the country's definition of "secularism," the proper role of religion in society, and the potential influence of the country's small minority of Islamists. Some Muslims, Christians, and Baha'is faced a few restrictions and occasional harassment for alleged proselytizing or unauthorized meetings. The Government continued to oppose "Islamic fundamentalism." Authorities continued their broad ban on wearing Muslim religious dress in government offices, universities, and schools.

According to the general perception, Turkish identity is based on the Turkish language and the Islamic faith. Religious minorities said they were effectively blocked from careers in state institutions. Christians, Baha'is, and some Muslims faced societal suspicion and mistrust, and more radical Islamist elements continued to express anti-Semitic sentiments. Additionally, persons wishing to convert from Islam to another religion sometimes experienced social harassment and violence from relatives and neighbors.

The U.S. government frequently discusses religious freedom with the Government as part of its overall policy to promote human rights. Embassy representatives met frequently with government officials and representatives of religious groups during the reporting year to discuss issues related to religious freedom, including legal reform aimed at lifting restrictions on religious minorities.

Section I. Religious Demography

The country has a total area of 301,383 square miles and a population of approximately 69.6 million. According to the Government, approximately 99 percent of the population was Muslim, the majority of which was Sunni. According to the human rights nongovernmental organization (NGO) Mazlum-Der and representatives of various religious minority communities, the actual percentage of Muslims was slightly lower. The Government officially recognized only three minority religious communities-Greek Orthodox Christians, Armenian Orthodox Christians, and Jews-although other non-Muslim communities existed. The level of religious observance varied throughout the country, in part due to the influence of secular traditions and official restrictions on religious expression in political and social life.

In addition to the country's Sunni Muslim majority, there were an estimated fifteen to twenty million Alevis, followers of a belief system that incorporates aspects of both Shi'a and Sunni Islam and draws on the traditions of other religions found in Anatolia as well. Some Alevis practice rituals that include men and women worshipping together through oratory, poetry, and dance. The Government considered Alevism a heterodox Muslim sect; however, some Alevis and radical Sunnis maintained Alevis are not Muslims.

There were several other religious groups, mostly concentrated in Istanbul and other large cities. While exact membership figures were not available, these religious groups included approximately 65,000 Armenian Orthodox Christians; 23,000 Jews; and fewer than 2,500 Greek Orthodox Christians. The Government interpreted the 1923 Lausanne Treaty as granting special legal minority status exclusively to these three groups, although the treaty text refers broadly to "non-Muslim minorities" without listing specific groups. However, this recognition did not extend to the religious leadership organs; for example, the Ecumenical and Armenian Patriarchates continued to seek recognition of their legal status.

*(handwritten margin notes)*
*1 million*
*4 yr 5 yr Tikoe?*
*He/Kev ili*
*just 3?*
*What about "the genocide"? 1.5 Million...*

There also were approximately 10,000 Baha'is; an estimated 15,000 Syrian Orthodox (Syriac) Christians; 5,000 Yezidis; 3,300 Jehovah's Witnesses; 3,000 Protestants; and small, undetermined numbers of Bulgarian, Chaldean, Nestorian, Georgian, Roman Catholic, and Maronite Christians. The number of Syriac Christians in the southeast was once high; however, under pressure from government authorities and later under the impact of the war against the terrorist Kurdistan Workers Party (PKK), many Syriacs migrated to Istanbul, Western Europe, or North and South America. Over the last several years, small numbers of Syriacs returned from overseas to the southeast, mostly from Western Europe. In most cases, older family members returned while younger ones remained abroad.

Christian organizations estimated there were approximately 1,100 Christian missionaries in the country.

Section II. Status of Religious Freedom

Legal/Policy Framework

The constitution provides for freedom of religion, and the Government generally respected this right in practice; however, the Government imposes some restrictions on Muslim and other religious groups and on Muslim religious expression in government offices, state-run institutions, and universities, usually for the stated reason of preserving the "secular state." The constitution establishes the country as a secular state and provides for freedom of belief, freedom of worship, and the private dissemination of religious ideas. However, other constitutional provisions regarding the integrity and existence of the secular state restrict these rights. The constitution prohibits discrimination on religious grounds. Core institutions of the state, including the presidency, armed forces, judiciary, and state bureaucracy, have played the role of defending traditional Turkish secularism throughout the history of the republic. In some cases, elements of the state have opposed policies of the elected Government on the grounds that they threatened the secular state.

The Government oversees Muslim religious facilities and education through the Diyanet, which is under the authority of the Prime Ministry. The Diyanet is responsible for regulating the operation of the country's more than 77,500 registered mosques and employing local and provincial imams, who are civil servants. Some groups, particularly Alevis, claimed that the Diyanet reflected mainstream Sunni Islamic beliefs to the exclusion of other beliefs; however, the Government asserted that the Diyanet treated equally all who requested services.

A separate government agency, the General Directorate for Foundations (GDF), regulates some activities of non-Muslim religious groups and their affiliated churches, monasteries, synagogues, and related religious property. There are 161 "minority foundations" recognized by the GDF, including Greek Orthodox foundations with approximately 70 sites, Armenian Orthodox foundations with approximately 50 sites, and Jewish foundations with 20 sites, as well as Syriac, Chaldean, Bulgarian Orthodox, Georgian, and Maronite foundations. The GDF also regulates historic Muslim charitable religious foundations, including schools, hospitals, and orphanages.

