UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BIENVENIDO I. LUGO MARCHANT,
　　　　　　　Plaintiff,

v.

PETER TSICKRITZIS, KEVIN
KINGSTON and UNITED LIQUORS
LIMITED,
　　　　　　　Defendants.

Civil Action No. 05 11317 NMG

## DEFENDANTS' STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

Pursuant to Fed. R. Civ. P. 56, Defendants, Peter Tsickritzis, Kevin Kingston and United Liquors Limited ("UL"), hereby submit their Statement of Material Facts Not In Dispute in support of their Motion for Summary Judgment.

### The Parties

1.　　　The Plaintiff, Bienvenido I. Lugo Machant, resides in Brockton, Massachusetts (Complaint, ¶1), and was employed by UL for approximately four years beginning in 1999. (Pl. Tr. Vol. I, pp. 125-26, 165)[1]

2.　　　Defendant, Peter Tsickritzis, is Director of Operations for UL. (Complaint, ¶2) Mr. Tsickritzis is a resident of Bourne, Massachusetts and has been employed by United Liquors since 1970. (Tsickritzis Dec., ¶ 1)[2]

---

[1] Reference is to the transcript of the deposition of Plaintiff taken on October 6, 2006 and December 15, 2006 and will be referenced as "Pl. Tr. Vol. I, p. ___" or "Pl. Tr. Vol. II, p. ___."
[2] Reference is to the Declaration of Peter Tsickritzis submitted in support of the motion for summary judgment and will be referenced as "Tsickritzis Dec., ¶ __."

3.    Defendant, Kevin Kingston, is the Operations Manager at UL. (Kingston Dec., ¶1)[3] Mr. Kingston is a resident of Onset, Massachusetts and has been employed by UL since 1975. (Kingston Dec., ¶ 1)

4.    Defendant, UL, is a liquor, beer and wine distributor with headquarters in Braintree, Massachusetts. The Company serves over 8,000 accounts, including 6,000 on-premise restaurants, bars and hotels and over 2,500 liquor stores. (Tsickritzis Dec., ¶ 2).

**Background Regarding Plaintiff**

5.    Plaintiff was born in the Dominican Republic in 1969 and moved to Puerto Rico at age four. (Pl. Tr. Vol. I, pp. 14-15) He is a United States Citizen who has been living in the continental United States, principally Massachusetts, since 1998. (Pl. Tr. Vol. I, pp. 19-22) Plaintiff has a Bachelor of Arts degree from the University of Puerto Rico and held a variety of positions there, working in a library, bookstore, office, restaurant, fast food outlet and in interior design. (Plaintiff's Answers to Interrogatories, Exhibit C to Ackerstein Dec.)[4] Plaintiff does not recall when he learned English but he was speaking English by the time he was in high school. (Pl. Tr. Vol. I, pp. 15-17)

6.    Plaintiff considers his race to be "multi-racial," since he is "part black, part brown and part white." (Pl. Tr. Vol. I, p. 55)

7.    Plaintiff considers his national origin to be "born in the Dominican Republic" but "raised in Puerto Rico." (Pl. Tr. Vol. I, p. 56)

8.    Plaintiff is a Jehovah's Witness. (Pl. Tr. Vol. I, p. 31)

--------------------

[3] Reference is to the Declaration of Kevin Kingston submitted in support of the motion for summary judgment and will be referenced as "Kingston Dec., ¶ __."
[4] Reference is to the Declaration of Joan Ackerstein submitted in support of the motion for summary judgment and will be referenced as "Ackerstein Dec., ¶ __."

## Employment at UL

9.      UL employs workers in its warehouse and road divisions who prepare shipments and deliver them to customers. (Tsickritzis Dec., ¶ 2)  In 2003, UL had approximately 200 employees in those divisions. (Tsickritzis Dec., ¶ 2)

10.     All UL warehouse and road division employees are represented by the General Teamsters, Chauffeurs, Warehousemen, and Helpers of Brockton and Vicinity, Local Union No. 653 (the "Union"), and work under the terms of a negotiated collective bargaining agreement (the "CBA") between the Union and UL. (Kingston Dec., ¶ 3)

11.     UL employs "regular" employees who are on the seniority list. It also employs "spare employees" who are assigned to various positions on an "as needed" basis.  Spare employees are not included on a seniority list and their assignments are based solely on ability, performance and UL's needs.  Spare employees call in when they want to work to learn if there are any available shifts the following day. (Kingston Dec., ¶¶ 4-6, Exhibit A)

