UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BIENVENIDO I. LUGO MARCHANT,
        Plaintiff,

v.

PETER TSICKRITZIS, KEVIN
KINGSTON and UNITED LIQUORS
LIMITED,
        Defendants.

Civil Action No. 05 11317 NMG

## DECLARATION OF JOAN ACKERSTEIN IN SUPPORT
## OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

I, Joan Ackerstein, on oath, depose and state as follows:

1.      I am a partner of Jackson Lewis LLP, a firm with an office at 75 Park Plaza, Boston, Massachusetts, 02116.  I have been involved in the defense of this action since its inception.

2.      On October 6, 2006, I took the deposition of Plaintiff, Bienvenido Lugo Marchant, in the above matter.  A true and accurate copy of relevant pages of the transcript from that deposition is attached hereto as Exhibit A.  Reference will be made to this transcript as "Pl. Tr. Vol. I, p.__."

3.      On December 15, 2006, I took a second day of deposition of Plaintiff.  A true and accurate copy of relevant pages of the transcript from that deposition is attached hereto as Exhibit B.  Reference will be made to this transcript as "Pl. Tr. Vol. II, p.__."

4.      On July 27, 2006, Plaintiff served answers to Defendants' interrogatories.  A copy of the answers is attached hereto as Exhibit C.

5.      Plaintiff testified that he filed a charge of discrimination against United Liquors Ltd. ("UL") in June 2003.  (Pl. Tr. Vol. I, pp. 124-125)  A copy of the charge is attached hereto as <u>Exhibit D</u>.

6.      Plaintiff testified that he amended his charge on or about August 26, 2003.  (Pl. Tr. Vol. II, pp. 35-36)  A copy of that amendment is attached hereto as <u>Exhibit E</u>.

7.      Plaintiff testified that he received a return to work note on December 18, 2003. (Pl. Tr. Vol. I, pp. 168-69)  A copy of the note is attached hereto as <u>Exhibit F</u>.

8.      Plaintiff testified that he entered into an agreement on his workers' compensation claim in February 2004.  (Pl. Tr. Vol. I, pp. 167-68)  A copy of the agreement is attached hereto as <u>Exhibit G</u>.

9.      Plaintiff testified that he filed a charge of discrimination against Horizon Beverage on December 15, 2005.  (Pl. Tr. Vol. I, pp. 121-22)  A copy of the charge is attached hereto as <u>Exhibit H</u>.

10.      Plaintiff testified that the MCAD dismissed the claim he filed against Horizon Beverages.  (Pl. Tr. Vol. II, pp. 46-47)  A copy of that dismissal is attached here to as <u>Exhibit I</u>.

11.      Plaintiff testified that, in drawings, he accurately described an incident which allegedly occurred in August 2003 while he was at the UL office in Braintree.  (Pl. Tr. Vol. II, pp. 68-69)  A copy of Plaintiff's drawings is attached hereto as <u>Exhibit J</u>.

Signed under the pains and penalties of perjury this 7th day of February, 2007.

/s/ Joan Ackerstein
Joan Ackerstein

**CERTIFICATE OF SERVICE**

I hereby certify that on February 7, 2007, this document was served upon Plaintiff, Bienvenido I. Lugo Marchant, 19 Grove Street, Brockton, MA 02301, by first class mail, postage prepaid.

/s/ Heather L. Stepler
Jackson Lewis LLP

# EXHIBIT A

1

1    UNITED STATES DISTRICT COURT

2    DISTRICT OF MASSACHUSETTS

3    C.A. No. 05 11317 NMG    ORIGINAL

4    *   *   *   *   *   *   *   *   *   *   *   *   *   *

5    BIENVENIDO I. LUGO-MARCHANT,                    *

6              Plaintiff                             *

7    v.                                             *

8    PETER TSICKRITZIS, KEVIN KINGSTON               *

9    and UNITED LIQUORS LIMITED, et al.,            *

10             Defendants                            *

11   *   *   *   *   *   *   *   *   *   *   *   *   *   *

12             VOLUME I

13             PAGES 1-193

14

15        DEPOSITION OF BIENVENIDO I. LUGO-

16   MARCHANT, a witness called on behalf of the

17   Defendants, pursuant to the Federal Rules of

18   Civil Procedure, before Jessica L.

19   Williamson, Registered Merit Reporter,

20   Certified Realtime Reporter and Notary

21   Public in and for the Commonwealth of

22   Massachusetts, at the Offices of Jackson

23   Lewis, LLP, 75 Park Plaza, Boston,

24   Massachusetts, on Friday, October 6, 2006,

25   commencing at 10:38 a.m.

14

1        from Mrs. Mansfield the business card she

2        gave me.  I saw her once for five minutes

3        maybe.  This is Peter's.  He wrote on the

4        back something -- it was him or her -- about

5        it.

6    Q.  Can I have Kathy's card?

7    A.  Sure.

8    Q.  Okay.  We'll make copies of this.

9    A.  I think we also sent this.

10   Q.  Okay.  I think we have this as well.  I'm

11       going to ask Heather to take a look at that,

12       too.

13            Now, the documents that you've just

14       given me to look at, are those the documents

15       that you were referring to when you spoke

16       with Heather Stepler and said you might have

17       some additional documents?

18   A.  Yes.  But that's the driving record.

19   Q.  Okay.  What is your date of birth?

20   A.  January 27, '69.

21   Q.  And where were you born?

22   A.  Country or city?  Dominican Republic, Town

23       of San Pedro de Macoris, S-A-N, P-E-D-R-O,

24       D-E, M-A-C-O-R-I-S.

25   Q.  And how long did you live in the Dominican

15

1      Republic?.

2  A.  I believe until 1973 -- or about 1973.

3  Q.  And where did you go in 1973?

4  A.  I went -- well, I was taken at that time.

5      It's not like I got to decide.  I went to

6      Guadeloupe.  That's French West Indies.

7  Q.  And how long were you there?

8  A.  Maybe weeks, maybe months.  No longer than

9      that.

10 Q.  And where did you go after that?

11 A.  San Juan, Puerto Rico.  At that time I was

12     about four to five years old, so if it was

13     San Juan first or Guadeloupe, I do not know

14     that right now.  Even we -- Puerto Rico

15     first, then Guadeloupe, then back to Puerto

16     Rico.

17 Q.  How long did you live in Puerto Rico?

18 A.  From 1973 until 1998 when I move here.

19 Q.  And when did you learn to speak English?

20 A.  People don't realize when they learn another

21     language, they just in the process of

22     learning and practicing.  I sometimes see

23     people who say, You speak well," or I other

24     time find people who say, "You don't speak

25     at all."

16

|     |     |                                                     |
|-----|-----|-----------------------------------------------------|
| 1   |     | So when did I realize that I could                  |
| 2   |     | speak English?  That's a rather                     |
| 3   |     | philosophical question in the -- I could say        |
| 4   |     | now that I can speak English, and you might         |
| 5   |     | argue with me, but then I find 2,000 people         |
| 6   |     | and they can be lined up and they say, no,          |
| 7   |     | you don't.  So that's -- there's no answer          |
| 8   |     | there.                                              |
| 9   | Q.  | Let me ask you the question this way:  Did          |
| 10  |     | you attend high school in Puerto Rico?              |
| 11  | A.  | Yes.                                                |
| 12  | Q.  | Were you speak -- were you able to speak            |
| 13  |     | English when you were in high school in             |
| 14  |     | Puerto Rico?                                         |
| 15  | A.  | I could call it English, but some other             |
| 16  |     | people would not agree with me or would or          |
| 17  |     | would not.                                          |
| 18  | Q.  | Okay.  Well, the language that you're               |
| 19  |     | speaking right now is English.  Without             |
| 20  |     | addressing the quality, were you speaking           |
| 21  |     | this language when you were in high school          |
| 22  |     | in Puerto Rico?                                      |
| 23  | A.  | I wouldn't say 100 percent accurately.  I           |
| 24  |     | would say there were some changes.  There           |
| 25  |     | was some -- people learn every day, so              |

17

1      it's -- the way I say things now doesn't

2      sound like when I was in high school, so...

3  Q.  I don't think this question is all that

4      difficult.  And I think what you're saying

5      to me is that you speak English better today

6      than you did in high school but that you

7      spoke English in high school; is that

8      accurate?

9  A.  That sounds more simplified.  I would say it

10     sounds better, how you put it.

11 Q.  Okay.  Did you graduate from high school?

12 A.  Yes.

13 Q.  What year was that?

14 A.  I don't remember right now.

15 Q.  About how old were you when you graduated

16     from high school?

17 A.  Between -- if I'm on ground, between 18 and

18     19, something like that.  I'm not really

19     sure about that number.

20 Q.  And if you came to the United States in

21     1998, you would have been about 28?

22 A.  I'd have to calculate that.  I -- say 1969

23     through 1998.  (Calculating.)  Sounds like

24     28.

25 Q.  Did you have any further education in Puerto

19

| 1 | Q. | Did you have any education in Puerto Rico |
| 2 | | beyond the University of Puerto Rico? |
| 3 | A. | I took basic computer skills course with the |
| 4 | | city also. |
| 5 | Q. | The City of San Juan? |
| 6 | A. | Yes. |
| 7 | Q. | Anything else? |
| 8 | A. | There was another one for -- I believe the |
| 9 | | one is in the context of work study or like |
| 10 | | summer jobs for inner city. That's the |
| 11 | | concept they have, but it was about |
| 12 | | mathematics. That was at the Uni -- it's |
| 13 | | called the, I believe, Universidad |
| 14 | | Interamericana, which is Interamerican |
| 15 | | University. |
| 16 | Q. | Now, when you came to the United States, |
| 17 | | since you've been in this country -- well, |
| 18 | | let me ask you this question: You came to |
| 19 | | the United States in 1998. Have you lived |
| 20 | | here since 1998 in the United States? |
| 21 | A. | Puerto Rico is considered part of this |
| 22 | | country. |
| 23 | Q. | Let's call it mainland United States. How's |
| 24 | | that? |
| 25 | A. | Massachusetts? |

20

| 1 | Q. | No.  Mainland United States, the continental |
| 2 | | United States. |
| 3 | A. | I don't know how to answer that in that the |
| 4 | | question sounds -- the way I see it, it |
| 5 | | sounds a little bit prejudice in that there |
| 6 | | was a mainland and there was a second land. |
| 7 | | If there was one main, then there has to be |
| 8 | | at least one second.  So I see it like the |
| 9 | | same country, Puerto Rico, Massachusetts. |
| 10 | | It's -- |
| 11 | Q. | Are you -- let me just make sure I |
| 12 | | understand this.  Because I asked you if |
| 13 | | you've lived in the continental United |
| 14 | | States, mainland United States since 1998, |
| 15 | | you believe that I'm expressing prejudice? |
| 16 | A. | Not -- well, let me see.  If someone main, |
| 17 | | there has to be one that is not main. |
| 18 | | That's how I see it.  So it's about the |
| 19 | | favories (sic).  Prejudice, that's the word |
| 20 | | you chose.  I didn't say it. |
| 21 | Q. | No, I don't believe I chose it. |
| 22 | | MS. ACKERSTEIN:  Do you want to |
| 23 | | read back his original answer to that |
| 24 | | question. |
| 25 | | (Record read.) |

21

1    Q.    Okay.  It was your word.  Did you see

2          prejudice because I distinguished

3          continental United States as the mainland?

4    A.    The way that an idea, concept works is that

5          in the areas there are some other lands

6          related to the one that is more predominant.

7          Still they are considered part of the same

8          nation, but it's in a -- that's the

9          difference.  It's like saying is Hawaii

10         mainland, or is Hawaii USA?  Hawaii is part

11         of the country.  Is Washington, D.C. a

12         state?  No, it is not.  It is part of the

13         country, so...

14   Q.    Can you answer this question?

15   A.    I think I answered, but if I live in any

16         other state, that's what you want to ask me?

17   Q.    No.  I want to ask you whether you have

18         lived in the continental United States

19         consistently since 1998.

20   A.    Okay.  After 1998 I lived most of the time

21         here in Massachusetts, not every day,

22         mostly.

23   Q.    And when you are not in Massachusetts since

24         1998, where are you living?

25   A.    I went -- I can't remember how many times,

22

```
 1        maybe once or twice I went to the Dominican
 2        for burial.  I went for another burial.  And
 3        what else?  I've gone a few times to other
 4        states, but it's not like living there for
 5        years or months.  It's just going.
 6   Q.   What other states have you been?
 7   A.   When I drive to New York, I have to cross
 8        Rhode Island, Connecticut, then enter New
 9        York.  Sometimes I take a turn by New
10        Jersey.
11   Q.   Okay.  What I'm -- the question I'm asking
12        you is, have you lived outside of
13        Massachusetts since 1998?  I'm not asking if
14        you've driven through a place or if you
15        visited a place.  I'm asking you if you have
16        lived outside of Massachusetts since 1998.
17   A.   Live, like being there more than one or two
18        weeks, no.
19   Q.   Okay.  Are you a citizen of the United
20        States?
21   A.   Yes.
22   Q.   When did you become a citizen?
23   A.   I believe it was in 2004.  2004?  Let me
24        see.  Around 2004 now.  It's -- I don't have
25        that date on mind, but I believe it was 1994
```

31

```
 1  Q.  Okay.  Now, other than the Berklee summer

 2      school course and the anthropology course

 3      and the paralegal course and this theocratic

 4      course, have you taken any other courses

 5      since you've been in Massachusetts?

 6  A.  Not that I remember now.

 7  Q.  I take it you are a Jehovah's Witness?

 8  A.  Yes.

 9  Q.  And have you been a Jehovah's Witness your

10      whole life?

11  A.  I would say yes.

12  Q.  When you first came to Massachusetts in

13      1998, where did you live?

14  A.  1998, on the same address I gave when I

15      started the -- when you started the

16      deposition.

17  Q.  Is that Grove Street in Brockton?

18  A.  Yeah, same one.

19  Q.  And is that a house or an apartment?

20  A.  A house.

21  Q.  Does anybody live there with you?

22  A.  I don't know how that's related to the

23      deposition in that I ask in one of the

24      interrogatories to the other employees, and

25      he put an objection, they are not parties of
```

47

1       showing music or doing anything about music,

2       they -- the student could have learned

3       something about music or about the

4       instrument.

5   Q.  Okay.  So you taught music as a substitute

6       teacher?

7   A.  Sometimes.

8   Q.  Other than as a substitute teacher, have you

9       ever taught music for money?

10  A.  Not that I remember.

11  Q.  Okay.  You told us that your first position

12      in Massachusetts was with United Liquors?

13  A.  I think so.

14  Q.  Since that position -- since you started

15      that position in 1999, who else has employed

16      you?  What other employment have you had?

17  A.  I work for a while with Brockton Public

18      Schools.

19  Q.  Okay.  Anything else?

20  A.  I also worked for Horizon Beverages.

21  Q.  Anybody else?

22  A.  Not that I remember.

23  Q.  Are you employed currently?

24  A.  I am looking for a job, but a gentleman who

25      I appreciate very much seem to be busy, and

48

```
 1              I don't get jobs.
 2    Q.    Who is the gentleman that you appreciate?
 3    A.    I'm guessing -- I'm guessing Peter, Peter
 4          Tsickritzis.
 5    Q.    Was Horizon Beverages your last employer?
 6    A.    I think so.
 7    Q.    And when did you last work for them?
 8    A.    I don't have that on mind right now, but I
 9          think it's in the duces tecum that you
10          subpoena Horizon.  So what they say there
11          on -- regarding when I work or not, I
12          wouldn't argue that.  When I started
13          working, when I finish working, I wouldn't
14          argue that.
15    Q.    So you have had no employment since Horizon
16          Beverages?
17    A.    No, not for money.
18    Q.    Okay.  Have you had some employment for
19          something that's non-money?
20    A.    For satisfaction?
21    Q.    Yes.
22    A.    Yeah.
23    Q.    What employment have you had for
24          satisfaction?
25    A.    I am -- I keep writing music.  I keep
```

51

1        take a short break and use the restrooms,

2        and then we'll come back and we'll do a

3        little more and then we'll take a lunch

4        break, okay?  Is that all right with you?

