UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Bienvenido I. Lugo Marchant<br>Plaintiff<br>v.<br>Peter N. Tsickritzis, Kevin M. Kingston,<br>United Liquors Limited et al.<br>Defendants | Civil Action No. 05-11317 NMG |

## MEMORANDUM OF FACTS REGARDING THIS ACTION

US Justice Thomas, and may it please the Court ("USSC"), said that "it's incongruous to plead more facts" and that a "short and plain statement of the claim showing that the pleader is entitled to relief" are enough in Swierkiewicz v. Sonema N.A. Opposing counsel did not conference in good faith to resolve or narrow issues. The Plaintiff ("BL", "Mr. Lugo") believes any of these facts is sufficient to prove his claim. There are other material facts, to be disclosed at trial, in relation to Defendant-Tsickritzis ("PT"), Defendant-Kingston ("KK"), collectively ("T-K"), and United Liquors ("UL") as follows:

1. PT harassed BL when BL went to UL to submit medical papers, and later at the lobby, when asking for a job application to be a salesman. PT said that BL *"would never be a regular employee for having a lawsuit against the company"* when demanding him to return a job application while his subordinates joked *about "if Spanish people needed to speak English to work in maintenance"*. Alexis v. McDonald's Rest' 67 F. 341, 352-53 (1st Cir. 1995).

2. PT unsuccessfully tried to persuade BL, through his assistant (Ms. Linley), to "drop the MCAD claim to be promoted" Then, denied BL light duty accommodation, and demanding him to submit "a medical authorization for regular work with no light duty".

3. PT mocked BL at a deposition for religious reasons, *"I didn't know Jehovah's Witnesses can lie, he-he!"* Ms. Ackerstein, Esq., did not tell the whole story in a truthful manner. Whenever she became a lawyer has nothing to do with this action. Mr. Lugo answered accurately that he was not under the influence of anything, though Ms. Ackerstein Esq., could not define something she asked about. *US v. Mancini, 721 F 2d*

1

840, 844 (1ˢᵗ Cir. 1983) PT is also known by his intemperance, and possibly that pushed him to make his comments. *Fed. R. of Evid. 406, US v. Newman, 982 F 2d. 665, 668 (1ˢᵗ Cir. 1992)* BL remembers T-K referring to the owner of the company, and son(s) by their ethnicity, and age in a dishonest manner when worried or solving problems.

4. Mr. Lugo believes that when UL include salacious documents produced by a subsequent employer, Horizon Beverages ("HB"), they fail to admit their influence in terminating BL from that job. *Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F. 3d 86, 96-98 (1ˢᵗ Cir. 1996)*. It seems as if "a silent defendant", as a favor, wrote the documents. In *Fabela V. Socorro Independent School District*, the 5ᵗʰ Circuit reminds BL when HB mentioned, *"the complaints brought against United"* in characterizing BL. *Awan v. Cort Furniture Rental Corp., 85 F 3d 1074 (3d Cir. 1996)* T-K, in opposition to the USSC decision in *Robinson v. Shell Oil Co.*, commented "secrets of people who might bring lawsuits". While working for HB, BL was told that *"United had called"* to interfere with employment opportunities as they also needed experienced drivers. *Moland v. Bill-Mar Foods 1998 WL 65404 (ND Iowa Feb 13, 1998)*

5. Once the Plaintiff claimed a religious accommodation, KK took on himself to even go from his very comfortable office to where the Plaintiff worked, a not so clean area, to harass him. KK continually joked about denying BL's overtime benefits and getting new drivers. *Soileau v. Guilford of Maine, Inc., 105 F 3d 12 (1ˢᵗ Cir. 1997)*

6. KK's malice is seen in that he associated praying and a termination from work for BL's having complained about the new working conditions. *Catrone v. Thoroughbred Racing Assn's of N. America., F. 2d 881(1ˢᵗ Cir. 1991)*. The Plaintiff would like to examine that aspect under the CRA of 1991.

