```
19673                                    F15Y                               Page:  1 of 1
                                                               Account Number:  1100633823
                                                               Statement Date:  02-20-2004
01135137100001100633823   00000000001100633823 00YNF16     Number of Checks:  1




                      BIENVENIDO I LUGO-MARCHANT
                      19 GROVE STREET
                      BROCKTON  MA  02301-6005




          Moving? Did you change your phone number? Please contact us whenever you
          change your address or your phone number. You are important to us.


Account Summary for NOW - 1100633823                                              FEED B
      Starting                Interest                      Service                Ending
      Balance    +  Deposits  +    Paid  -  Withdrawals  -  Charges    =          Balance
       204.00         60.00        0.00        214.00         0.00                  50.00

----------Deposits and Credits for NOW - 1100633823

Date  Description                                                                 Amount
01-28 Deposit                                                                      60.00

----------Withdrawals and Debits for NOW - 1100633823

Date  Description                                                                 Amount
01-21 ATM Withdrawal BROCKTON CREDIT UNION 68 LEGION PARKWAY                      -60.00
      BROCKTON     MA
01-30 ATM Withdrawal BROCKTON CREDIT UNION 68 LEGION PARKWAY                      -20.00
      BROCKTON     MA
02-03 ATM Withdrawal HARBORONE CREDIT UNION 68 LEGION PARKWAY                     -20.00
      BROCKTON     M
02-03 Withdrawal                                                                 -45.00

----------Checks for NOW - 1100633823

Date   Check Number            Amount
01-29        597               69.00

----------Daily Balance for NOW - 1100633823

Date          Balance     Date          Balance    Date          Balance
01-21          144.00     01-29          135.00    02-03           50.00
01-28          204.00     01-30          115.00    02-05           50.00


        EFFECTIVE 4-1-04, THE FEE FOR RETURNED CHECKS AND RETURNED DEBITS FOR
        MONEY MARKET ACCOUNTS, SAVINGS ACCOUNTS, FREE CHECKING, AND NOW ACCOUNTS
        WILL CHANGE TO $24.00.
        EFFECTIVE 4-1-04, THE FEE FOR STOP PAYMENTS WILL CHANGE TO $20.00.
```

19 Grove Street
Brockton, MA 02301

Ms. Alison Hope
Investigator
Massachusetts Commission Against Discrimination
One Ashburton Place
Room 601
Boston, MA02108

RE:    Wascar Williams v. United Liquors, Ltd.,
       Docket No. 03BEM02308

Dear Ms. Hope:

I went to United Liquors Limited (hereinafter referred to as "ULL", "the company") on August 26-2003 to submit medical papers regarding an accident I suffered on June17-2003 while working at ULL. I wanted to know why until that date I had not seen any compensation but non-satisfying explanations from Linley Binge ("Linley", "Ms. Bigney"), Warehouse Personnel Coordinator. I could not reach her. I prefer to fax or mail letters since she lately mocks how I speak. Her assistant Laura Stec ("Laura", "Ms. Stec"), who handles job applications, was not there either. This office has a table for interview and a big sign next to it highlighting: **"...you must READ, WRITE and SPEAK ENGLISH to work... the decision to determine your communication skills is made by the Human Resources Department and all Decisions are final".** Another sign says: **"you'll be given a basic literacy test that includes spelling and math. There are 15 spelling words..."**

I found Peter Tsickritzis ("Mr. Tsickritzis", "Peter"), Director of Operations, at the corridor and he told me to leave any paper in Ms. Bigney's box. Shortly after, I went to the main reception area to take a job application (in Spanish) for a neighbor who wanted to work at ULL. Then, I saw some disturbing actions described as follow.

An unknown man was treated with respect because he spoke English with no foreign accent or peculiarities. As he left I asked the receptionist, who was filling in, ("Jane Secretary", "Jane", "Ms. Jane") for a job application and she ignored me. She ignored me once again. I noticed Wascar Williams ("Mr. Williams") filling a job application. I was the only one at her desk and she had no person on the phone either. I asked her: **"can I have a job application in Spanish, for a neighbor?"** Jane gave me an application and stressed, **"you have to speak English".** I asked her about the stress in English and she looked with pity while sighing at Mr. Williams. I understood that she meant him. I did not speak in any other language.

1

Jane ignored Mr. Williams when he asked her for assistance and about advancement opportunities. At times Jane took the phone and did not talked with anyone on the other line. When I sat she joked about Mr. Williams's ethnicity in a loud manner with every employees passing by provoking laughs; others looked down at him. Jane asked **"Do you think Spanish people need to speak English to work here?"** and **"Do you think Spanish people need to speak English to work in the warehouse?"** while looking at Mr. Williams. She said this looking at me also; that offended me. She kept a smiling face after employees reacted to her blunt jokes. Office employees asked her about her new job and Jane said, **"I just started to like this new job, ha, ha, ha!"** Ms. Jane did not know which positions were available when I asked and offered me **"work in the warehouse ... maintenance"** because **"many Spanish people work there, too"**. Mr. Williams did not like being the center of racially spiced jokes and let her know that was not welcomed. She ignored him sighing with attitude.

Jane laughed at how I spoke **(see footnote)** and I showed my disapproval to that; she did not like my disapproving her actions. At this moment, she made a phone call looking at where I was seated. A tall man ("John") walked down the stairs to the lobby while staring at Mr. Williams and me. After briefly conferencing with Jane, John returned the same way he came staring at us and defiantly asked, **"What's up? everything all right?"** while stopping in the middle of the stairs. John came back a third time with Mr. Tsickritzis. They fixated their eyes on Mr. Williams another person and me. Mr. Tsickritzis asked me, **"Hi, Ben what are you doing here now?"** I answered: **"I came for a job application in Spanish, for a neighbor"** Mr. Tsickritzis told me **"No, we don't have that. I would appreciate if you LEFT!**

---

Sporadically, I stutter as it is a handicap I suffer and aggravates with higher level of stress. Sometimes I can put in practice the suggestions I was given as a patient of Speech Therapy. At times I can control my stuttering; other times nothing at all works. Linguists and Speech Disorder professionals agree in that speech disorders are involuntary, unpredictable and are caused by anxiety and fear. I have many relatives who present this condition; it seems to be hereditary. ULL wants employees with good communication skills. As a helper I did not have to do too much talking. As a driver I have to take the lead. Many times managers have concerns about their delivery or as we comment at ULL *'we have to be extra careful with some of them'*. They may be prone to take things out of proportions or place. Other times honesty is a product of *'breaking arms or being diplomatic'*. This raises the level of stress. Some customers gave me disrespectful attitude when I spoke and my supervisors did not handle that with decency. Others wanted to have my helper talking because he was English monolingual.

Many times I mentioned Mr. Kingston **"managers were rude with me and laughed at how I spoke"**. His answer was **"don't argue with people"**, when I always put up with that. I am the responsible when I drive and if a driver makes a mistake I can be blamed as a non-written rule. I am known for my flexibility and discretion, too.

2

Ms. Jane contradicted Mr. Tsickritzis by saying: **"Laura has other applications for Spanish people... at her office",** causing him to suddenly look at her. She looked intimidated and bowed her head down. I asked Mr. Tsickritzis: **"what happened Peter, am I fired?"** After meditating for an instant he said **"No, but I don't want to see you either. You have a lawsuit against the company and I don't want to see you here, LEAVE!"** Jane looked intimidated and asked me **"Sir, can I have your application back?"** I gave nothing back even though she insisted. John moved to my side and that intimidated me. I assured Mr. Tsickritzis (to calm him down): **"...it's only a difference of opinions, a misunderstanding, I appreciate you Pete"**.

Without showing restraint, Mr. Tsickritzis concentrated on Mr. Williams loudly asking him and another person (while they filled their job applications) **"What are you doing here, huh? Are you with him?"** However, when Jane said **"they are not together, they** (Mr. Williams and another man) **came before him** (me)," Peter suddenly looked at Jane causing her to shyly look down at her desk. Mr. Tsickritzis did not leave time for Mr. Williams to fill his application and yelled **"I don't have all the day for you, come on, when you finish filling that application just give it to me and GO! I can't have you here...alright?"** At times Mr. Williams looked confused while writing. Mr. Williams asked him who he was and that he wanted a little bit of time to finish his application. Mr. Tsickritzis answered: **"I'm the Director of Operations here... give me that application, are you done?"** I asked Mr. Tsickritzis *on what Spanish people would be tested* and *why requiring applicants to pass a Literacy Test in English* when they themselves misspelled the word opportunity (oppoortunity) in an ad giving the chance to buy returned goods. At this Mr. Tsickritzis and Jane joked that **"Oh, this is just a typo ha, ha, ha!"** Mr. Tsickritzis insolently added **"that's only for regular employees, don't worry about it"**.

I left understanding he did not see me as regular after more than 4 years of loyal and excellent service. I volunteered many times to help out so Mr. Tsickritzis would not get in trouble with the Vice-president. I realized too late there was no appreciation.

Two weeks later I saw another co-worker. He was allowed to buy goods despite not being a regular employee. He also felt discriminated. Months after I met his neighbor who was fired, he felt discriminated.

Mr. Williams was given no time to finish his application and the environment was not respectful at all. Ms. Jane interrupted him many times (joking about him), John (with his suspicious looks and hostile attitude) and Mr. Tsickritzis (recklessly determined to torment some people) as he finished his application. He was ordered to leave once he finished his applying for a

3

warehouse job. When he got up, Mr. Tsickritzis put his hands on his hips as expecting something that never happened. Mr. Tsickritzis had some lips movement while Mr. Williams talked, and John kept his eyes on Mr. Williams all the time he was there. Mr. Williams was polite all the time and walked out with his head down after being harassed.

For the most part John maintained intense concentration on Mr. Williams, never letting his eyes stray from him. Mr. Tsickritzis's loudness caused distraction and fear in Jane while John did not appear to be impressed at all. John continued to stare straight towards Mr. Williams and me. Mr. Williams was given a poor opportunity to work .

ULL actively encourages employees to recommend people to apply and work for them. ULL has many employees' relatives working at their premises and that has never been an issue. ULL even posted a sign welcoming new employees/drivers (from a company they recently bought) in which they refer to such ones as "family".

While I entered or exited the premises of ULL Security had a fixation on me. One time the Security lady asked me **"let me see your bag!"** so loud that office personnel were distraught. I gave her my backpack and authorized her to thoroughly search in it. Nothing was found but office staff raised their eyebrows as I waited for the search. Kevin Kingston ("Mr. Kingston" "Kevin"), Warehouse Manager, was at his desk at that moment. I did not have to claim anything since he should have seen and heard everything. Before and after that incident I have taken the lead volunteering for search as it was posted. A worker who does not work at ULL anymore confessed me that a few times office personnel called Security to check me at the door. I never saw that attitude with others. I noticed that Security used to take so much time searching some workers' bags (entering and exiting) that other employees had time to take their punching card from the not so organized rack, punch in and walk in. When receiving my paycheck Security remembered my full name but always asked for ID as posted. Others were given their checks by mentioning their names.

One week I lost one day of paycheck after a new Security harassed me and I made my point. He did not like it, though and took a good look at my name. After I complained of this with payroll they do not pay an extra $2.00 when I take late trucks or the extra hour after crossing the bridge when I drive. I am losing money as ULL combines the rates of salary in one but paying the lesser. I went to the Massachusetts Attorney General for an orientation. ULL pays me less than workers similarly situated.

ULL's attitude was marked by an inexcusable failure to exercise intelligence or sound judgment. ULL had large cardboards boldly stressing the knowledge of English, **"...if you can read this message you can work here"**. Another one says: **"You must READ, WRITE, and**

4

**SPEAK English ... The decision to determine your communication skills is made by the Human Resources Department and <u>all Decisions are final</u>"** and **"You'll be given a basic literacy test that includes spelling and math. There are 15 spelling words"**. ULL does not offer English lessons, communication skills, a pronunciation or phonetics seminar, speech therapy or respect to anyone. ULL uses capital letters when they want. Many times some people employ slang expressions without facing penalties. Many of them do not have education. Sometimes we hear about other workers and why they got fired.

At the previous location, West Bridgewater, there were no signs requiring *'fluency in English'* as a condition to work. I did not see any sign like that back in June1999. At the job interview I was offered **"the chance to be trained as a driver and to make the list"**. I was encouraged **"to learn the runs we have so we like you and can use you more as a helper"**. Ms. Bigney interviewed me and was very respectful and professional. I was respected like the other applicants. When Mr. Williams applied for a job he was not offered advancement opportunities. Ms. Bigney and Ms. Stec were not present. He was ignored when he addressed the fill-in receptionist with some concerns about advancement opportunities. I am not a list driver as of this date.

Mr. Tsickritzis does not keep a proper physical distance with people who disagree with him. One time he told me: **"Hey, what's wrong with you? Do you want to get shot? You can't wear a Budweiser t-shirt in here, Mr. Tye was here just now, take it off!"** I told him I could not take it off **"because I bought it with my own money but would take it off as soon as he'd give me any t-shirt from ULL, even one with his name"**. Mr. Tsickritzis agreed adding: **"Ok, this time *you* win... the next time *I* win"**. Mr. Tsickritzis gave me a bag of Wild Turkey's t-shirts which I appreciated.

I fell once in a slippery stairs at a delivery for ULL. Mr. Tsickritzis warned me with his hand over my sore shoulder **"I already have a little old man suing me, I don't want another lawsuit, I don't think I can't take more. You want to work here... do you understand? Take some days off"**. I heard that about this lawsuit Mr. Tsickritzis might have even been physical with another worker.

William Nagle, supervisor, told me that **"Kevin said 'he's not going to cater all your fancy accommodations...' you know about Mike, the old guy, he got fired... I don't know what you're going to do"**. I told him I had a different view about it. I had discussed that with Mr. Kingston early in March.

I did an overtime and Mr. Kingston threw me the overtime paper to my face. He added: **"take this to your driver, I'm not gonna pay you that... I know you're smarter than what**

**you look like. Get the h... out of here!"** He did not pay me and the next week (when I received my paycheck, next to his office) he laughed in my face asking me **"how's that, brother?"**

After 4 years of working at ULL I still do not know their secret requirements. This seems to be a ridiculous situation where some drivers like me are despised while others are put on the seniority list in 2 weeks or 2 minutes. Others are trained in secret. ULL denied me a promotion and when I asked about it I was demoted. Another driver, older than me, was demoted and later fired after asking Mr. Kingston about not being promoted even though he worked very hard. We were not called according seniority rules by office's instructions.

