## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

**Bienvenido I. Lugo Marchant**                  Civil Action No. 05 11317 NMG
    Plaintiff
        v.
**Peter Tsickritzis, Kevin Kingston,**
**United Liquors Limited et al.**
    Defendants

## MOTION TO INCLUDE PLAINTIFF'S POSITION ON FALSE DECLARATIONS

The Plaintiff ("BL", "Mr. Lugo", "Ben", "I") hereby tells his view of the Defendants' ("ULL") Declarations for they are fraudulent and deceitful, one by one.

### PETER TSICKRITZIS, PETER N. TSICKRITZIS'S DECLARATION

Mr. Tsickritzis ("PT"), on his declaration failed to admit that he offered a retaliatory shift and subjected BL to intense scrutiny through his assistant (Ms. Linley, "LB"), and others. PT's subordinates usually commented on former employees, their issues, and new employments. BL never worked the 3rd shift, though many times stood overtime for "experienced" drivers who consistently came later than expected and were not demoted. Regarding accidents, the Hotel controls its doors and has technology to assist them. The other option was violating a state law about yielding to pedestrian on the crosswalk/sidewalk. It appears, as BL was not at fault, as ULL did not produce a bill of damages. On the second accident, BL waited for the driver to appear and gave her a piece of an invoice as the registration was missing. Other drivers have left the scene of an accident, other issues, and nothing happens.

On his 5th point, the new drivers, "experienced", did not avoid the company being bought a few times as BL had warned ULL of a market tendency but they laughed at it with jokes. On the 7th point, BL faxed, spoke and sent medical papers to LB asking for light duty work. LB later confessed to BL she "was under a gag" for being unsuccessful in persuading BL to drop his MCAD claim. On the 9th point, the warehouse exposed BL to numerous salacious comments that blur the line between personal and business practices and were unbearable for BL as the US Supreme Court decided on *Suders*. On the 15th point, the MCAD did not mention that they were in questionable contact with Hale and Dorr.

### KEVIN KINGSTON, KEVIN M. KINGSTON'S DECLARATION

Mr. Kingston ("KK"), on his 4th point, the "all biding takes place according seniority" is not necessarily the case as the drivers promoted in their majority, selected their runs (routes) according when they were hired. The next group refers to the ones who came from a rival company (Whitehall at the beginning of 2003) promoted in about 2 weeks and the ones with

1

assistance of the union (from Martignetti, later on 2003), at once. BL was put behind Whitehall's drivers, when selecting runs, on a trial time with no specified duration or parameters, allowing them to select a better run. The latter group was hired with no trial test; BL did not see a minority driver. KK's subordinates harassed BL even more in front of them. In the two instances, BL was left out of the picture though having worked for the Defendants for almost 5 years.

     Talking, either stuttering/national origin accent or manner according the EEOC was never an issue as BL worked as a helper limiting his speech to the truck and asking for the customers' needs. A former manager, who ULL wantonly defamed though now oversensitive of PT, emphasized costumer service. Two Black drivers who worked for ULL, before BL initiating his MCAD claim, were not promoted though being monolingual in English. Some office people referred to them by race in a disrespectful manner.

     KK's 5th point shall be analyzed according *Suders*. On the 9th point, Mr. Montgomery as Fleet Manager ("KMo") assisted BL, maybe once or twice, on his driving test and that caused BL to fail. Non-white workers were denied that training as well. KMo deceived BL saying that no truck was available for test on a day when a white worker went to the same site BL was scheduled, but had to cancel. BL could have passed the test with KMo's assistance as when ULL advised in newspapers their hiring drivers. On the 8th point, KK and others joked, "if a customer don't speak good English have Ben translate for him", for BL's multilingual knowledge.

     On the 11th and 12th points, ULL experienced complications with a new computer and automated system they just installed. That delayed the departing time, at times for more than an hour, as well as calling BL to work *after* the shift had begun. KK schedules the deliveries and tried to send a truck to a new territory with a very poor routing/schedule, and a new helper. Other times not having proper equipment to work, poor routing that sent BL to a stop when it was closed or after their receiving time, and having keys to start the truck but not to re-enter the truck caused the leasing company to send a copy since KMo was not found. That morning, KMo was in the warehouse and BL insistently called him with no result.

     BL advising customers to call KK to correct the situation was not welcomed by KK, though he identifies himself as a manager in relation to deliveries issues on his 13th point. KK did not appreciate BL's honesty in declaring accidents as the Police Dept's of Boston, Attleboro, Cambridge and the MA Sate Police, among others, had warned ULL. Some other runs bordered on Rhode Island and could have infringed on state line violations as some were rushed to finish quick. The 16th point shall be compared with other drivers who had more serious issues and were not demoted. On the 17th point, BL had warned KK of possible legal action with no result.

The 18th point shall not be read, as it is not truthful. On the 19th point, BL has record of his attending Bible courses prior to working for ULL and PT working for ULL. On the 23rd point, it is not "I would not have said that" but that he said it and later engaged on more harassing. On the 24th point, BL asked PT's assistant, who on occasions lost documents, for light duty work and supplied her with medical papers asking for light duty work. BL, on the 25th point, had no control over the Hotel door but had to stop according state law because life is more precious than the $800.00 they do not compare with repairing a brand new truck for a white driver passing by a lower bridge. BL was told said repair surpassed $50,000.00 since the insurance company did not accept ULL using a non-experienced driver (white) or many other repairs on properties, equipment, and personal injury. ULL cancelled BL's medical coverage as he refused to drop his MCAD claim.