In 1936, the Government required all foundations to declare their sources of income. In 1974, amid political tensions over Cyprus, the High Court of Appeals ruled that the minority foundations had no right to acquire properties beyond those listed in the 1936 declarations.

The court's ruling launched a process, which continued during the period covered by this report, under which the state has seized control of properties acquired after 1936. The law also allows the state to expropriate properties in areas where the local non-Muslim population drops significantly. Minority religious groups, particularly the Greek and Armenian Orthodox communities, have lost numerous properties to the state in the past and continued to fight ongoing efforts by the state to expropriate properties.

The law allows the 161 religious minority foundations recognized by the GDF to acquire property, and the GDF has approved 364 applications by non-Muslim foundations to acquire legal ownership of properties. However, the legislation does not allow the communities to reclaim the hundreds of properties affiliated with foundations expropriated by the state over the years. Foundations have also been unable to acquire legal ownership of properties registered under names of third parties, including properties registered under the names of saints or archangels, during periods when foundations could not own property in their own name.



2-8

Guttenberg / Freedom of Press / Writing ?

heresy

Government authorities do not interfere in matters of doctrine pertaining to non-Muslim religions, nor do they restrict the publication or use of religious literature among members of the religion.

There are legal restrictions against insulting any religion recognized by the Government, interfering with that religion's services, or debasing its property.

Freedom of Speech / words then bend

Alevis freely practiced their beliefs and have built "cem houses" (places of gathering), although cem houses have no legal status as places of worship. Representatives of Alevi organizations maintained that they often faced obstacles when attempting to establish cem houses. They said there were approximately one hundred cem houses in the country, a number that they claimed was insufficient to meet their needs.

impose a chatena MA?

Alevis in the Kartal district of Istanbul continued to fight a court battle against a decision by local authorities to deny them permission to build a cem house. In January 2005, Alevis in the Cankaya district of Ankara applied to acquire property to open a cem house. Municipal authorities consulted the Diyanet, which issued a letter stating that Alevis in Cankaya did not need a cem house because they could worship at a local mosque. Also in January 2005, the Diyanet issued a letter to authorities in the Sultanbeyli district of Istanbul stating that cem houses violate Islamic principles and Turkish law.

Belmont Mormons ?

Park ? AGW'i Belmont ??? # Mormons like

In May 2006, authorities in the Istanbul municipality of Sultanbeyli reportedly halted the construction of a cem house on the grounds that the Pir Sultan Abdal Association, an Alevi group, had not acquired the necessary construction permits. Association officials said the local mayor and his staff had attended the groundbreaking ceremony and had promised not to interfere with the project.

Turkish?

The Diyanet covers the utility costs of registered mosques, but not of cem houses and other places of worship that are not officially recognized. In May 2006, Diyanet President Ali Bardakoglu said the Diyanet could not provide such support to cem houses as it did not have funds for "supporting mystical worship."

Many Alevis alleged discrimination in the Government's failure to include any of their doctrines or beliefs in religious instruction classes in public schools. They also charged a bias in the Diyanet, which does not allocate specific funds for Alevi activities or religious leadership.

ah mm!

The constitution establishes compulsory religious and moral instruction in primary and secondary schools. Religious minorities are exempted. However, some religious minorities - such as Protestants - faced difficulty obtaining exemptions, particularly if their identification cards did not specifically list membership in a minority religion. The Government claims that the religion courses cover the range of world religions; however, religious minorities said the courses reflected Sunni Islamic doctrine, which, they maintained, explains why non-Muslims are exempt.

freedom ?

In January 2004, an Alevi parent filed suit in the European Court of Human Rights (ECHR), charging that the mandatory religion courses violate religious freedom; the case is ongoing. In a June 2004 report, the European Commission against Racism and Intolerance recommended that the Government either make the courses optional, or revise the content so that they genuinely and fairly cover all religions.

it was about time

In April 2006, an Istanbul court announced its ruling in favor of an Alevi father who requested that his son be exempt from the religion courses at school; in May, however, a higher court overturned the ruling on appeal.

Officially recognized religious minorities may operate schools under the supervision of the Ministry of Education. Such schools are required to appoint a Muslim as deputy principal; reportedly, these deputies have more authority than their nominal supervisors. The curriculum of these schools includes Greek Orthodox, Armenian Orthodox, and Jewish instruction.

so one else

The Caferis, the country's principal Shi'a community, numbering between 500 thousand and 1 million (concentrated mostly in eastern Turkey and Istanbul), do not face restrictions on their religious freedoms. They build and operate their own mosques and appoint their own imams; however, as with the Alevis, their places of worship have no legal status and receive no support from the Diyanet.

Restrictions on Religious Freedom

Restrictions ?

3 - 8

Government policy and practice contributed to the generally free practice of religion; however, state policy imposes some restrictions on religious groups and on religious expression in government offices and state-run institutions, including universities.

Secularists in the military, judiciary, and other branches of the bureaucracy continued to wage campaigns against what they label as proponents of Islamic fundamentalism. These groups view religious fundamentalism as a threat to the secular state. The National Security Council (NSC) categorizes religious fundamentalism as a threat to public safety. President Sezer delivered a speech in April 2006 in which he listed separatism and religious fundamentalism as threats facing the country. The president said that the "fundamentalist threat has reached a dangerous level" and that "Turkey's best protection against this threat is its secular order."