12.     In accordance with the terms of the CBA, regular road division employees bid on a position for each workday as a driver or driver's helper on a particular delivery route.  The driver drives the truck during the delivery process and the driver's helper assists in a variety of tasks, such as making deliveries, directing the driver, etc.  All bidding takes place according to seniority. (Kingston Dec., ¶ 4, Exhibit A)

13.     Following this bidding process, spare employees are used to fill any remaining positions.  Every evening, spare employees who want to work call UL to find out if there are available shifts the following day. (Kingston Dec., ¶ 5-6)

14.     The driver's helper position is a training position, used for employees who are interested in obtaining a commercial drivers' license ("CDL") and in becoming drivers for UL. (Kingston Dec., ¶ 16)

15.     In January 2003, UL and the Union agreed to reduce the hourly wages of spare employees to $13.00 per hour in order to enhance UL's ability to compete in its industry. Accordingly, the hourly wage for all spare employees, whether drivers, driver's helpers or warehouse employees, was $13.00 per hour. (Tsickritzis Dec., ¶ 13)

16.     Plaintiff began his employment with UL in June 1999, as a spare employee. He generally was scheduled to work as a driver's helper, assisting drivers on their routes. As a spare employee, Plaintiff was supervised by Kevin Kingston, UL's Operations Manager. (Kingston Dec., ¶¶ 1, 8)

17.     Employees with seniority picked hours first and it was rare that Plaintiff worked five days a week. (Pl. Tr. Vol. I, p. 131) He began at 6:00 – 6:30 a.m. but sometimes his days could go as late as 10:00 p.m. – 11:00 p.m. (Pl. Tr. Vol. I, p. 132)

## Plaintiff Obtained His CDL With Assistance From UL

18.     UL encourages its employees to obtain CDL's and Plaintiff took advantage of that encouragement while employed. (Kingston Dec., ¶ 9) Plaintiff practiced driving with UL trucks and Mr. Kingston encouraged Plaintiff to obtain his CDL license. (Pl. Tr. Vol. I, p. 135) In March 2002, Plaintiff passed the necessary written examination and received his permit to become a CDL holder. (Pl. Tr. Vol. I, pp. 135-136, 148-49)

19.     Kenneth Montgomery, UL's Fleet Manager, and other UL employees accompanied Plaintiff when he went to take his driving test. Plaintiff failed the driving test a number of times but passed in March 2003. (Pl. Tr. Vol. I, pp. 148-51; Kingston Dec., ¶ 9)

4

**Plaintiff Did Not Perform Satisfactorily As A Driver**

20.    After Plaintiff obtained his CDL, and while he was a spare employee, UL assigned Plaintiff to work as a driver on a number of daily shifts during an approximate month period, January 29, 2003 to the end of February 2003. (Kingston Dec., ¶ 11)  Plaintiff was paid $13.00 per hour in this position. (Tsickritzis Dec., ¶ 13)

21.    During the time Plaintiff worked as a driver, he did not satisfactorily perform the responsibilities of a driver.  Plaintiff consistently took longer than other drivers to complete his assigned routes and failed to deliver products on time.  UL received a number of complaints from customers regarding Plaintiff's late deliveries. (Kingston Dec., ¶ 12)

22.    Plaintiff had an accident while driving on February 19, 2003. (Kingston Dec., ¶ 13) Plaintiff reported that he was driving a UL truck when he hit a parked car. (Pl. Tr. Vol. II, p. 48).  Plaintiff submitted an accident report to UL. (Pl. Tr. Vol. II, pp. 47-49; Kingston Dec., ¶ 13, Exhibit B).  UL was required to pay $820.27 for repairs to the automobile Plaintiff hit. (Kingston Dec., ¶14, Exhibit C)

23.    As a result of Plaintiff's failure to timely make deliveries and his inability to complete routes as scheduled, UL stopped using Plaintiff as a driver on the regular shifts. Thereafter, it began to assign Plaintiff to work in the warehouse.  UL did not assign Plaintiff to work as a driver's helper after he was given the opportunity to drive but failed to perform satisfactorily because UL reserves the driver's helpers positions for training purposes for persons who do not yet have CDLs. (Kingston Dec., ¶¶ 15-16)