5   A.   Yeah, sounds good.

6            (Recess taken.)

7   Q.   Before we took our short break you were

8        telling us about the theocratic class that

9        you take.  Do you recall that?

10  A.   Yes.

11  Q.   Is that given any other times at Kingdom

12       Hall other than Tuesday from 7:00 to 9:00?

13  A.   Depending on the congregation schedule,

14       that's how it's arranged.  As an example, if

15       there is downtown Boston congregation, they

16       have a schedule, and they stick to that

17       schedule.  If there is South End Boston

18       congregation, they might have the same

19       schedule, but it's going to be at a more

20       physical place.  If they share the same

21       Kingdom Hall, like say there's a Kingdom

22       Hall, physically there's no way that two

23       congregations going to be here.  It's going

24       to be either one comes Tuesdays for that

25       meeting or the one Wednesday or vice versa

52

| | |
|---|---|
| 1 | or any other day of the week according how |
| 2 | they schedule. |
| 3 | Q. | Okay.  So a different Jehovah's Witness |
| 4 | | congregation -- |
| 5 | A. | Yes. |
| 6 | Q. | -- might have their theocratic class on a |
| 7 | | different day or time? |
| 8 | A. | Yes, that's the way it is. |
| 9 | Q. | And is it just once a week that they have |
| 10 | | these theocratic classes? |
| 11 | A. | Each congregation has that once a week. |
| 12 | Q. | Okay.  And you told us that your brother and |
| 13 | | sister and mother do not attend the class |
| 14 | | that you go to at Kingdom Hall. |
| 15 | A. | That's -- |
| 16 | Q. | Do they go to a different theocratic class, |
| 17 | | or do they just not go to theocratic class? |
| 18 | A. | They -- let me see.  I would object the |
| 19 | | question that it's not directed at the |
| 20 | | parties, but in order to give you an answer, |
| 21 | | I could say that they have a different |
| 22 | | schedule.  They go to another one. |
| 23 | Q. | Where do they go? |
| 24 | A. | They go to another congregation. |
| 25 | Q. | Oh.  Where is that? |

53

1   A.   Hmm?

2   Q.   Where is that?

3   A.   What do you mean?

4   Q.   What other congregation?

5   A.   Where do they go?

6   Q.   Where do they go?

7   A.   I don't believe they are parties here, so I

8        will object, but in order to give you some

9        answer, I would say that they go to one of

10       the other congregations in the vicinity.

11  Q.   Okay.  And let's say if you were to take

12       Brockton as the center, about how many

13       Jehovah's Witness congregations would you

14       say there are in the, like, you know, 15

15       miles around Brockton?

16  A.   15 miles, let's see.  There are three in

17       English in Brockton.  There are, I believe,

18       two in Holbrook.  I believe there are two in

19       the Bridgewater area.  There was another

20       one, I believe, in Stoughton, one or two.

21       I'm not sure about that.  But, like, 15

22       miles from the border of Brockton can be

23       even almost Quincy.  Quincy I believe has

24       another one.  Hingham, but I don't know if

25       Hingham is in the 15 miles radius.

55

```
 1        conventions or definition of the United
 2        Nations belonging to U.S.A. or to Spain or
 3        to Haiti.  I don't know.
 4   Q.   Well, when you allege race discrimination --
 5   A.   So --
 6   Q.   -- what race are you alleging that you are?
 7   A.   I have -- the way I was raised and the way I
 8        was firstly educated is that I was told that
 9        I have this race and another one, I have
10        this, I have all these races, so I cannot
11        say I only have one.  I can only say I am
12        100 percent black or 100 percent white or
13        100 percent brown, so that's why I told you
14        as in the interrogatories, I said I have
15        different races.  What's the percentage?
16        That's -- if I were to compare my answer, I
17        would say like when Tiger Woods was asked,
18        "What's your race?", and he said, "I have
19        white, I have black, I have this, I have all
20        of this."
21            So in order to simplify, if that's
22        your point, I would rather put -- state it
23        multi-dimensional, multi-racial --
24   Q.   I'm sorry, I missed that.
25   A.   Multi-racial.
```

56

1   Q.   Multi-racial?

2   A.   Yeah, multi-racial.

3   Q.   Multi-racial, okay.

4   A.   Like saying I have a few.  What's the

5        average?  That's something else.

6   Q.   Okay.  And you're claiming discrimination

7        based on your national origin?

8   A.   Uh-huh.

9   Q.   What are you claiming is your national

10       origin?

11  A.   I always when people ask me, always or most

12       of the times -- I most of the time when

13       people ask me, "Where are you from?", I

14       always ask, "What do you mean?  National

15       origin?  Where I was raised?"  But in order

16       to answer, I say, "I was born in the

17       Dominican Republic, but I was raised in

18       Puerto Rico."  That's my answer in most of

19       the cases.

20  Q.   Now, when you go to your theocratic course

21       at Kingdom Hall, is there some sign-in sheet

22       or something that you do to show that you

23       came?

24  A.   Like attendance list --

25  Q.   Yes.

121

```
 1        It's either there's no money or there's no
 2        interest.
 3   Q.   Okay.  Now, look at Page 12.  We asked you
 4        whether you had made any effort to seek new
 5        employment following your separation from
 6        United Liquors, and you told us that you
 7        have, I guess, spoken with George Joseph?
 8   A.   Yes.
 9   Q.   He's a representative of the Teamsters?
10   A.   I think so.
11   Q.   And the Mass. Rehab. Commission?
12   A.   Yes, that's the one.
13   Q.   And the placement office.  What is the
14        placement office?
15   A.   Placement office and job fairs and on-line
16        searches, that's the Department of Labor,
17        they have listings, and they offer -- they
18        offer jobs, just like a newspaper.  Or they
19        assist people with how to write a resume.
20             (Exhibit No. 2, Photocopy of Charge
21        filed against Horizon Beverages, marked for
22        identification.)
23   Q.   Marked as Exhibit 2 is a photocopy of the
24        charge that you filed against Horizon
25        Beverages.  Take a look at that.  I take it
```

122

| | | |
|---|---|---|
| 1 | | you've seen that previously? |
| 2 | A. | Yes. |
| 3 | Q. | And is that your signature at the bottom? |
| 4 | A. | Yes. |
| 5 | Q. | And you went to the MCAD in Boston and made |
| 6 | | a complaint of -- |
| 7 | A. | Yes. |
| 8 | Q. | -- discrimination? |
| 9 | A. | Yes. |
| 10 | | (Exhibit No. 3, Copy of |
| 11 | | Massachusetts Commission Against |
| 12 | | Discrimination Intake Interview Form, marked |
| 13 | | for identification.) |
| 14 | Q. | Now, Exhibit 3 is a copy of a document which |
| 15 | | is the Massachusetts Commission Against |
| 16 | | Discrimination intake interview form.  This |
| 17 | | indicates that you met with somebody at the |
| 18 | | MCAD on December 20th, 2005, and I guess |
| 19 | | it's from this that they prepared the |
| 20 | | charge.  Is that your signature down at the |
| 21 | | bottom of that page? |
| 22 | A. | Uh-huh.  Yes. |
| 23 | Q. | And did you go to the MCAD and meet with |
| 24 | | someone? |
| 25 | A. | For this claim? |

123

```
 1   Q.   Yes.
 2   A.   If I had, like, interviews with them?
 3   Q.   Yes.
 4   A.   I had -- I think I misplaced the dates when
 5        I had to go, and for that reason I didn't
 6        file.
 7   Q.   You did file.  We've marked as Exhibit 1 the
 8        charge.
 9   A.   Where is 1?
10   Q.   I'm sorry, Exhibit 2.
11   A.   Exhibit 2, I filed this (indicating).
12   Q.   Yes.
13   A.   And this one (indicating) the same date.
14   Q.   Yes.
15   A.   But I think what you asked me was if I met
16        with them or --
17   Q.   Well, Exhibit 3 is this intake form.
18   A.   Yes.
19   Q.   Did you talk to somebody at the MCAD?
20   A.   Yes.
21   Q.   And after you talked to them, they made
22        these notes, and then you signed your name
23        to it?
24   A.   Yes.
25   Q.   And you complained that at Horizon Beverages
```

124

1    they made racial slurs and disability

2    comments and name calling; isn't that what

3    you allege down there?

4  A.  Yes.

5  Q.  Now, the MCAD has since dismissed the case,

6    haven't they?

7  A.  I think so.

8  Q.  They found against you?

9  A.  Well, they didn't find in my favor.  I don't

10   know how you want to put it.

11 Q.  Okay.  And are you appealing that?

12 A.  No, I don't think so.

13 Q.  Are you planning to file a lawsuit against

14   Horizon Beverages?

15 A.  I object that question in that it seems like

16   harassment, the same, the same, the same,

17   the same.  I think I answered that.  But in

18   order to give you some kind of answer, I

19   think they should -- they didn't address

20   things properly.

21 Q.  Who didn't?

22 A.  Horizon.

23          (Exhibit No. 4, Photocopy of charge

24   of discrimination filed against United

25   Liquors, marked for identification.)

125

1    Q.    Exhibit 4 is a photocopy of the charge of

2          discrimination that you filed against United

3          Liquors; is that right?

4    A.    Let's see.

5                (Witness reviews document.)

6    A.    Yeah, this is about a complaint against

7          United Liquors.

8    Q.    Okay.  And if you look at the second page,

9          that's your signature, isn't it?

10   A.    Yeah.

11   Q.    And so, again, when you filed this charge,

12         you went to the MCAD and you met with

13         someone and they listened to you, and they

14         put together this charge which we've marked

15         as Exhibit 4?

16   A.    I went to MCAD.  I told them at that time --

17         what's the date? -- 6/27/03, I told them

18         this unlawful behavior and discrimination

19         and harassment and the rest of the list at

20         United.  And MCAD wrote this, and I signed.

21         Is that your question?

22   Q.    Yes.

23   A.    Yes.

24   Q.    Okay.  Now, this says that you started

25         employment with United Liquors in or about

126

1        June 1999?

2   A.    Yes.

3   Q.    Does that seem right to you?

4   A.    That's my recollection.

5   Q.    Okay.  And United Liquors is a liquor

6         distributor?

7   A.    So far.

8   Q.    Well, that's accurate, isn't it?

9   A.    Well, I just read yesterday in the newspaper

10        that the company was going down or it was

11        going to be bought, things like that.  Today

12        I don't know.

13  Q.    Okay.  Well, when you worked there in 1999,

14        United Liquors was a liquor distributor?

15  A.    Yes.

16  Q.    And it was located, it had its headquarters,

17        in Braintree, Massachusetts?

18  A.    When I started there, it was West

19        Bridgewater.

20  Q.    West Bridgewater, okay.

21  A.    And then it moved to Braintree, yes.

22  Q.    Okay.  When you started and it was in West

23        Bridgewater, you lived in Brockton?

24  A.    Yes.

25  Q.    And so you drove yourself in your Nissan to

131

1    A.    Yeah, that was...

2    Q.    Now, when you were a driver -- or driver's

3          helper, excuse me, when you started your

4          employment at United Liquors as a driver's

5          helper, how many days a week did you work?

6    A.    Depending on the season.  If it was a good

7          season, I could work four days, which is

8          considered the maximum, sometimes, but it

9          would be very rare, because it's about

10         seniority.  The ones with more time they

11         pick first.  A few times I worked five days

12         a week, but it was very strange.  It was --

13         four days is the usual at that time.  I

14         don't know how they do business now.

15   Q.    And what hours did you work as a driver's

16         helper?

17   A.    I would punch in at -- before 7:00 a.m.,

18         say, 6:00, 6:30, and I wait for the truck to

19         be load -- I mean loaded, and then when the

20         truck was ready, the driver and helper would

21         leave the warehouse and go to the stops,

22         deliver, unload.  If we had to pick up

23         anything, pick it up.  If there was a

24         misunderstanding with the customer, I

25         apologize with the customer, tell the

132

```
 1        customer, "We appreciate your business," you
 2        know, things like that, "We're very sorry.
 3        We're going to correct this problem," or
 4        whatever he's claiming, very nice.  People
 5        always understood that.
 6   Q.   What time did your day end?
 7   A.   Oh, sometimes it would finish early, 2:00
 8        p.m., 3:00 p.m.  Sometimes it would finish
 9        later.
10   Q.   If it finished late, what would that be?
11   A.   Late, sometimes finished at 7:00 p.m., 9:00.
12        A couple of times I think it was like 10:00
13        or 11:00.
14   Q.   10:00 or 11:00 at night?
15   A.   Yeah, p.m.  And I remember when I was
16        working at the warehouse as a demotion, some
17        of the other co-workers -- but there were
18        not claiming -- they could come back by
19        12:30 a.m. or even 1:00 a.m., and we were
20        still there.  And they were not penalized
21        for coming back late.
22   Q.   Okay.  So when you were a driver's helper,
23        you would start around 7:00 in the morning
24        and work until the work was done; is that
25        it?
```

135

· 1  A.  Yes.

 2  Q.  And so you had to learn how to drive one of

 3      these trucks?

 4  A.  Yes.

 5  Q.  Where did you do that?

 6  A.  Learning?

 7  Q.  Yes.

 8  A.  The first step is to get a driver's permit,

 9      which is issued by the Commonwealth of

10      Massachusetts.  Excuse me, the permit is

11      issued by the Commonwealth.  The one who

12      wants to get his license goes to the

13      registry, takes a book, reads the book,

14      question, answers them.  When he's ready,

15      you go for the permit.  When he has the

16      permit, he can practice with a driver.

17  Q.  And did you practice on United Liquors

18      trucks?

19  A.  Yes.

20  Q.  And did Mr. Kingston know that you were

21      practicing on United Liquors trucks?

22  A.  I think so.

23  Q.  Yeah.  He encouraged you to go for this

24      commercial driver's license --

25  A.  Yes.

136

1    Q.    -- didn't he?

2    A.    Yes.

3    Q.    And then according to this, and I assume

4          this is true, that after you got your

5          commercial driver's license and you told Mr.

6          Kingston you had it, he started you as a

7          driver?

8    A.    Yes.

9    Q.    Now, you say that after a couple of weeks of

10         driving you were told that you were not

11         successful as a driver; is that right?

12   A.    Uh-huh.   They say.

13   Q.    Yes.   And it's after that that you were

14         assigned to work in the warehouse?

15   A.    I say I was assigned warehouse because my

16         impression is that Kevin didn't like

17         backtalk, especially in front of office

18         people.   There was a -- he had -- he said

19         some things that I didn't like.   I asked him

20         for an explanation, and he didn't explain.

21         Mr. Tsickritzis was also here.   I believe

22         that's my best recollection.   Mr.

23         Tsickritzis was there.   He listened.   He

24         didn't correct that.   Then the next days I

25         was told, "So now you're going to work in

137

```
 1            the warehouse," just like when he said that.
 2   Q.    Okay.  I missed this.  I didn't understand
 3         quite what you were saying.  You said Kevin
 4         didn't like backtalk.  You had some
 5         discussion with him about something, and Mr.
 6         Tsickritzis was there.  Is that what you're
 7         saying?
 8   A.    Yes, you could say that.  And there was a
 9         difference of opinions or --
10   Q.    On what?  What was there a difference of
11         opinion on?
12   A.    Well, I -- as far as I remember, one of the
13         things that might have pushed Kevin was that
14         in the many cases I had in that truck, one
15         of the cases were going to a stop.  The stop
16         was scheduled for the -- for a time that
17         seem to be in conflict with the whole
18         schedule.  It seemed to be an obvious
19         mistake, and Mr. Kingston many times allowed
20         a driver to skip a stop if traffic was bad
21         or if something -- you know, there was a
22         driver's manifest or a trip sheet if you
23         want to call it, either way, that says this
24         is the order of stops, one, two, three,
25         four, five, should be followed.
```

138

1    But if Stop No. 5 as an example, is

2    closed, I don't have to wait there until

3    they open unless I know they're going to

4    open quick.  I can skip that, go to the next

5    stop, and then go back to that stop.  That's

6    one option.  Another option is call the

7    office.  Office calls Customer No. 5, "Are

8    you there?"  "Yes."  "Okay.  We're in your

9    back door.  Do you want your delivery back

10   door, front door?"  They take it.