7. On KK praising Mr. Lugo's speaking skills, he shall also remember to submit all the documents authored by Mr. Lugo as this US Court already ordered and not involve the 1ˢᵗ US Circuit in remedying it. *Megwinoff v. Banco Bilbao Viscaya, 233 F. 3d 73, 77 (1ˢᵗ Cir. 2000)*

8. The Defendants had record of Mr. Lugo's request and from that time on retaliated more. *Nereida-Gonzalez v. Tirado-Delgado*, 990 F 2d 701, 706 (1st Cir. 1993)

9. BL and UL know of numerous accidents, and other issues where no driver was fired. In fact, some have been promoted on or about the time when destroying, almost in its entirety, a brand new truck when driving by a low bridge. BL had to stop, according state law, to allow pedestrians the right of way in the sidewalk that separates the Hotel from the paving. The Hotel had a person or electronic device controlling the gate/sliding door. The other one is just a pretext to complement their writing as BL witnessed many accidents and the drivers were not ridiculed. Indeed, BL had to wait for the other car's driver (mentioned in the second accident) but was unable to give the registration as it was missing. Other times, it was commented that several police departments had warned many drivers for unsafe driving practices as some used forbidden roads to finish their runs earlier, blocked public alleys, and double parking.

10. The Plaintiff believes the race aspect has many examples to analyze to prove intent and motive according *Sabree v. United Bhd'. Of Carpenters and Joiners*, 921 F 2d 396, 403-04 (1ˢᵗ Cir. 1990)

11. As a warehouse rumor, some mentioned that PT had a video where a former warehouse manager, Mr. Hannon, was drunk while at work and had him fired. Later, PT shared the video with others to joke about it and the settlement offered in order "to keep him quiet". Another time, it was mentioned (PT's office) that a high financial officer's relative (Iris) drank so much in a corporate party that was fired for her inappropriate behavior. On a driver (Mr. Taverna) who allegedly committed suicide, it was mentioned that "her wife and the divorce was the cause"

[handwritten annotation: BL corrected "his"]

12. While working under Mr. Nagle ("WN"), the Plaintiff had to endure the two faced approach of his supervisor. WN occasionally referred to others with a racial slur. Sometimes, they heard and that caused recurrent friction as the Plaintiff was seen, because his long time with the company in comparison with them, as "his second hand or someone not to be trusted". Still, WN asked BL to give them rides when leaving earlier as they also lived in Brockton. Occasionally, WN asked BL "to take Dexter

3

home on your way to your Bible study" when allowing the earlier dismissal that KK sometimes complained of. BL asked WN why he had to offer them rides with him. On a certain day, WN almost caused a fight at the warehouse, between BL and a co-worker, as some people heard WN using indecent words to refer to them. WN is not the only one using that kind of language when referring to people. *Harris v. Forklift Sys., Inc., 510 U.S. 17 (1993)*

13. T-K intentionally discriminated against BL and claim pretexts as reasons. *St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1992)*. BL believes this can be analyzed according the Civil Rights Act of 1991, as it was obvious their behavior worsened once BL mentioned the possibility of a lawsuit.

14. PT's assistant, Miss Bigney, under a gag, told BL to "take English classes to be promoted"

15. Under the Fed. R. of Evid. 406, evidence of a person's habits, regardless of the presence of eyewitness, is relevant to show conformity with a particular event. On *US v. Newman, 982 F. 2d 665, 668 (1st Cir. 1992)*, the evidence the court wants is the "adequacy of sampling and uniformity of response". PT is well known, and as personal knowledge of BL and others, as a violent person who sometimes gets too confrontational when demanding things. His loud confession to BL, of "never being a regular employee for having a lawsuit against the company" and not correcting other co-workers, was a voluntary one. Fed, R. of Evid. 104(c); Lego v. Toomey, 404 US, 477, 478-9 (1972); *US v. Jackson, 918 F2d. 236, 241 (1st Cir. 1990)*.

16. Whether the collective agreement, referred to in the Defendants' defense is legal, and if so, if it is enforceable within the context of the National Labor Relations Board in *U-Haul Co of California* decided on June 8, 2006, and the US 1st Amendment. No law can be over the US Constitution.

17. On the retaliation aspect, BL opposed the unlawful, and then suffered a demotion, more harassment, and a discharge. BL believes T-K did so as a mixed motive thinking. BL engaged in a protected activity and was retaliated for complaining about discrimination and opposing a retaliatory offer. As an adverse action, T-K refused to give more work

4

to BL, a promotion, though being experienced, and knowing how to get them out of trouble with their respective bosses. As post-termination adverse actions, BL suffered a dismissal from another job very likely at the behest of the Defendants and refusal of jobs in many other places, as decided in *Robinson* v. *Shell Oil Co.,* 519 U. S. 337, 346 (1997).