ULL has too many classless, crass and deplorable people in administrative positions who treat people according their skin color, national origin, disabilities; visible or invisible. These words are to the best of my memory and knowledge and listening. I have worked at ULL since 1999.

**I, Bienvenido I. Lugo-Marchant, authorize Wascar Williams to use this letter.**

Sincerely yours,

Bienvenido I. Lugo-Marchant

On the 23rd of February, Bienvenido Lugo-Marchant appeared before me of his own free act and deed.

Notary Public

My Commission Expires
May 18, 2008

6

20 Auna Drive Apt 4
Brockton, MA 02301

Ms. Alison Hope
Investigator
Massachusetts Commission Against Discrimination
One Ashburton Place
Room 601
Boston, MA 02108

Re:   Bienvenido I. Lugo-Marchant v. United Liquors Ltd.,
      Docket No. 03BEM01651

Dear Ms. Hope:

I applied for a job at United Liquors Limited ("ULL") on August 26-2003 and was treated with disrespect. I identified myself at the Security Office, asked for a job application and was referred to Laura Stec ("Ms. Stec", "Laura") at the Personnel Office. She was not present, only signs saying: **"you must READ, WRITE and SPEAK ENGLISH to work... the Decisions are final"**. When I returned to the front, Security gave me suspicious looks and sent me to the main lobby. The receptionist ("Jane Secretary", "Miss Jane", "Jane") pointed to a name on the wall ("Marie Collins") as hers while saying: **"I'm just filling in today".** I understood 'Marie Collins' was her name. Jane ignored me and laughed when I spoke.

Ms. Jane respected another man because he spoke English with no foreign accent or peculiarities. At that time, Bienvenido Lugo ("Mr. Lugo", "Ben") waited next to him. When he left, Mr. Lugo asked Jane for a job application (written in Spanish) for a neighbor who wanted to work at ULL. Jane ignored Mr. Lugo when he asked her and took the phone. She didn't talk over the phone. Mr. Lugo asked her again for a job application and she ignored him. Nobody else was at her desk.

After a while, she handed him the job application but stressed, **"you have to speak English"** with a pessimistic look. Mr. Lugo asked her in English if she had any in Spanish and she denied so. He asked her **"why that stress in**

1

**English?"** and she looked at me. I felt offended. Mr. Lugo spoke all the time in English.

Mr. Lugo was professionally dressed and well groomed. He asked her about positions currently available at ULL and Jane asked him if he wanted to **"work in the warehouse or maintenance"** adding, **"many Spanish people work there, too"**. Jane asked every passing person **"do you think Spanish people need to speak English to work in the warehouse?"** and **"do you think Spanish people need to speak English to work here?"** After that, some employees looked at Mr. Lugo and me with disrespectful looks and laughs. When Mr. Lugo talked with her at the desk he struggled to say some things and she grinned at him as he stuttered. She sighed in relief once he moved from her desk.

Mr. Lugo sat next to me and shook his head disapproving her disrespectful attitude (Jane saw Mr. Lugo disapproving her). Mr. Lugo looked at the job application he was given, took a magazine found at the reception area and started reading from it as she made a phone call. At once a tall man ("John") came down the stairs and stared at Mr. Lugo, another person and me. John approached Jane and she looked at where we were seated. John left by a door behind her. Immediately, he came back, leaving the same way he came at the beginning. He stopped at the middle steps and asked, **"what's up, everything alright?"** John didn't seem friendly.

Shortly after, John came a third time by a door next to Jane with an older man. Said man, Peter Tsickritzis ("Mr. Tsickritzis", "Pete", "Peter") Director of Operations, addressed Mr. Lugo **"Hi, Ben what are you doing here, now?"** Mr. Lugo answered **"I came for a job application in Spanish... for a neighbor"**. Mr. Tsickritzis said, **"No, we don't have that. I would appreciate if you LEFT! You can't be here"**. Jane contradicted Mr. Tsickritzis saying: **"Laura has other applications for Spanish people at her office"**. Mr. Tsickritzis suddenly looked at Jane and she timidly looked down to her desk. Mr. Lugo asked Mr. Tsickritzis **"what happened Peter, am I fired?"** After an instant Mr. Tsickritzis said **"No, but I don't want to see you here either, you have a lawsuit against the**

2

**company. LEAVE! "**. That made Jane ask Mr. Lugo **"Sir, can I have that application back?"** Her voice was not as loud as before. She asked again extending her hand but Mr. Lugo gave nothing back. At this John moved to Mr. Lugo's side. Mr. Lugo looked intimidated and told Mr. Tsickritzis **"It's only a difference of opinions, a misunderstanding, I appreciate you Pete"**. Mr. Tsickritzis laughed at this and raised his voice more asking Mr. Lugo to leave as he left. Then, Mr. Tsickritzis asked me in a loud manner **"What are you doing here? Are you with him, huh? when you finish filling that application just give it to me and GO!"** Jane answered: "**they are not together** (I and another person who entered before me and applied for a job too) **they came before him** (Mr. Lugo) ". At this Mr. Tsickritzis looked at her and she timidly bowed her head. Mr. Tsickritzis harassed me more rushing me to finish, hand him my application and leaving. He looked agitated in only a few minutes while John seemed passively hostile. Mr. Lugo asked Mr. Tsickritzis why he treated me like that and what it meant to be *"tested in English"* when they had misspelled a word in an announced sale for employees. The word was **opportunity** and ULL had spelled it as **oppoortunity**. That would disqualify me from being hired, though. Mr. Tsickritzis and Jane dismissed that, as **"this is just a typo, ha, ha, ha!"** Mr. Tsickritzis said **"that sale is for regular employees, don't worry about it"** and laughed with Jane and John at Mr. Lugo. At this, Mr. Lugo left disapproving this last joke while Mr. Tsickritzis and Jane stared at him. John kept staring at me, without blinking.

Mr. Tsickritzis angrily looked down at Mr. Lugo when he answered and showed no respect at all. I thought he was going to stop his yelling and hand movements. His companion stood on his side giving me, other people and Mr. Lugo bad looks. Some employees passing by looked at us as if we did something wrong. They didn't laugh anymore, though.

I am OSHA certified and love working hard. I gave Mr. Tsickritzis my job application and I never saw Ms. Stec or Marie Collins when I went to ULL. ULL doesn't offer English lessons, communication skills or respect to anybody. I was the object of many jokes, provocations, intimidating looks and harassment at

3

ULL. None of them was decent or respectful with me. I just wanted to get a job but was given the impression that I didn't belong there. This is not the America I know, colorful... full of the colors I see when I open my eyes. Nobody asked Mr. Tsickritzis or others to volunteer in being rude. Mr. Tsickritzis complicated everything when applying for a job and working is something very natural in America. All the employees I saw where white except for one doing maintenance. I speak English and am willing to be trained for any job I take. I always volunteer to be trained. I wasn't hired. This is how I best remember ULL and applying for a job there.

**I, Wascar Williams, authorize Bienvenido I. Lugo-Marchant to use this letter.**

Sincerely yours,

Wascar Williams

Wascar Williams
Subscribed and sworn to before me
This 25th day of Feb. 2004
By Daura M. Desloches
DARA M. DesRoches
NOTARY PUBLIC
my Comm. Exp. Jan. 17, 2008

4

121 Main Street
Brockton, MA 02301

Ms. Alison Hope
Investigator
Massachusetts Commission Against Discrimination
One Ashburton Place
Room 601
Boston, MA 02108

Re:    Bienvenido I. Lugo-Marchant v. United Liquors Ltd.,
       Docket No. 03BEM01651

Dear Ms. Hope:

      I worked at United Liquors Limited ("ULL", "the company") and was fired after some tension. Bienvenido Lugo Marchant ("Mr. Lugo", "Ben") works very hard and accommodates himself and his schedule to work as needed. Mr. Lugo is loudly called over the intercom almost always by Mark McGill ("Mr. McGill"): **"Ben Lugo to the office! Ben Lugo to the office!"** Most of the time it's for a 'late truck' because he knows many routes and is reliable. A late truck usually means 3-4 stops, 15-20 cases and a couple of kegs. The delivering area is concentrated in one area and leaves the warehouse before rush hour traffic. A late truck for Mr. Lugo means 9-12 stops, more than 150 cases and 3-15 kegs weighing around 165 lbs. The delivering area goes from Cape Cod-South Shore-Boston to Western Massachusetts and usually leaves the warehouse at rush hour traffic. Mr. Lugo is called when we are at break time taking it away from him. Many times his being loudly called over the intercom sounds like he did something wrong, causing other workers to look at him as if he's in trouble. Then, he needs to wait for a supervisor to check the goods and sign him out. Usually this meant waiting more than an hour and having William Nagle ("Mr. Nagle", "Bill"), supervisor, check his goods and send him out. Sometimes, other supervisors are not found delaying his departure.

      One afternoon, Mr. Lugo waited almost two hours for the load to be picked up. The picker had already left for a Celtic's basketball game without leaving notice. Mr. Lugo was harassed for this; the picker, a White employee, was not harassed. Mr. Lugo commented me that, after he explained the delay,

1

Mr. McGill told him: " ...**next time don't come to say that at the office!**"
Kevin Kingston ("Mr. Kingston", "Kevin") Warehouse Manager, didn't like this,
either. Mr. McGill went a few times to the unloading area to give Mr. Lugo
invoices for a late truck and looked desperate as Mr. Lugo talked with him. Mr.
Lugo is expected to stay in the warehouse and work some more after having a
late truck. When Mr. Lugo leaves the unloading area, there is a considerable
decrease in speed and production since he also has to take trucks (more than
40) to the other end of the warehouse. Other times Mr. Nagle or Ken
Montgomery ("Ken", "Mr. Montgomery"), Fleet Manager, reminded him **"to clean
new trucks and put them in the other side to train new drivers/employees
who'd make the list"**. Mr. Lugo was not given indications or expected to be in
the list although he had a CDL license.

Mr. Montgomery came once to the unloading area and talked with Mr.
Lugo about an accident report he owed him. Mr. Lugo showed me a copy he
made for himself. This accident was in Boston. Mr. Lugo told me *"he was
confused... why Ken asked about it when he was practically all the time
in the warehouse and ULL didn't have Wilmington or Reading in their
runs"*. Mr. Montgomery grinned as Mr. Lugo talked with him. I asked Mr.
Montgomery about the CDL I had signed for and he answered, **"I've got others
with seniority waiting"**. I was interested in that training because the company
was growing and needed more drivers. They hired more drivers, though. As far
as I know nobody from unloading area was trained. I was denied training. Some
other workers were denied training, too.

One night Mr. Kingston was looking for Mr. Lugo to shuttle a truck from
Reading or Wilmington. Mr. Lugo had already left to practice his beliefs. Mr.
Nagle could not find Mr. Lugo until the next day.

Mr. Nagle used to comment about Mr. Lugo having a late truck, leaving
early (for religious observances) or not working on Fridays (after midnight). Mr.
Nagle used to ask Mr. Lugo **"how long are you gonna work tonight?"** or **"are
you gonna stay all night long?"**. Sometimes Mr. Lugo stood all night long. At
times Mr. Nagle was called over the intercom and after that he would frantically
ask. **"Did Ben already leave?"** Another time Mr. Kingston called Mr. Nagle (as
it was commented) and Mr. Lugo was harassed for supposedly leaving the cargo

2

light (possibly valued at $0.55) on in a truck. The truck had came at that moment from the road but no one thought about the one driving the truck all day long as responsible. According to comments, Mr. Montgomery alerted Mr. Kingston of this insignificant incident. They could have turned the light off themselves or post a memo about it. I do not remember hearing of that with a white worker. It's normal to turn the lights on inside the trucks to work safely and prevent accidents. Most of the trucks have a 30 minutes timer that turns the lights off as expected. It is common to leave the lights on (on the road), the truck idling or sometimes the 4-way flashers. At that date, ULL had more than 125 drivers and none of them was treated like Mr. Lugo.

Many times we had to wait until late at night **"because a new driver was coming late and we had to unload it"**. New drivers came after Mr. Lugo was sent out and finished a late truck. I never heard of a supervisor harassing a driver for coming late. New drivers laughed at Mr. Lugo when they came back creating a hostile environment. Mr. Lugo was polite all the time. Many drivers had left the warehouse with less than 200 cases at 6:30AM and came after Mr. Lugo. They were not harassed. Some others had more cases, a helper and were not harassed for coming late. Trucks with larger loads were sent to accounts where a merchandiser would take care of the managers' needs. A merchandiser works for Mass Marketers, a division of ULL. Usually, Mr. Lugo was called to take a late truck shortly after beginning the afternoon break and he used to come back most of the time around 10PM. After this he was expected to work some more. Some trucks used to finish after rush hour; many at midnight or later.

On June, Mr. Lugo fell inside of a truck with poor illumination in the cargo area. His arm got cut causing him to bleed, he also walked with a limping on his left leg. He was working next to me. After this accident he worked until break time and then left the workplace. Shortly after, Mr. Nagle was called to the office hurried to talk with Mr. Lugo who seemed to be in pain when leaving. Mr. Nagle made a phone call to the office after talking with him. I've been asked if I've **"seen him in Brockton and when he's coming back"**. Another driver was injured and nobody asked when he was coming back to work. I have not been asked about other people coming back.

3

Mr. Lugo doesn't like wasting time when leaving and is very serious about his faith. Other employees commented about his **"leaving early to go and pray or study the Bible"**. Mr. Lugo told me that he had an agreement with Mr. Kingston about leaving early. Still, Mr. Kingston used to give Mr. Lugo suspicious looks when visiting Mr. Nagle. I was sent home after they saw me (as I kept working) looking at their conversation. When giving me rides, Mr. Lugo wouldn't stop even when I insisted on I buying my soup. I appreciated the rides. He told me *"for cultural reasons it's was normal to take care of elderly relatives"*.

Many times other employees were excused from work because of any and every reason. Others were allowed to leave earlier to practice or display their faith. Some other employees didn't like the shift they had and were changed whenever they pleased. On the contrary, ULL granted a Haitian employee ("Francois") religious accommodation. He was assigned to work away from others and finally got fired in a few days. He talked about discrimination with Mr. Lugo and seemed very serious about his faith. None of them was hired before Mr. Lugo, all began working in 2003.