LB, named a decision maker on the English test and hiring of new workers, asked BL "to re-apply for work to test his English". However, if KK likes so much BL's skills, then, he shall submit the documents this **Honorable US Court** ordered them to submit and stop playing games.

## WILLIAM NAGLE'S DECLARATION

Mr. Nagle ("WN") was completely deceived by his superiors as BL already communicated his petitions to KK, PT and others in the higher ranks. It is implied that KK/PT would let WN know about it when visiting him and stopping to harass BL before going back to their comfortable and more hygienic office. WN is asked to declare 1 1/2 page against what his superiors well knew as BL constantly asked them for respect and a promotion.

A worker who is less insistent on asserting his rights, as an employee, is more appreciated than one who by asking for his rights is seen as saber-rattling while KK's pounding the table is to be accepted. On the 2nd shift, BL was subjected to heavier work with WN, including but not limited to:

1. Emptying trucks with no safety glasses or gloves,
2. Sweeping the floor (while a Maintenance crew was available),
3. Pick the merchandise for the late truck by himself since the picker(s) left for a social or sportive events with no penalty,
4. Driving a late delivery truck (departing on rush hour) with loads similar to trucks leaving on or about 6:30 AM but extending from Cape Cod to Framingham to Boston and then expected to go back to the warehouse, before midnight, to work more,
5. Loosing his union breaks, not paid the overtime nor the higher rate of a driver,
6. Preparing trucks for the 1st shift workers as the company expanded duties and lowered rates,
7. Preparing trucks for white workers who were trained by the Fleet Manager and assured a promotion,
8. Leaving his unloading equipment for 1st shift drivers who could have a 3rd shift worker recharging the jack pallets overnight, and
9. Enduring management's harassing him with no reason or privilege.

3

## KATHLEEN C. MANSFIELD'S DECLARATION

Ms. Mansfield ("KMa") is also known as part of the United Group ("UG"), the policy maker of ULL. It appears as if KMa assisted PT in his offering BL a retaliatory new shift. On her 2nd point, BL was there and saw PT's voluntarily acting as BL's statements and illustrations rightly depict. That afternoon PT assured BL that BL *"would never be a regular employee for having a lawsuit against the company"* PT was in sound mind as when he confessed to BL facing legal action for assaulting a co-worker and suggesting BL days off for an accident.

On her 3rd point, BL worked with Dexter Cooper ("DC") and saw the abusive conditions that DC was subjected to. In fact, DC was required to clean a chemically polluted area with no equipment/training, according OSHA. Braintree Fire Dep't went to ULL for an accident involving a non-trained worker. DC commented BL being asked about BL all the time, when BL was denied light duty work. DC confessed to BL being rewarded with alcohol after sharing documents BL authored. ULL claims DC was fired for drinking. According DC, KMa warned James Tye, a Vice President, son of the owner, UG officer, not to read BL's documents when he was done. When offering a retaliatory new shift, KMa warned PT not to read a medical paper BL brought when PT was done reading.

No disrespect intended, BL was given a treatment of confederated magnitude in a Pilgrim State as the 21st century began. BL was not burned for asserting his FMLA and Civil Rights, like in the Middle Ages, but was fired as a mere pretext.

## CONCLUSION

When ULL uses as comparator evidence that they hired more experienced new drivers with assistance of the Union, they fail to involve the comparable new drivers with nearly identical circumstances to have that evidence received and considered. BL suspects ULL of mendacity in that BL had to write his petitions to formalize it and still KK refused to signed it using inappropriate language to reject BL. BL consistently asked KK to broaden his comment of "not to talk like that anymore" whether KK meant national origin accent (born in the Dominican Republic, raised in Puerto Rico), speech impairment (as the Mass Rehab Commission, and Mass General Hospital stated), or manner of speech as defined by the EEOC.

BL disagrees that nameless customers complained of BL's late deliveries as KK himself schedules them. Many times, KK scheduled an afternoon stop for the morning causing problems. BL has no control over what KK schedules but would suggest customers to call KK to correct the situation, something KK did not appreciate. BL offered over 200 pages of direct evidence to ULL as ULL trivializes it in a sentence as "because the United States Constitution says so". This **Honorable US Court** shall deny ULL's motion following the rulings on *Reeves V. Sanderson*

*Plumbing Products, Inc., Anderson v. Liberty Lobby, Inc., and Lytle v. Household Manufacturing, Inc.*

BL, in the FMLA retaliation/discrimination aspect, is entitled to a denial of the motion for summary judgement in light of the Court's rulings in *Desert Palace* and *Reeves v. Sanderson Plumbing Products, Inc.,* and 29 C.F.R. s. 825.220(c). WN and KK comments on performance issues, while having more than 200 pages of direct evidence, shall not be accepted. Their inconsistent and conflicting testimony about BL's petitions, though KK visited WN, proves that ULL is less worthy of belief.

**WHEREFORE,** the Plaintiff respectfully prays this **Honorable US Court** accepts this **Motion to Include Plaintiff's Position on False Declarations.** The Plaintiff demands, very respectfully, **TRIAL BY JURY.**

Signed under the pains and penalties of perjury of things that I saw, of personal knowledge, and collected by others.

Very respectfully submitted,

Bienvenido I Lugo-Marchant
*Pro se, in forma pauperis*

**CERTIFICATE OF SERVICE**
I hereby certify that on March 2l , 2007, this document was served upon the Defendant's counsel, **JACKSON LEWIS**, by first class mail, postage paid.