*ust like Date...*

*Don't ask Don't tell*

According to Mazlum-Der and other groups, some government ministries have dismissed or barred from promotion civil servants suspected of anti-state or Islamist activities. Reports by Mazlum-Der, the media, and others indicated that the military sometimes dismisses religiously observant Muslims from military service. Such dismissals were based on behavior that military officials believed identified these individuals as Islamic fundamentalists; they were concerned that such behavior could indicate disloyalty to the secular state.

According to Mazlum-Der, the military charged soldiers with lack of discipline for activities that included performing Muslim prayers or being married to women who wore headscarves. According to the military, officers and noncommissioned officers were sometimes dismissed for maintaining ties to Islamic fundamentalist organizations, despite repeated warnings from superior officers.

*Keep your nose clean*

Mystical Sufi and other religious-social orders (tarikats) and lodges (cemaats) have been banned officially since the mid?1920s; however, tarikats and cemaats remain active and widespread. Some prominent political and social leaders continue to associate with tarikats, cemaats, and other Islamic communities.

*Restrictions*
*Isaiah 56:6,7*
*US 1st Am*

Under the law, religious services may take place only in designated places of worship. Municipal codes mandate that only the Government can designate a place of worship, and, if a religion has no legal standing in the country, it may not be eligible for a designated site. Non-Muslim religious services, especially for religious groups that do not own property recognized by the GDF, often take place on diplomatic property or in private apartments. Police occasionally bar Christians from holding services in private apartments, and prosecutors have opened cases against Christians for holding unauthorized gatherings.

*intolera*

The law prohibits imams, priests, rabbis, or other religious leaders from "reproaching or vilifying" the Government or the laws of the state while performing their duties. Violations are punishable by prison terms of one month to one year, or three months to two years if the crime involves inciting others to disobey the law.

The authorities continued to monitor the activities of Eastern Orthodox churches, but generally did not interfere with their activities. The Government does not recognize the ecumenical status of the Greek Orthodox Patriarch, acknowledging him only as the head of the country's dwindling Greek Orthodox community. High-level government leaders often assert publicly that use of the term "ecumenical" in reference to the patriarch violates the 1923 Lausanne Treaty. However, government officials privately acknowledge that Lausanne does not address the issue.

*Compliance?*

As a result, the Government has long maintained that only citizens of the country can be members of the Church's Holy Synod and participate in patriarchal elections. However, in 2004, Ecumenical Patriarch Bartholomew I appointed six non?Turkish-citizen metropolitans to the Holy Synod, representing the first time in the eighty-year history of the country that noncitizens had been appointed to the body. The Government did not formally respond to the appointments.

Members of the Greek Orthodox community said the legal restrictions threatened the survival of the Ecumenical Patriarchate in Istanbul because, with fewer than 2,500 Greek Orthodox left in the country, the community was becoming too small to maintain the institution.

The Ecumenical Patriarchate in Istanbul continued to seek to reopen the Halki seminary on the island of Heybeli in the Sea of Marmara. The Government closed the seminary in 1971, when the state nationalized

*4-8*

all private institutions of higher learning. The state provides training for Sunni Islamic clergy; religious communities outside the Sunni Islamic mainstream cannot legally train new clergy in the country for eventual leadership. Co-religionists from outside the country have been permitted to assume leadership positions in some cases, but in general all religious community leaders, including patriarchs and chief rabbis, must be citizens.

In April 2005, the Patriarchate filed an appeal with the ECHR concerning the GDF's expropriation of an orphanage on the Prince's Islands that had belonged to the Patriarchate. There were no new developments in the case.

The Armenian Orthodox community continued a legal battle against the Government's expropriation of properties belonging to the Yedikule Surp Pirgic Armenian Hospital Foundation in Istanbul. In March 2005, the Treasury attempted to sell a building expropriated from the foundation to a private company, but the Finance Ministry blocked the sale. The ECHR continued proceedings related to the appeal by the Armenian Orthodox community of the 1999 expropriation of two other foundation properties.

No law explicitly prohibits proselytizing or religious conversions; however, many prosecutors and police regard proselytizing and religious activism with suspicion. Police occasionally bar Christians from handing out religious literature. Proselytizing is often considered socially unacceptable; Christians performing missionary work are sometimes beaten and insulted. If the proselytizers are foreigners, they may be deported, but generally they are able to reenter the country. Police officers may report students who meet with Christian missionaries to their families or to university authorities.

By the end of the reporting period, there was no verdict in the trial proceedings in the case of three members of the Nationalist Movement Party who severely beat Yakup Cindilli, a convert to Christianity, for distributing New Testaments in Bursa Province in 2003.

Authorities continued to enforce a long-term ban on the wearing of headscarves at universities and by civil servants in public buildings. Women who wear headscarves and persons who actively show support for those who defy the ban have been disciplined or have lost their jobs in the public sector as nurses and teachers. Students who wear head coverings are officially not permitted to register for classes, although some faculty members permit students to wear head coverings in class.

Many secularists accuse Islamists of using advocacy for wearing the headscarf as a political tool and say they fear that efforts to repeal the headscarf ban will lead to pressure against women who choose not to wear a head covering.