24.    Even after UL began to use Plaintiff in the warehouse because of his failing to perform satisfactorily as a driver, UL gave Plaintiff an additional opportunity to drive. On one occasion, Friday, April 11, 2003, Plaintiff had another accident while driving a UL truck.  UL

needed to send out a delivery truck in the afternoon to make last-minute deliveries to customers in order to fulfill their weekend requirements and asked Plaintiff, who was working in the warehouse that day, to drive the delivery truck since there were no other available employees with a CDL. During that delivery, Plaintiff stopped short while exiting a hotel where deliveries were being made and the hotel door closed on the truck. Again, Plaintiff filed an accident report in connection with that accident. (Pl. Tr. Vol. II, pp. 50-54; Kingston Dec., ¶ 25, Exhibit E)

25.    While Plaintiff was employed, Kevin Kingston never received complaints from customers about Plaintiff's speech. Nor did Mr. Kingston speak with Plaintiff about Plaintiff's speech. In fact, Plaintiff's English is quite good and Mr. Kingston had no difficulty understanding him. (Kingston Dec., ¶ 18)

26.    In or about the spring of 2003, UL was able to hire ten (10) drivers from a competitor with assistance from the union. These drivers previously worked as delivery truck drivers for UL's competitor and, thus, were experienced drivers. (Tsickritzis Dec., ¶ 5)

**Plaintiff's Work In The Warehouse**

27.    After Plaintiff was unsuccessful as a driver, Plaintiff continued to call in for work as a spare employee and was thereafter assigned to work in the warehouse on the second shift. The second shift runs from 2:00 p.m. to 10:30 p.m. (Kingston Dec., ¶ 15) Plaintiff was paid $13.00 per hour in that position. (Tsickritzis Dec., ¶ 13)

28.    Until Plaintiff began in the warehouse in March 2003, he had never requested any accommodation based on his religion. (Kingston Dec., ¶ 19)

29.    After beginning in the warehouse on March 13, 2003, Plaintiff gave a letter to UL requesting that his work schedule be accommodated on Tuesdays and Thursdays "to attend some religious instructions" and the letter also asked to be permitted to cease working at midnight on Friday to avoid work on the Sabbath. (Kingston Dec., ¶ 19, Exhibit D)

6

30.     After Plaintiff submitted his request for religious accommodation, Plaintiff was advised that as a spare employee, he did not have to accept work on Tuesdays or Thursdays. (Kingston Dec., ¶ 21)  Plaintiff also was allowed to leave work at midnight on Friday nights. (Nagle Dec., ¶¶ 3-4)[5]  Indeed, Plaintiff's supervisor, William Nagle, allowed Plaintiff to leave at midnight even before Mr. Nagle knew there was a religious reason for Plaintiff's desire to leave at midnight. (Nagle Dec., ¶ 3)

31.     Under the terms of the CBA, "any employee who reports for work as scheduled shall be guaranteed a minimum of eight (8) hours of work, or pay, except where such work is rendered impossible because of fire, flood, utility failure or Act of God, providing the employee accepts the work offered and is able to do the work."  (Tsickritzis Dec., ¶ 14, Exhibit E) Accordingly, if UL brought in employees to assist in the middle of a shift, UL would be required to pay them for a full eight hours even if they did not actually work eight hours. (Tsickritzis Dec., ¶ 14)

32.     Plaintiff continued to call in and accept job assignments for second shift positions on Tuesdays and Thursdays.  Plaintiff had no obligation to do so.  (Kingston Dec., ¶ 22)

33.     Plaintiff continued to work until June 17, 2003, when he injured himself at work and began a leave of absence. (Pl. Tr. Vol. I, p. 165; Tsickritzis Dec., Exhibit A)

### Plaintiff's Religious Instruction Classes

34.     Plaintiff is a member of the West Campello Congregation of Jehovah's Witnesses in Brockton.    At that congregation, they hold a "Theocratic Ministry School and Service Meeting" on Tuesdays, 7:30 – 9:16 p.m. and a "Congregation Book Study" on Thursday, 7:00 – 8:00 p.m. (Pl. Tr. Vol. II, p. 21)

---

[5] Reference is to the Declaration of William Nagle submitted in support of the motion for summary judgment and will be referenced as "Nagle Dec., ¶ __."