11      I think what happened was one customer

12   didn't receive his one case at some time,

13   some chronological time, and Mr. Kingston

14   didn't like that.  And instead of just

15   saying, "Ben, you screw up," or "You made a

16   mistake here, you were supposed to go at

17   that time," Mr. Kingston added, "And you

18   cannot talk like that" in front of people at

19   the office.  And everybody at the office

20   looked like whoa, they look at me like

21   uh-oh, Ben is in trouble.

22      And I ask him, "What do you mean by

23   'You cannot talk like that?'"  Because

24   people know what's a national origin accent,

25   people know that when there were some

```
 1        stuttering, so what did he mean "Don't talk
 2        like that"?  Did he mean stop being a
 3        stutterer or stop having a national origin
 4        accent?  He didn't specify, so for that
 5        reason I say it's the two, he waive one, he
 6        waive two.
 7   Q.   Okay.  So what he said to you was, "You
 8        cannot talk like that"?  That's what he
 9        said?
10   A.   He said, "And you cannot talk like that."
11   Q.   Okay.  Now, when he told you about skipping
12        the stop, and I guess he was mad that you
13        had skipped a stop?
14   A.   Well, it's not -- it's not really like the
15        stop was the ultimate thing, but all of that
16        when they come at the same time, it's
17        like -- and I hope that same takes -- and
18        it's like the hair that broke the camel's
19        back, something like that.  That's an
20        expression.
21            So I think that the problem was that
22        Mr. Kingston wanted to look as if he's the
23        one in charge, which I remember.  And I know
24        he's the boss there.  I always had that
25        clear mind.  The things that he -- he got
```

140

|     |     |                                                    |
|-----|-----|----------------------------------------------------|
| 1   |     | confused with that thing of having the             |
| 2   |     | appearance --                                      |
| 3   | Q.  | Well, that's what I'm trying to get at.  You        |
| 4   |     | were disagreeing with him about something --       |
| 5   | A.  | Yes.  Yes.                                          |
| 6   | Q.  | -- because you felt that you had the right          |
| 7   |     | under the manifest to miss the stop, to not        |
| 8   |     | go?                                                 |
| 9   | A.  | Well, there are traffic conditions also.           |
| 10  | Q.  | I see.  Okay.  So because of traffic               |
| 11  |     | conditions you felt that you were justified        |
| 12  |     | in skipping the stop?                              |
| 13  | A.  | Yes.                                               |
| 14  | Q.  | And he felt that you weren't?                       |
| 15  | A.  | He made a bigger case of that.                     |
| 16  | Q.  | Okay.  And there were people sort of in            |
| 17  |     | earshot listening as you were having this          |
| 18  |     | disagreement with him?                             |
| 19  | A.  | I'd say that office is maybe two times             |
| 20  |     | larger than this room where we are, and he         |
| 21  |     | told me that -- I'm not saying that he has         |
| 22  |     | to be polite, it's not like I need cookies         |
| 23  |     | and milk, but I'm saying that he came loud,        |
| 24  |     | and everybody in the office know that,             |
| 25  |     | people look like wow.  There was no respect.       |

141

1    So many times -- I mean, I'm not into

2    complaining that everything that happens

3    every day.  I mentioned that happened.  I

4    just -- as people say, I just my mouth shut

5    and...

6  Q.  No, I'm just trying to get the scene.  So

7    you're having a discussion with Mr. Kingston

8    about the fact that the stop was missed?

9  A.  Yes.

10  Q.  There are some people who were around and

11    can overhear because he's angry, and you

12    disagree with him and give him your view,

13    and then he says to "You can't talk like

14    that"?

15  A.  Yes.

16  Q.  Okay.  And it's after that that you go to

17    the warehouse?

18  A.  Yes.

19  Q.  And you think he was angry about that

20    argument?

21  A.  Mr. Kingston?

22  Q.  Yes.

23  A.  Mr. Kingston was like that.  Also Mr.

24    Tsickritzis, he was nearby.  I ask Peter,

25    "What does he mean by 'You cannot talk like

142

```
 1         that'?  It's like a disrespectful way."
 2              I work with disabled students.  I do
 3         not tell the student who was blind or
 4         legally blind, you know, any jokes that
 5         would make him feel miserable.  I handle the
 6         students who are in a wheelchair or need
 7         some help, and I never made fun of them.  I
 8         see people walking here with dogs, and I
 9         don't see that the way they play with the
10         dog they play with people.  Why do they play
11         like that?  That's what I'm saying.
12    Q.   Now, isn't it the case -- I think it's the
13         case that during the couple of weeks that
14         you were driving you had an accident with
15         the truck?
16    A.   Let me see.  I had an accident when I was
17         driving?
18    Q.   Yes.
19    A.   There was -- I remember on the two weeks
20         period of basically testing without -- not
21         being told that I was testing, yes, there
22         was an accident on Washington Street.
23         That's basically what's there.  I was
24         backing in a parking.  I had space, I was
25         going, but I -- unfortunately I took the, as
```

143

```
 1          I remember, the plastic cover that goes in
 2     the rear wheel of a vehicle.  I left a note
 3     on the driver's window, "I hit you.  This is
 4     my license number.  This is" -- I think I
 5     put either the license number, license
 6     plate.
 7          Anyways, when I did the delivery, when
 8     the driver came out, I told a woman who was
 9     going to the car, "Hey, I hit your car."
10     And I couldn't show her all my records, but
11     I told her, "Look, I hit your car."
12  Q.  Okay.  And you reported that to United
13     Liquors?
14  A.  I think so.
15  Q.  Yes.  Didn't you have another accident with
16     the truck as well?
17  A.  On those two weeks?
18  Q.  Yes.
19  A.  I remember that one now.  At that time --
20  Q.  How about beyond the two weeks?
21  A.  After the two weeks?
22  Q.  Yes.
23  A.  I remember I was doing a solo, which is a
24     driver goes by himself and takes everything
25     by himself.  It was a hotel off Atlantic
```

144

1    Avenue, that area.  When I was leaving, I

2    know that state law says stop for

3    pedestrians under the law.  As I'm going

4    out, as I'm approaching the exit, some

5    people were going by, and I stopped like the

6    state law says.

7        Once they finished passing, I started

8    going forward, but I'm under the impression

9    that that hotel brought the door, sliding

10   door they operate from another place, which

11   I don't have any control of, they brought it

12   down on the cargo area of the truck.  When

13   the -- my impression is that when the

14   rolling door comes down, the hotel itself

15   caused the accident, not me, because I have

16   to follow state law.  I cannot run people

17   over, I have to stop.  And that's it I'm

18   thinking about.

19 Q.   Was the truck damaged?

20 A.   I think there has to be damage.  I don't

21   know if it was large damage or if it was

22   just dented and the motor that controls the

23   door shuts and doesn't go anymore or if it

24   was more damage.

25 Q.   And you reported that to United Liquors as

145

1         well?

2    A.   I think so.

3    Q.   Now, you allege in this paragraph that while

4         you were driving during that couple of weeks

5         that you worked as a driver some customers

6         complained about you.  How do you know that?

7    A.   I was told at the office.

8    Q.   And who told you?

9    A.   Mr. Kingston.

10   Q.   What is it that Mr. Kingston said?

11   A.   Well, I think what he meant was the manner

12        of speaking, because --

13   Q.   Well, I'm not interested in what he meant.

14        What exactly did he say to you?

15   A.   "I receive complaints about you."  I say,

16        "About what?"  He say, "You cannot talk like

17        that."  He comes again with the same, like,

18        that "You cannot talk like that."

19   Q.   And that's all he said to you, "You cannot

20        talk like that"?

21   A.   Well, he -- maybe now he's more aware of the

22        American Disabled Act, and you know

23        harassment and telling people who have a

24        speech impairment, and that's not the cure.

25        He's not a speech therapist, he's not a

148

1  Q.   Okay.

2  A.   But I know it was common conversation.

3       "They didn't put you there."

4  Q.   Then it says that in May of 2003 ten new

5       white drivers were hired without testing by

6       the company?

7  A.   Yes.

8  Q.   What drivers are you talking about there?

9  A.   I -- again, I was told -- at that time I was

10      told that the company's looking for drivers.

11      There is -- it's going to get -- to be a

12      bigger.  I said fine.  So I went to Kevin,

13      and I say, "Kevin, you need drivers?"  He

14      said, "No, no, no, no.  No, no, no, no, no."

15 Q.   Okay.  So the thing you heard about the ten

16      white drivers being hired, this was, again,

17      just from some of the warehouse workers?

18 A.   Yes.  When I was working at the warehouse,

19      it was common conversation.  "We're going to

20      get ten new drivers.  They're going to make

21      the list.  They're going to work hard" and

22      blah, blah, blah, all of that.

23 Q.   Okay.  Now, when you were -- after you got

24      your permit to learn to get -- to drive a

25      truck --

149

1    A.    Yes.

2    Q.    -- and I think you told me that you

3          practiced with United Liquors trucks.  Do

4          you recall that?

5    A.    Yes.

6    Q.    Didn't you also have assistance from United

7          Liquors drivers?  Didn't they drive the

8          truck with you or sit there while you drove

9          the truck?

10   A.    I could say that -- like, practicing for the

11         exam?

12   Q.    Uh-huh.

13   A.    The one that was supposed to practice with

14         me was Mr. Montgomery.  He's the fleet

15         manager.  He claims to have a CDL for I

16         don't know how many years.  I think he said

17         once -- I might be wrong -- 20 or 25 years

18         with no accident, and he knows, and he's the

19         best, so I always ask him.  He practice with

20         me once after I practically beg him, and I

21         went to Peter, and Peter say, "Practice with

22         him."  He just gave me like 20 minutes or

23         something.

24   Q.    Did you have other United Liquors drivers

25         who practiced with you?

150

1  A.    Yes.

2  Q.    They went out in the truck with you when you

3        had just a permit?

4  A.    Yes.  They -- many times they sponsored me,

5        but that was on the day of -- most of the

6        time I think it was on Mondays, because

7        Mondays was a slow day.  I don't know how it

8        is now, but they used to practice with me

9        and they sponsor me to the test.

10 Q.    And somebody from United Liquors went with

11       you when you took the test?

12 A.    Well, they ask drivers of the company who

13       was co-workers help me very much, which I

14       appreciate, to practice and to pass the

15       exam.  Fleet manager is the one in charge.

16       As far as I remember, he only help me once

17       practicing in the yard, and he always told

18       me, "When you get a date for your road test,

19       take them for Monday in Stoughton," which is

20       the next town over.  If it was in another

21       town, no, that's too far, that's too far.

22       So I had to cancel dates.

23 Q.    But you took the test and passed the first

24       time?

25 A.    No.

151

1    Q.    No.  You took it more than once?

2    A.    Yeah, a lot of time.

3    Q.    How many times did you take it?

4    A.    I don't remember, but it was a lot, many,

5          . many, many times.  And I went -- I think I

6          supplied you with one copies and all the

7          times --

8    Q.    All the times you took it?

9    A.    Yeah, well, either took it or called the

10         registry to schedule that date but had to

11         cancel because the fleet manager was not

12         available.  Like they did when all the white

13         drivers wanted to go for a license there was

14         a light duty employee, maybe somebody who

15         was injured could assist this guy here, but

16         when it was my case, I was never given that

17         information.  I don't -- I mean, guys here

18         are very nice people.  I like them very

19         much.  I work with them.  They are not the

20         stereotype that people have about drivers,

21         very nice people, very elegant (sic).

22   Q.    Now, you said that you were transferred to

23         the warehouse, and if I understand this

24         correctly, when you're working in the

25         warehouse, you were what's called a spare;

165

|    |    |                                                            |
|----|----|------------------------------------------------------------|
| 1  |    | salesman or management.  He was like anybody               |
| 2  |    | else working in the warehouse, so everything               |
| 3  |    | says -- if I were to answer because of all                 |
| 4  |    | that I see, I would say he's a spare --                     |
| 5  | Q. | Okay.                                                      |
| 6  | A. | -- or he was.                                              |
| 7  | Q. | Now, you worked in the warehouse until about               |
| 8  |    | June of 2003 when you had an injury?                        |
| 9  | A. | Yes.                                                       |
| 10 | Q. | And then you filed a workers' compensation                 |
| 11 |    | claim in connection with that injury, didn't               |
| 12 |    | you?                                                       |
| 13 | A. | I think so.                                                |
| 14 | Q. | And you were out of work and considered to                 |
| 15 |    | be disabled through the end of December                    |
| 16 |    | 2003; isn't that correct?                                  |
| 17 | A. | I think so.                                                |
| 18 | Q. | And you received a workers' compensation                   |
| 19 |    | settlement towards the end of that period of               |
| 20 |    | time?                                                      |
| 21 | A. | Not at that time.  I think -- I believe -- I               |
| 22 |    | might be wrong, I don't have that paper in                 |
| 23 |    | my face.  I think it was after that                         |
| 24 |    | December.                                                  |
| 25 | Q. | After December there was a settlement?                     |

166

| | | |
|---|---|---|
| 1 | A. | After December 2003, then. But I don't have |
| 2 | | the paper right now. |
| 3 | Q. | Okay. But after sometime in December of |
| 4 | | 2003, I believe, your doctor cleared you to |
| 5 | | return to work? |
| 6 | A. | Let me put it this way, and you might want |
| 7 | | to revise. I know of the light duty |
| 8 | | accommodation policy, people have an |
| 9 | | accident, they can withdraw into light duty |
| 10 | | accommodation. I requested from the |
| 11 | | defendants light duty accommodation. I was |
| 12 | | told, "Because you have this MCAD claim, you |
| 13 | | are not making friends, you need to come |
| 14 | | back when you are completely healthy." So |
| 15 | | that is how I see it. |
| 16 | Q. | Well, I think you know that is not true, and |
| 17 | | so I guess I will make the effort to get the |
| 18 | | documents because I can't have you testify |
| 19 | | falsely. You assured us today you were not |
| 20 | | going to do that, and you just did that, so |
| 21 | | we're going to take the time to correct the |
| 22 | | record because either that testimony is |
| 23 | | false or you took money under false |
| 24 | | pretenses, and I don't think you're going to |
| 25 | | say that. |

167

1  A.    Took money where?

2  Q.    Well, I'm going to show you.

3              (Pause.)

4                    (Exhibit No. 5, Agreement to pay

5        without prejudice dated February 25th, 2004,

6        marked for identification.)

7  Q.    Exhibit 5 is an agreement to pay without

8        prejudice which appears to be dated February

9        25th, 2004.  Is that your signature on this

10       document?

11 A.    Yes.

12 Q.    And does this say that the parties, you and

13       United Liquors, reached an agreement on the

14       workers' compensation claim that you filed?

15 A.    It says here "Agreement to pay without

16       prejudice."

17 Q.    Yes.

18 A.    That's the document?

19 Q.    Yes.

20 A.    What I --

21 Q.    Well, this says that the insurer -- workers'

22       comp insurer agreed to pay you benefits from

23       June 17th, 2003 to December 18th, 2003 at

24       the weekly rate of $278.21 based on an

25       average weekly wage of $463.69; isn't that

168

1    correct?