18. In *Faragher v. City of Boca Raton* and *Burlington Industries, Inc., v. Ellerth* the USSC established the legal framework governing employer liability. In it, the employer is liable after the harassment *"culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment"*. Once BL asked T-K for an explanation/apology about their comments and the reason for not promoting him to a seniority list, after more than 4 years of excellent work, BL was demoted and continually harassed by T-K and others. BL took the lead in trying to persuade T-K to stop their acts. In the end, BL's refusing another reassignment with a tougher supervisor relates to cases where *"an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes"*. As the 1st and 7th Circuits decided the *"pretextual constructive discharge was effected through a supervisor's official act"* as when PT, and Ms. Mansfield offered the Plaintiff another change in presence of Mr. Queto Local 653 steward. *Reed v. MBNA Marketing Systems, Inc.,* and *Robinson v. Sappington.*

19. In *Pennsylvania State Police v. Suders*, a similar situation shows why BL is justified in refusing another reassignment that would have a tougher, authoritarian and more vulgar supervisor. *Meritor Savings Bank, FSB* v. *Vinson,* 477 U. S. 57, 67 (1986); see *Harris v. Forklift Systems, Inc.,* 510 U. S. 17, 22 (1993) It is not possible to work where one must show that the abusive working environment would be so intolerable that resignation qualifies as a fitting answer. BL had no choice but refusing the offer as he also asked Mr. Keimach (a policy maker) to correct PT's misconduct . *Burlington N. & Santa Fe Railway Co. v. White 5 US 259 (2006).* Mr. Keimach was (is) PT's superior, and according some, a source of distress for him as PT also asked BL "why did you have to call him, huh?" The "hot potato issue" was given back to PT to perpetuate the significant change in benefits and failing to promote. T-K shall not assert the Ellerth/Faragher defense.

20. On the tardiness, BL had to wait for his equipment since it was removed or given to other workers before he began his shifts. Other times, he was called to begin work (after 7AM) after work had begun (6:30AM) and then asked "why it took you so long to come?" Leaving later caused BL to face more traffic when beginning, when delivering according the trip sheet, and when finishing work. This shall be analyzed as in *Molnar v. Booth, 229 F 3d 593 (7th Cir. 2000)*

21. If this action is seen as "mixed motive" BL is still the victim. In fact, BL was "singled out" for "intense stalking" by the supervisors when:
    a. Was disciplined more severely than people who did not bring complaints
    b. Was treated less favorably than Whites in benefits-promotion
    c. Supervisors inflated disciplinary records
    d. Supervisors supported with their indifference countless of abuses against the Plaintiff

22. T-K did not provide BL proper documentation of corporate policies, as BL was expected to improvise, ask supervisors, or rely on others' explanations as oral tradition in cultures where there is no written language. For the CDL test, BL had to ask the Massachusetts State Police for advice, as the Fleet Manager was available for some.

23. In *Johnson v. Transportation Agency*, the USSC reminds BL of KK's comment that "one was enough" when referring to a non-white who they promoted when BL asked about his expected promotion.

24. In *Griggs v. Duke Power Co.*, the Court also ruled what can be construed in this action as the new policy of "speaking English".

25. In *Blackie v. Maine, 75 F. 3d 716 (1st Cir. 1996)* T-K "took something from the Plaintiff in a demotion that meant less earnings, and holding an accoutrement of the employee relation". A driver or his helper earns about $250.00 daily (or more) while a warehouse worker earns close to $100.00. *Crady v. Liberty Nat' Bank & Trust of Indiana, 993 F 2d 132, 136 (7th Cir. 1993)*

26. On the Defendants asking "when the Plaintiff learned English", that is a question that no one can answer as no one can certify or state when one learned how to speak any language. There is no such thing as a "certificate of knowing" stating a date. The question is ultimately burdensome.

27. On the Defendants suggesting where to go and when to practice one's faith, they forget that Massachusetts has a rich history of religious tolerance and not one of regulating when to practice one's faith for capricious reasoning. 1st and 10th US Amendment

This is written as personal knowledge of a *pro se in forma pauperis* Plaintiff, and others, and contains facts that shall be admitted as evidence. The Plaintiff is competent to testify to these matters and very respectfully demands, **TRIAL BY JURY**, according his rights under the CRA 1991, CRA 1964, the ADA, and the FMLA.

Respectfully submitted,

Bienvenido I Lugo-Marchant

*Pro se, in forma pauperis*

**CERTIFICATE OF SERVICE**

I hereby certify that on Feb 23 2007, this document was served upon the defendant's counsel, JACKSON LEWIS, by first class mail, postage paid.

7