Mr. Nagle didn't seem happy and commented about Mr. Lugo leaving early. Mr. Lugo left earlier some days of the week to practice his religious belief. Another night we had our break and Mr. Kingston along with Tim Bishop ("Mr. Bishop", "Tim"), loading supervisor, stood out of the break room looking at Mr. Lugo, other employees and me. Their visual angle allowed them to see some employees while they talked. When the break was over, Mr. Kingston (according comments, others said it was Mr. Bishop) called Mr. Nagle over the intercom and told him **"not to allow extra time to Ben"**. Mr. Lugo came back from break with all the ones working at unloading. The supervisors' appreciation was distorted; the clocks at unloading area and break room were not synchronized. When Mr. Nagle took the call Mt. Lugo was already working. Many times, Mr. Lugo met the rest of the crew late at the break room because he wanted **"to leave bay doors open/available for incoming trucks"**, this shortening his break time.

Another night Mr. Bishop loudly complained of **"Ben putting kegs in the cooler"**. Mr. Bishop sent two employees from a distant work area to

4

confront Mr. Lugo about this. Said two employees rushed in riding forklifts faster than allowed inside the warehouse. They ordered Mr. Lugo to **"take the kegs out of there because Tim didn't like that"**. This created a hostile environment when Mr. Lugo did not remove the kegs. Mr. Nagle had sent Mr. Lugo to put the kegs at that area along with others. Mr. Bishop did not mention other workers when complaining to Mr. Nagle. The next day that was commented and Mr. Bishop visited the area giving people attitude and unfriendly looks.

Other times Peter Tsickritzis (" Mr. Tsickritzis", " Peter"), Director of Operations, passed by the break room and talked with supervisors looking at Mr. Lugo, others, and me. Sometimes they sent me home and I took rides with Mr. Lugo.

After an accident, caused by an employee who was fired, ULL had an OSHA related seminar. I had to clear exits with another worker. Mr. Lugo told me he didn't feel capable of handling OSHA regulated equipment because he wasn't trained in that after almost 4 years at ULL.

Many drivers joked and loudly commented about Mr. Lugo not being in the seniority list after working so long at ULL. They asked him **"when are you going back in the road, we need drivers and you know how to work, what happened? Ask Kevin to put you in the list, it's about time!"** Others commented, **"...more new drivers are coming!" "They (ULL) are going to put it in the classifieds"**. Another commented **"hey brother, it seems like you did something wrong, I haven't seen anything like that and I know you work hard"**. Others commented **"Talk to Kevin and tell him to put you in the list!"** Sometimes this sounded like a joke and Mr. Nagle (being next to them) didn't correct that allowing this to continue.

Mr. Tsickritzis subjected me to harassment loudly claiming, **"you're doing drugs here, look at your eyes, you dope!"** threatening to **" you're selling drugs... I'm gonna fire you** (me) **so no one sees you again here"**. I volunteered for a substance test and he declined it. I offered to pay for it so he would stop his harassment and he mocked me more. I didn't see him acting like that with other employees. I thought Mr. Tsickritzis was going to attack me, I could hear him breathing. Mr. Tsickritzis seemed to be getting more than

5

hostile and I had to step back because he came too close. I did not appreciate that.

Security used to thoroughly search me when I entered or exited the building. Security asked me about personal things like my soap, fragrance, extra t-shirt to change after work and my lunch. I didn't see that with White workers carrying bags. At times, security passed by the unloading area talking over their CB radios, giving suspicious looks to some workers, Ben and me. After this Security talked with Mr. Nagle and left. A few times we were warned: **"Peter is watching us all from the Security office"** I never saw Security at the offices.

I was not considered for a CDL training even though I worked hard and signed for it. Mr. Montgomery said: **"...others with seniority were waiting".** Other times he had different excuses. I was sent home many times at half shift once Mr. Nagle had Mr. Kingston, Ms. Linley Bigney (taking notes), Mr. Tim Bishop or Mr. Tsickritzis (suspiciously looking and talking). At times, I saw racist comments in the restroom; I felt offended as a black man. Mr. Tsickritzis posted a memo against graffiti. There was a doll hanging from the wall next to where I worked, like a voodoo doll. Some felt offended; others scared.

I've gone a few times to ULL to ask why I'm denied unemployment benefits ("DET"). I spoke with Kathy Mansfield, Human Resources Vice President, ("Ms. Mansfield") and James Tye, Vice President, ("Mr. Tye") among other people. I answered some of their questions and Ms. Mansfield warned Mr. Tye not to read my papers when he was practically done reading. When I left they gave me beers and liquors and promised me to fix my unemployment.

I'm still waiting for ULL's statement about my MCAD claim. ULL was supposed to mail their response at the deadline but after this meeting apparently changed their mind. I was told at the DET that I was fired because I was involved in illegal activities while working. At a meeting with ULL, days before my hearing at MCAD, I was offered to have my DET benefits as they asked me about Mr. Lugo's claim and other details. Days later I called MCAD regarding my hearing date because of inconveniences in my schedule and was told ULL's representative were absent. I'm still waiting for their answer and my unemployment benefits.

This letter is to my best memory and as I heard commented by other co-workers. Mr. Lugo works very hard and looks for ways to help some more but that is not appreciated. There was a constant interest from office personnel and supervisors from other areas in everything concerning Mr. Lugo. Anything about Mr. Lugo made him the focus of a water cooler conversation. I was fired after Mr. Tsickritzis offended me.

**I, Dexter Simmons Cooper, authorize Bienvenido I. Lugo-Marchant to use this letter.**

Sincerely,

Dexter Simmons Cooper

Subscribed and sworn to before me
This _____ day of _____, _____
By _____
NOTARY PUBLIC
Comm. Exp Dec. 2, 2005

7

**Peter N. Tsickritzis**
**Director Of Operations**

**United Liquors Limited**
**175 Campanelli Drive**
**Braintree, MA 02185**

**Dear Mr. Tsickritzis:**

      I am interested in working at United Liquors Ltd., as before but there is an apparent conflict in the taking your offer. I would like to work at the Maintenance shift or one that does not causes any conflict with what we have under investigation at the MCAD. I will wait for your answer and will expect a change of mind, thanks for your cooperation.

      I consulted with my lawyer and he was unavailable these lasts days but he encouraged me to consult with you a schedule when there is no conflict. Trusting on your usual understanding and kindness I say no more.

**Sincerely yours,**

**Bienvenido I. Lugo-Marchant**

**Friday, February 27, 2004**

**copy to George Joseph,**
**Business Representative**
**Teamsters 653**

James Tye , VP

John Ashcroft, Secretary of Justice
US Department of Justice, EEOC
Federal Building
Boston, MA 02108

Mitt Romney, Governor
Commonwealth of Massachusetts

US Senator John Kerry
US Congress

Thomas F. O'Reilly, Attorney General Office
200 Portland Street
Boston, MA 02108

Alison Hope, Investigator
Massachusetts Commission Against Discrimination
One Ashburton Place, Room 601
Boston, MA 02108

        Re:  **Bienvenido I. Lugo Marchant v. United Liquors Limited**
             **Docket Number 03BEM01651**

Dear Ms. Hope:

        This set of illustrations should complement what is written about United Liquors
Limited and working conditions. The rest of the words are written in another letter

        This is completely accurate and truthful as I witnessed these actions. Nobody was
asked to volunteer in their actions as these graphic representations show. Some of the
comments are abbreviated.

March 5-2004

Bienvenido I. Lugo-Marchant

GAIL M. PLOURDE, NOTARY PUBLIC          3-5-04
My commission Expires May 30, 2008





Mr. Wade
supervisor

General work area for unloading

# Break Room







Brand New truck  with no damage

Truck with considerable damage
after being driven by lower bridge

Working area with doll on the wall

Truck with small dents

John Ashcroft, Secretary of Justice
US Department of Justice, EEOC

Mitt Romney, Governor
Commonwealth of Massachusetts

Thomas F. O'Reilly, Attorney General Office
Commonwealth of Massachusetts

Alison Hope, Investigator
Massachusetts Commission Against Discrimination
One Ashburton Place, Room 601
Boston, MA 02108

Re: **Bienvenido I. Lugo-Marchant v. United Liquors Limited**
**MCAD Docket Number 03BEM01651**

Dear Ms. Hope:

This set of illustrations should complement what is written about United Liquors Limited ("ULL") and working conditions. One of the drawings depicts when Ms. Bigney (Personnel Coordinator), told me that an Asian applying for a job **"needed to speak good English to work here".** That day I went to deliver medical papers and she loudly joked about my communication skills. After that time, I prefer to fax or mail my letters. The other drawing shows how the office was when I went (August 26-03) but found it empty. ULL had signs on the wall 'asking English' as a condition to work there. **"You must READ, WRITE, and SPEAK English to work here.... the decision to determine your communication skills is made by the Human Resources Department and all Decisions are final...", "you'll be given a basic literacy test that includes spelling and math. There are 15 spelling words"** There were more posters in highly visible areas such as the main entrance for employees and applicants. The security window had one almost blocking the pathway to Personnel Office. Some times people applying for a job were told to read that sign before entering..

This is completely accurate and truthful as I witnessed these actions. Thank you in advance for your prompt attention to this matter.

SWORN TO AND SUBSCRIBED BEFORE ME
THIS DAY OF _12th March_, 20 04

Sincerely,

Bienvenido I. Lugo-Marchant

Applicants / Employee's entrance









## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| Bienvenido I. Lugo Marchant<br>    Plaintiff<br>        v.<br>Peter N. Tsickritzis, Kevin M. Kingston,<br>United Liquors Limited et al.<br>    Defendants | Civil Action No. 05 11317 NMG |

## SUPPLEMENTARY DIRECT EVIDENCE, DOCUMENTS OF 2003-2004

      The Plaintiff offers these documents as direct evidence of the sufferings at the hands of the Defendants in a claim filed with the Massachusetts Commission Against Discrimination ("MCAD")

2003  January  24 Spare Company Policy (rate)
      June      26 Two unsuccessful attempts to confer (fax) with Defendant-Tsickritzis ("PT")
                  27 MCAD claim
      July      30 "light duty petition"
      Aug'    18 Contract with attorney
                  18 Hale & Dorr Position Statement
                  29 BlueCross BlueShield note on cancellation
      Sept'   9 Plaintiff's response to Position Statement
      Dec'    1 Letter to MCAD (signed by Hale & Dorr)
                  18 Medical letter to work
2004  Jan'     29 ULL's website encouraging open communication
      Feb'     5 Dept'of Employment ("DET") letter's stating that "I quit on 6-17-2003"
                  6 MCAD's letter asking for rebuttal
                  6 MA Registry of Motor Vehicles; states when Fleet Manager did not help
                  23 West Campello Congregation letter, demanded to supplement rebuttal
                  26 DET confusion caused by ULL
                  27 Letter to PT
      March  9 Letter to PT
                  19 Letter to PT
      April    1 Letter to PT
                  16 Mass' Rehab' Comm' (establishing the Plaintiff as a client of them)
                  16 Letter to MCAD
      May     21 Letter to the Attorney General, MA
      June     9 MA Attorney General's answer
                  21 MA Attorney General's answer, Civil Division
      Sept'  21 Appeal of MCAD's decision
      Oct'    26 MCAD, Lack of Probable Cause

                      Respectfully submitted,

                                            Bienvenido I Lugo-Marchant
                                            *Pro se, in forma pauperis*

## ✎ CERTIFICATE OF SERVICE

I hereby certify that on Feb  23 , 2007, this document was served upon the defendant's counsel, JACKSON LEWIS, by first class mail, postage paid.

# United Liquors Ltd.

## *Wholesalers and Importers*

Date:      **January 24, 2003**

To:        **All Spare Employees**

From:      Peter N. Tsickritzis

Re:        **Spare Company Policy**

*As a spare or on-call employee you must call in every night to see if there is work available for you that evening or the following morning. At the time of the call you will either be offered work, or if there is no work available, you will be considered a "lay off" However, if you do not call in you will be considered not available for work on that day nor laid off.*

*If you don't call in for five consecutive days, with no prior notice to the shipping office, this will be considered a voluntary resignation.*

*To call in for work for the warehouse shift, which is 8:00pm-4:30am , you must call between the hours of 5:00pm-6:00pm, Monday-Thursday. For road work, call between the hours of 8:30pm-10:00pm,Monday-Thursday. You must call 1-800-862-4585 ext. 400.*

*Please be advised the rate of pay for each shift is currently $13.00 per hour. For drivers the rate of pay will be $14.50 per hour, however, that is ONLY if that employee drives that day. If they work in the warehouse or go as a driver's helper the rate will remain at $13.00.*

*Due to your irregular work schedule, we have provided you with a copy of "How to File for Unemployment Benefits." Please retain the copy in your files for future use.*

*For our records, we will file a copy of this with your signature indicating that you were fully informed of our on-call/spare policy and have a clear understanding of the rate of pay for the positions available.*

_____
Warehouse Personnel

03-31-03
_____
Date

_____
DEXTER Simei-Coulter
Spare Employee

```
*********************
***   TX REPORT   ***
*********************
```

TRANSMISSION OK

TX/RX NO               2505
CONNECTION TEL              917813566364
SUBADDRESS
CONNECTION ID
ST. TIME               06/26 14:32
USAGE T                00'46
PGS. SENT              2
RESULT                 OK

---

**facsimile transmittal**

$(781) 356 \cdot 6364$

(ULL)

To:  United Liquors Ltd.          Fax:

From: B · Lago               Date:

Re:  injure.              Pages:

CC:

☒ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle

At the present I'm going to some
medical examinations and would send more
medical papers/documentation. Tomorrow I'll have
another exam.

```
**********************
***   TX REPORT   ***
**********************
```

TRANSMISSION OK

TX/RX NO                  2508
CONNECTION TEL                917813566364347
SUBADDRESS
CONNECTION ID
ST. TIME                  06/26 14:36
USAGE T                   00'33
PGS. SENT                    1
RESULT                    OK

## facsimile transmittal

To: United Liquors Ltd. (ULL) (ULL)
   (781) 356 - 6364     Fax:

From: B. Lugo Marchant     Date:

Re: accomodation -     Pages:

CC:

☑ Urgent    ☐ For Review    ☐ Please Comment    ☐ Please Reply    ☐ Please Recycle



I would like to have my schedul-
accomodated to fulfill some religious observan-
It is not possible to be in two places at the same
but I think there is a chance to accomodate my wo...
.... at ULL.

**The Commonwealth of Massachusetts**
**Commission Against Discrimination**
**One Ashburton Place , Boston, MA 02108**
**Phone:  (617) 994-6000 Fax:  (617) 994-6024**

6/27/2003

RE: Bienvenido Lugo   vs. United Liquors Ltd.
MCAD Docket Number: 03BEM01651
EEOC/HUD Number: 16CA301983

Dear Complainant Party:

Please be advised that the Massachusetts Commission Against Discrimination (MCAD) has assigned to
investigate the above referenced complaint of discrimination.  The Commission's investigator will review
the allegations in the complaint and will keep the parties informed of developments arising from that
investigation.