In February 2006, the Council of State ruled in favor of a decision by education authorities to revoke the promotion of an Ankara teacher to a nursery school principal position on the grounds that the teacher regularly wore an Islamic headscarf outside of school. Some journalists and religious rights advocates asserted that the court's decision effectively expanded the headscarf ban into the private sphere. The court, however, maintained that the teacher had violated the principle of secularism in education by wearing the headscarf while traveling to and from school.

In May 2006, attorney Alparslan Arslan opened fire in the Council of State court responsible for the February ruling, killing Judge Mustafa Yucel Ozbilgin and wounding four other judges. Arslan, who was apprehended at the scene, reportedly said he was motivated by anger over the ruling. Thousands of protestors attending Ankara funeral ceremonies for Ozbilgin accused government leaders of inciting the attack by criticizing the headscarf ban and the Council of State ruling. There were no similar protests in other cities.

In another February 2006 ruling, the Council of State upheld a decision by the Education Ministry to deny the application of religion instructor Abdullah Yilmaz to be assigned to a position in Central Asia because Yilmaz's wife wears a headscarf.

A 1997 law made eight years of secular education compulsory. After completing the eight years, students may pursue study at imam hatip (Islamic preacher) high schools, which cover both the standard high school curriculum and Islamic theology and practice. Imam hatip schools are classified as vocational, and graduates of vocational schools face an automatic reduction in their university entrance exam grades if they apply for university programs outside their field of high school specialization. This reduction effectively bars

imam hatip graduates from enrolling in university programs other than theology. Many pious citizens criticized the religious instruction provided in the regular schools as inadequate. Most families who enrolled their children in imam hatip schools did so to expose them to more extensive religious education, not to train them as imams.

In December 2005, the Education Ministry issued a regulation allowing imam hatip students to earn degrees from regular high schools by taking distance learning courses. However, the Higher Education Council objected to the regulation, and, in February 2006, the Council of State suspended the regulation pending a final ruling.

Only the Diyanet is authorized to provide religion courses outside of school, although clandestine private courses do exist. Students who complete five years of primary school may enroll in Diyanet Qur'an classes on weekends and during summer vacation. Many Qur'an courses function unofficially. Only children twelve and older may legally register for official Qur'an courses, and Mazlum-Der reported that law enforcement authorities often raided illegal courses for younger children.

Jehovah's Witnesses reported continuing official harassment of their worship services because they were not members of an officially recognized religion. Jehovah's Witnesses continued to engage in a legal battle over their efforts to form an association.

Restoration or construction may be carried out in buildings and monuments considered "ancient" only with authorization of the regional board on the protection of cultural and national wealth. Bureaucratic procedures and considerations relating to historic preservation in the past have impeded repairs to religious facilities, especially in the case of Syriac and Armenian Orthodox properties. Groups are prohibited from using funds from their properties in one part of the country to support their existing population in another part of the country.

Religious affiliation is listed on national identity cards. Some religious groups, such as the Baha'i, are unable to state their religion on their cards because their religion is not included among the options; they have made their concerns known to the Government. In April 2006, Parliament adopted legislation allowing persons to leave the religion section of their identity cards blank or change the religious designation by written application. However, it appeared that the Government may restrict applicants' choice of religion; members of the Baha'i community said government officials had told them that, despite the new law, they would not be able to list their religion on the cards.

There were reports that local officials harassed some persons who converted from Islam to another religion when they sought to amend their cards. Some non-Muslims maintained that listing religious affiliation on the cards exposed them to discrimination and harassment.

In October 2004, the Government's Human Rights Consultation Board issued a report on minorities, which stated that non-Muslims were effectively barred from careers in state institutions, such as the armed forces, the Ministry of Foreign Affairs, the National Police, and the National Intelligence Agency. Professors Baskin Oran and Ibrahim Kaboglu faced criminal charges for their roles as principal authors of the report. An Ankara court acquitted them in May 2006. Members of minority religious communities confirmed the report's conclusions. They said non-Muslim citizens were viewed as foreigners and were therefore considered unqualified to represent the state.

In January 2006, the ECHR ruled against the country in a case involving conscientious objector Murat Ulke. The court determined that Ulke, who had been imprisoned for refusing to carry out his military service, had suffered ill-treatment.

At the end of the reporting period, court proceedings continued in the Istanbul trial of sixty-nine suspects charged in connection with the November 2003 terrorist bombings of two synagogues, the British consulate, and a bank.

There were no reports of religious prisoners or detainees in the country.

Forced Religious Conversion



There were no reports of forced religious conversion, including of minor U.S. citizens who had been abducted or illegally removed from the United States, or the refusal to allow such citizens to be returned to the United States.

Improvements and Positive Developments in Respect for Religious Freedom

In April 2006, Roman Catholic authorities reopened the Bebekli Church in Adana for Sunday services. Catholic leaders had closed the church in September 2005 because local authorities had failed to enforce zoning regulations requiring a ten-meter offset around the church building, and noise from an adjacent wedding hall had been interfering with church services. In April, local Catholic officials thanked municipal authorities for discontinuing the operating license of the wedding hall.

In June 2006, officials in the Tasdelen municipality of Istanbul allocated land to an Alevi organization for the construction of a cem house. Members of the Alevi community said the decision marked the first time a cem house had been officially recognized as a place of worship, rather than as a cultural center.