35.     Each Jehovah's Witness congregation has a theocratic class once a week. They are all scheduled at different times. (Pl. Tr. Vol. I., pp. 51-52)

36.     There are approximately 10 to 11 congregations of Jehovah's Witnesses within a 15 mile radius of Brockton. (Pl. Tr. Vol. I, p. 53) Plaintiff's mother and brother, with whom he lives, also are Jehovah's Witnesses. They attend a different congregation and different theocratic classes. (Pl. Tr. Vol. I, pp. 52-53)

**Plaintiff's Allegations of Harassment**

37.     Plaintiff's Complaint alleges three instances of harassment. He charges Kevin Kingston with telling him "not to talk like that" (Complaint, ¶ 2), Kevin Kingston with asking him if he wanted to get fired for leaving early (Complaint, ¶ 2), and a receptionist for asking if people needed to speak English to work in the warehouse. (Complaint, ¶6)

38.     As to the first comment, Plaintiff states that he had a confrontation with Mr. Kingston about late deliveries when Plaintiff was driving and that Mr. Kingston "didn't like backtalk, especially in front of office people." (Pl. Tr. Vol. I, p. 136) A customer did not receive his order at the scheduled time and Mr. Kingston spoke with Plaintiff about it. Plaintiff believed he was justified in skipping the stop and disagreed with Mr. Kingston. (Pl. Tr. Vol. I, pp. 137-141) It was during this argument, when there were other employees around who overheard the conversation that Plaintiff contends Mr. Kingston told him not to talk like that:

> Q:     No, I'm just trying to get the scene. So you're having a discussion with Mr. Kingston about the fact that the stop was missed?
>
> A:     Yes.
>
> Q:     There are some people who were around and can overhear because he's angry, and you disagree with him and give him your view, and then he says to "you can't talk like that"?

A:      Yes.

(Pl. Tr. Vol. I, p. 141)  Further, Plaintiff admitted he did not know what Mr. Kingston meant:

A:      ...I think what happened was one customer didn't receive his one case at some time, some chronological time, and Mr. Kingston didn't like that.  And instead of just saying, "Ben, you screw up," or "You made a mistake here, you were supposed to go at that time," Mr. Kingston added, "And you cannot talk like that" in front of people at the office.  And everybody at the office looked like whoa, they look at me like uh-oh, Ben is in trouble.

And I ask him, "What do you mean by 'You cannot talk like that?'"  Because people know what's a national origin accent, people know that when there were some stuttering, so what did he mean "Don't talk like that"?  Did he mean stop being a stutterer or stop having a national origin accent?  He didn't specify, so for that reason I say it's the two, he waive one, he waive two.

(Pl. Tr. Vol. I, pp. 138-139)

39.     As for the second comment, it allegedly was made in August 2003, while Plaintiff was at the UL office in Braintree.  He contends that at that time, a substitute receptionist, being asked for an application for employment for a Spanish-speaking neighbor, asked of others, "Do you think Spanish people need to speak English to work here?"  (Pl. Tr. Vol. II, pp. 62-63) Plaintiff described this incident in drawings and those drawings are an accurate depiction of that event. (Pl. Tr. Vol. II, pp. 68-69; Ackerstein Dec., Exhibit J)

40.     As for the third comment, Plaintiff acknowledges that when he began working in the warehouse, Plaintiff would leave without permission to attend Bible class.  (Pl. Tr. Vol. II, p. 80)  Plaintiff contends that Mr. Kingston said to him that if he kept leaving early, he would be fired. (Pl. Tr. Vol. II, p. 81)  Mr. Kingston did not tell Plaintiff that he would be fired if he went to pray.  However, he might have said to Plaintiff that he could be fired if he regularly left his shift early without permission. (Kingston Dec., ¶ 23)

9

**Plaintiff's Workers' Compensation Injury**

41.    On June 17, 2003, Plaintiff had an accident at work. (Complaint, ¶ 4; Tsickritzis Dec., Exhibit A)  He had back pain and was treated through physical therapy and by a chiropractor. (Pl. Tr. Vol. II, pp. 40-41)  By medical statement dated December 18, 2003, Plaintiff's physician certified that Plaintiff could return to work. (Pl. Tr. Vol. II, p. 41; Ackerstein Dec., Exhibit F)

42.    In February 2004, Plaintiff came to an agreement on his workers' compensation claim, receiving pay based on his average weekly wages, for the six month period June 17, 2003 to December 18, 2003. (Ackerstein Dec., Exhibit G; Pl. Tr. Vol. I, pp. 167-168)  Plaintiff acknowledged that he was "out of work and considered to be disabled through the end of December 2003." (Pl. Tr. Vol. I, p. 165)