2  A.  That's what it says here.

3  Q.  And didn't you get that money?

4  A.  Yes.

5  Q.  And it's true that you did not work between

6      June 17th, 2003 and December 18th, 2003?

7  A.  I don't believe I work anywhere.  I was all

8      the time asking, "Can I work?  Can I be in

9      the warehouse?  Can I do any light duty

10     job?"  I didn't see any work at all at the

11     warehouse.  June 17, 2003 to that time I

12     didn't work.  I was --

13              MS. ACKERSTEIN:  Okay.  We're going

14     to mark the next exhibit.

15              (Exhibit No. 6, Copy of a note from

16     the Brockton Neighborhood Health Center,

17     marked for identification.)

18 Q.  Exhibit 6 is a copy of a note from the

19     Brockton Neighborhood Health Center.  Have

20     you been to the Brockton Neighborhood Health

21     Center?

22 A.  Yes.  Which one?  Brockton Neighborhood?

23 Q.  Right there, Exhibit 6 (indicating), right

24     in front of you.

25 A.  Let me see.  I don't know, where is 4?  Do

175

1       prepare this?

2   A.  I went to the Unemployment Office.  They

3       have a computer.

4   Q.  And you did it there?

5   A.  Well, I first did my draft.  I followed the

6       instructions at the USDC, and they put it

7       there.

8   Q.  Okay.  Now, look at Paragraph 7.  It says,

9       "On or about January of 2004 the defendant

10      invited the plaintiff to have a meeting at

11      ULL with the human resources vice president

12      Kathleen Mansfield."

13          The defendant is United Liquors, and

14      you're the plaintiff, so you're saying that

15      in January United Liquors invited you to

16      have a meeting with Kathy Mansfield; is that

17      correct?

18  A.  Yes.

19  Q.  And did you go in to see her?

20  A.  I went to see her, and I also saw Peter.

21  Q.  Okay.  And at that point was the

22      headquarters in Braintree?

23  A.  Yes, it was.

24  Q.  And did you drive there?

25  A.  I think so.

176

1   Q.   Did you go by yourself?

2   A.   I think so.

3   Q.   And you think you met with Peter before you

4        met with Kathy, or you don't know?

5   A.   Well, it's not like if I know, if I don't.

6        It's -- I know Peter's personality, so I

7        went to the -- when I enter, I went to the

8        security office, and I was told, "Hold it

9        right there.  I have to call Peter."

10            And I waited there, and Peter came.  I

11       believe he tell me to go there by -- when

12       was that? -- 9:00 a.m. or something like

13       that.  And he had told me, "What's wrong

14       with you?  You don't know people here have

15       to work?  We have to be done with this."

16            Then he called Miss -- Miss or Mrs.

17       Mansfield.  And I asked Peter for a union

18       representative.  Peter say, "Go and get him

19       yourself."  So I told the security person to

20       contact him because Mr. Tsickritzis wouldn't

21       want to call him.  So when the union

22       representative came, then we had the

23       meeting.

24   Q.   Okay.  So the union rep and you and Kathy

25       Mansfield met, and you think Peter was there

177

1      as well?

2  A.   Yes.  I -- I think Peter was there.  I think

3       Mansfield was there, I think I was there,

4       and --

5  Q.   And the union rep was there?

6  A.   Yes.

7  Q.   Where did the meeting take place?

8  A.   It's an office adjacent to the security

9       area.  That's my best recollection.

10 Q.   Okay.  And in the meeting you were offered

11      the opportunity to return to work in the

12      warehouse, the same spare role you had

13      before you were injured; isn't that correct?

14 A.   My best recollection is that I was offered a

15      different shift, like say before the

16      accident I was working 2:00 p.m. to when the

17      job was done, 1:00 or 2:00 p.m., whenever it

18      started.  And when I finish -- when I

19      finished with all the medical treatments

20      when I go back, my impression, I was -- I

21      was offered another shift.

22 Q.   What shift do you think you were offered?

23 A.   I think it was one to work later on, and

24      that was in conflict with the accommodation

25      I was asking in the first place.  That's

178

1    what I remember.

2  Q.  What exactly did Kathy Mansfield say to you?

3     Do you remember?

4  A.  I vaguely remember her.  To be more

5     specific, I know she was there.  She was --

6     she introduce herself.  Peter said she was

7     going to take either a master or Ph.D. in

8     human resources, something like that.  I

9     believe she had a cane or walking stick,

10    some orthopedic help, I believe.  But that

11    was just once.  It was January 2004.

12 Q.  So you just have a vague recollection that

13    she offered you an unacceptable shift and

14    you did not return to work?

15 A.  Well, she was there, and we discussed the

16    way of I going back to work.  I ask Mr.

17    Tsickritzis for his business card and also

18    the business card or name of Hale and Dorr,

19    Attorney Julie Murphy Clinton, and I was

20    given that, like I provided you.  But

21    verbatim I don't remember that.

22 Q.  Okay.  But you did not return to work at

23    United Liquors at that time, did you?

24 A.  No, I did not.

25 Q.  Now, there was a union representative

179

1          present --

2    A.    Yes.

3    Q.    -- at the meeting?

4          After the meeting did you ask the

5          union representative to do anything about

6          the offer that had been made?

7    A.    I think I spoke with him about what were my

8          options when coming back, if he could

9          negotiate or represent me or some way have a

10         say in the decisions of I going back and

11         also what I was claiming.

12   Q.    Now, in the next paragraph you say that the

13         plaintiff, that's you, has supportive

14         declarations from a co-worker who was given

15         corporate goods and favors in exchange for

16         information about you and others.  Who is

17         the co-worker who was given corporate goods

18         and favors?

19   A.    That's No. 8, paragraph --

20   Q.    Yes.

21   A.    His name is Dexter, Dexter -- I know him by

22         Dexter Simon Cooper.

23   Q.    And what was his position at United Liquors?

24   A.    He was a -- what do you call that?  He was a

25         spare worker.  He work at the warehouse.  I

192

```
 1        United States District Court

 2        District of Massachusetts

 3

 4            I, Jessica L. Williamson, Registered,

 5        Merit Reporter, Certified Realtime Reporter

 6        and Notary Public in and for the

 7        Commonwealth of Massachusetts, do hereby

 8        certify that BIENVENIDO I. LUGO-MARCHANT,

 9        the witness whose deposition is hereinbefore

10        set forth, was duly sworn by me and that

11        such deposition is a true record of the

12        testimony given by the witness.

13            I further certify that I am neither

14        related to or employed by any of the parties

15        in or counsel to this action, nor am I

16        financially interested in the outcome of

17        this action.

18            In witness whereof, I have hereunto set

19        my hand and seal this 17th day of October,

20        2006.

21

22                    Jessica L. Williamson   JG.

23            Jessica L. Williamson, RMR, RPR, CRR

24            Notary Public, CSR No. 138795

25            My commission expires: 12/18/2009
```

# EXHIBIT B

1

ORIGINAL                    VOLUME: 1

                            PAGES: 1-97

                            EXHIBITS: 1-26


              UNITED STATES DISTRICT COURT
              DISTRICT OF MASSACHUSETTS


------------------------------:

BIENVENIDO I. LUGO MARCHANT    :

          Plaintiff            :

vs.                            :C.A. NO. 0511317NMG

PETER TSICKRITZIS, KEVIN       :
KINGSTON & UNITED LIQUORS,
LIMITED                        :

          Defendant            :

------------------------------:



          DEPOSITION OF BIENVENIDO I. LUGO MARCHANT,

Plaintiff, called on behalf of the Defendants,

pursuant to the provisions of the Massachusetts

Rules of Civil Procedure, before Mary Jo Boxer,

Professional Court Reporter and Notary Public, in

and for the Commonwealth of Massachusetts, at

Jackson, Lewis, Schnitzler & Krupman, 75 Park Plaza,

4th floor, Boston, Massachusetts, on Friday,

December 15, 2006, commencing at 10:55 a.m.

21

 1    2004; is that your handwriting on the last page?

 2         A.    Yes.

 3               (Deposition Exhibit No. 10, letter, marked

 4               for identification.)

 5    BY MS. ACKERSTEIN:

 6         Q.    Exhibit No. 10 is a letter dated February

 7    23, 2004 from Norman Soule of West Campello

 8    Congregation, "To whom it may concern"; you have seen

 9    this previously?

10         A.    Yes.

11         Q.    Did you obtain this letter from Mr. Soule?

12         A.    Let's see, yes.

13         Q.    Okay.  And I see that he says in the

14    letter that you have been a member of this congregation

15    for five years and that it was your custom to attend the

16    weekly meetings of the congregation, and he identifies

17    one meeting, Tuesday from 7:30 to 9:15, and one from

18    Thursday, 7 to 8; do you see that?

19         A.    Yes.

20         Q.    Those are the two programs that you wanted

21    to attend when you were working in the warehouse at

22    United Liquors?

23         A.    Those two were in conflict with the no

24    working schedule after complaining as part of demotion,

24

1  verbatim, what they offered me would be in conflict with

2  that schedule.

3        Q.    Okay, so you got an offer, you didn't want

4  to take it, so you wrote this letter to Mr. Tsickritzis;

5  is that what happened?

6        A.    I think so.

7        Q.    You said you consulted with your lawyer;

8  Did you have a lawyer at that time?

9        A.    At that time, I had retained a lawyer.  I

10  had spoken with him beforehand about what we spoke about

11  verbatim.  And some of those days -- some days I

12  couldn't get him.

13        Q.    So who was the lawyer?

14        A.    His name?

15        Q.    Yes.

16        A.    Lawrence Mehl, M-E-H-L. I gave you a

17  business card.

18        Q.    But he's not representing you in this

19  proceeding?

20        A.    No.  I wish.

21              (Deposition Exhibit No. 12, letter, marked

22              for identification.)

23  BY MS. ACKERSTEIN:

24        Q.    And Exhibit 12 is a copy of a letter dated

25

 1   March 9; it appears to be the same as the other letter,

 2   or very similar.

 3         A.      Yes.

 4         Q.      You wrote.  Is this letter something you

 5   did as well?

 6         A.      Yes, same idea, same, right.

 7         Q.      And you sent this to the Department of

 8   Justice and the Attorney General in addition to

 9   Mr. Tsickritzis?

10         A.      I think I sent -- yeah, copies to all.

11                 (Deposition Exhibit No. 13, letter, marked

12                 for identification.)

13   BY MS. ACKERSTEIN:

14         Q.      And I'm showing you Exhibit 13, which is a

15   copy of a letter from Mr. Tsickritzis to you.  He says,

16   "I received your letters of February 27, 2004, and March

17   9, 2004, requesting your return to work."  And

18   Mr. Tsickritzis states in here that as they previously

19   told you, you could return to work as a spare employee,

20   but that you were not guaranteed a particular position

21   or shift on a daily basis.  That's the offer that they

22   made to you, isn't it?

23         A.      That's the letter, as I understand,

24   somebody wrote for Mr. Tsickritzis to sign.

26

1    Q.    And you didn't want to come back on that

2 basis, isn't that right?

3    A.    I didn't see it as a sincere or truthful

4 way of offering a job.  I'm not asking for red carpet; I

5 never asked for a red carpet or anything like a

6 chauffeur, anything like that, but after putting in the

7 MCAD claim, everything was retaliation, retaliation,

8 harassment, retaliation, harassment.

9              (Deposition Exhibit No. 14, dismissal of

10             claim letter, marked for identification.)

11 BY MS. ACKERSTEIN:

12    Q.    Exhibit 14 is a copy of the MCAD's

13 dismissal of your claim; you have seen this previously,

14 haven't you?

15    A.    Yes.

16    Q.    So you are aware that they found that they

17 could not conclude that there was a violation of any

18 statute in connection with your employment?

19    A.    They said so, not that I -- that I agree

20 with them.

21    Q.    Now, you left work in June of 2003 after

22 your injury; do you remember that?

23    A.    Yes.

24    Q.    And then you've made an allegation that

27

1  you came back one day in August with a friend; do you

2  remember that?

3         A.    Which one was that?

4         Q.    I'm asking you.

5         A.    I don't know.  I need to know more.

6         Q.    Well, after June, when you stopped working

7  because of your injury, was there ever an occasion when

8  you went to the United Liquors facility with a friend or

9  someone you knew who wanted to pick up an employment

10 application?

11        A.    I think I went to drop off some medical

12 records that was requested as a condition to work again.

13 I went to drop off some papers; I went to Lindley's

14 office; she wasn't there; Laura Stec wasn't there

15 either; I asked around and I was told -- I don't

16 remember right now who -- that I could drop it at the

17 front door also or the main lobby.

18        Q.    And so did you drop it off in the main

19 lobby?

20        A.    I wouldn't remember that now.  I know the

21 security person, who was that day, basically pulled me

22 to the side, like, you know, "wait here, I need to call

23 Peter before you enter," and all of that protocol.  When

24 I was working there --

28

1      Q.    Well, on this day that you were there, you

2  hadn't been working for a couple of months due to your

3  injury, isn't that right?

4      A.    Yes.

5      Q.    So the security guard, you think, said,

6  "Hold, I'm going to call Peter"?

7      A.    I believe, if I'm not wrong in what I

8  remember, the security person -- those days they were

9  kind of more sensitive with me, like "Where are you

10  going, let me call Peter, let me see if you can do this,

11  let me see if you can do that." There was increased

12  surveillance on me.

13      Q.    Well, you hadn't been at work for a couple

14  of months at that point?

15      A.    I was denied light work accommodations for

16  some time.

17      Q.    I'm going to ask you about that. When you

18  say there was increased surveillance on you, you don't

19  know what the security guard did with respect to people

20  on other days when you weren't there, do you?

21      A.    When I wasn't there, I don't know what

22  happened.

23      Q.    So on that day, the security guard,

24  according to you, said "I'm going to call Peter"?

29

1      A.      I believe, but I wouldn't say that the

2 security person said that verbatim, "I'm going to call

3 Peter."

4      Q.      Okay.

5      A.      I would say it's like, "wait here," you

6 know, authoritarian tone, "wait here; let me call

7 Peter," then I could go.

8      Q.      And what happened after that?

9      A.      I actually passed by Peter's side on one

10 of the lobbies.  He just walked, like shaking his head,

11 and I told him I was going to drop the papers.  That was

12 2003.  I wouldn't know exactly what he said to repeat,

13 but I think he's the one who told me that I could put

14 the papers there.

15      Q.      That you could leave the papers?

16      A.      Yes.

17      Q.      And then you left?

18      A.      No.  I went to -- I went to the front

19 lobby for a job application for a neighbor because I was

20 told that the company was getting bigger but they had

21 lots of need of workers for either helpers or

22 maintenance.

23      Q.      And did anything else happen while you

24 were there?

30

1        A.      At the lobby?

2        Q.      Yeah.

3        A.      I asked for a job application in Spanish,

4   I believe, for my neighbor.  The receptionist was

5   rude-like.  I also went that day professionally dressed.

6   I asked her if they had need for sales person; I guess

7   the company is getting bigger.

8                There was another applicant there, I could

9   say quite well dressed, well groomed, all of that, and

10  she took good care of him.  She was polite with him.

11               When I asked for -- if she knew about

12  there was an opening for salesmen, she told me there was

13  maintenance.  And I said okay, can I also have a job

14  application for maintenance, one in Spanish, and she

15  said that they were -- she looked there, I believe, but

16  those forms were in Laura Stec's office; she gave me a

17  job application.

18       Q.      And then you left?

19       A.      No.  I sat on a chair, like the ones you

20  have at the entrance, I took a magazine, something, the

21  big distributors that come through the company, and I

22  was reading that, and there was some worker; he looked

23  tall; he looked white; he came down the stairs, up and

24  down a couple of times looking at me, looking at other

1   people, exchanging looks with the front desk, and then

2   he start asking "what's up, what's up," kind of in a

3   rough way.  I'm just there with the magazine, the job

4   application; and then he came back with Peter

5   Tsickritzis; Peter Tsickritzis started yelling, "You

6   cannot be here; you have a lawsuit; you are suing the

7   company."  And then the receptionist started asking me

8   back for my -- for the job application.