Please indicate the following by initialing the correct statement:

_____ I am represented by an attorney in this matter. If you initial this statement, you must submit to the
investigator a Notice of Appearance from your attorney within 10 days of the date of this letter in order to
be considered represented by counsel.

_____ I am not represented by an attorney in this matter.

Please note that if your situation changes you must notify the Commission immediately.  Also, failure to
accurately complete this statement may result in your claim being administratively closed for failure to
cooperate with the Commission's investigation.

In order to reduce the time necessary to investigate and resolve complaints of  discrimination, the  MCAD
schedules  an Investigative Conference with the parties  shortly after  the complaint  is filed.  Information
about the Conference is included with this notice.

An Investigative Conference regarding the above complaint will be held at the Commission's  Office, One
Ashburton Place , Boston, MA at  on .  You are required to attend this conference and your failure to do so
will be taken as representing a lack of interest on your part in pursuing this claim.

If you have any questions pertaining to the Investigation, please contact  at .

Very truly yours,

8|25/03 @ 10.30

Investigator

Cc:   ALISON HOPE

# Brockton Neighborhood Health Center

157 Main Street
Brockton, MA 02301
Phone: (508) 559-6699
FAX: (508) 583-4649
TDD: (508) 587-4224

## Visit Verification

Dear _To Whom it may Concern._

This is to inform you that _Mr. Bienvenido Lugo 1/27/69_
    (Patient Name)                                    (D.O.B.)

medical visit

☐ has been seen on _____7 | 30 | 03_____ for a ~~physical exam.~~

☐ is/has been under my care for _____.

☐ is in good health and free from communicable diseases.

☐ may return to school _____.

☐ may return to work _____.

☐ is current in his/her immunizations.

☐ is under my care and in good health.

☐ unable to participate in gym until _____.

☐ may participate in _____.

☐ other _____.

**Limitations/Remarks:**

_Please try to accomodate him for some lighter job. Thank you._

**Sincerely,**

_D. Fuentes_

note.exam

# CONTINGENT FEE AGREEMENT

The Client, **Bienvenido Lugo**, retains John N. Lewis & Associates. to perform the legal services mentioned in paragraph (1) below. The attorneys agrees to perform them faithfully and with due diligence.

**(1)**   The claim, controversy, and other matters with reference to which the services are to be performed are:

Advise in connection with claim filed with MCAD v. United Liquors Ltd., assist in drafting reply to Charged Party's response and in mediation.

**(2)**   The contingency upon which compensation is to be paid is the recovery of any sums, whether by settlement or by litigation.

**(3)**   The Client is not liable to pay compensation otherwise than from amounts collected for him by the Firm, except that the Firm shall be entitled to the reasonable value of its services to the Client in the event of any recovery by any other Attorney or Law Firm on the Client's behalf.

**(4)**   Reasonable compensation on the foregoing contingency is to be paid by the Client to the Attorney, but such compensation (including that of any associated counsel) is not to exceed the following maximum percentages of the gross recovery:

**33 1/3%**        of any and all sums awarded as the result of any settlement

**(5)**   The Client is in any event liable to the Firm for its reasonable expenses and disbursements.

This agreement and its performance are subject to Rule 3:14 of the Supreme Judicial Court of Massachusetts.

Dated: August 18, 2003

BY: _____
          John N. Lewis

_____
Bienvenido Lugo

# HALE AND DORR LLP

COUNSELORS AT LAW

**haledorr.com**

60 STATE STREET • BOSTON, MA 02109
617-526-6000 • FAX 617-526-5000

JULIE MURPHY CLINTON

617-526-6212
julie.clinton@haledorr.com

August 18, 2003

## Via Fax, Hand Delivery
## And First Class Mail

Ms. Allison Hope
Investigator
Massachusetts Commission Against Discrimination
One Ashburton Place
Boston, MA 02108

> Re:   Bienvenido Lugo v. United Liquors, Ltd.;
>       MCAD Docket No. 03BEM01651

Dear Ms. Hope:

In his Charge, Bienvenido Lugo ("Complainant") alleges that United Liquors Ltd. ("United Liquors" or the "Company") discriminated against him on the basis of his race, national origin, color and religion. Specifically, Complainant alleges that because of his race, national origin and color, he was assigned to a warehouse position rather than a position as a truck driver or driver's helper. He also alleges that the Company has failed to accommodate his religion by refusing to assign him an early shift on Tuesdays and Thursdays so that he can attend Bible meetings and by not granting his request to have Saturdays off to observe the Sabbath.

Contrary to Complainant's allegations of discrimination based on his race, national origin or color, Complainant's assignment to a warehouse position was the result of his unsatisfactory performance as a driver during an acknowledged two week trial period. Also contrary to Complainant's allegations, the Company has not refused to grant Complainant religious accommodations. As soon as Complainant made the Company aware of his inability to work on Saturdays due to his religious beliefs, the Company assured him that he would not be required to work on Saturdays and has since ensured that he has not worked on a Saturday. Similarly, the Company has offered Complainant a reasonable accommodation to his request to have Tuesday and Thursday evenings off to attend Bible meetings, even though the Company maintains that Complainant does not possess a sincere religious belief requiring this accommodation.

## I.   BACKGROUND.

### A.   The Company.

United Liquors, founded in 1934, is a liquor, beer, and wine distributor in Massachusetts, with headquarters in Braintree. Presently, the Company serves over 8,500 accounts including

BOSTON   LONDON*   MUNICH*   NEW YORK   OXFORD*   PRINCETON   RESTON   WALTHAM   WASHINGTON

*Hale and Dorr LLP is a Massachusetts Limited Liability Partnership*                    *an independent joint venture law firm*
BOSTON 1720779v3

6,000 on premise restaurants, bars, and hotels, and over 2,500 liquor stores. United Liquors also offers additional services to its customers including custom sign production and assistance with creation of wine lists.

United Liquors employs workers in the warehouse and road divisions of the Company who prepare shipments and deliver these shipments to customers. All United Liquors warehouse and road division employees are represented by the General Teamsters, Chauffeurs, Warehousemen, and Helpers of Brockton and Vicinity, Local Union No. 653 (the "Union") and work under the terms of a negotiated collective bargaining agreement between the Union and the Company (the "Agreement"). United Liquors employs regular employees who are on the seniority list, as well as spare employees who are assigned various positions selected by the Company on an as-needed basis. Spare employees are not included on a seniority list and their daily assignments are based solely on ability, performance and the Company's needs.

In accordance with the terms of the Agreement, regular road division employees bid on a position for each workday as a driver or driver's helper on a particular delivery route. All bidding takes places according to seniority. Following this bidding process, the Company selects spare employees to fill any remaining positions. Every evening, spare employees call United Liquors to find out whether the Company has work for them the next day. If the spare employee is needed, the Company assigns the employee to a shift and position for the next day. Although there are no set schedules or job assignments for spare employees and a spare employee's shift and position can change daily, the Company tends to repeatedly utilize a spare employee on the same shift and in the same position, taking into consideration the employee's skills, experience and the needs of the Company.

In order for a spare employee to work as a driver, the spare employee must have a valid Commercial Driver's License ("CDL"). As a practice, the Company generally does not allow spare employees who have their CDLs to work in positions as drivers' helpers. The Company abides by this policy so that it can use the driver's helper position as a training position for spare employees who are trying to obtain their CDLs and become drivers for the Company. [1]

## B. Complainant's Employment With The Company.

Complainant began his employment with the Company in June of 1999 as a spare employee. The Company repeatedly assigned Complainant to the position of driver's helper, in which he assisted drivers on their routes. As a spare employee, Complainant was supervised by Kevin Kingston, the Company's Operations Manager who oversees the movement of all goods in and out of the warehouse. In addition, Complainant had contact with Kenneth Montgomery, the Company's Fleet Manager who is responsible for overseeing the Company's fleet of trucks, ensuring that the trucks are maintained and insured and that accident reports are filed properly.

---

[1] There are two exceptions to this policy. In the rare event that a driver's helper position is empty and there is no work for a spare employee who usually performs successfully as a driver, the spare employee might be assigned to the driver's helper position. Also, if the Company hires a new spare employee who has a CDL, the Company will initially assign the new employee the position of driver's helper to familiarize the new employee with the Company's paperwork and procedures. However, the Company will not assign a spare employee with a CDL who is unable to successfully perform as a driver to a driver's helper position.

Ms. Allison Hope
August 18, 2003
Page 3

1.    Complainant Obtains His Commercial Driver's License.

United Liquors encourages all of its employees to obtain CDLs and, like many other employees, Complainant sought to obtain his CDL after starting work at the Company. Complainant passed the necessary written examination and received his permit to become a commercial driver in or about March of 2002. The Company was very supportive of Complainant's efforts to obtain his CDL and allowed him to use its trucks when he practiced driving and attempted to pass the commercial driving test. United Liquors employees, including Mr. Montgomery, even took turns accompanying Complainant to his commercial driving tests. After failing the commercial driving test on numerous attempts, Complainant obtained his CDL in or about March of 2003.

On a few occasions, Mr. Montgomery suspected that Complainant hit something while practicing with a Company truck because of the condition of the truck after Complainant's use. On these occasions, Mr. Montgomery asked Complainant if he had an accident while driving. Complainant always denied having any accident and Mr. Montgomery merely reminded him of the need to report any accidents. Contrary to the allegations in Complainant's charge, Mr. Montgomery has no recollection of ever asking Complainant to file an accident report after Complainant stopped driving Company trucks. In any event, to the extent any requests were made, they were not because of Complainant's race, national origin or color, and there is no evidence to suggest otherwise.

2.    Complainant Fails To Perform Adequately As A Driver.

After Complainant obtained his CDL, the Company repeatedly assigned him to a driver position for approximately two weeks. During this time, however, Complainant did not satisfactorily perform the responsibilities of a driver. Complainant consistently took longer than other drivers to complete his assigned route and failed to deliver products on time. The Company received several complaints from customers regarding Complainant's late deliveries.[2] Based solely on his late deliveries and inability to complete routes as scheduled, the Company stopped using Complainant as a spare driver and instead began assigning him to work in the warehouse on the second shift.

3.    Complainant Leaves Work Before the End Of The Second Shift.

Complainant began working the second shift in the warehouse, which is from 2:00 p.m. to 10:30 p.m., but may end earlier or later based on the day and workload. On one Friday evening in March of 2003, the shift ran late and Complainant insisted that he needed to leave at midnight. Complainant did not explain why he needed to leave early. The second shift supervisor, William Nagle, told Complainant that all employees generally stay until the job is done and that he would be disappointed if Complainant left early. When Complainant persisted in demanding that he needed to leave, Mr. Nagle told him that he should do what he felt was necessary. Complainant then left work at midnight.

---

[2] The Company, however, has no knowledge of any complaints regarding Complainant's speech. Furthermore, Mr. Kingston has no recollection of any conversations with Complainant regarding his speech.

Ms. Allison Hope
August 18, 2003
Page 4

> ### 4.    Complainant Informs United Liquors of His Religious Beliefs And United Liquors Accommodates His Beliefs.

The following week, on March 13, 2003, Complainant wrote a letter to United Liquors requesting that the Company accommodate his religious beliefs by not requiring him to work on Saturdays, the Sabbath, and assigning him to an earlier shift or allowing him to leave early on Tuesdays and Thursdays to attend religious instruction. A copy of the letter is attached as Tab 1. When Complainant made his religious beliefs known to the Company, the Company told him that he would never be required to work on a Saturday and that he could leave early in the event that a Friday night shift ran late. In fact, Mr. Nagle even confronted Complainant and asked him why Complainant never told him that he needed to go home because of his religion. Complainant replied that he assumed Mr. Nagle knew of his religious beliefs. Mr. Nagle informed Complainant that, if the situation ever arose again, he should leave work before midnight on a Friday night.

The Company also explained to Complainant that it could not allow him to continuously leave early from a shift because the Company would then need to pay extra for someone to fill in for him and such preferential treatment could lead to a dispute with the Union. In response to Complainant's request to be assigned to an earlier shift on Tuesdays and Thursdays, the Company offered to stop assigning Complainant to a position on the second shift but explained that, as a spare employee, he could not be guaranteed work on a different shift. The Company informed Complainant that, based on his skills and the Company's needs, the Company would probably not be able to assign him a position on an earlier shift. Complainant chose to continue taking assignments to the second shift on Tuesdays and Thursdays. Recently, Complainant has been out of work due to an injury and has been receiving workers' compensation.

## II.    COMPLAINANT CANNOT ESTABLISH THAT HE WAS SUBJECT TO DISPARATE TREATMENT ON THE BASIS OF HIS RACE, NATIONAL ORIGIN OR COLOR.

Complainant has not offered any direct evidence of discrimination based on race, national origin or color. Where there is no direct evidence of discrimination, to prevail on a claim of discrimination, the Complainant must carry the burden under the well-known three-stage burden-shifting standard of analysis. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973) (articulating burden-shifting paradigm in racial discrimination claim). Complainant cannot meet the first prong of the standard of analysis, as he cannot establish a *prima facie* case that he was discriminated against on the basis of his race, national origin or color. Even if the Complainant could establish a *prima facie* case, he cannot prevail because the Company had a legitimate, non-discriminatory business reason for reassigning him, and he can offer no evidence to suggest that this stated reason was a pretext for discrimination.

### A.    Complainant Fails To Establish A *Prima Facie* Case Of Discrimination Based On His Race, National Origin Or Color.

In order to establish a *prima facie* case of discriminatory treatment based on race, national origin or color, Complainant must show that: (1) he is a member of a protected class; (2) he was adequately performing the essential duties of his job; (3) he was the victim of an adverse

employment action; and (4) similarly situated employees not of his protected class were treated differently. Lynch v. Mass. Bay Transp. Auth., 22 MDLR 372, 373 (2000); Santiago v. Dep't of Correction, 22 MDLR 290, 292 (2000); Muhammad v. City of Springfield, 20 MDLR 63, 65 (1998).[3] Complainant cannot establish a *prima facie* case of discrimination based on race, national origin or color because he was not adequately performing the essential duties of his job and he cannot establish that the Company treated him differently than similarly situated employees not of his protected class.