Section III. Societal Abuses and Discrimination

The generally tolerant relationship among religions in society contributed to religious freedom; however, some Muslims, Christians, Baha'is, and other religious communities faced societal suspicion and mistrust. Jews and Christians from most denominations freely practiced their religions and reported little discrimination in daily life. However, citizens who converted from Islam to another religion often experienced some form of social harassment or pressure from family and neighbors. Proselytizing on behalf of non-Muslim religions was socially unacceptable and sometimes dangerous. A variety of newspapers and television shows regularly published and broadcasted anti-Christian messages, and government officials asserted that missionary activity was a threat to the state and was not covered under the concept of religious freedom.

Religious pluralism was widely viewed as a threat to Islam and to "national unity." Nationalist sentiments sometimes contained anti-Christian or anti-Semitic overtones. Some in the Jewish community reported growing feelings of insecurity in the wake of the 2003 attacks in Istanbul, and certain media outlets promoted anti-Semitic propaganda, including allegations that the Jewish community aided and even orchestrated the Kurdish nationalist movement.

In January 2006, five assailants severely beat Protestant church leader Kamil Kiroglu in Adana. One attacker wielded a knife and threatened to kill Kiroglu unless he renounced Christianity.

In February 2006, an assailant shot and killed Catholic priest Andrea Santoro in a church in Trabzon. A witness said the gunman shouted "God is great" as he shot Santoro from behind. A sixteen-year-old was charged in the case; his trial was ongoing at the end of the reporting period. The suspect reportedly told police he was angry about the caricatures of the Prophet Muhammad that had been published in a Danish newspaper. Prime Minister Erdogan and other government officials condemned the killing.

Also in February, a group of young men beat and threatened to kill a Catholic friar in Izmir. The attackers shouted anti-Christian slogans and said they wanted to "clean Turkey of non-Muslims."

In March 2006, an assailant entered a Catholic church in Mersin, threatening church members with a knife and shouting anti-Christian statements. Police arrived at the scene and arrested the assailant.

In April 2006, a group of young men entered the Syriac compound in Diyarbakir and shouted threats at church members. Police refused to send patrols to the neighborhood of the church until a few days later, when the church's Easter ceremonies were held.

In May 2006, Greek Orthodox Christians held a mass at a historical church in Bergama. A group of nationalist and leftist protestors attempted to disrupt the mass with loud slogans and music. Ecumenical Patriarch Bartholomew I, who attended the mass, thanked local officials for authorizing the event.

7 – 8

Members of the Syriac community said local villagers, particularly village guards, often occupied the homes of Syriacs who fled the country, refusing to leave when Syriacs attempted to return. The village guards are a civil defense force of approximately 57,000, mostly in the southeast. They were reputed to be the least disciplined of the security forces.

According to the Syriac community, more than fifty unoccupied Syriac homes have been destroyed in the village of Bardakci, Mardin province, since 2000. The majority of the village's Syriac residents fled the region in the mid-1980s. One of the village's two Syriac churches was converted into a mosque without consulting the Syriac community. Some returning Syriacs claimed that government authorities reclassified properties while the Syriacs were out of the country in ways that caused them to lose some of their lands.

Trial proceedings continued in the appeal of Kerim Akbas, who was convicted in 2004 for television broadcasts inciting violence against Christians.

Members of the secular establishment fear the influence of Islamism and reject the involvement of even moderate Islam in politics.

Section IV. U.S. Government Policy

The U.S. government discusses religious freedom issues with the Government as part of its overall policy to promote human rights. The ambassador and other mission officials, including staff of the U.S. Consulate General in Istanbul and the U.S. Consulate in Adana, enjoyed close relations with the Muslim majority and other religious groups. The U.S. Embassy continued to urge the Government to permit the reopening of the Halki seminary on Heybeli Island.

In November 2005, the U.S. charge d'affaires addressed an Istanbul conference on interfaith dialogue organized by the Appeal of Conscience Foundation. Speaking to an international audience representing diverse religions, she emphasized the importance of religious freedom and the need for leaders of all faiths to stand up against terrorism. 

The mission collaborated with the Gaziantep American Corner, the Gaziantep Rotary Club, and the Anatolian Journalists Union in organizing a photo exhibit in June 2005 on religious diversity in the country that helped to engage attendees in dialogue about issues important to the country's continued democratic development.

The mission sponsored a series of presentations on religion in the United States by Wilfred McClay, professor of history at the University of Tennessee, in March 2006. McClay addressed audiences of students, faculty, theologians, opinion makers, and others in Istanbul, Bursa, and Ankara, including at the ambassador's residence. He explained the basic assumptions that underpin the U.S. Constitution as part of his discussion of secularism in the United States.

The ambassador discussed religious freedom regularly in private meetings with cabinet members. These discussions touched on both government policy regarding Islam and other religions, and specific cases of alleged religious discrimination. The ambassador met with Diyanet President Ali Bardakoglu. During introductory calls in Istanbul, he met with Ecumenical Patriarch Bartholomew I, Chief Rabbi Isak Haleva, and Armenian Orthodox Patriarch Mesrob II to show support for religious freedom and to discuss issues affecting their respective communities.

Other embassy officers held similar meetings with government officials. Diplomats from the embassy and consulates met regularly with representatives of the various religious groups. These meetings covered a range of topics, including problems faced by non-Muslim groups and the debate over the role of Islam in the country.