43.    Subsequently, Plaintiff met with Peter Tsickritzis, Kathleen Mansfield, UL's Human Resources Director, and the Union Steward and they made Plaintiff an offer to return to work. (Pl. Tr. Vol. I, p. 175-79; Tsickritzis Dec., ¶ 7-8)  Mr. Tsickritzis also wrote to Plaintiff extending an offer but Plaintiff did not see it as a "sincere or truthful offer." (Pl. Tr. Vol. II, pp. 24-26; Tsickritzis Dec., ¶ 11, Exhibit D)

44.    Plaintiff did not return to work at UL. (Pl. Tr. Vol. I, p. 178; Tsickritzis Dec., ¶ 12)

**Plaintiff's Charge Against UL**

45.    On or about June 27, 2003, Plaintiff filed a charge of religious discrimination and discrimination based on race and national origin against UL.  This is the only charge Plaintiff filed in connection with this dispute. (Pl. Tr. Vol. I, p. 124-125)  The charge does not name any individual as Respondent. Nor does it make any claim of disability discrimination. (Ackerstein Dec., Exhibit D)

46.    Plaintiff submitted one amendment to his charge of discrimination against UL. On August 26, 2003, Plaintiff filed a document called "Amendment" with the MCAD in which he complained of an incident on August 26, 2003 when he went to submit "medical papers" to the UL personnel office. (Ackerstein Dec., Exhibit E; Pl. Tr. Vol. II, pp. 36-37)  He complained that Peter Tsickritzis, UL's Director of Operations, yelled at him and was hostile. (Pl. Tr. Vol. II, pp. 30-33)  He also claimed that a substitute receptionist asked if people needed to speak English to work for UL. (Pl. Tr. Vol. II, pp. 30-33)

47.    In or about September 2004, UL received notice from the MCAD that it dismissed Plaintiff's charge of discrimination, finding that Plaintiff could not make a *prima facie* showing of discrimination and that the claim of a failure to reasonably accommodate lacked merit. (Tsickritzis Dec., ¶ 15; Exhibit F; Pl. Tr. Vol. II, p. 26)  The decision makes clear that the MCAD did not consider the claim of disability discrimination Plaintiff currently is making.  Nor did it consider any allegation of denying light duty work.

### Plaintiff's Subsequent Employment

48.    Plaintiff began work with Horizon Beverage, a competitor of UL, as a per diem driver's helper in September 2004.  Ultimately, Horizon ceased to give him shifts. (Pl. Tr. Vol. I, pp. 121-124; Ackerstein Dec., Exhibit H)

49.    On December 20, 2005, Plaintiff filed a charge of race, color, and disability discrimination against Horizon Beverages.  Plaintiff alleges that he was injured during the course of his employment and that despite calling in, he was never given shifts due to his disability and race. (Pl Tr. Vol. I, pp. 121-24; Ackerstein Dec., Exhibit H)  The MCAD dismissed the claim against Horizon Beverages. (Pl. Tr. Vol. I, p. 124; Ackerstein Dec., Exhibit I)

## Diversity of Spare Employees

50.    United Liquors has a diverse workforce. As of August 12, 2004, when UL supplied information to the MCAD which was assessing Plaintiff's claim, the racial breakdown of the active spare employees included 25 who were Caucasian; 14 who were African-American; nine (9) who were Hispanic; and one (1) who was Asian. As of January 31, 2007, the racial breakdown of the active spare employees included 23 who are Caucasian, seven (7) who are African American, one (1) who is Hispanic, four (4) who are Asian, and six (6) who are Cape Verdean. (Tsickritzis Dec., ¶ 4)

51.    Plaintiff confirmed the diversity of UL's workforce. He stated that at UL he worked with Haitians who spoke French Creole and employees who were Portuguese, Greek and/or Spanish speaking. (Pl. Tr. Vol. II, pp. 33-34)  Most of these employees did not speak English as well as Plaintiff. (Pl. Tr. Vol. II, p. 34)

Respectfully submitted,

UNITED LIQUORS LIMITED, PETER
TSICKRITZIS and KEVIN KINGSTON,

/s/ Joan Ackerstein
Joan Ackerstein (BBO# 348220)
Heather Stepler (BBO# 654269)
JACKSON LEWIS LLP
75 Park Plaza, 4th Floor
Boston, Massachusetts 02116
(617) 367-0025; Fax: (617) 367-2155

Dated: February 7, 2007

## CERTIFICATE OF SERVICE

I hereby certify that on February 7, 2007, this document was served upon Plaintiff, Bienvenido I. Lugo Marchant, 19 Grove Street, Brockton, MA  02301, by first class mail, postage prepaid.

/s/ Heather L. Stepler
Jackson Lewis LLP