9             They had a paper because they had lost at

10  that time or were losing the beer market because

11  suggestion I gave them that they wouldn't take because

12  they were either stubborn or I don't know what, so the

13  flyer said something like we are giving the opportunity

14  to take some beers because that chunk of the market was

15  lost, so there were some beers, and it would be

16  practically given away or sold for a lower price,

17  something like that.  I don't remember the flyer;

18  Peter took it from my hand, but the paper said

19  "opportunity," misspelled, and in the context that the

20  receptionist was joking about Spanish people with

21  co-workers who walked in and out by the doors, do you

22  think -- what was she asking, do you think -- no, do you

23  have to speak Spanish to do maintenance, something like

24  that, or that Spanish people could do maintenance at the

32

1  company; that was basically her idea, that Spanish

2  people were good for maintenance, that if Spanish

3  speaking was a requirement to do maintenance.  And when

4  I asked her for a position as a salesman, she said no,

5  she told me about maintenance.

6           And when Peter was there, Peter was

7  boisterous, I would say ferocious, "You're not going to

8  be a rebel, are you; you have a lawsuit against the

9  company," he was like that; that was unfortunate that we

10 couldn't fix that on time.

11      Q.    So at that point, you left?

12      A.    More or less at that time, I left.

13      Q.    Now, was this in about August of 2003?

14      A.    On or about August 2003.

15      Q.    Do you know the name of the receptionist?

16      A.    I don't remember right now.

17      Q.    Okay.

18      A.    But she was -- like I learned later that

19 the one who was at that time was a substitute

20 receptionist.

21      Q.    The person that day was a substitute

22 receptionist?

23      A.    The person at the time when I was there.

24 I don't know about the morning.

33

1       Q.      But the person you are talking about, when

2   you told us about a receptionist, you learned she was a

3   substitute receptionist?

4       A.      Yeah, just to put it in those terms, she

5   worked at that time as either as a substitute

6   receptionist or she was the one that was there.

7       Q.      Now, when you worked in the warehouse,

8   were there people there who spoke Spanish?

9       A.      I didn't -- I didn't ask them

10  specifically, like asking every employee who worked

11  nearby "do you speak Spanish fluently, are you

12  conversant," I didn't ask people.  There are some people

13  who might know some Spanish.  And I don't know -- and

14  there are some people who claim to know, so it's --

15      Q.      When you worked in the warehouse, did you

16  work with any Haitian employees?

17      A.      Yes.

18      Q.      Did they speak French?

19      A.      French or Haitian Creole, which language

20  is related.  Sometimes I spoke French with some of them;

21  sometimes I learned some Haitian Creole with them, not

22  that I'm fluent, not that I'm conversant.  It's learning

23  about people, diverse people, appreciating the culture.

24      Q.      When you worked at United Liquors in the

34

1    warehouse, other than people who spoke Spanish or French

2    or Creole, were there any other languages spoken in the

3    warehouse?

4        A.    There was Portuguese, the way it's spoken

5    in Brazil, which is basically the same; Portuguese works

6    in the different countries; they have what is called a

7    regional accent.  I believe there were people who spoke

8    other languages.  There were Greeks; I think there were

9    some who spoke -- I don't know what his language,

10   English, but he was very -- not to put him down, but his

11   language skills were very limited and it wasn't an issue

12   for him because he was white.

13       Q.    Well, some of the employees who were

14   Haitian or Spanish speaking, were there some of them

15   whose English is not as good as yours?

16       A.    Well, not to be humorous, but the more you

17   hear me, maybe the more you understand, the more you are

18   going to like it, or I don't know, find it interesting.

19       Q.    But my question to you is of some of the

20   people who are foreign-born that you worked with at

21   United Liquors, either they are Brazilian or Haitian or

22   Spanish speaking, there were some people, I would assume

23   many people, whose English is not as good as yours?

24       A.    I always try to improve my language

35

1    skills, either the language itself, like grammar,

2    syntax, lexicon, vocabulary, and also the stuttering.

3    There are many techniques.  I was going to bring you

4    some more papers from the -- if you go, you can find it

5    too.  It's S-T-U-T-T-E-R.org; they have many suggestions

6    there about stuttering, how to control.

7         Q.    My question to you is -- listen to the

8    question -- isn't it the case that many of the

9    foreign-born employees you worked with at United Liquors

10   did not speak English as well as you did?

11        A.    Of the ones I met, I would say yes.

12              MS. ACKERSTEIN:  Can I have that marked?

13              (Deposition Exhibit No. 15, amendment to

14              charge of discrimination, marked for

15              identification.)

16   BY MS. ACKERSTEIN:

17        Q.    Exhibit 15 is an amendment to the charge

18   of discrimination that you filed against United Liquors;

19   is this your handwriting?

20        A.    Some.

21        Q.    Some of it?

22        A.    Some of it is my handwriting.

23        Q.    What is not your handwriting?

24        A.    Beginning with where it says "on" and

36

 1    until where it says "now," and after that, signature.

 2         Q.    That's your handwriting?

 3         A.    Yes, that area is my handwriting.

 4         Q.    So at the top, where it says August 26,

 5    2003, and amendment and a number, your name and address,

 6    phone number, that somebody else's handwriting?

 7         A.    Yes.

 8         Q.    Is that the handwriting of somebody at the

 9    Mass Commission Against Discrimination?

10         A.    I would say so.

11         Q.    Because you took this amendment down to

12    the MCAD and you gave it to them?

13         A.    One second.  Let me read it.  What was

14    your question again?

15         Q.    My question to you was did you take this

16    amendment to the MCAD and turn it in to them there?

17         A.    Yes.

18         Q.    So some MCAD employee is the one who wrote

19    your name and the date and so forth?

20         A.    The heading of Exhibit 15, that was

21    written by some MCAD intake, whoever was at the time,

22    and the last -- let me see my sentences -- the last four

23    sentences, before the signature, also were written by

24    the same one, the sentence beginning -- saying that you

37

1   need up until where it says license and the period.

2       Q.    So "You need to speak English here; your

3   accent is bad," was written by somebody else?

4       A.    Yes.  I told him that was what I was told.

5       Q.    Is this what the receptionist -- you are

6   claiming the substitute receptionist told you?

7       A.    That kind of comment, I didn't hear that,

8   let's put it this way, before September 11.

9       Q.    I'm sorry, say it again.

10      A.    I didn't hear that kind of comment before

11  September 11, just to put it in a time.  After that,

12  like collective paranoia, everybody who looks or sounds

13  as a foreigner is told "you need to speak English; this

14  is America."

15      Q.    You're talking about September 11, 2001?

16      A.    Yes.

17      Q.    But your accident that caused you to stop

18  working at United Liquors was June of 2003?

19      A.    You're right.

20      Q.    And you continued to work after September

21  11, 2001, through the date of your injury when you

22  stopped working due to your injury?

23      A.    There was, after September 11, more or

24  less that time, there were some let's call it economic

40

·1      A.      Yes.

2       Q.      You were examined -- you see it says "DOE

3  12-8-1998;" do you see that?

4       A.      Yes.

5       Q.      You were evaluated in 1998 in connection

6  with the Mass Rehab Commission; is that right?

7       A.      Yes.

8       Q.      And you see under the section that says

9  "Impression: this evaluation was conducted in English

10  because of Bienvvenido's excellent English speaking

11  skills."  Do you see that?

12      A.      Yes.

13      Q.      Is that the case, was the examination

14  conducted in English?

15      A.      I think so, it was in English.

16              MS. ACKERSTEIN:  Let me mark this.

17              (Deposition Exhibit No. 18, statement,

18              marked for identification.)

19  BY MS. ACKERSTEIN:

20      Q.      That's No. 18.  Exhibit 18 is a statement

21  from the Brockton Neighborhood Health Center.

22      A.      Yes.

23      Q.      I take it you've seen this before?

24      A.      Yes.

41

1    Q.    When you had your Worker's Comp injury in

2   June of 2003, you had back pain as a result of that; is

3   that correct?

4    A.    Yes.

5    Q.    And you went through physical therapy,

6   didn't you, saw a chiropractor?

7    A.    Therapy, chiropractor, yes.

8    Q.    And on December 18, 2003, you got a note

9   from the Brockton Neighborhood Health Center that you

10  could return to work?

11   A.    Yes.

12   Q.    And are you saying that you took that to

13  someone and they didn't give you a job?

14   A.    Yes.  I had to provide United with medical

15  papers saying that I was in good health, I didn't have

16  any issues so they could give me work.

17   Q.    I'm sorry, say that again.

18   A.    I was required to submit medical records

19  or medical letter saying that I could return to work and

20  I didn't have any issues about anything.  I was

21  beforehand asking for light duty accommodation, like

22  other people would receive, and in my case, it was

23  denied in the context of retaliation after voicing

24  concerns about harassment, racist comments, attitudes.

42

1      Q.     Well, this form that we have marked as

2  Exhibit 18, is this what you are talking about that you

3  gave to someone and they didn't give you a job?

4      A.     I had to submit that Exhibit 18.

5      Q.     Who did you give it to?

6      A.     I remember faxing many of my paperwork to

7  United, and sometimes I actually went there physically,

8  like the time that you just asked me.

9      Q.     In August of 2003?

10     A.     On or about that time.

11     Q.     Well, can you tell us anybody that you

12  actually talked to about light duty work?

13     A.     Lindley.

14     Q.     Ms. Lindley?

15     A.     Yes.

16     Q.     Was that in person?

17     A.     When I was there, but I couldn't remember

18  what date specifically.  As you see, I don't have a

19  watch or clock, watch.  I don't have a watch to mark the

20  dates and times.  I remember asking her -- let's put it

21  this way, I remember begging her for light duty

22  accommodation, and she said "no, no, no, no, no, no."

23     Q.     When did that happen?

24     A.     I don't have the exact date on my -- like

43

1  saying August 4, August 5, any combination of months and

2  number, but I asked her many times, and she always said

3  no.

4       Q.    That's what I'm asking you; can you give

5  us any date when you talked to her?

6       A.    Any date, I say between the time of the

7  accident and between December 2003, say between June and

8  the period of time between June, December 2003; I called

9  her a number of times and I always get the same answer.

10      Q.    Okay, and do you have any medical

11 statements that you gave her?

12      A.    I gave her one.

13      Q.    This one that we have marked as Exhibit

14 18?

15      A.    Yes.  And I think I also faxed her some

16 other forms beforehand.  One of them said, if I'm not

17 wrong, light duty accommodation, please provide him

18 light work accommodation, light duty accommodation,

19 which is what usually people do, except when -- when is

20 my case.

21      Q.    Well, when you worked in the warehouse as

22 a spare, what did you do there?

23      A.    I had to unload trucks; I had to take the

24 goods that can be sent again, put them in one place; the

46

1      A.      Before they moved to Braintree, I worked

2  once -- I believe it was once when the company was in

3  West Bridgewater, I believe; maybe I'm wrong, but I

4  don't think so.  I worked in the warehouse once or

5  twice.  When it was slow season, I was asked can I work

6  in the warehouse, and they say no, we want a helper for

7  driver because you are good, and that's why I worked

8  there so many years.

9           The warehouse I only did maybe once or

10  twice, and the equipment I handled is one that looks

11  kind of flat that I can step on; there is a lever that

12  controls back and forth, the speed, and can lift cases,

13  pallets, but it's not the one that I have to sit, and I

14  don't believe and I wasn't told that in case I needed a

15  certification to operate that, I was required to.

16           (Deposition Exhibit No. 19, memo, marked

17           for identification.)

18  BY MS. ACKERSTEIN:

19      Q.      Exhibit 19 is a memorandum from the MCAD

20  dismissing your claim of discrimination against Horizon

21  Beverages; is that right?

22      A.      Horizon?

23      Q.      Yes.

24      A.      What about it?

47

1        Q.      You made a claim against Horizon Beverages

2  for discrimination, and the MCAD dismissed that claim,

3  and this is the notice of dismissal, isn't it?

4        A.      Yes.

5        Q.      So you received this from the MCAD?

6        A.      I'm receiving it from you now.

7        Q.      Didn't you receive it from the MCAD?

8        A.      I think they sent a copy to the

9  Complainant, and I should have a copy.

10       Q.      You should have a copy?

11       A.      Should.

12               (Deposition Exhibit No. 20, accident

13               report, marked for identification.)

14  BY MS. ACKERSTEIN:

15       Q.      Exhibit 20 is a copy of an accident report

16  dated 2-19-2003; have you seen this previously?

17       A.      One second.  I'm still with the one

18  before, 19.

19       Q.      Okay.

20       A.      Okay, 20 now?

21       Q.      Yes.

22       A.      Okay, this is driver accident report form

23  from United Liquors.

24       Q.      You've seen this previously, haven't you?

48

1          A.      I'm the one who wrote this.

2          Q.      Okay.  And this indicates that on

3    February 19, 2003, you were involved in an automobile

4    accident while you were driving a United Liquors truck;

5    isn't that what this says?

6          A.      Yes.

7          Q.      Is this your description where it says

8    happened, what happened, is that your handwriting?

9          A.      It says "when backing in parking spot,

10   United truck dented vehicle on left, plastic covering

11   tire.

12         Q.      So you were driving; you were backing a

13   truck into a parking spot, and you dented a vehicle that

14   was parked; is that what happened?

15         A.      Yes.

16         Q.      And you had to turn this in; that's the

17   process at United Liquors, if you have an automobile

18   accident or an accident with the truck, you turn in one

19   of these accident reports?

20         A.      Yes.  I had to wait for the driver of the

21   car to show up to let -- in that case her, to let her

22   know that I hit her car because the company says if you

23   have an accident, things like that, you need to inform

24   the company and you need to inform the person or the

49

1    property affected so they can take care of that.

2         Q.    The driver-owner's name is Tanya Lucas?

3         A.    Yes.

4         Q.    So you waited for her to come?

5         A.    Yes.

6         Q.    How long did you have to wait for her?

7         A.    I didn't have a clock -- a watch on me, so

8    I wouldn't be specific on the timing, but I did wait for

9    her.  I took a piece of paper with the company logo,

10   like put it on the window, and while I finished

11   delivery, I looked out, and then I found her and I told

12   her.

13        Q.    Okay.

14              (Deposition Exhibit No. 21, repair

15              document, marked for identification.)

16   BY MS. ACKERSTEIN:

17        Q.    Exhibit 21 is a repair document which

18   indicates a repair to Tanya Lucas' vehicle at a cost of

19   $820.27, and it's dated March 3, 2003; do you see that?

20        A.    Yes.

21        Q.    Now, that's a repair cost that United

22   Liquors paid; isn't that right?

23        A.    Yes.

24        Q.    You didn't have to pay that $820.27, did

50

1   you?

2       A.      Companies are required to be insured.

3   United is insured.   United handled that.

4       Q.      Were you involved in an automobile or a

5   truck accident at the Boston Harbor Hotel in Boston?

6       A.      I know I left a hotel after a delivery,

7   and I had an accident at one hotel but it's -- if it's

8   the one on Atlantic Avenue, then I can say yes.   That's

9   the one with the sliding door?

10      Q.      Yes.

11      A.      Yes.

12              (Deposition Exhibit No. 22, report, marked

13              for identification.)

14  BY MS. ACKERSTEIN:

15      Q.      Exhibit 22 is a copy of another report of

16  property damage; have you seen this previously?

17      A.      I did the accident paper.   I find the

18  third page that I did not put here.

19      Q.      The last page is not yours?

20      A.      The last page, I did it, but not for this

21  accident.   It was for the one that you just referred to.

22      Q.      Let's take the last page off.   We'll just

23  say the first two pages then relate to the April 11

24  accident?