        1.        Complainant Was Not Adequately Performing The Essential Duties Of His Job As A Driver.

During the two week period Complainant was utilized as a driver, Complainant consistently failed to complete deliveries in a timely manner. Regardless of race, national origin or color, if a driver is unable to make deliveries on time, the Company must either terminate the employee or assign the employee to a different position. The Company stopped assigning Complainant to the position of driver and instead assigned him to a warehouse position solely because Complainant was unable to adequately perform the essential duties required of a driver. Therefore, Complainant cannot establish a *prima facie* case of discrimination based on race, national origin or color.

        2.        Complainant Was Not Treated Differently Than Similarly Situated Employees.

Complainant cannot present any comparative evidence to raise an inference that the Company treated others similarly situated to him in all relevant aspects differently and, thus, cannot establish a *prima facie* case of discrimination based on his race, national origin or color. Complainant alleges that the Company hired additional full-time drivers after assigning Complainant to a warehouse position. It is true that, as a result of recent growth, the Company hired additional drivers. The Company's action of hiring additional drivers, however, is not proof of discrimination because the newly hired drivers are not similarly situated to Complainant. Unlike the recently hired drivers whose years of experience with another distribution company demonstrated their ability to adequately perform as drivers, Complainant had only recently obtained his CDL and proved during a two week trial period, that he was unable to adequately perform the essential duties of a driver. The Company assigned Complainant to a warehouse position because of his poor performance as a driver, just as the Company previously assigned a white spare employee to a warehouse position after he was unsuccessful as a driver.

---

[3] The elements necessary to establish a *prima facie* case in employment discrimination cases brought under Massachusetts General Laws, Chapter 151B may vary depending on the specific facts of the case. Wheelock College v. Mass. Comm'n Against Discrimination, 371 Mass. 130, 135 n.5 (1976). The MCAD, however, has required complainants to establish the above elements in cases alleging discrimination based on an adverse employment action.

Ms. Allison Hope
August 18, 2003
Page 6

      **B.**      **Even If The Complainant Established A *Prima Facie* Case Of
Discrimination, His Claim Must Fail Because The Company Assigned Him
To A Warehouse Position For Legitimate, Non-Discriminatory Business
Reasons.**

      When Complainant was utilized as a driver, he repeatedly failed to adequately perform
the essential duties of the position, resulting in his reassignment. The Company has not assigned
Complainant to the position of driver's helper because of its legitimate, neutral policy against
such assignments. Complainant has made no allegations and has presented no evidence to
support a determination that the Company's articulated legitimate, non-discriminatory business
reasons for assigning him to a warehouse position are pretextual and, thus, cannot establish a
claim for discrimination based on race, national origin or color.

## III.    COMPLAINANT'S ALLEGATIONS FAIL TO ESTABLISH THAT THE COMPANY DID NOT ACCOMMODATE HIS RELIGIOUS PRACTICES.

      Complainant alleges that the Company failed to accommodate his religious beliefs by
requiring him to work on Saturdays and by refusing to assign him to an earlier shift or let him
leave early when assigned to the second shift on Tuesdays and Thursdays. In order to establish a
*prima facie* case of religious discrimination based on a failure to accommodate, Complainant
must show that: (1) he had a sincerely held religious belief that required him to refrain from or
abide by certain practices; (2) he informed the Company of this belief; and (3) the Company
refused to accommodate his practices. See, e.g., Rodrigues v. Dep't of Corrections, No. 98 BEM
2296, 2003 WL 21802104, at *12 (Mass. Comm'n. Against Discrimination, June 27, 2003);
Whiteside v. Filene's, 25 MDLR 71, 73 (2003); Estabrook v. Mass. Bay Transport. Auth., 23
MDLR 125, 128 (2001). If Complainant establishes a *prima facie* case, the burden shifts to the
Company to show that it could not accommodate Complainant's needs without incurring an
undue hardship. See, e.g., Rodrigues, 2003 WL 21802104, at *12; Whiteside, 25 MDLR at 73;
Marquez v. Mass. Bay Transport. Auth., 24 MDLR 197, 199 (2002).

      **A.**      **Complainant Fails To Establish A *Prima Facie* Case Of Failure To
Accommodate His Religious Beliefs.**

            1.      Complainant Did Not Have A Sincerely Held Religious Belief Requiring
Him To Attend Bible Meetings On Tuesday And Thursday Nights.

      The Company is only required to accommodate Complainant's sincere religious beliefs.
Estabrook, 23 MDLR at 129. Complainant's actions prior to his assignment to a warehouse
position were inconsistent with his professed belief that he must leave work early on Tuesday
and Thursday nights to attend Bible meetings. When Complainant worked as a driver, his
inability to complete his routes on time often necessitated that he work into the evenings, but he
never requested an accommodation to meet his alleged religious needs. This failure to request an
accommodation undermines the sincerity of Complainant's belief because it shows his
willingness to work on Tuesday and Thursday evenings when working in a position he favored,
despite his religious beliefs. See id. at 130 (finding religious beliefs not sincerely held where
employee previously worked religious holidays without requesting an accommodation).
Furthermore, even if Complainant possesses a sincerely held religious belief requiring him to

attend Bible meetings, there is no evidence that Complainant cannot satisfy this belief by attending Bible meetings at a time when he is not scheduled to work.

        2.     United Liquors Reasonably Accommodated Complainant's Religious Beliefs.

Even though the Company does not believe Complainant's religious beliefs are sincere, the Company has reasonably accommodated Complainant's religious practices. Specifically, since it became aware of Complainant's religious beliefs, the Company has not required Complainant to work on a Saturday. Also, the Company reasonably accommodated Complainant's request not to work Tuesday and Thursday evenings. While the Company is required to provide a reasonable accommodation to Complainant's sincerely held religious beliefs or practices, it is not obligated to provide the specific accommodation requested by Complainant. Id. at 128 (stating any reasonable accommodation is sufficient). The Company has reasonably accommodated Complainant's religious belief by offering not to assign him to the second shift on Tuesdays and Thursdays.

**B.**    **Even If The Complainant Established A *Prima Facie* Case Of Failure To Accommodate His Religious Beliefs, His Claim Must Fail Because The Company Can Demonstrate That It Could Not Accommodate Complainant's Request To Work Partial Shifts Or An Earlier Shift Without Incurring An Undue Hardship.**

The Company cannot guarantee Complainant work on an earlier shift on Tuesdays and Thursdays because he is a spare employee and spare employees are selected for positions on a daily basis based on the employee's skills and experience and the Company's needs. Furthermore, because Complainant is a spare employee, the Company cannot guarantee him any position on a daily basis.

In addition, the Company cannot allow Complainant to leave early from the second shift every Tuesday and Thursday.[4] The Agreement between the Company and the Union requires that any employee who reports for work must be guaranteed a minimum of eight hours work or pay. Therefore, the Company would have three options if it allowed Complainant to leave early. One option would be to operate one worker short for the rest of the shift, requiring the other employees to work harder and longer, likely earning overtime pay due to Complainant's absence. Another option is that the Company could bring in an employee to replace Complainant for the second half of his shift. The Union contract, however would require the Company to pay this employee for eight hours of work, even though the employee would not work eight hours. Finally, the Company could pay overtime to an employee who has already worked eight hours in the day so that the employee could cover the second half of Complainant's shift. In any scenario, the Company would incur an undue hardship if it is required to guarantee Complainant work on an earlier shift, where no work may exist, or leave early on Tuesdays and Thursdays. See New York and Mass. Motor Serv., Inc. v. Mass. Comm'n Against Discrimination, 401 Mass.

---

[4] The Company has no knowledge of the Complainant's allegation that it allows Haitians to leave work by sundown. However, even if this is true, it only evidences the Company's willingness to accommodate its employees' sincerely held religious beliefs.

Ms. Allison Hope
August 18, 2003
Page 8

566, 577-79 (1988) (implying undue hardship may be established by showing that more than a *de minimus* cost would be incurred in accommodating employee's religious beliefs).

## IV.    OTHER AFFIRMATIVE DEFENSES ASSERTED BY UNITED LIQUORS.

In compliance with 804 CMR 1.10(8)(d), United Liquors formally asserts the following defenses in response to the allegations contained in the Complainant's Charge:

1.    Complainant has failed to establish a claim of unlawful discrimination upon which relief can be granted.

2.    Complainant has failed to establish a claim for failure to accommodate his religious beliefs pursuant to which relief can be granted.

3.    United Liquors had a legitimate, non-discriminatory business reason for assigning Complainant to the warehouse position.

4.    United Liquors has complied with all laws and regulations and has otherwise satisfied its statutory obligations to the Complainant under M.G.L., c. 151B.

5.    Without conceding that Complainant has suffered damages as a result of any alleged wrongful act of United Liquors, upon information and belief, he has failed to mitigate his damages.

6.    The Commission should not consider any allegations in the Charge which occurred outside the statute of limitations established in M.G.L. c. 151B, § 5, as they are untimely.

Pursuant to 804 CMR §1.20(5)(c), United Liquors reserves its right to a jury trial.

Ms. Allison Hope
August 18, 2003
Page 9

## V.    CONCLUSION.

Complainant has failed to state a cognizable claim of discrimination on the basis of race, national origin or color. In addition, Complainant has failed to establish a claim of failure to accommodate his religious beliefs. Therefore, the Commission should dismiss Complainant's Charge in its entirety for lack of probable cause.

If you have any questions or require any additional information, please contact me at your convenience.

Very truly yours,

Julie Murphy Clinton

cc:    Mr. Bienvenido Lugo (Complainant)
19 Grove Street
Brockton, MA 02301

Ms. Allison Hope
August 18, 2003
Page 9

## AFFIRMATION

I, Peter Tsickritzis, hereby certify and affirm, under oath, and consistent with 804 CMR §1.10(8)(e), that I have reviewed this Position Statement and that it contains accurate and truthful information to the best of my knowledge.

Peter Tsickritzis
Director of Operations
United Liquors, Ltd.

Sworn to before me this 18th day of August, 2003.

Notary Public

My Commission Expires:
January 31, 2008

To    United Liquors Limited

From Bienvenido Lugo

Re    work schedule

In the interest of working at United Liquors Limited (ULL) I'd like to have my work
schedule to the usual or in the worst case scenario to accommodate it to attend some
religious instructions. Working on Tuesday and Thursdays is not possible for me
(Bienvenido Lugo) because it creates a conflict between my work, cultural habits and
beliefs. I hereby request from ULL the aforementioned petition based on the previous
sentence and the seniority relation when compared to new workers. There would be a
reasonable compensation on workforce not causing undue hardship on ULL.

BL believes the end is near and he needs to be prepared to face it. Attending such regular
meetings would equip him better. Hebrews10:24; **"And let us consider one another in
order to stir up love and good works not forsaking the assembling of ourselves
together, as is the manner of some, and so much the more as you see the Day
approaching"**. At the same time BL needs to medically take care of his elderly mother
following 1Timothy 5:3-4 **"Honor widows who are really widows. But if any widow
has children or grandchildren, let them first learn to show piety at home and to
repay their parents; for this is good and acceptable before God"**. Finishing that shift
so late causes a disruption in that treatment. Finally, BL would like to finish his shift no
later than 12:01AM on Saturdays that being consistent with Exodus 20:8; **"remember
the Sabbath day, to keep it holy"**.

ULL has many new employees who can work in that shift and that will be greatly
appreciated by BL.

March 13, 2003                        Bienvenido Lugo

**BlueCross BlueShield**
of Massachusetts

AUGUST 29, 2003

Identification No.:     5825375000000

BIENEVIDES L MARCHANT
19 GROVE ST
BROCKTON          MA    02301

Dear BIENEVIDES L MARCHANT:

We're writing to let you know that the health care coverage you have been receiving through your employer has ended or is about to end.

However, you may be able to continue this coverage through your employer's group plan under certain conditions for a specified time period. Your employer can tell you more about your options under the Federal government's COBRA provisions or state continuation of coverage law, as well as make premium payment arrangements with you.

If you aren't eligible to continue your coverage through COBRA or other continuation of coverage law, you may be eligible to join one of our nongroup direct payment plans. With these health plans, you can get the health coverage you need, from the name more people in Massachusetts turn to for health care coverage, at a cost far less than you might have thought possible. However, you must apply within 63 days from the time you cease to be covered under your employer's group health plan.

If you do not live in Massachusetts, you are not eligible for enrollment in our nongroup direct payment plans. We can assist you in obtaining information from the Blue Cross and Blue Shield office in your state to find out what nongroup plans may be available.

If you are interested in more information about nongroup direct payments plans, please contact our member service department at 1-800-822-2700. Our member service associates are available to answer your call Monday through Friday, from 8:00 a.m. to 6:00 p.m.

We hope you'll continue to look to us for your health care coverage in the future. Thank you for being a member of Blue Cross and Blue Shield of Massachusetts.

Sincerely,

Louise Daigneau
Member Services
Business Unit Leader

ZCON01
042100
REV7
CHHB

19 Grove Street
Brockton, MA 02301
September 9, 2003

Ms. Alison Hope
Investigator
Massachusetts Commission Against Discrimination
One Ashburton Place
Room 601
Boston, MA 02108

Re:    Bienvenido Lugo v. United Liquors, Ltd., Docket No. 03BEM01651

Dear Ms. Hope:

I am writing this letter to you to respond to the Position Statement sent to you and me by Attorney Julie Murphy Clinton on August 18, 2003.

**1.** For Ms. Clinton to challenge my sincere religious beliefs is outrageous. I take my religion very seriously, and at the next meeting with the MCAD, I will present written proof from my religious organization church elder. I was advised by a lawyer that this may violate Chapter 151B, Section 4 of the Massachusetts General Laws.

**2.** Mr. Montgomery took only one 20 minute break to practice driving with me and sponsored me one time in the examination for the road test. Ms. Clinton would have you believe (Page 3 of her Letter) otherwise. He now leads a driver's course for new drivers; yet he had very little time for me unless I literally begged him and would go at his schedule. Also contrary to the statements made in the letter on Page 3, there have been other drivers who had several accidents, including substantial damage to a new truck; yet they weren't singled out or ridiculed. Sometimes, Mr. Montgomery would make the cross sign on his chest before I drove away.

**3.** On Page 4 of her letter, Ms. Clinton states I have been receiving workers' compensation. This is untrue. I applied for workers' compensation, but have not received any payments.

**4.** Some new employees have asked for a change in schedules for various reasons and were granted their requests. Only I had trouble getting a different schedule.

**5.** When i asked Mark McGill about the religious accommodation needed, he replied "come to work or don't come at all."

**6.** On day when Kevin Kingston berated me in front of office personnel, I tried to explain myself but, due to my speech impediment (stuttering), I had extreme difficulty

caused by the high level of tension. Both Mr. Kingston and his boss, Peter Tsickritzis told me to stop talking like that. Then they smiled.