The mission utilizes the International Visitor Program to introduce professionals in various fields to the United States and American counterparts. Religious issues are included among these programs.
Released on September 15, 2006

8-8

*US Dept of State*



# Cyprus
## International Religious Freedom Report 2006
### Released by the Bureau of Democracy, Human Rights, and Labor

The Constitution of the Republic of Cyprus provides for freedom of religion, and the Government generally respected this right in practice.

*(not always)*

There was no change in the status of respect for religious freedom during the period covered by this report, and government policy continued to contribute to the generally free practice of religion.

The generally amicable relationship among religious groups in society contributed to religious freedom.

The U.S. government discusses religious freedom issues with the Government as part of its overall policy to promote human rights.

Section I. Religious Demography

Cyprus has an area of 5,747 square miles, and the population in the Government-controlled areas was estimated at 766,600.

Prior to 1974, the country experienced a long period of strife between its Greek and Turkish Cypriot communities. In response, the U.N. Force in Cyprus (UNFICYP) began peacekeeping operations in 1964. The island has been divided since the Turkish military intervention of 1974, following a coup d'etat directed from Greece. The southern part of the island is under the control of the Government of the Republic of Cyprus, while the northern part is administered by Turkish Cypriots. In 1983, their administration proclaimed itself the "Turkish Republic of Northern Cyprus" ("TRNC"). The United States does not recognize the "TRNC," nor does any other country except Turkey. A buffer zone, or "green line," patrolled by UNFICYP separates the two parts. In 2003, Turkish Cypriot authorities relaxed many restrictions on movement between the two communities, including abolishing all crossing fees. The new procedures led to relatively unimpeded contact between the communities and permitted Greek Cypriots and Turkish Cypriots to visit religious sites located in the other community; however, Cypriots, as well as foreigners, must show identification at the buffer zone checkpoints to cross from one side to the other.

*→ "this ain't your hood"*

*oops!*

*stick with your gang?"*

Approximately 96 percent of the population in the Government-controlled areas belonged to the Greek Orthodox Church of Cyprus. An estimated 0.7 percent of the remaining population was Maronite, slightly less than 0.4 percent was Armenian Orthodox, 0.1 percent was Latin (Roman Catholic), and 3.2 percent belonged to other groups. The latter category included small groups of Protestants and Jews and immigrants of various religious beliefs, including Muslims and Buddhists.

In July 2005 the first Buddhist temple in Cyprus opened in Nicosia. In September, Cyprus's first new synagogue in at least twenty years opened in Larnaca.

*compare a report in Greece p. ?*

A 1998 opinion poll indicated that an estimated 48 percent of Greek Cypriots regularly attended church services, while 49 percent attended only for major religious holidays and ceremonies such as weddings and funerals. The remainder did not attend religious services at all.

There was some Protestant missionary activity in the Government-controlled area.

Section II. Status of Religious Freedom

Legal/Policy Framework

The constitution of the Republic of Cyprus provides for freedom of religion, and the Government generally respected this right in practice. The Government at all levels sought to protect this right in full and did not tolerate its abuse, either by governmental or private actors.

*Koffee 4ths !*



The 1960 constitution specifies that the Greek Orthodox Church of Cyprus, which is not under the authority of the mainland Greek Orthodox Church, has the exclusive right to regulate and administer its internal affairs and property in accordance with its holy canons and charter. The Church of Cyprus is exempt from taxes with regard to religious activity, and according to law, is required to pay taxes only on strictly commercial activities. Under the 1960 constitution, the same applies to the Vakf, or Evkaf, the Muslim institution that regulates religious activity for Turkish Cypriots and which operates only in the area administered by Turkish Cypriots.

Three other religious groups are recognized in the 1960 constitution: Armenian Orthodox, Maronite Christians, and Latins (Roman Catholics). These groups also are exempt from taxes and are eligible, along with the Church of Cyprus and the Vakf, for government subsidies to their religious institutions.

The Government of Cyprus has constitutional or legal bars against religious discrimination. The 1975 Vienna III Agreement remains the basic agreement covering treatment of Greek Cypriots and Maronites living in the area administered by Turkish Cypriots and Turkish Cypriots living in the Government-controlled area. Among other things, this agreement provides for facilities for religious worship.

Religions other than the five recognized religions are not required to register with the authorities; however, if they desire to engage in financial transactions, such as maintaining a bank account, they must register as a nonprofit company. To register, a group must submit an application through an attorney that states the purpose of the nonprofit organization and provides the names of the organization's directors. Upon approval, nonprofit organizations are tax-exempt and are required to provide annual reports of their activities. Registration is granted promptly, and many religious groups are recognized. No religious groups were denied registration during the reporting period.

There are no prohibitions against missionary activity or proselytizing in the Government-controlled areas. Foreign missionaries must obtain and periodically renew residence permits in order to live in the country; normally, renewal requests are not denied.

The Government requires children in public primary and secondary schools to take instruction in the Greek Orthodox religion. Parents of other religions may request that their children be excused. These children are exempted from attending religious services and instruction. In the past, however, some Jehovah's Witnesses parents reported that their children were not excused from all religious instruction.