51

1        A.        Yes, that's April 11.

2        Q.        Look at the first page; is that your

3    handwriting on the first page?

4        A.        Yes.

5        Q.        How about the second page, is that your

6    handwriting?

7        A.        Yes.   There's another page missing.

8        Q.        I'm going to ask you if you could, on the

9    first page, to read us so that the court reporter can

10    take it down clearly, read us the paragraph that you

11    wrote where it says "give full description of damages."

12        A.        Do you want out loud or for myself?

13        Q.        Yes, I want you to say it out loud slowly

14    so the court reporter can take it down.

15        A.        "Hotel opens sliding door used for

16    delivery; at the moment of leaving, driver stopped

17    because there were pedestrians crossing by, between

18    brackets; state law says yield or be fined.

19                  When pedestrians passed driver, drove

20    forward and a scratching noise was heard.   Driver

21    believes hotel closed the door on truck as driver waited

22    for pedestrians.   Then as door closed on the truck, the

23    hotel itself created the aforementioned accident.

24    Driver gave information to the security desk."

52

1    Q.    So the hotel had sliding doors that were

2    opened.  The truck was -- or I guess the back of the

3    truck was partially in those sliding doors, and you were

4    leaving and then you came to a stop and the sliding

5    doors hit the truck; is that what happened?

6    A.    I put on the second page the sequence of

7    events that would answer that.  Basically it's what you

8    said.

9    Q.    Okay, so you're driving, you are in the

10   car, you're the driver, you honked so that the hotel

11   would open the doors, but then you saw some pedestrians

12   and you stopped, and the hotel doors closed on the

13   truck; is that what happened?

14   A.    That's my impression without saying that

15   from the driver's seat, I couldn't see the one

16   controlling it.

17   Q.    So you made this report to United Liquors

18   as well?

19   A.    Yes, but there's a page missing there.

20   Q.    There's a page missing?

21   A.    Yes.  I believe that that accident had --

22   that accident report had other pages of drawings.

23   Q.    You are right.  I have a different copy of

24   it.

53

1          MS. ACKERSTEIN:  Can we get that marked?

2       You're right.  We're going to attach it.

3            Okay, the witness has just pointed out

4     that there was a page missing; that he drew

5     pictures of what happened, and we have attached a

6     third page then to Exhibit 22.

7   BY MS. ACKERSTEIN:

8       Q.     Is that third page the drawings that you

9   were talking about?

10       A.     Yeah, that's it.  That's the one.

11       Q.     Pardon?

12       A.     Yeah, that's the one, a drawing divided

13   into four parts.

14       Q.     This is your handwriting?

15       A.     Yes, handwriting and the drawing as well.

16       Q.     Okay, in the fourth, the last box, you

17   have a picture of a hotel rep.

18       A.     Yes.

19       Q.     Laughing "ha ha ha"?

20       A.     Yes.

21       Q.     And I guess a picture of you?

22       A.     Yes.

23       Q.     Do you think that the hotel rep was

24   laughing at you?

54

1      A.    He was like trying to put the blame on me

2   for the accident.  I'm just -- I drew myself there

3   making no comments, basically biting my tongue because

4   the company says to be cordial with the people, not to

5   be argumentative.  Anyways they have people who know

6   better how to handle that sort.  There is no point in my

7   talking in excess.

8              MS. ACKERSTEIN:  Could I have this marked?

9              (Deposition Exhibit No. 23, complaint,

10             marked for identification.)

11  BY MS. ACKERSTEIN:

12     Q.    Exhibit 23 is a copy of a complaint; it

13  looks like it was filed on your behalf against Wal-Mart;

14  you previously testified about the lawsuit that you

15  brought against Wal-Mart where a can of Pepsi sprayed in

16  your eyes; is this a copy of the complaint?

17     A.    Complaint and demand for trial by jury,

18  and that's the Wal-Mart case?

19     Q.    Yes.

20     A.    Yes.

21             (Deposition Exhibit No. 24, appeal of

22             dismissal, marked for identification.)

23  BY MS. ACKERSTEIN:

24     Q.    Exhibit 24 is a copy of a dismissal -- an

62

1    a picture of the reception desk at United Liquors?

2         A.    Yes, that's how I saw reception area.

3         Q.    Okay, are you in this picture?

4         A.    I am the one to the left waiting behind

5    one who is talking with the receptionist.

6         Q.    Can you point to which one you are, just

7    show me.

8         A.    You are going to see one to the left.  If

9    you are facing the paper to the left of the flower vase.

10        Q.    Right here?

11        A.    Yes.

12        Q.    So you are the person standing?

13        A.    Yes.

14        Q.    To the left of the flower basket on the

15   desk; is that right?

16        A.    Yes.

17        Q.    And on the second page, is this you

18   speaking?

19        A.    Yes.

20        Q.    And you are saying to the receptionist

21   "can I have a job application in Spanish for my

22   neighbor?  What positions do you have?"

23        A.    Yes.

24        Q.    She is talking on the phone?

63

1        A.      She sometimes was talking, sometimes she

2  took the phone and pressed some numbers, but I didn't

3  hear her speaking; it would be -- I'm holding my ear and

4  nothing is happening.

5        Q.      On page 3, is this you to the right

6  standing near the chair?

7        A.      I'm the one standing with a paper on the

8  right hand.

9        Q.      And you have a tie on?

10       A.      I had a tie and I had a suit.

11       Q.      Okay, and you are near the chair, and

12  there are some people standing in the lobby, I guess?

13       A.      Yes.

14       Q.      And she says, "Do you think Spanish people

15  need to speak English to work here?"

16       A.      Yes.

17       Q.      That's what she said?

18       A.      She said practically to any and everybody

19  who walked in and out, "Do you think Spanish people need

20  to speak English to work here?"  That was a joke.

21       Q.      That's the substitute receptionist that

22  you told us about?

23       A.      Yeah, that's the one I later learned was

24  substituting.

68

1   page 1.  What I would like to do -- is it okay with you

2   if we put your initials on you so we know who you are in

3   these pictures?

4           A.     That's okay.

5           Q.     So on Exhibit 25, this is you right here?

6           A.     Yes.

7           Q.     And what initials do you use, B-L-N?

8           A.     You can put B-L just to keep it simple.

9           Q.     So where we put B-L, we are referring to

10  the Plaintiff.  And on the second page, this is you

11  right here?

12          A.     Yes.

13          Q.     I'm going to put B-L next to that.  And on

14  the third page, you're over here with a piece of paper?

15          A.     Yes.

16          Q.     And on the fourth page, is this you over

17  here?

18          A.     Yes.

19          Q.     And on page 5, is this you with the piece

20  of paper and the tie?

21          A.     Yes.

22          Q.     And on page 6, this is you right here?

23          A.     Yes, walking out the door.

24          Q.     So we've put B-L next to the places on the

69

1    paper that indicate the Plaintiff.

2              Now, this is unusual to see a story told

3    like this in art.  I take it you like to draw?

4         A.    Yes, it's good.

5         Q.    And do you think that sometimes you

6    express yourself well in your art?

7         A.    Yes.

8         Q.    And so did you try with these drawings to

9    capture the event as it happened?

10        A.    As it happened, but not as it happened in

11   the moment that I was drawing it and doing it at the

12   same time.

13        Q.    Well, I understand that you didn't draw it

14   while you were in the lobby.

15        A.    Yes.

16        Q.    But when you did draw it, you did your

17   best to do it the way you recalled it?

18        A.    Yes.

19        Q.    And so you think this is a pretty good

20   depiction of what happened?

21        A.    Yes.

22        Q.    Now, I'm going to give you what we marked

23   as Exhibit 8 on the first day of your deposition, which

24   is a copy of the complaint filed in this action, and I'm

80

1      Q.     Let me see if I understand this; before

2   you gave this letter to Kevin Kingston on March 12, on

3   some occasions, when you were working in the warehouse,

4   on Tuesday or Thursday, you simply left early before the

5   end of the shift?

6      A.     I believe so.

7      Q.     And isn't it the case that at some point

8   Mr. Kingston learned about that?

9      A.     Yes.

10     Q.     Isn't it in that context that he said "are

11  you going to get fired for your beliefs" because you

12  were leaving early without permission?

13     A.     Well, I'm not a slave; I don't have to ask

14  permission to my master at that time.  I don't have to

15  ask him can I go and practice what I believe in.  It's

16  very part of the American universal history that says at

17  some time the Nation of Israel was commanded by God to

18  leave.  That's an exodus, actually the name of the book,

19  Exodus, leave, forget about that, come --

20     Q.     But didn't Kevin Kingston tell you that if

21  you left without permission, you are going to be fired?

22     A.     I don't believe Kevin Kingston is about

23  the history of Massachusetts, like Pilgrims.

24     Q.     The question is didn't Kevin Kingston tell

81

1  you if you left without permission, you were going to be

2  fired?

3          A.     He said that I could be fired for leaving

4  to go and pray.

5          Q.     Okay.

6          A.     But Kingston is not above either Exodus or

7  any Bible teaching, the history of Massachusetts, the

8  pilgrim state, so -- the Constitution actually says that

9  there should not be servitude.

10              MS. ACKERSTEIN:  I need to take a short,

11          two-minute break.

12              (Brief recess.)

13  BY MS. ACKERSTEIN:

14          Q.     Okay, Mr. Lugo-Marchant, are you ready?

15          A.     One second.

16          Q.     Okay, getting back to the period of time

17  that you worked in the warehouse, at that period of

18  time, you were a member of the union, correct?

19          A.     Yes.

20          Q.     And you were working under a collective

21  bargaining agreement, isn't that right?

22          A.     Yes.

23          Q.     You knew that when you were called to

24  work, you were called to work for an 8-hour shift?

85

1    you were driving, there were new workers on the

2    seniority list?

3            A.      More or less at the time when I started

4    driving because I got my license; more or less, at that

5    time, they put a number of drivers on the seniority

6    list.

7            Q.      Now, you didn't put any driver's names on

8    a seniority list, did you, that was not your

9    responsibility?

10           A.      Meaning if I give contracts, I assign

11   people to the seniority list, no.

12           Q.      You didn't make the seniority list?

13           A.      If I didn't make, meaning what?

14           Q.      Meaning it was not your responsibility to

15   draw up the seniority list?

16           A.      Let me see if I understand.  I did not

17   decide who was going to be included --

18           Q.      Okay.

19           A.      -- on the seniority list.

20           Q.      And you didn't have any role in promoting

21   anybody to the seniority list?

22           A.      Suggestions, no, nothing, that's not in my

23   scope.

24           Q.      And then you say "later, another group of

86

1 new workers, all white, with no experience with ULL,"

2 what happened to them, they got promoted?

3          A.     Yes, that's what I was told.

4          Q.     So you didn't do it, you don't have

5 personal knowledge; somebody told you this happened?

6          A.     There was this rumor, we're going to

7 promote drivers, we need to train people so they get the

8 license.  I said, "I already have a license, what about

9 me?"  They say nope, nope, nope; they say no on I don't

10 know how many times, and at that time, I was given the

11 knowledge then that the company hired -- what was the

12 number, I don't know, but a number of new drivers.

13          They were put -- basically, open the door,

14 anyone who can work in here, is going to be put, but I

15 wasn't told about that.

16          Q.     That was a rumor going around?

17          A.     I wouldn't say rumor because I don't know

18 if rumor has another implication, but the company, as

19 far as I know at that time, hired a group of drivers and

20 just for applying.

21          Q.     You don't know the background of the

22 drivers?

23          A.     I heard that they were experienced, and I

24 believe they are experienced people.

Page 97

I, MARY JO BOXER, a Notary Public in and for

the Commonwealth of Massachusetts, do hereby certify

that BIENVENIDO LUGO MARCHANT came before me on the 15th

day of December 2006, at the law firm of Jackson, Lewis,

Schnitzler & Krupman, 75 Park Plaza, 4th floor, Boston,

Massachusetts, and was duly sworn to testify to the

truth and nothing but the truth as to his knowledge

touching and concerning the matters in controversy in

this cause; that he was thereupon examined upon his oath

and said examination reduced to writing by me; and that

the statement is a true record of the testimony given by

the witness, to the best of my knowledge and ability.

I further certify that I am not a relative or

employee of counsel/attorney for any of the parties, nor

a relative or employee of such parties, nor am I

financially interested in the outcome of the action.

WITNESS MY HAND this 21st day of December,

2006.

*Mary Jo Boxer*

Mary Jo Boxer                    My Commission expires:

# **EXHIBIT C**

# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

Bienvenido I. Lugo-Marchant
    Plaintiff,
       v.

Peter Tsickritzis, Kevin Kingston,
and United Liquors Limited et al.,
    Defendant

Civil Action No. 05 11317 NMG

## ANSWERS TO INTERROGATORIES

The following answers are to the best of the Plaintiff abilities, knowledge, record and recollection under the pains of perjury and according his best intention. There are some attachments with self explanatory information in order to provide the Defendants more information.

PRODUCTION OF DOCUMENTS

Plaintiff will send the documents to the Defendants as soon as possible and if some new documents are produced will let Defendants know. Plaintiff states that all his documents available at this time will be sent today or tomorrow in a separate envelope.

Bienvenido I. Lugo-Marchant

PRO SE , in forma pauperis

July 27-2006

EXHIBIT
Lugo/Marshal
10/6/06

# INTERROGATORIES

## INTERROGATORY NO. 1

Please state Plaintiff's name, address, date of birth, place of birth, date of arrival

in the United States, marital status, (including spouse's name and date of marriage if applicable),

race, religion and social security number.

1. Bienvenido I. Lugo-Marchant
   19 Grove Street Brockton, MA 02301
   JAN 27-1969    DOMINICAN REPUBLIC — Entered USA (PR) on or about 1973
   Single
   Several races by grandparents: 25% White [unknown if at that time Puerto Rico was part of Spain or US,
                                              or if the Jones Act was in effect]
                                   25% Native American/White [unknown if at that time DR was US
                                              Protectorate],
                                   25% Black-Native; British West Indies,
                                   25% other Europeans/Black; French West Indies

   Jehovah's Witnesses
   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

4

## INTERROGATORY NO. 2

Identify each educational institution Plaintiff attended, and state the dates of attendance, whether Plaintiff received a degree or certificate therefrom, and the nature and the date of the degree or certificate, if applicable.

2. Puerto Rico Public Schools-Department of Education; kindergarden-12th
   Technological Institute of San Juan; between 1986-88, basic computer course
   Interamerican University, San Juan; between 1986-88, math courses      PUERTO RICO
   Instituto de Cultura Puertorriqueña, between 1986-89, arts
   Instituto Nacional de Música, between 1986-88; music
   University of Puerto Rico ("UPR"), 1997 [?] music   B.A.
   Some of these dates are approximated as this interrogatory seeks information that is overly burdensome
   and impossible to calculate and covering a long period of time.

   University of Massachusetts, 2001; language and culture    BOSTON
   Berklee School of Music,    2002; music songwriting    BOSTON
   Northeastern University,    2006; legal training    BOSTON

5

## INTERROGATORY NO. 3

Identify each and every employer, other the United Liquors, by whom Plaintiff has been employed from 1985 to date, and for each such employer, state: the date(s) of commencement and termination of each such employment; the duties performed by Plaintiff for each employer; Plaintiff's rate(s) of pay during each of the above positions, including identification of any raise(s) in pay in connection with any of the positions, with the dates thereof; a summary description of any employee benefits Plaintiff received in connection with each employment; and the reason for the termination or conclusion of each employment, including, but not limited to, a statement of whether the termination of such employment was voluntary or involuntary.