**7.** A former Haitian employee with strong religious beliefs was rescheduled with no problem; however, he later was fired.

**8.** Ms. Clinton tries to distinguish me from Union employees. She clearly does not know that I also am a member of the Union, and therefore, there is no conflict with the Union.

The evidence shows I have not been treated fairly and have been discriminated against by certain people at United Liquors even though I have been employed there for 4 years, longer than most people in my position. I look forward to presenting my case. Thank you.

Sincerely yours,

Bienvenido Lugo

Ms. Allison Hope, Investigator
Massachusetts Commission Against Discrimination
One Ashburton Place
Boston, MA 02108



Re: Wascar A. Williams v. United Liquors
MCAD Docket No. 03BEM02308

Dear Ms. Hope:

Please accept this explanation of facts to my best recollection. I believe this claim is valid for the following reasons.

I.    a. When I applied for a job, United Liquors Limited (ULL) had a fill in receptionist who declined to identify herself. **"I'm just filling in today"**
b. Said 'fill in' ignored me, although she had no other person present or on the phone.
c. When she handed me the job application, she stressed **"you have to write... read... understand... and speak English to work here, ok?"** without being asked.
d. She joked with everybody about my ethnicity and fluency in a loud manner provoking constant laughs in listeners. **"Do you think Spanish people need to speak English to work in the warehouse?"**
e. When I asked her for assistance she kept her hilarious attitude and did not help at all.

II.    a. A man who suspiciously stared at me, as I finished my application, came a third time with another man who irately asked why I was there.
b. Said companion, Peter, interrupted in a loud manner causing an elevated stress and confusion that led to the alleged dates discrepancies.
c. Peter continued his many questions leaving no time to answer as I struggled to answer the application and Peter. At that time, he became louder **"when you finish filling your application just give it to me and LEAVE !, I can't have you here"**. After this, he struggled to breathe.
d. I asked who he was and Peter answered **"I'm the Director of Operations here"** as he shook his head with his legs spread and hands on his hips.

I have a great interest in working while ULL has a fictitious vision. Apparently, ULL mentions non related facts to create confusion and not recognize their dealings with some people. Mrs. Collins was not present at her desk that day. Ms. Stec was not present and her desk is under Peter's scrutiny as he is the Director of Operations. Peter took my application. There was no privacy nor decency from the employees present when I applied for a job.

Wascar A. Williams

Received on 12/1/03 by Julie Murphy Clinton



# FACTS ABOUT
# NATIONAL ORIGIN DISCRIMINATION

Title VII of the Civil Rights Act of 1964 protects individuals against employment discrimination on the basis of national origin as well as race, color, religion and sex.

It is unlawful to discriminate against any employee or applicant because of the individual's national origin. No one can be denied equal employment opportunity because of birthplace, ancestry, culture, or linguistic characteristics common to a specific ethnic group. Equal employment opportunity cannot be denied because of marriage or association with persons of a national origin group; membership or association with specific ethnic promotion groups; attendance or participation in schools, churches, temples or mosques generally associated with a national origin group; or a surname associated with a national origin group.

## SPEAK-ENGLISH-ONLY RULE

A rule requiring employees to speak only English at all times on the job may violate Title VII, unless an employer shows it is necessary for conducting business. If an employer believes the English-only rule is critical for business purposes, employees have to be told when they must speak English and the consequences for violating the rule. Any negative employment decision based on breaking the English-only rule will be considered evidence of discrimination if the employer did not tell employees of the rule.

## ACCENT

An employer must show a legitimate nondiscriminatory reason for the denial of employment opportunity because of an individual's accent or manner of speaking. Investigations will focus on the qualifications of the person and whether his or her accent or manner of speaking had a detrimental effect on job performance. Requiring employees or applicants to be fluent in English may violate Title VII if the rule is adopted to exclude individuals of a particular national origin and is not related to job performance.

## HARASSMENT

Harassment on the basis of national origin is a violation of Title VII. An ethnic slur or other verbal or physical conduct because of an individual's nationality constitute harassment if they create an intimidating, hostile or offensive working environment, unreasonably interfere with work performance or negatively affect an individual's employment opportunities.

03130|657
Amendment

Aug. 26, 2003

Bienvenido Lugo
19 Grove St,
Brockton, MA
62301
(508) 587-1018

On Aug 26 I went to YLL to submit medical papers to Personnel Office. Nobody was there so Peter Tsieritzis told me to leave it there and leave. I did and proceeded to the reception area, where I was mistreated by the receptionist. Peter came to the area and along with another man yelled at me and warned me not to be there. Peter joked while harassing me for a mispelling and told me "you can't be here" and when I was going to leave blocked my way in a hostile manner. Peter looked erratic and kept mumbling about me with the other employees. I'm not fired as of now. You need to speak english here your accent is bad. I have a CDL license but have been denied to drive. I work in the warehouse, and it's less money. Other guys who drive have not been tested or asked about having a license.

x B.Lugo



RECEIVED
DEC 01 2003
COMMISSION AGAINST
DISCRIMINATION

**Brockton Neighborhood
Health Center**

*157 Main Street
Brockton, MA 02301
Phone: (508) 559-6699
FAX: (508) 583-4649
TDD: (508) 587-4224*

## Visit Verification

Dear _To Whom it may concern_

This is to inform you that _Mr. Bienvenido Lugo Merchant_
          **(Patient Name)**          **(D.O.B.)** 1/27

❏ has been seen on _12|18|03_ for a ~~physical exam.~~ medical visit.

❏ is/has been under my care for _____

❏ is in good health and free from communicable diseases.

❏ may return to school _____

☑ may return to work _____

❏ is current in his/her immunizations.

❏ is under my care and in good health.

❏ unable to participate in gym until _____

❏ may participate in _____

❏ other _____

Limitations/Remarks:
_____
_____
_____

           _M. Munton_
           12|18|03
           Brockton Neighborhood Health Center
           157 Main Street
Sincerely,          Brockton, MA 02301
           (508) 559-6699
_____

note.exam



click logo to
return to home
page

Search for a Job

Job Listings

Submit a
Resume

Employment
Policies

## Employment Opportunities

### Our customers are number one... our employees are our competitive advantage!

**As one of New England's largest liquor, wine and beer distributors, we have an established commitment to provide quality products, and exceptional service to our customers and to foster an atmosphere of personal and professional growth for our employees.**

**We encourage an environment of trust and open communication. Our management team is progressive, aggressive, and always thinking outside the box. As positions become available, we are looking for people who are truly outstanding...in character, ability and talent.**

**The pace of change, the scope of opportunities, the intensity of competition and, very importantly, the need for leaders has never been as great as it is today. As opportunities open we will be looking to those individuals who will fit into this philosophy and help us continue to grow the organization.**

**Our common commitment to core values and pride in achievement has always been our greatest strength. Within the framework of diversity and individualized talents, our values unite us.**

**We invite you to visit our site often...**

**Take a closer look at us. You'll like what you see!**

**Please visit us again; at this time we have no current openings.**

```
UQS019                        EMPLOYMENT HISTORY DETAIL                  02-05-04 10:17

LO: 36-0  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  004  LUGO          BIENVEN     ST: MA    BYB: 12-28-03
DET NBR: 00-824080        REPLACED DET:                SIC/NAICS CODE : 424820
FED NBR: 04-1923720       REPLACED FED:                    IP EMP       ? Y
EMP NAME: UNITED LIQUORS LTD              SEAS-EMP: N SCHOOL EMP   ? N
EMP ADDR:                                      P O BOX 859219
CITY: BRAINTREE            ST: MA  ZIP: 02185-0000  PHONE: 000-000-0000
CONTACT:                      PH:                  ER AGT:              COM?
1062 REC'D    ? Y        WAGE CODE  : S         WAGE SOURCE    : W
FORM TYPE    : 1         PRINT CODE : P         WAGE ENTRY LO : 36
CHARGE DATE   : 00-00-00 CHARGE CODE: N         LATE RULING    :
EMP START DATE : 07-01-99 CHARGE TYPE: C        ORG CODE       : 05
EMP END DATE  : 06-17-03 EXTENDED BP? N         EMP CONTRIB    ? Y
RECALL EXPECTED:          RECALL DATE?           PEN/FICA REC'D?
FORM MAIL DATE : 01-05-04 586 ACTION : 00-00-00   586 RESOLVED  : 00-00-00
FORM POSTMARK  : 01-15-04 SEP REASONS: EMP: Q  CLT: L  UCX:    GRADE:
WR WAGE ACCEP. : Y         MULTI-LOC EMP: N            OTHER PAY? N
  XX-XX-XX   10-01-02  XX-XX-XX   01-01-03   04-01-03   07-01-03   10-01-03
  XX-XX-XX   12-31-02  XX-XX-XX   03-31-03   06-30-03   09-30-03   12-27-03
T            4624.02              5680.90    4138.16
A            4624.02
              NEXT TRAN:  _____  _____  *
I0518 NO MORE RECORDS TO DISPLAY
```

UQS027                           SIGNING DATA SUMMARY                    02-05-04 10:18

LO: 36-0   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   004   LUGO              BIENVEN      ST: MA   BYB: 12-28-03

MOST REC EMPLOYER: 00-824080 XC: N   ISS: 01    BYE: 12-25-04        CREDIT: 5199
UNITED LIQUORS LTD                   APP PEND? N POP:                R-BAL:  5199
 ST DTE: 07-01-99   CURR P/E EMPS     CURR DISQ      ADJ PROC:       BENRTE:  198
SEP DTE: 06-17-03   1:                FR: 00-00-00   MON CMPLT? Y     DA AMT:    0
RO W/E:             2:                TO: 00-00-00   BP USED: PRI      PENS:     0
                    FILE CHOICE: M    CMMTS:  - -    TAX WITH?  /     OFFSET:    0
RO REAS:   /STAT:  PIN STAT: PENDING FYI: 00-00-00   SPEC MON?        CHLD S:    0
PROF/PERM SEP   :X HEALTH INS?        WORKSHARE? N     TEUC-A?        PAYRTE:   198

 SN          SIGNING      CODES              LOST    NET     NET    P AJ CHECK   CHECK
  # W/E DATE DATE     M T P  CD    P/E        TIME   BEN      DA    G CK  BEN     DA

  4 01-24-04 01-29-04 M S 07 00   0.00       0.00   0.00    0.00 R N   0.00     0.00
  3 01-17-04 01-29-04 M S 07 00   0.00       0.00   0.00    0.00 R N   0.00     0.00
  2 01-10-04 01-15-04 M S 07 00   0.00       0.00   0.00    0.00 R N   0.00     0.00
  1 01-03-04 01-15-04 M S 07 00   0.00       0.00   0.00    0.00 R N   0.00     0.00


                NEXT TRAN: _____   _____   *
I0518 NO MORE RECORDS TO DISPLAY



**THE COMMONWEALTH OF MASSACHUSETTS**
**COMMISSION AGAINST DISCRIMINATION**
ONE ASHBURTON PLACE, BOSTON, MA 02108-1518



Mitt Romney
Governor

Kerry Healey
Lieutenant Governor

Eric A. Kriss
Secretary

Dorca I. Gómez
Chairwoman

Walter J. Sullivan, Jr.
Commissioner

Cynthia A. Tucker
Commissioner

February 6, 2004

Bienvenida Lugo
19 Grove Street
Brockton, M 02301

RE:      Lugo v. United Liquors, LTD.
MCAD No:  03BEM01651

Dear Mr. Lugo:

Respondent filed its position statement on August 18, 2003, and a copy has been forwarded for your preview. Now that you have received Respondent's position statement, you are required to submit a written rebuttal, to my attention only, within twenty-one (21) days upon receipt.

Your rebuttal is your response to Respondent's position statement you may include documentation as evidence to support your claims. *Your rebuttal is now due in or around September, 2003.*

If by the expiration of the date noted above, I do not hear from you, please be advised that a final disposition on this matter may be submitted to the Investigating Commissioner without the benefit of your Rebuttal to the Respondent's statements.

If you have any questions please feel free to contact me at (617) 994-6085. Thank you in advance for your prompt attention to this matter.

Sincerely,

Allison Hope
Investigator, *Pro Se 1*

```
SCREEN PRINT TRANSACTION_ID: CP2616BCGEBR010403701358218
02-06-2004 13:58    MASSACHUSETTS REGISTRY OF MOTOR VEHICLES              UGB0030
                                   EXAM HISTORY
 FUNCTION: EH    MSG: EXAM HISTORY DISPLAYED

LICENSE#: S97494998    STATE: MA     SS#: 582537509

NAME L: LUGO-MARCHANT    F: BIENVENIDO   M: I         DOB: 01/27/1969
   SEX: M        HEIGHT: 5 10

  LOCATION                  DATE    TIME    EXAM TYPE              RESULT    PAID
OTIS AFB                  01/23/2003 10:30 ROAD CDL CLASS B       PASSED      Y
METHUEN ARMORY            01/16/2003 07:30 ROAD CDL CLASS B       FAILED      Y
STERLING DPW              01/09/2003 09:00 ROAD CDL CLASS B       FAILED      Y
DARTMOUTH DPW             01/07/2003 10:30 ROAD CDL CLASS B       FAILED      Y
DARTMOUTH DPW             12/27/2002 12:30 ROAD CDL CLASS B       NOSHOW      Y
EVERETT MBTA YARD         12/16/2002 09:00 ROAD CDL CLASS B       FAILED      Y
OTIS AFB                  12/05/2002 07:30 ROAD CDL CLASS B       NOSHOW      Y
METHUEN ARMORY            11/18/2002 12:30 ROAD CDL CLASS B       FAILED      Y
OTIS AFB                  10/16/2002 10:30 ROAD CDL CLASS B       CANCEL-V    Y
STOUGHTON DPW             09/12/2002 09:00 ROAD CDL CLASS B       FAILED      Y
METHUEN ARMORY            08/12/2002 10:30 ROAD CDL CLASS B       NOSHOW      Y
STOUGHTON DPW             07/09/2002 09:00 ROAD CDL CLASS B       NOSHOW      Y
BROCKTON                  03/28/2002 16:30 CDL AIR BRAKES         PASSED
BROCKTON                  03/26/2002 14:30 CDL AIR BRAKES         FAILED
```

*West Campello Congregation*
*of Jehovah's Witnesses*

*Kingdom Hall Address*
*444 Plain Street*
*Brockton, MA*
*02402*

*Mail: c/o Norman Soule*
*380 Hillberg Avenue*
*Brockton, MA*
*02401*

February 23, 2004

To Whom It May Concern:

This letter is to affirm that Bienvenido Lugo has been a member of the West Campello Congregation of Jehovah's Witnesses for five years since his arrival from Puerto Rico.  It is his custom to attend the weekly meetings of the congregation which are arranged as follows:

| | |
|---|---|
| Public Talk and Watchtower Study | Sunday 3:00-5:00 pm |
| Theocratic Ministry School and Service Meeting | Tuesday 7:30-9:15 pm |
| Congregation Book Study | Thursday 7:00-8:00 pm |

This, or a similar schedule, is followed by over 6 million Witnesses worldwide.  It is fundamental to their belief in the importance of regular spiritual instruction in harmony with the inspired admonition...