In February 2006 the Ministry of Education announced that it was preparing a proposal to reduce the number of hours of religious instruction required in public schools from two hours to one hour per week. The Church of Cyprus and other religious organizations strongly objected. The ministry promised that no new regulations would be adopted without appropriate debate and discussion.

The Government of Cyprus recognizes the following holy days as national holidays: Epiphany, Annunciation, Good Friday, Easter Monday, Holy Spirit Day, Assumption Day, and Christmas.

Restrictions on Religious Freedom

Government policy and practice contributed to the generally free practice of religion in Cyprus. In 2001, however, the European Court of Human Rights ruled that the Government of Turkey was responsible for imposing restrictions on the movement of Greek Cypriots in the area administered by Turkish Cypriots, which limited their access to places of worship.

Since 2003, when restrictions of movement were relaxed, Greek Cypriots have reported relatively easy access to Apostolos Andreas Monastery and other religious sites in the area administered by Turkish Cypriots. Likewise, Turkish Cypriots enjoyed relatively easy access to religious sites, including Hala Sultan Tekke in the Government-controlled area.

Missionaries have the legal right to proselytize, but the Government closely monitors missionary activity. It is illegal for a missionary to use "physical or moral compulsion" to make religious conversions. The police may investigate missionary activity based on a citizen's complaint. They may also open an investigation if missionaries are suspected of being involved in illegal activities that threaten the security of the republic,

constitutional or public order, or public health and morals. In the past there were occasional apprehensions but no arrests under these laws.

Members of Jehovah's Witnesses are exempt from active military duty; however, they are legally required to complete an alternative military service and perform reservist duty in the Greek Cypriot National Guard. 

In May 2006 a nongovernmental organization (NGO) reported that it had filed complaints with the Ombudsman's Office and the independent body formed in April to investigate the police regarding police treatment of Muslim asylum seekers.

There were no reports of religious prisoners or detainees in the country.

Forced Religious Conversion

There were no reports of forced religious conversion, including of minor U.S. citizens who had been abducted or illegally removed from the United States, or of the refusal to allow such citizens to be returned to the United States. 

Section III. Societal Abuses and Discrimination

The generally amicable relationship among religious groups in society contributed to religious freedom. There were polite relations between the Greek Orthodox Church of Cyprus and the other religious communities in the Government-controlled area.

· holy ground...

In April 2005 a Turkish Cypriot cemetery in Larnaca, which had recently been rehabilitated as part of a U.S.-funded project aimed at improving bi-communal relations, was vandalized. In 2005, there were also reports of Turkish Cypriot cemeteries in the Government-controlled area being destroyed for the construction of roads and other development.

Although Turkish Cypriots occasionally have reported that unused mosques in the Government-controlled area have been vandalized, the Government of Cyprus routinely maintains and repairs them.

The Greek Orthodox Church of Cyprus is suspicious of any attempts to proselytize among Greek Cypriots and closely monitors such activities. Religion is a prominent component of Greek Cypriot society, with considerable long-standing cultural and political influence. During the 1950s, the head of the Greek Orthodox Church of Cyprus, Archbishop Makarios III, led the Greek Cypriot campaign for independence and served as president from independence in 1960 until his death in 1977. While the preeminent position of the Church of Cyprus has been somewhat reduced in recent years, it remains an important power center in politics. As the largest owner of real estate in Cyprus and the operator of several large business enterprises, the Church of Cyprus is also a significant economic actor. Present-day influence of the Church can be seen in the political messages bishops and priests regularly include in their Sunday sermons. In February 2005, an organization known as the Pancyprian Christian Orthodox Movement, with links to the Greek Orthodox Church of Cyprus, issued a booklet alleging that clubs such as the Lions, Rotary, and Boy Scouts were "recruiting grounds for Freemasonry" and were thus a danger to Cypriot society.

In March 2005 the Government requested that an additional Church of Cyprus priest be assigned to minister to the Greek Cypriots living in the Karpas region of the area administered by Turkish Cypriots. The enclaved community already had one full-time priest but decided it needed a second. Turkish Cypriot authorities agreed in principle to this request, but the first proposed individual could not go for personal reasons. Turkish Cypriot authorities objected to the second individual who was proposed, claiming he disliked Turkish Cypriots and had made inappropriate statements about their community. Turkish Cypriot authorities asked that the Government nominate a different priest. At the end of the reporting period, the position remained open and the Government had not nominated a new priest.

In November 2005 press reports claimed that the police and the municipality had harassed the Buddhist temple in Strovolos. The municipality allegedly claimed that the temple did not have the proper license to operate as a temple, and police said they visited the site as required by law after receiving numerous



anonymous and formal complaints about disturbances. There were also reports that police had visited the Jewish synagogue because of complaints of disturbances soon after its opening.

*bullies of Mr. Bully?*

In November 2005 the Ombudsman's Office issued a report on a complaint from Jehovah's Witnesses whose child was excused from religious instruction but who was subsequently harassed by fellow students and pressured by a religious instructor. The report concluded that the student's complaint was valid and that the instructor's remarks during a lesson on religious sects violated the student's religious freedom.

*employment discrimination?*

In May 2006 an NGO reported complaints from recognized political asylees of Muslim origin who had difficulty securing employment because of their religion. Several women reported that potential employers did not like their headscarves. Another asylee alleged that he could not secure housing because he was a Muslim.