3. Pizza Hut, PR [on or about 1990] duties typical of fast food industry, voluntary ending
   * Water Sewage Authority PR, [1987-88] duties typical of office, voluntary ending
   El Guaynabeño Café', PR [until 1998] duties typical of food industry, voluntary ending
   Alfombras Pizarro, PR [1994-97] duties typical of interior design, voluntary ending
   Self employed, PR [1992-97], performing music at social places, voluntary ending
   *UPR, Bookstore [between 1993-95] duties typical of bookstore
   *UPR, Law School [between 1990-93] duties typical of librarian
   UPR, Disabled Students Library, [1993-97] duties typical of librarian, voluntary work

Some of these dates [*] are approximated and cover work-study experiences as this interrogatory seeks information that is overly burdensome, too broad and impossible to calculate and covering a long period of time. Plaintiff has no record of them except mental vague recollection. Salary is not available as the dates are too old or records are not found anywhere, though diligently sought.

NJ K-Mart, [1990], duties typical of warehouse. Salary unknown

MA, Brockton Public Schools [1999-2001], substitute teaching duties, $75 daily[?]
   ULL [1999-2003] driver' helper until demoted to warehouse work by racist reasons and denied work.
   Horizon Beverages [ "HB", 2004-2005] driver' helper until having work-related accident and given light duty accommodation, then not called anymore for work once Defendants divulged complaints with HB as post-employment retaliation. Salary about $15.00 though not corroborated

6

## INTERROGATORY NO. 5

Identify each and every person who Plaintiff or a representative thereof has contacted or interviewed in connection with this matter, but whom Plaintiff does not intend to call as a witness at a trial of this matter.

5. Lawrence Mehl, Esq., Robert Berger, Esq., David Lindley, Esq., Stephen Ault, Esq., Jackson Lewis, Albert Grady, Esq., Smyth Law Office, Siskind and Siskind Law Office, [see attachment on details, Plaintiff will let Defendants know if new attorneys are consulted]. There are some former coworkers though not seen since termination for unlawful and racists pretexts.

7



Law Offices of
JHN LEE DIAZ

JOHN LEE DIAZ
ATTORNEY AT LAW

801C BELMONT STREET
BROCKTON, MA 02118

TEL (617) 445-7900
FAX (617) 445-8002
TOLL FREE: (888) 445-4378

---

145 Munroa Street, Suite 409
Lynn, MA 01902
Call Phone: 781-
838-1241

BENNETH O. AMADI, ESQ.
Attorney at Law

* Immigration * Personal Injury
* Criminal Defense * General Civil Practice

Phone: 781-581-5144
Fax: 781-581-5145
E-mail: bamadi@gis.net

---

Alec G. Sulmer
ATTORNEY AND COUNSELOR AT LAW

71 LEGION PARKWAY, SUITE 23
BROCKTON, MASSACHUSETTS 02301
TEL
FAX (508) 583-6510
(508) 583-1263
www.disabilityassistance.com

---

SMYTH LAW OFFICES, P.C.

ILLINE VOEGTLIN

The Renaissance
180 Belmont Street
Brockton, MA 02301

Telephone: (508) 580-2300
Telefax: (508) 580-6999
smythlaw.brockton@worldnet.att.net

---

The Commonwealth of Massachusetts
STATE ETHICS COMMISSION

SCOTT E. COLE
SPECIAL INVESTIGATOR

ONE ASHBURTON PLACE
BOSTON, MA 02108

TELEPHONE
(617) 727-0060

---

Member of Liberty Mutual Group

WAUSAU
Wausau Insurance Companies
Riverside Office Park
13 Riverside Drive
Weston, MA 02493
1-800-762-9026, ext. 27812
kevin.kelly@libertymutual.com

Kevin G. Kelly
Senior Field Investigator
Commercial Professional Services

---

OFFICE OF
ALBERT E. GRADY
ATTORNEYS AT LAW

Edward S. Bear Jr.
Attorney At Law

226 Montello Street
Brockton, Massachusetts 02301
(508) 583-8562 • Fax (508) 586-0734

TEL (617) 423-7575
Fax (617) 275-8000

ROBERT O. BERGER
ATTORNEY AT LAW

11 BEACON STREET SUITE 1210
BOSTON, MA 02108

---

Lawrence R. Mehl, Esq.
Of Counsel

Tel. 617-523-0777
Fax 617-523-1755
jlewis4284@aol.com

JOHN N. LEWIS & ASSOCIATES
21 Merchants Row, 5th Floor
Boston, MA 02109

---

FORD, MULHOLLAND & MORAN, P.C.

JOHN KENNETH FORD
Attorney at Law

288 North Main St., P.O. Box 4499, Brockton, MA 02303-4499

Telephone (508) 586-5353    Facsimile (508) 588-8855

---

PAUL T. SHEILS
ATTORNEY AT LAW

10 Tremont St., Suite 300
Boston, MA 02108

Tel: 617-973-0600
Fax: 617-742-1724
Email: PTSheils@aol.com



Stephen Hult 222 8501

Stephen Ault  222 8801

**PAUL T. SHEILS**
ATTORNEY AT LAW

10 Tremont St., Suite 300
Boston, MA 02108

Tel: 617-973-0600
Fax: 617-742-1724
Email: PTSheils@aol.com

Telephone (508) 586-5353          Facsimile (508) 588-8855

**JOHN KENNETH FORD**
Attorney at Law

**FORD, MULHOLLAND & MORAN, P.C.**

288 North Main St. P.O. Box 4499, Brockton, MA 02303-4499

61.972

Nass
-Thanks,
Thank you,
Since I am unable to
Please call at Rossdale

**SMYTH LAW OFFICES, P.C.**

ILLINE VOEGTLIN

The Renaissance
180 Belmont Street
Brockton, MA 02301

Telephone: (508) 580-2300
Telefax: (508) 580-6999
smythlaw.brockton@worldnet.att.net

**JOHN LEE DIAZ**
ATTORNEY AT LAW

801C TREMONT STREET
BOSTON, MA 02118

TEL (617) 445-7900
FAX (617) 445-8002
TOLL FREE: (888) 445-4378

Law Offices of
JOHN LEE DIAZ

**Lawrence R. Mehl, Esq.**
Of Counsel

JOHN N. LEWIS & ASSOCIATES
21 Merchants Row, 5th Floor
Boston, MA 02109

Tel.  617-523-0777
Fax  617-523-1755
jlewis4284@aol.com

**The Commonwealth of Massachusetts**
STATE ETHICS COMMISSION

**SCOTT F. COLE**
SPECIAL INVESTIGATOR

TELEPHONE
(617) 727-0060

ONE ASHBURTON PLACE
BOSTON, MA 02108

**OFFICE OF
ALBERT E. GRADY**
ATTORNEYS AT LAW

*Edward S. Bear Jr.*

Attorney At Law

* Criminal Defense * General Civil Practice
* Immigration * Personal Injury

**BENNETH O. AMADI, ESQ.**
Attorney at Law

145 Munroe Street, Suite 409
Lynn, MA 01902
Cell Phone: 781-

Phone: 781-581-5144
Fax: 781-581-5145
E-mail: bernadi@gis.net

**ROBERT O. BERGER**
ATTORNEY AT LAW

BEACON STREET, SUITE 1210
STON, MA 02108

TEL (617) 423-7575
Fax (617) 423-0008

226 Montello Street
Brockton, Massachusetts 02301
(508) 583-8562 • Fax (508) 586-0734

781-335-1211

### INTERROGATORY NO. 6

Identify each expert witness whom Plaintiff intends to call at a trial of this matter and, for each such expert witness, please provide the following information: his or her name, residential address and business address, the subject matter on which the expert is expected to testify, the substance of the facts and opinions to which the expert is expected to testify, and a summary of the grounds for each such opinion.

6.    No experts at this time

8

### INTERROGATORY NO. 7

If at any time from 1995 to date, Plaintiff attended Bible study classes, for any

such classes: state the dates of attendance; the name and address of the school or church where

the classes are taught; the names of the instructors; and the titles of the classes in which Plaintiff

was enrolled.

7. Objection to term "church", some faiths choose how to call their houses of worship/adoration as mosques, synagogues, cathedral, shrine, temple, church; Jehovah's Witnesses call it Kingdom Hall. Learning is Bible based and has the participation of everyone who attends the meetings [see attachment on courses description and time duration]
   a. 1969-1973 Dominican Republic;
   b. 1973-1998 410 Williams Street San Juan PR
   c. 1998-present 444 Plain Street Brockton, MA

(FRONT)

# FREE BIBLE COURSES AVAILABLE

**PUBLIC MEETING**
A Bible-based discourse on a topic of interest

**WATCHTOWER STUDY**
A question-and-answer discussion of Bible subjects

**THEOCRATIC MINISTRY SCHOOL**
A speaking course featuring Bible teachings

**SERVICE MEETING**
Talks and demonstrations on use of the Bible

**CONGREGATION BOOK STUDY**
A small group discussion of the Bible

__Everyone Welcome    No Collections__

These meetings last 45 min to 1 hour.

9

(BACK)

## Enjoy a Home Bible Course

In addition to the meetings mentioned on the front side of this handbill, publications are available for use in study of basic Bible teachings. One of these is entitled *What Does God Require of Us?* It may be studied privately or with the help of a qualified Bible teacher. One of Jehovah's Witnesses would be happy to assist you in your study free of charge.

*What Does God Require of Us?* is a 32-page brochure that shows clearly what God's purpose is for mankind and provides information from the Bible that highlights what we need to do to receive his approval.

To request a copy without obligation, simply fill in the accompanying coupon and mail it to:

**Jehovah's Witnesses
25 Columbia Heights
Brooklyn, NY 11201-2483**

www.watchtower.org

Name _____

Address _____

City _____ State _____ ZIP Code _____
sf-E 12-03                                    Printed in Canada

## INTERROGATORY NO. 8

Identify each and every individual with knowledge of any facts pertaining to the

allegations in Plaintiff's Complaint and give a detailed description of the facts possessed by each

such person.

8. Objection, Plaintiff can not read people's mind in how they perceive things or pay attention to Plaintiff's nor their appreciation. Other people were affected by the systematic racial disparate treatment the Defendants have as general practice. Other were threathened with termination, laid off for

days, harassment, etc.

Same as Interrogatory #5

10

**INTERROGATORY NO. 9**

Describe in complete detail each item of damage, including amounts, for which

Plaintiff intends to seek recovery at trial, the manner in which such amount has been calculated,

and the specific basis and support for said amount.

9.  JVR Book, websites, newspapers, eeoc-mcad reports. Plaintiff had many years of experience working for the Defendants while people of lighter skin color were promoted in a few weeks and Plaintiff demoted for asking the reason.

Plaintiff had worked since 1999 without negative incident but others were favored irace being a great factor. Also, Plaintiff gave literature to Defendants with concerns. Most drivers (if not all) have a desirable work and living conditions associated with experience, license, etc.





ROUTE CUSTOMER SERVICE DRIVER
- Have CDL B License with no experience?
- Have the ability To lift 60 lbs consistently?
- Possess excellent communication & customer service skills
- Looking for a great opportunity?

✔ Potential yearly earnings$40k-50k/yr
✔ Great Employee programs - Benefits (medical, dental RRSP), uniforms provided, work shoe allowance, incentives, monthly bonuses, etc.

Please Submit Resume by sending to: bostongm@shredit.com
Fax: 781-937-0408

All successful candidates will complete full security clearance.
We are an equal opportunity employer

**Drivers**
Class B CDL

Expected Salary
$60,000 to
$70,000 yearly

Teamster benefits including Pension. Minimum 1 year verified tractor trailer experience, 23 years or older.

Apply in person
LEASEWAY AUTO CARRIERS
98 Sturbridge Rd
Charlton, MA 01507

11

## INTERROGATORY NO. 10

State whether Plaintiff made any efforts to seek new employment following his separation of employment with United Liquors or following his separation from any post-United Liquors employer, and if so, state: the name and address of each potential employer, entity or person to whom Plaintiff made application and the date of each such application and the position for which application was made; the name and address of any employment agency, career counselor or other employment recruiter with whom Plaintiff had contact, including the date and the nature of contact; and identify each and every document reflecting or relating to Plaintiff's efforts to seek new employment, including self-employment, and any independent contractor or consulting work.

10. George Joseph, [Teamster 653 Business Rep']; Mass Rehab Commission; Placement Office; Job Fairs; Online Search , Newspapers , etc.

12

## INTERROGATORY NO. 11

If Plaintiff has a Commercial Drivers License ("CDL"), state the date of the

license; the state which issued the license; and the name and address of any employer for whom

Plaintiff has used that CDL in the course of his employment.

11. ULL [ Defendants]; Horizon Beverages

80 Stockwell Dr  (?)
Avon, MA



MASSACHUSETTS
COMMERCIAL DRIVER'S LICENSE
NUMBER
S97494998
DATE OF BIRTH   CLASS   REST   HEIGHT   SEX
01-27-1969   B   5-10   M
EXPIRES   ISSUED   ENDORSE
01-27-2008   02-03-2003
LUGO-MARCHANT
BIENVENIDO I
19 GROVE ST
BROCKTON, MA
02301-6647

**MEDICAL EXAMINER'S CERTIFICATE**

I certify that I have examined
Bienvenido Lugo
(Print Driver's Name)

In accordance with the Federal Motor Carrier Safety Regulations (49 CFR 391.41-391.49) and with knowledge of the driving duties, I find this person is qualified; and, if applicable, only when

☐ wearing corrective lenses
☐ wearing hearing aid
☐ accompanied by a _____ waiver/exemption
☐ driving within an exempt intra-city zone (49 CFR 391.62)
☐ accompanied by a Skill Performance Evaluation Certificate (SPE)
☐ qualified by operation of 49 CFR 391.64

The information I have provided regarding the physical examination is true and complete. A complete examination form with any attachment embodies my findings completely and correctly, and is on file in my office.

----------------- FOLD -----------------

Cheryl A. Staples, NP          (508) 427-3900
Medical Examiner (Print Name and Credentials)   (Phone No.)

_____  06 29 2005
(Signature of Medical Examiner)              (Exam Date)

106515          MA
(License/Certificate No.)   (Issuing State)

_____  S97494998   MA
(Signature of Driver)   (License No.)   (State)

19 Grove St. Brockton MA 02301
(Address of Driver)

06 29 2007
(Medical Certificate Expiration Date)

13

## INTERROGATORY NO. 12

State whether Plaintiff has previously instituted litigation or administrative charges (such as claims at the Equal Employment Opportunity Commission or the Massachusetts Commission Against Discrimination) against any other company, state, municipality or any other organization by which he was or had been employed or applied for employment. If the answer is in the affirmative, state the date each suit or administrative action was commenced; the name and address of the agency or other forum in which it was commenced; the substance of each such complaint; the outcome or present status of each matter; and identify each and every document upon which Plaintiff relied in answering or which in any way relates to the information requested in this interrogatory.

12. Objection, shotgun approach, no . This interrogatory is not clear in that there seems to be a contradiction in it.

14

## INTERROGATORY NO. 13

If Plaintiff contends that he was unable to work at any time from June 2003, to date due to an injury or other physical ailment, state the condition which disabled Plaintiff; the period of time he was disabled; and the name and address of any physician who treated him during that period.