> *"Let us be concerned for each other, to stir a response in love and good works.*
> *Do not stay away from the meetings of the community, as some do, but*
> *encourage each other to go."*     *- Hebrews 10:24, 25 (Jerusalem Bible)*

We look forward to Bienvenido's continued attendance and participation at upcoming congregation meetings.

Sincerely,

*Norman Soule*

Norman Soule
Presiding Overseer

## REQUEST TO CLAIMANT TO RESPOND BY TELEPHONE

Post Office Box 7000
Brockton, MA 02303
(508) 894-4759
Fax # 508-894-6678

DATE: February 26, 2004

BIENVEN LUGO
19 GROVE STREET,
BROCKTON, MA 02301-6005

**CLAIMANT:** BIENVEN LUGO                    SS#: 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

ADDITIONAL INFORMATION VITAL TO THE ABOVE-MENTIONED CLAIM MUST BE OBTAINED
BEFORE A DETERMINATION ON ELIGIBILITY CAN BE MADE.

PLEASE CONTACT ME IMMEDIATELY AT THE TELEPHONE NUMBER LISTED ABOVE BETWEEN THE
HOURS OF 9:00 AM AND 4:00 PM.

IF YOU FAIL TO RESPOND BY **03/03/04,** A DETERMINATION WILL BE MADE UPON THE
INFORMATION CURRENTLY AVAILABLE, AND YOU WILL BE NOTIFIED OF THAT DETERMINATION
BY MAIL.

**IF YOU HAVE ALREADY MADE A STATEMENT BY PHONE PLEASE IGNORE THIS NOTICE.**

**A STATEMENT REGARDING YOUR SEPARATION IS NEEDED. PLEASE CONTACT ME NO LATER
THAN THE DATE ABOVE.**

                              _____**DOREEN LANGIS**_____
                              **Customer Service Representative**

**Commonwealth of Massachusetts**
**Form 3743-1 New 8-93**

```
*********************
***   TX REPORT   ***
*********************

TRANSMISSION OK

TX/RX NO              1076
CONNECTION TEL             917813564172
SUBADDRESS
CONNECTION ID
ST. TIME             02/27 11:50
USAGE T              00'28
PGS. SENT               1
RESULT               OK
```

791·356·4172

Peter N. Tsickritzis
**Director Of Operations**

**United Liquors Limited**
**175 Campanelli Drive**
**Braintree, MA 02185**

Dear Mr. Tsickritzis:


      I am interested in working at United Liquors Ltd., as before but there
is an apparent conflict in the taking your offer. I would like to work at the
Maintenance shift or one that does not causes any conflict with what we
have under investigation at the MCAD. I will wait for your answer and will
expect a change of mind, thanks for your cooperation.
      I consulted with my lawyer and he was unavailable these lasts days
but he encouraged me to consult with you a schedule when there is no
conflict. Trusting on your usual understanding and kindness I say no more.


**Sincerely yours,**

**Bienvenido I. Lugo-Marchant**



**Friday, February 27, 2004**

Tuesday, March 09, 2004

US Department of Justice, John Ashcroft
EEOC, Federal Building
Boston, MA 02109

Thomas F. O'Reilly, Attorney General
Commonwealth of Massachusetts
200 Portland Street
Boston, MA 02109

**Peter N. Tsickritzis,Director Of Operations**
United Liquors Limited
175 Campanelli Drive
Braintree, MA 02185

**Dear Mr. Tsickritzis:**

      I am interested in working at United Liquors Ltd., as before but there is an apparent conflict in the taking your offer. I would like to work at the Maintenance shift or one that does not cause any conflict with what we have under investigation at the MCAD. I recently read a complainant lost his claim at the MCAD for accepting a shift against what he claimed. I will wait for your answer and will expect a change of mind, thanks for your cooperation.

      My lawyer was unavailable these lasts days. I am also sending copies of my files to the persons mentioned at the heading. I also contacted some local news papers and the Dept. of Labor; sometimes they know how to handle things. I hope they help you in speeding your decision since they have lots of experience with these situations. Trusting your usual understanding I say no more.

**Sincerely yours,**

Bienvenido I. Lugo Marchant

**copy to George Joseph,**
**Business Representative**
**Teamsters 653**

Hello Peter

I received a letter where you signed below. It seems as if you didn't get my letter and opinion. Whatever happened I'd like to work in a shift where there's no conflict with my claim.

I read (at the MCAD website) of a person with a similar claim, he was offered work against his claim and lost his claim for accepting it. I want to know if this offer is the product of my claiming discrimination or real and sincere needs from your office. In a word, is this offer a "retaliatory accommodation"?. Whatever misunderstanding let me know.

Thanks for that first letter. I appreciate that.

Bienvenido Lugo

Friday, March 19, 2004

**April 1, 2004**

US Department of Justice, John Ashcroft
EEOC, Federal Building
Boston, MA 02109

Thomas F. O'Reilly, Attorney General
Commonwealth of Massachusetts
200 Portland Street
Boston, MA 02109

**Peter N. Tsickritzis,Director Of Operations**
United Liquors Limited
175 Campanelli Drive
Braintree, MA 02185

$7\,8\,'\,356\cdot\,4551$

**Dear Mr. Tsickritzis:**

I haven't seen any answer to my letter. **I recently read a complainant lost his claim at the MCAD for accepting a shift against what he claimed**. I will wait for your answer and will expect a change of mind, thanks for your cooperation.

My lawyer was unavailable these days. I am also sending copies of my files to the persons mentioned at the heading. I hope they help you in speeding your decision since they have lots of experience with these situations. If you don't think you can handle that let me know. Let me know if you can handle these. Trusting your understanding I say no more.

**Sincerely yours,**

**Bienvenido I. Lugo-Marchant**

**copy to George Joseph,**
**Business Representative**
**Teamsters 653**

*The Commonwealth of Massachusetts*
*Executive Office of Health and Human Services*
*Massachusetts Rehabilitation Commission*
*55 City Hall Plaza*
*Brockton, MA  02301*

**MITT ROMNEY**
**GOVERNOR**

**KERRY HEALEY**
**LIEUTENANT GOVERNOR**

**RONALD PRESTON**
**SECRETARY**

**ELMER C. BARTELS**
**COMMISSIONER**

April 16, 2004

To whom it may concern,

I am writing regarding:
Bienvenido Lugo-Marchant
dob 1/27/69
ss# 582 53 7509

He was a client of the Mass Rehab Commission. He was determined eligible for our services 1/5/99. This was due to his being disabled. He should be considered to be a person with a substantial impediment to employment. His application for other benefits may be supported by our determination.

If more information is needed please feel free to contact this office. We have documentation on file which with Mr. Lugo Marchants permission could be provided to you.

Sincerely

*Dell a King*

Dell  King

508  583 - 1530

John Ashcroft, US Department of Justice
Equal Employment Opportunities Commission

Thomas F. Reilly, Attorney General
Commonwealth of Massachusetts

Dorca I. De Gómez, Chairwoman
Massachusetts Commission Against Discrimination

Alison Hope, Investigator
Massachusetts Commission Against Discrimination
One Ashburton Place Room 601
Boston, MA 02108

> ### Re: <u>Bienvenido I. Lugo-Marchant v. United Liquors Limited</u>
> ### <u>MCAD Docket No. 03BEMO1651</u>
> ### <u>EEOC Docket No. 16CA301983</u>

Dear Ms. Hope:

I am writing this letter to let you know how serious I am about some essential things for me. Because of my upbringing, personal beliefs, cultural traits and choice I do certain activities and I am not willing to bargain, nor change them. I believe spiritual things and beliefs should not be changed for material things under any circumstances. <u>I cannot take a work shift conflicting my religious observances and thus reject God</u> **(note # 1)**.

Sometimes while working at United Liquors Limited ("ULL", "the company") circumstances pushed for unwishable overtimes **(note #1b)**. I always wrote in the trip sheet the time in, time out and comments, as it was required from drivers and helpers. My intention was to improve the customer service should store managers complain. Some office personnel took this as a joke asking: **"hey, who helped you writing, huh?"** and similar thoughts.

I believe that if an accidental overtime happens it should not be blamed on me or construed as **"not having a sincere religious belief requiring accommodation"** as ULL obscenely claims. <u>ULL supports many holidays, festivities and celebrations having a religious</u>

---

1. "Jesus Christ is the same yesterday and today and forever"- Hebrews 13:8; Jesus Christ said: "whoever disowns me before men, I will also disown him before my Father who is in the heavens"- Matthew 10:37. In addition, that suggestion is against the 1st Amendment (US Constitution) "prohibiting the free exercise thereof; [...] or the right of the people peaceably to assembly..."

1b. During the 2 weeks trial, most of the time loading the trucks finished at 8:00 or after 9:00 AM (this is supposed to end by 6:30 AM or earlier) disrupting the whole day. The paperwork was not printed on time having many drivers - including me - wait until the situation was corrected. The conveyor system as well as the printing equipment was new and operators had trouble learning how to use it. A couple of days many trucks were held at the warehouse not delivering anything at all. No other driver was blamed for this. New drivers who did overtimes were not demoted. Many other times, ULL had bad scheduling (deliveries were too early or too late) or instructed store managers to require from drivers to satisfy every little wish. Marketers from Mass Marketers (a division of ULL) are supposed to arrange the merchandise as requested, not drivers. I should not be blamed for these inconveniences, though.

background. I have no comment about them; that is not my concern. ULL has an irrational vision when I am offered to work the 5:30 PM, 6:30 PM or 9:00 PM shift. I was working for less but am not willing to settle for less anymore. That will be in direct conflict with my beliefs **(note # 2)** and my conscience should not be measured by $13.00 an hour after being demoted by Kevin Kingston ("Mr. Kingston", "Kevin"), Warehouse Manager **(see note # 3).**

I am well known as a very reasonable person who takes care of elderly relatives and people in general **(note # 2c)**. Finishing my shift between 2:00-5:00 AM pushes me against the Family Leave Act and 'Religious Beliefs and Cultural Traits' as defined in the US Civil Rights Act 1964. I have consulted with people who have successfully brought claims to the US Supreme Court, I am not into that although am optimistic. I just want to work like anyone else.

Lately, I have been required documentation related to my beliefs when other workers at ULL are not required to show anything. They can request a religious, social, job search, and festive or sport related leave at any time. I have taken many days off to practice what I believe in without specifying why and they were granted. Once I said <u>why</u> I wanted a day off or another shift, ULL denied everything. Working that new shift risks what I claim **(note # 4)**. I like putting

---

2. It is not possible to take care of some medical treatment if I come home at 2:00-5:00 AM. **"Honor your father and your mother, which is the first command with a promise"** -Ephesians 6:1-2. ULL has many disrespectful persons who do not appreciate this and prefer to laugh. I asked why I was not promoted and was told, **"because of not having a full shift... regardless of creed. Keep on praying!".**

2b. I finished my medical treatment and was authorized to go back to work (Dec. 18, 2003). I called Kathleen Mansfield, Human Resources Vice-President, and her assistant Vera told me *"to call her back after January 5th because she's absent. There's nothing I can do about you."*. She denied me her fax number and did not help at all. After The 5th of January, I had a meeting with Ms. Mansfield, Peter Tsickritzis, Director of Operations, and Kenny Queto, Union Steward-Teamsters Local 653. Mr. Tsickritzis (who told me I did not need a steward for that meeting) offered me to work at 5:30 PM, 6:30 PM or 9:00 PM. I told him that was unacceptable because of the nature of the claim and he suggested me *"if we can't work then we have to go our separate ways"*. I call and fax Mr. Tsickritzis but he rarely answers in return claiming he does not have my phone number. ULL used to call me to work precisely by phone and now claims they do not know my phone number. I have not changed my phone number since 1998.

2c. At nights, I used to call ULL to transfer my phone calls to my home (if an overtime would be imminent). Tim Bishop ("Mr. Bishop"), loading supervisor, used to take the phone and hung up on me rejecting to transfer the call. On several occasions, he left the phone open while mouthing off and joking with other office personnel (Howie, Ray and others) about my calling. They used profane language while talking with others causing laughter. When I got to the warehouse, higher supervisors were at the office and kept working as usual. One night, I was called about 2:00 AM to go and pick up my paycheck causing hardships in my home. No supervisor was penalized for that. Workers pick up their paychecks whenever they want. Another time, Mr. Bishop asked me why I came late (something that happen to others). As I answered, he constantly interrupted me with **"what the H...is that supposed to mean?"** mocking how I speak. Mr. Kingston limited himself to listening as Mr. Bishop elevated his voice. He is not a road supervisor; his poor skills caused trucks to leave the warehouse later than expected.

3. I gave him suggestions to improve business in a meeting I had with him and asked for a religious accommodation, none was appreciated. Mr. Kingston was disrespectful and rejected to sign the letter I gave him. I had to use the punch-in clock as he refused to sign. Before that, he threw papers to my face laughing: *"take this to your driver. I'm not gonna pay you that. Get the h... out of here, will you?"* The following week he laughed when I took my smaller paycheck mocking me with a *"how's that brother?"*

4. Another co-worker "Wilson/Francois" was fired after he requested a religious accommodation. After that, everyone knew about him. ULL cannot dictate anything related to faith (Cantwell v. Connecticut 310 US 296(1940), Murdock v. Pennsylvania [...](1943)) when they lack faith in people of other races.

4b. According to the 13th Amendment (US Constitution) "Neither slavery nor involuntary servitude...shall exist within the United States, or any place subject to their jurisdiction".

in practice what I believe in to the fullest of my possibilities but ULL offers me servitude **(note # 4b)** after they learned I might be related to other claims.

Massachusetts, founded (in part) by Pilgrims looking for Religious Freedom, is known as **"the spirit of America"**. As part of my personality, I am an avid reader and on a regular basis read, study, meditate and practice what I believe in from the Bible.