Section IV. U.S. Government Policy

The U.S. government discusses religious freedom issues with the Government as part of its overall policy to promote human rights.

*pick up the pace.*

The ambassador and other embassy officers meet periodically with Greek Cypriot religious authorities regarding specific religious freedom concerns.

AREA ADMINISTERED BY TURKISH CYPRIOTS

Since 1974, the northern part of Cyprus has been governed by a Turkish Cypriot administration that proclaimed itself the "Turkish Republic of Northern Cyprus" ("TRNC") in 1983. The United States does not recognize the "TRNC," nor does any other country except Turkey.

The basic law in the area administered by Turkish Cypriots refers specifically to a "secular republic" and provides for freedom of religion, and Turkish Cypriot authorities generally respected this right in practice. The politically divisive environment of Cyprus, however, engendered some restrictions on religious freedom, particularly for Greek Cypriots and Maronites.

There was no change in the status of respect for religious freedom during the reporting period, and Turkish Cypriot policies continued to contribute to the generally free practice of religion.

The generally amicable relationship among religious groups in society contributed to religious freedom; however, there were a few reports of vandalism of religious sites and cemeteries.

The U.S. government discusses religious freedom issues with Turkish Cypriot authorities as part of its overall policy to promote human rights.

Section I. Religious Demography

Approximately 250,000 persons lived in the area administered by Turkish Cypriots. An estimated 99 percent of Turkish Cypriots was at least nominally Muslim. There was a small Turkish Cypriot Baha'i community. Most other non-Muslims in the area administered by Turkish Cypriots were foreigners from Western Europe who were generally members of the Roman Catholic or Anglican churches. Approximately 10 percent of the population in the area administered by Turkish Cypriots attended religious services regularly.

Section II. Status of Religious Freedom

Legal/Policy Framework

The "TRNC Constitution" provides for freedom of religion, and Turkish Cypriot authorities generally respected this right in practice.



The "TRNC Constitution" does not recognize any specific religion. It does state, however, that the Vakf or Evkaf, the Muslim institution that regulates religious activity for Turkish Cypriots, has the exclusive right to regulate and administer its internal affairs and property in accordance with Vakf laws and principles. The Vakf is tax-exempt in its religious activities, but its commercial operations are subject to the applicable taxes. The Vakf also receives official subsidies. No other religious organization is tax-exempt or receives subsidies. The Vakf is the largest landowner in the area administered by Turkish Cypriots.

Turkish Cypriot authorities bar religious discrimination. The 1975 Vienna III Agreement is the basic agreement covering treatment of Greek Cypriots and Maronites living in the area administered by Turkish Cypriots and Turkish Cypriots living in the Government-controlled area. Among other things, this agreement provides for facilities for religious worship.

Religious organizations are not required to register with Turkish Cypriot authorities unless they wish to engage in commercial activity or apply for tax-exempt status. There are no legal restrictions on missionary activity; however, such activity was rare.

There is instruction in religion, ethics, and comparative religions in two grades of the primary school system in the area administered by Turkish Cypriots. There is no formal Islamic religious instruction in public schools, and there are no state-supported religious schools.

Turkish Cypriot authorities do not sponsor any interfaith activity.

The following holy days are observed widely in the Turkish Cypriot community: Kurban Bairam, Birth of the Prophet Muhammad, and Ramadan Bairam.

Restrictions on Religious Freedom

Greek Cypriots and Maronites were prohibited from visiting religious sites located in military zones in the area administered by Turkish Cypriots. Greek Cypriots and Maronites were allowed to worship at only seven sites designated by the Turkish military in the area administered by Turkish Cypriots.

Turkish Cypriot authorities once again gave permission for an Orthodox service to be held in Agias Mamas Church near the town of Guzelyurt/Morphou on September 1 and 2, 2005. In 2004, a bomb exploded in the doorway of the church during the service. During the September 2005 service, two Greek Cypriots' cars were burned in the parking lot. Turkish Cypriots maintained the fire was due to an electrical problem, but Greek Cypriot forensic tests indicated arson.

There were no reports of religious prisoners or detainees in the area administered by Turkish Cypriots.

Forced Religious Conversion

There were no reports of forced religious conversion, including of minor U.S. citizens who had been abducted or illegally removed from the United States, or of the refusal to allow such citizens to be returned to the United States.

Section III. Societal Abuses and Discrimination

In the area administered by Turkish Cypriots there are few non-Muslims, and no noticeable friction between them and the Muslim population.

Greek Cypriots report that unused Orthodox Church of Cyprus churches and cemeteries in the area administered by Turkish Cypriots continued to be robbed and vandalized, and the Government maintained its claim that Orthodox Church of Cyprus icons had been smuggled out of the area administered by Turkish Cypriots. In February 2005, a Greek Cypriot cemetery near Lapta/Lapithos, which had recently been rehabilitated as part of a U.S.-funded project aimed at improving bi-communal relations, was vandalized. In May 2005, Turkish Cypriot media alleged that a Greek Cypriot church committee had taken a religious icon across the buffer zone (or green line) into the Government-controlled area.

Section IV. U.S. Government Policy



The U.S. government discusses religious freedom issues with the authorities as part of its overall policy to promote human rights.

The ambassador and other embassy officers meet periodically with Turkish Cypriot religious authorities regarding specific religious freedom concerns.

Released on September 15, 2006