13. Objection, oppresive, business cards supplied with their information
   Dr. Rina Bloch, New England Medical Center;
   Dr. Mohammed Mumtaz, Brockton Neighborhood Health Center
   Dr. John Doherty, [as mentioned in the Defendants Disclosure]
   Dr. Robert Baritz, Pleasant St Brockton    unknown #
   Brockton Hospital -Emergency

**Rina M. Bloch, MD**
Assistant Professor
Department of Physical Medicine and Rehabilitation

**Tufts-New England Medical Center**

750 Washington Street, Tufts-NEMC #400
Boston, MA 02111
Patient Appts 617 636-3003  Fax 617 636-2551

TUFTS UNIVERSITY SCHOOL OF MEDICINE



**WAUSAU**

**Kevin G. Kelly**
Senior Field Investigator
Commercial Professional Services

Renewed Lugo
Morchan!
Stopped up for
SVR 1:30 pm
Appoinfment

**Wausau Insurance Companies**
Riverside Office Park
13 Riverside Drive
Weston, MA 02493
1-800-762-5026, ext. 27812
kevin.kelly@libertymutual.com

Member of Liberty Mutual Group




Brockton Neighborhood
HealthCenter
157 Main Street
Brockton, MA 02301

PRIMARY CARE SERVICES FOR ALL AGES

Emergencies & Appointments (508) 559-6699
(508) 587-4224 TDD

## INTERROGATORY NO. 14

State whether Plaintiff has previously instituted litigation or administrative charges against any entity which was not described in response to Interrogatory No. 12 because it is not an employer. If the answer is in the affirmative, state the date each suit or administrative action was commenced; the name and address of the agency or other forum in which it was commenced; the substance of each such complaint; the outcome or present status of each matter; and identify each and every document upon which Plaintiff relied in answering or which in any way relates to the information requested in this interrogatory.

Objection, this Interrogatory does not give a clear question as to what they mean. Plaintiff considers this wording, phrasing to be confusive and not calculated as to what Defendants really mean. However, Plaintiff believes (as he was communicated a few times) that Defendants divulged secrets as post-employment retaliation to HB. Plaintiff further believes the Defendants have the tendency of sharing information they consider negative or vindictive.

16

## INTERROGATORY NO. 15

Identify each and every physician, psychiatrist, psychologist, social worker or other healthcare provider whom Plaintiff visited, consulted or received treatment from relative to any physical, mental or emotional condition Plaintiff alleges United Liquors caused. For each physician or other healthcare provider identified, state his or her address; any institutions with which he or she is presently associated or affiliated; any institutions with which the person was associated or affiliated while treating Plaintiff; his or her occupation; his or her area of specialization, if any; the date Plaintiff first consulted that person or entity; the condition for which treatment was sought; the diagnosis that was rendered; the nature of the treatment rendered; whether Plaintiff is presently receiving treatment or consultation from such person or entity; and the cost of treatment.

Same as Interrogatory # 13, Plaintiff further state that Defendants cancelled his medical coverage and promised to "fix it" as long as Plaintiff withdraws claim at MCAD.

diagnostic - forgotten
specialization - unknown
nature of treatment - consistent with injury
cost — unknown
at the present not receiving treatment but being careful and conscious

17

CERTIFICATE OF SERVICE

I certify I served this document to Jackson Lewis on ___July 27___ 2006 by first class postage paid.

Bienvenido I. Cruz - Marchant

Pro se, in forma pauperis

# **EXHIBIT D**



## The Commonwealth of Massachusetts
## Commission Against Discrimination
### One Ashburton Place , Boston, MA 02108
### Phone:  (617) 994-6000 Fax:  (617) 994-6024

| | |
|---|---|
| MCAD DOCKET NUMBER: 03BEM01651 | EEOC/HUD CHARGE NUMBER: 16CA301983 |
| FILING DATE:  06/27/03 | VIOLATION DATE:  06/27/03 |

**Name of Aggrieved Person or Organization:**
Bienvenido Lugo
19 Grove Street
Brockton, Ma 02301
Primary Phone: (508)587-1018 ext. _____

**Named is the employer, labor organization, employment agency, or state/local government agency who discriminated against me:**
United Liquors Ltd.
attn. Human Resources
175 Campanelli Drive
Braintree, Ma 02185
Primary Phone: (800)862-4585 ext. 400_

No. of Employees:        25+

Work Location: Braintree

**Cause of Discrimination based on:**
Creed, Jehovah's Witness, Sabbath Observer;  Creed, Jehovah's Witness, all other;  National Origin, Caribbean Islands;  Race, Color, Race, Color;  Race, Color, Hispanic.

**The particulars are:**
I, Bienvenido  Lugo, the Complainant believe that I  was discriminated against by United Liquors Ltd., on the basis of Creed, Creed, National Origin, Race, Color, Race, Color. This is in violation of M.G.L. 151B Section 4 Paragraph 1; M.G.L. 151B Section 4 Paragraph 1A; M.G.L. 151B Section 4 Paragraph 16A and Title VII.

I commenced employment with the Respondent on or about June, 1999 as a helper to delivery drivers on their routes.  I never had any complaints from the company or clientele regarding my work habits.  I was encouraged by supervisor, Kevin Kingston, warehouse manager, to become a driver after acquiring my permit.  On or about March, 2002, I had shown him my permit to which he answered that it was the best thing that I could have done.  About one year later. I obtained my license to which he answered that he would start me as a driver the next day.  I then started as a driver on a trial basis for the next two weeks.  It was during this time that several of the customers had complained about me.  The reason was speech impediment-they couldn't understand what I was saying.  There was an incident during this trial period in which during an argument about a late delivery, Kevin told me not to speak that way anymore.  I took this to mean my accent or stuttering.  At about this time, six drivers were promoted full time (five were white, one Cuban).  At the end of two weeks, I was told that I would be transferred to the warehouse at $100-$150/day less in pay.  When I requested to be returned to my former position as helper, he refused stating that he was no longer satisfied with my work.  In May, 2003, 10 new white drivers were hired without testing by the company.  After being transferred to the warehouse, I had requested of Kevin Kingston an accommodation for religious purposes.  As I am a practicing Jehovah's Witness, I asked to have an earlier shift on Tues./Thurs. to attend bible meetings and bible book studies.  I also requested not to be required to work on Saturday in order to observe the Sabbath.  The answer was that I could not be granted the request,

LUGO 00186

because I was needed there. I know of 10 Haitians, newly employed, who have been granted religious accommodation by not having to work beyond sundown. I have experienced harassment at the hands of Fleet Manager, Kenneth Montgomery. On several occasions he has asked me when hearing of accidents in various towns, to file an accident report when he knows full well that I no longer drive for the company. This seems to be an ongoing joke.

I swear or affirm that I have read this complaint and that it is true to the best of my knowledge, information and belief.

_____
(Signature of Complainant)

SWORN TO AND SUBSCRIBED BEFORE ME ON THIS DAY of 6/27/2003.

NOTARY PUBLIC: _Kevin Edwards_

SIGNATURE NOTARY PUBLIC: _____
MY COMMISSION EXPIRES: _Jan 24 2008_

LUGO 00187

**EXHIBIT E**

03130|657
Amendment

Aug. 26, 2003

Bienvenido Lugo
19 Grove Sts
Brockton, MA
62301

(508)587-1018

On Aug 26 I went to YLL to submit medical papers to Personnel Office. Nobody was there so Peter Tsieritzis told me to leave it there and leave. I did and proceeded to the reception area, where I was mistreated by the receptionist. Peter came to the area and along with another man yelled at me and warned me not to be there. Peter joked while harassing me for a mispelling and told me "you can't be here" and when I was going to leave blocked my way in a hostile manner. Peter looked erratic and kept mumbling about me with the other employees. I'm not fired as of now. You need to speak English here your accent is bad. I have a CDL license but have been denied to drive. I work in the warehouse, and it's less money. Other guys who drive have not been tested or asked about having a license.

x B. Lugo


RECEIVED
DEC 01 2003
COMMISSION AGAINST
DISCRIMINATION


DEPOSITION
EXHIBIT

15

LUGO 00206

**EXHIBIT F**



**Brockton Neighborhood Health Center**

157 Main Street
Brockton, MA 02301
Phone: (508) 559-6699
FAX: (508) 583-1649
TDD: (508) 587-1224

## Visit Verification

Dear _To Whom it may concern_

This is to inform you that _Mr. Bienvenido Lugo Merchant_
(Patient Name)                                    (D.O.B.) 1/27

☐ has been seen on _12|18|03_ for a physical exam.

☐ is/has been under my care for _medical visit_

☐ is in good health and free from communicable diseases.

☐ may return to school _____

☑ may return to work _____

☐ is current in his/her immunizations.

☐ is under my care and in good health.

☐ unable to participate in gym until _____

☐ may participate in _____

☐ other _____

Limitations/Remarks:

_____

_____

_____

Sincerely,                          12|18|03

                          Brockton Neighborhood Health Center
                          157 Main Street
                          Brockton, MA 02301
                          (508) 559-6699

P - ULL/LUGO 0092

# **EXHIBIT G**

COMMONWEALTH OF MASSACHUSETTS

DEPARTMENT OF INDUSTRIAL ACCIDENTS          BOARD NO. 13201-02

EMPLOYEE:       BIENVENIDO LUGO MARCHANT
EMPLOYER:       UNITED LIQUORS LTD.
INSURER:        WAUSAU UNDERWRITERS
DATE OF INJURY: JUNE 17, 2003

## AGREEMENT TO PAY WITHOUT PREJUDICE

The Parties reached an agreement to resolve this claim by a Payment Without Prejudice pursuant to G.L., C. 152, §19.

The Insurer agrees to pay §34 benefits to the Employee from June 17, 2003 to December 18, 2003 at the weekly rate of 278.21 based on an average weekly wage of 463.69 .

The Insurer agrees to pay outstanding medical expenses which are reasonable, necessary, causally related and not otherwise paid by a collateral source, pursuant to G.L., C. 152, §§13 and 30.

The Insurer agrees to pay an attorney's fee of $893.39 and reimbursement of litigation expenses of $491.78.

It is expressly understood that all payments made pursuant to this Agreement are without prejudice to the rights of all parties and do not constitute an admission of liability by the Insurer.

The approval of this Agreement to Pay Without Prejudice in accordance with G.L., C. 152, §19 does not constitute an "award" or "lump sum settlement" as those terms are used in §§46A or 48 of the Workers' Compensation Act.

_2/25/04_
Date

Bienvenido Lugo Marchant
Employee

_2/12/04_
Date

Leonard Y. Nason, Esq.
Counsel for the Insurer

EXHIBIT
5
Lugo-Nason
10/6/06

P - ULL/LUGO 0122

- 2 -

2/25/04
_____
Date

John K. Ford, Esq.
Counsel for the Employee

Approved By:

2/26/04

_____
Date

Administrative Judge
Department of Industrial Accidents

P - ULL/LUGO 0123

# **EXHIBIT H**

**The Commonwealth of Massachusetts**
**Commission Against Discrimination**
**One Ashburton Place , Boston, MA 02108**
**Phone:  (617) 994-6000 Fax:  (617) 994-6024**

| | |
|---|---|
| MCAD DOCKET NUMBER: 05BEM03324 | EEOC/HUD CHARGE NUMBER: 16CA600423 |
| FILING DATE: 12/20/05 | VIOLATION DATE: 12/01/05 |

<u>Name of Aggrieved Person or Organization:</u>
Bienvenido  Lugo
19 Grove Street
Brockton, MA 02301
Primary Phone: (508)587-1018 ext. _____

<u>Named is the employer, labor organization, employment agency, or state/local government agency who discriminated</u>
<u>against me:</u>
Horizon Beverages
Attn: Director of Human Resources
80 Bodwell Drive
Avon, MA 02322
Primary Phone: (508)584-1110 ext. _____

ENTERED

No. of Employees:        25+

Work Location: Avon, MA

<u>Cause of Discrimination based on:</u>
Disability, Disability, unspecified or general;  Race, Color, Hispanic.

**The particulars are:**
I, Bienvenido  Lugo, the Complainant believe that I  was discriminated against by Horizon Beverages, on the basis of
Disability, Race, Color. This is in violation of M.G.L. 151B Section 4 Paragraph 1, 16 and ADA, Title VII.

Respondent hired me as a driver's helper in September 2004.  I was a per diem employee and would call the Respondent for
any open shifts on a weekly basis.  In December 2004, I suffered and on the job injury when I fractured my finger.
Between December 2004 and February 2005 I was given shifts as a worker in the warehouse.  I was cleared to return as a
driver's helper in February 2005.  On February 2, 2005, I requested another set of shifts and was denied.  I believed at the
time that this was discrimination; however Respondent informed me that I should keep calling back in case something
became available.  I kept requesting work throughout 2005 and was never given any shifts.  In December 2005, I requested
work again, and Respondent told me that they did not want me back.  I believe that I have been discriminated against on the
basis of my race and my work related injury.

I hereby verify, under the pains and penalties of perjury, that I have read this complaint and the allegations contained herein
are true to the best of my knowledge.

(Signature of Complainant)

Dec 20th - 2005

EXHIBIT
Lugo-Marchant

MCAD Docket Number 05BEM03324, Complaint

# **EXHIBIT I**



# MEMORANDUM

TO CASE FILE:    Bienvenido Lugo v. Horizon Beverages
MCAD NO:         05-13-03324
EEOC NO:         16C-2006-00423
# OF EMPLOYEES:  25+
FROM:            Carmen M. Zayas
RE:              Dismissal and Notification of Rights



**DEPOSITION EXHIBIT**
19
12/15/06

## Issues Investigated:

Whether Complainant was discriminated against by Respondent in employment on the basis of his Disability (work related-fractured finger), Race, Color (Hispanic) in violation of M.G.L. Chapter 151B Section 4 Paragraph 1,16, the Americans Disability Act and Title VII of the Civil Rights Act.

## Summary of Findings:

Respondent is a family owned and operated alcoholic beverage wholesaler. Complainant began working for the Respondent on September 8, 2004 as a "casual road spare". According to the collective bargaining agreement, there are three job categories of employees with seniority rights. One is a "list" employee (drivers, day warehousemen and night warehousemen) and four categories of spare workers (regular road spares, night spares and casual road spares and casual night spares). Respondent states that spares are not always needed and some spares are laid off during the winter months (January through March) and there is more regular work from April through December although not always available.

Complainant alleges discrimination in that he was denied shifts during February 2005, even though he was told to continue calling in case something became available. Complainant continued calling throughout 2005.

Investigation reveals that from September through December 2004, when Complainant became injured, he worked a total of 13 days. In addition, other drivers did not wish to work with the Complainant because he was slow and wanted to be paid overtime, whereas, drivers are paid a flat daily rate and any increased hours mean drivers do not get any increase in pay.

Respondent denies all allegations of discrimination, stating that Complainant frequently talked about legal actions that he brought against former employers to supplement his income. Respondent also learned from other workers that Complainant made negative comments and was rated as the worst performer of the "casual road spares". After his injury in December 2004, he was returned to work in the warehouse performing light duty, until cleared to return to his regular work classification. In addition, this position

was a better position and also steady work for Complainant. It was also revealed that while working in the warehouse, there were complaints from workers because Complainant was extremely rude and displayed a negative attitude. These concerns were brought to the attention of Mr. Arrighi, Warehouse Manager.

Investigation revealed that Complainant was cleared to return to work effective February 3, 2005. Prior to this time, Complainant was informed that there was no work available for "casual road spares", and that they were on layoff status, but Complainant continued to call requesting work from February through June 2005.

Investigation reveals that three (3) other drivers were also not offered work because drivers did not want to work with them. Investigation reveals that Respondent does employ other Hispanic workers. Furthermore, because of Complainant's behavior, performance, and work ethic, Respondent decided not to offer work to Complainant and he was eventually placed on a "Do Not Call" list. Investigation also revealed the Complainant previously filed another complaint against another alcoholic beverage wholesale distributor.

Although Complainant disagrees with Respondent's defense, he has failed to provide any evidence in support of his claim and failed to produce evidence showing that Respondent's actions were motivated by prejudice against his race and disability.

Respondent has introduced credible evidence to show that Complainant's performance and attitude were an issue and the reason why he was placed on the Do Not Call list. Respondent has articulated a nondiscriminatory business reason for their actions. For the above reasons, there is insufficient evidence that Complainant was discriminated against by Respondent on the basis of his race and disability. Therefore, a Lack of Probable Cause is recommended.

Carmen M. Zayas
Investigator

Jean A. Clanton
Supervisor

# **EXHIBIT J**



DEPOSITION EXHIBIT



LUGO 00529



LUGO 00530



LUGO 00531

LUGO 00532