Going to a Christian meeting presupposes hygiene **(note # 5).** I also need time to take a shower **(note # 6).** The Civil Rights Act (1964) allows time to go from the workplace to where the religious observance takes place while ULL laughs when one changes clothes.

ULL has hundreds of employees with less time and contributions to the company than me and treats them better because they do not claim anything. ULL wants to have people who do not disagree with them, especially if they are diverse. When I started working at ULL (1999) the usual daily load used to be 400-500 cases and it doubled as business grew (2003). I worked with inexperienced people and had to satisfy endless store manager's requests **(note #7).** ULL does not consider the circumstances surrounding work but prefer to ask co-workers who were not present creating a hostile environment **(note # 7b).** ULL offers training and advancement opportunities to some people; as a coincidence, they are not diverse.

Other people who have brought similar claims have commented me that ULL has asked them about my claim while denying them unemployment benefits ("DET") unless ULL knows more; *"what is Ben up to?...we'll take care of you".* After they answer their questions, they are given more alcohol all the while they were fired, according ULL, for consuming alcohol.

---

5. As preparation for my meetings, I take extra clothes to ULL to change so I dress accordingly. **"Now as for Joshua, he happened to be clothed in befouled garments and standing before the angel. Then he answered and said to those standing before him: Remove the befouled garments from upon him", And he went on to say to him: "See, I have caused your error to pass away from you, and there is a clothing of you with robes of state."**-Zechariah 3:3.

6. **"They are holy (clean) garments. And he must bathe his flesh in water and put them on."**- Leviticus 16:4. Security used to ask me why I was dressed like that with a different tone from when I punched in. That happened everyday I changed my clothes, they did not celebrate how others dressed, though.

7. Several times, I asked Mr. Kingston to assign me a more experienced helper when I had a load higher than normal (over 650 cases). I did not ask for that if the load were normal or reasonable. He rejected that petition. Mr. Kingston used to assign me to new drivers when they had a big load or were not familiar with the route. I was assigned to work with new drivers due to my experience and reliability. I reminded Mr. Kingston that I was not called to pick runs according to when I started working for ULL. Spare drivers have no seniority but all the White drivers promoted were called according the date when they started working. In my case, they called new drivers -from a company that was going out business before me- claiming they will be promoted in two weeks. In two weeks, they were promoted as Howie, a supervisor, warned me. Other new drivers (over 50 years old) were sent to work in the warehouse and denied a promotion. Howie told me **"they were too old and worked slow".**

7b. Many times, I myself was asked about co-workers "how 'So and so' works? ", "how is the Black guy, any good?", "is 'So and so' a good worker?". I was told "since you work with 'So and so' he does not do overtime, that's the way to work him!". At times their wages were held, just like mine lately. That created a hostile environment with co-workers.

8. The 4th Amendment (US Constitution) establishes **"The right of the people to be secure in their person...against unreasonable searches...shall not be violated"**. ULL posted a memo about this but singles out some people. . Maybe they have another procedure for them. This should not be taken as dishonesty; they are not racially diverse.

3

I applied for DET and was told I did not qualify because I quit on June 17, 2003 (when I had the accident, I did not quit). <u>My medic plan was suspended once ULL learned I had a claim at the MCAD.</u> I call ULL asking for work and they do not answer me **(note # 2b)**. Some other people bringing claims to the MCAD are asked about me. I cannot receive my DET (this recently improved) nor Mass Health because these two offices are given false information. <u>ULL lied in a notarized statement (August 2003) saying I was receiving Workers Comp'.</u> My Workers Comp' started to be resolved (March 2004) recently.

When I go to ULL the security person <u>holds me at the door</u> and calls <u>Mr. Tsickritzis to determine if I am needed.</u> Anybody else is allowed to go in and out without being harassed. As a common practice, security checks my belongings **(note # 8)** but allow others to walk out the door with goods. These ones do not show any paperwork about what they take out.

I believe it is of great importance for me to attend some Christian meetings **"not forsaking the gathering of ourselves together, as some have the custom, but encouraging one another, and all the more as you behold the Day near"- Hebrews 10:24. "It is a very fearful thing to fall into the hands of the living God"-Hebrews 10:31.** I do not want the One who is going to judge the Earth to reject me before his Father because I rejected him for $35.00-40.00 while finishing a discriminatory shift **(note # 1)**.

It is common knowledge that when ULL does not want to give people work, nothing can be done. Some other people bringing claims, after being fired, have found the same situation. I am also enclosing some illustrations regarding general working conditions at ULL. I have applied for a job at other places and have received no answers after I put ULL as a reference. It seems as if ULL is offering me a 'retaliatory accommodation'. I believe this is accurate and truthful in its entirety.

Sincerely,

Bienvenido Lugo-Marchant

April 16-2004

**STEVEN D. WASHBURN**
**NOTARY PUBLIC**
My Commission Expires Oct. 3, 2008

**Bienvenido I. Lugo-Marchant**
**19 Grove Street**
**Brockton, MA 02301**

**Thomas Reilly, Attorney General**
**Commonwealth of Massachusetts**

**Dear Mr. Attorney General:**

**Re: withholding wages/MCAD 03BEM01651**

I started working at United Liquors Limited ["ULL", "the company"] in 1999 and have been discriminated in opportunities, training and promotions for unlawful reasons. I was paid less than similarly situated workers. ULL combined my hours to pay me the lowest rate. The company used to specify in the paychecks when a worker worked in the warehouse and when a worker worked in the road. I am supposed to be paid an extra hour when going over some geographical area but my paychecks never included that extra hour. I asked payroll and was given a non satisfying answer. The company owes me money.

After I put a discrimination claim at the MCAD [I was suggested to *"withdraw it and things would improve"*] my medic plan was cancelled. Wherever I went for medical treatment they were told I was no longer an employee, thus blocking my medical treatment. I had many hardships because of this, oftentimes being given looks at clinics as if I was not telling the truth. At the same time, I called ULL to ask about this situation and was laughed at and told I *"needed to improve my speaking skills and accent because I was not understood"*. Other times when I stuttered [I am a client of the Massachusetts Rehabilitation Commission] I was laughed at and interrupted while talking. I have to fax my letters to ULL to avoid more humiliations. I understood the company did not want me anymore and wanted to make me feel small in comparison to racially different co-workers.

At the beginning of this year my unemployment benefits were blocked as ULL said I had quit [that is false], that also happened with other workers. I am offered to work a shift against what I claim because of the Civil Rights and the Medical/Family Leave Act. Other people bringing claims to the MCAD have been asked about my claim and details as they are given alcohol. I do not know how my claim is going at the MCAD. I have written ULL as a reference when applying for jobs and other companies do not call me. When I do not include ULL, I am called for interviews. While unemployment rate is going lower my waiting becomes longer.

May 21 - 200 4

Sincerely,

Bienvenido I. Lugo-Marchant

B. Lugo
currently unemployed


Peter Tsickritzis- Kevin Kingston

Re: Payroll


I reviewed my pay stubs and found that I was paid less than similarly
situated co-workers. I called payroll and the person who handled the call did
not give me a satisfying answer. I would like you to correct this situation
where you -from my point of view- owe me some money. Maybe you can
explain why I was paid less. Many times I worked out of the warehouse and
my wages were combined and paid the lesser wage. That was never
remedied. This should be taken as an inquiry of why I was paid less money.
I think you know that when a driver works in some geographical area he is
supposed to be paid more. That did not apply in my case, though. I also want
to know whether or not you are searching for drivers with experience or
willing to be trained.

Have a nice day!

on or about MAY 21



# THE COMMONWEALTH OF MASSACHUSETTS
## OFFICE OF THE ATTORNEY GENERAL

ONE ASHBURTON PLACE
BOSTON, MASSACHUSETTS 02108-1598

THOMAS F. REILLY
ATTORNEY GENERAL

June 9, 2004

(617) 727-2200
www.ago.state.ma.us

Bienvenido I. Lugo-Marchant
19 Grove St.
Brockton, MA 02301

### RE: United Liquors Limited

Dear Mr. Lugo-Marchant:

Attorney General Tom Reilly's Fair Labor and Business Practices Division has received your correspondence dated May 21, 2004. We have carefully reviewed your correspondence, and we have found that unfortunately, your complaint against United Liquors Limited is not within our jurisdiction.

The Fair Labor and Business Practices Division of the Attorney General's Office enforces the payment of wages, minimum wage, overtime, meal breaks, child labor, public bidding, and the prevailing wage laws. Although your complaint of unfair treatment may be a valid one, our division would not be able to effectively address that complaint, as it is not covered by the Massachusetts General Laws over which we have jurisdiction.

Please note, however, that the Office of the Attorney General is committed to finding more ways to ensure that the civil rights of people of color, the gay and lesbian community, individuals with disabilities and members of other under-represented groups are protected and that they are provided equal justice and equal opportunity. As such, the Office has established the Employment Discrimination Project through the Civil Rights/Civil Liberties Division, which may prove to be more useful to you with regard to your complaint.

For your convenience, I have forwarded your correspondence to the Civil Rights/Civil Liberties Division. Also, for your information, I have provided the division's address and phone number below:

**Office of the Attorney General**
Civil Rights/Civil Liberties
One Ashburton Place
Boston, MA 02108
(617) 727 - 2200

I hope that this information is helpful to you regarding your complaint.

Sincerely,

Erika Gully-Santiago
Information Officer
Fair Labor and Business Practices Division

egs



THE COMMONWEALTH OF MASSACHUSETTS
OFFICE OF THE ATTORNEY GENERAL

ONE ASHBURTON PLACE
BOSTON, MASSACHUSETTS 02108-1598

THOMAS F. REILLY
ATTORNEY GENERAL

(617) 727-2200
www.ago.state.ma.us

June 21, 2004

Bienvenido I. Lugo-Marchant
19 Grove St.
Brockton, MA 02301

Dear Mr. Lugo-Marchant,

Thank you for contacting the Office of the Attorney General. Your complaint against United Liquors Limited was referred to an Assistant Attorney General in the Civil Rights Division for a response. After review of your claim, I regret that we will be unable to pursue this matter.

The Civil Rights Division of the Attorney General's Office receives inquiries and complaints on a daily basis from citizens across the Commonwealth. Every such inquiry and complaint is reviewed and a decision made whether or not to take action on the inquiry or complaint. In some instances, inquiries and complaints raise issues that generally are not handled by this office, do not fall within our jurisdiction, or are more appropriately handled by another agency. Please be advised that we are not going to further investigate or intervene in this matter at this time.

With regard to your claim that you suffered employment discrimination by United Liquors Limited, you have indicated that you have already filed a complaint of discrimination with the Massachusetts Commission Against Discrimination (MCAD) . The MCAD is the appropriate agency to handle this matter.

Should you wish to pursue this matter with the aid of a private attorney, you may obtain a referral through the Massachusetts Bar Association's Lawyer Referral Service at (617) 654-0400.

Again, I regret that we cannot assist you with this matter.

Sincerely,

Michael Fleischer

Michael Fleischer
Paralegal
Civil Rights Division

The Commonwealth of Massachusetts
Commission Against Discrimination
One Ashburton Place, Room 601, Boston, MA 02108
Tel (617) 994-6000
Fax (617) 994-6024

September 21, 2004

Bienvenido Lugo
19 Grove Street
Brockton, MA 02301

RE: Bienvenido Lugo v. United Liquors Ltd.
MCAD Docket No 031301651

Dear Parties:

You are hereby notified the Commission has received your appeal in the above
referenced matter. A preliminary hearing has been scheduled for October 6, 2004 at 1:00
p.m., in the Boston Office.

Please bring any additional information you wish to present to the Commission in support
of your appeal.

If Complainant is unable to attend, a written appeal may be submitted. If the Respondent
is unable to attend, no continuance will be granted.

Very truly yours,

Nancy M. To
Appeals Process Coordinator

cc: Julie Murphy Clinton, Esquire
Wilner Cutler Pickering
Hale & Dorr LLP
60 State Street
Boston, MA 02109

The Commonwealth of Massachusetts
Commission Against Discrimination
One Ashburton Place, Room 601, Boston, MA 02108

**OCT** 2 6 2004

Bienvenido Lugo
19 Grove Street
Brockton, MA 02301

            RE: Bienvenido Lugo v. United Liquors Ltd
            MCAD DOCKET NO: 03BEM01651

Dear Parties:

On October 6, 2004 a preliminary hearing was held regarding the above reference complaint to consider the Complainant's appeal of lack of probable cause finding issued in this Complaint on September 1, 2004.

Based upon information presented at the appeal hearing and a review of the evidence adduced in investigation, I have determined that the Lack of Probable Cause finding in this case is affirmed. This means that investigation and appeal evidence fails to establish sufficient evidence to determine that an unlawful act of discrimination has been committed.

All employment complaints where applicable, are dual filed with the U.S. Equal Employment Opportunity Commission (EEOC). Our finding will be forwarded to its Area Office, JFK Federal Building, Boston, MA 02203. The MCAD finding will be given substantial weight by the EEOC provided that such finding are in accordance with the requirements of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967, and or The Americans with disabilities Act of 1990.

                              Very truly yours,

                              Dorca I Gomez        *MB*
                              Investigating Commissioner

cc: Julie Murphy Clinton, Esquire
    Wilner Cutler Pickering
    Hale & Dorr LLP
    60 State Street
    Boston, MA 02109

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

Bienvenido I. Lugo Marchant                    Civil Action No. 05 11317 NMG
    Plaintiff
       v.
Peter N. Tsickritzis, Kevin M. Kingston,
United Liquors Limited et al.
    Defendants

## SUPPLEMENTARY DIRECT EVIDENCE, DOCUMENTS OF 2004

The Plaintiff offers these documents as direct evidence of the sufferings at the hands of the Defendants in a claim filed with the Massachusetts Commission Against Discrimination ("MCAD")

| | | |
|---|---|---|
| 2004 | January 29 | Bank statement with a $69.00 check for English lessons |
| | 29 | Course Description |
| | February 23 | Letter to MCAD about incidents that occurred on or about August 26 with Defendant-Tsickritzis' ("PT") |
| | 25 | Letter of Mr. Williams ("WW") |
| | 26 | Letter of Mr. Cooper ("DSC") |
| | 27 | Letter to PT |
| | March 5 | Illustrations about working conditions |
| | 12 | Illustrations about premises |

Respectfully submitted,

Bienvenido I Lugo-Marchant
*Pro se, in forma pauperis*

## CERTIFICATE OF SERVICE

I hereby certify that on Feb 23, 2007, this document was served upon the defendant's counsel, JACKSON LEWIS, by first class mail, postage paid.