UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BIENVENIDO I. LUGO MARCHANT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION |
| v. | ) | NO. 05-11317-NMG |
| | ) | |
| PETER TSICKRITZIS, KEVIN | ) | |
| KINGSTON and UNITED LIQUORS | ) | |
| LIMITED, | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT AND RECOMMENDATION ON
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

May 23, 2007

DEIN, U.S.M.J.

### I.  INTRODUCTION

The pro se plaintiff, Bienvenido I. Lugo Marchant ("Marchant") is a former

employee of the defendant United Liquors Limited ("UL").  He has brought this action

against UL and two of his former supervisors alleging violations of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e-2(a), and Title I of the Americans with

Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq., on the grounds that the defendants

allegedly denied his request for a religious accommodation and that they discriminated

against him and harassed him based on his race/color, disability, national origin and/or

religion.

The matter is presently before the court on the Defendants' Motion for Summary Judgment (Docket No. 69) by which the defendants are seeking summary judgment in their favor on all counts of the complaint.[1]  The material facts are not in dispute.  For the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the motion for summary judgment be ALLOWED.

## II.  <u>STATEMENT OF FACTS</u>[2]

### <u>The Parties</u>

The defendant UL is a liquor, beer and wine distributor with headquarters in Braintree, Massachusetts.  (DF ¶ 4).  The defendant Peter Tsickritzis ("Tsickritzis") is the Director of Operations for UL, and the defendant Kevin Kingston ("Kingston") is UL's Operations Manager.  (<u>Id.</u> ¶¶ 2-3).  The plaintiff, Marchant, was born in the Dominican Republic in 1969 and moved to Puerto Rico at age four.  (<u>Id.</u> ¶ 5).  He is a citizen of the

---

[1]  There are a number of additional related motions which are also before the court.  This court has ruled on these motions by separate orders issued on this date.

[2]  The facts as presented by the defendants are derived generally from "Defendants' Statement of Material Facts Not in Dispute" (Docket No. 71) ("DF"); the supporting affidavits filed by the defendants ("___ Aff."), including those by Peter Tsickritzis, Director of Operations at UL (Docket No. 72), Kevin Kingston, Operations Manager at UL (Docket No. 73), William Nagle, Second Shift Warehouse Supervisor for UL (Docket No. 74), and Kathleen Mansfield, Vice President of Human Resources at UL (Docket No. 80).  The defendants have also submitted various exhibits ("Defs. Ex. __") which are attached to the affidavit of their counsel Joan Ackerstein (Docket No. 75).  The plaintiff has submitted a "Memorandum of Facts Regarding this Action" (Docket No. 77) ("PF"), and "Plaintiff's Declaration" (Docket No. 84), as well as various exhibits filed under seal attached to a filing entitled "Corporate Documents on Policies, Memos, Hierarchy, Irregular Paystubs, and Withholding Wages" (Docket No. 78) and to plaintiff's "Motion to Add Recently Produced or Found Documents, and Grammatical Corrections" (Docket No. 82) ("Pl. Ex. ___").

United States, and has lived in the continental United States, principally Massachusetts, since 1998. (Id.). Marchant has a Bachelor of Arts degree from the University of Puerto Rico and held a variety of employment positions in Puerto Rico. (Id.). As detailed below, Marchant was employed as a "spare employee" at UL from 1999 until 2003. (Id. ¶ 1). Marchant also is a Jehovah's Witness. (Id. ¶ 8).

## Employment Opportunities at UL

UL employs workers in its warehouse and road divisions who are responsible for preparing shipments and delivering them to customers. (Id. ¶ 9). These workers are unionized and are represented by the General Teamsters, Chauffeurs, Warehousemen and Helpers of Brockton and Vicinity, Local Union No. 653 (the "Union"). (Id. ¶ 10). There is a collective bargaining agreement ("CBA") between UL and the Union. (Id.).

UL's workers include "regular" employees, who are on the seniority list, and "spare employees" who are assigned to different positions on an "as needed" basis. (Id. ¶ 11). In accordance with the CBA, regular employees bid on a position for each workday either as a driver or driver's helper for a particular delivery route.[3] (Id. ¶ 12). This bidding takes place according to seniority. (Id.). Once the bidding is complete, spare employees are used to fill any open positions. (Id. ¶ 13). They may be hired to work as a driver, driver's helper or warehouse employee, and all positions pay the same

---

[3] The driver's helper position is used as a training position for employees who are interested in obtaining a commercial drivers' license ("CDL") and in becoming drivers for UL. (DF ¶ 14).

hourly rate.  (See id. ¶ 15).  Spare employees are not on any seniority list and call in the evening before they want to work to find out if there are open shifts the following day. (Id. ¶¶ 11, 13).  The specific assignments for spare employees are based on UL's needs and the employees' ability and performance.  (Id. ¶ 11).

### Marchant's Employment with UL

Marchant began his employment with UL in June 1999 as a spare employee.  (Id. ¶ 16).  Kingston was his supervisor.  (Id.).  Initially Marchant worked most often as a driver's helper.  (Id.).  He was rarely needed to work as much as five days a week, although on occasion he worked from 6:00 a.m. until 10:00 - 11:00 p.m.  (Id. ¶¶ 16-17). Marchant wanted to become a driver, and Kingston encouraged him to obtain his CDL. (Id. ¶ 18).  Marchant passed the written exam in March 2002, and after several unsuccessful attempts eventually passed the driving test.  (Id. ¶¶ 18-19).

UL assigned Marchant to work as a spare employee driver on a number of daily shifts, but was not satisfied with his performance.  (Id. ¶¶ 20, 21-23).  UL contends, but Marchant denies, that Marchant was too slow in making deliveries and that there were customer complaints about the timeliness of the deliveries.  (Id. ¶ 21; PF 20).  It is undisputed that in February 2003, Marchant was in a minor accident — he hit a parked car, causing less that $1,000 worth of damage.  (DF ¶ 22).  Marchant contends that such accidents are not uncommon among UL drivers.  (PF ¶ 9).  Thereafter, UL stopped assigning Marchant as a driver, but assigned him to work in the warehouse, usually on the second shift, which ran from approximately 2:00 p.m. to 10:30 p.m., depending on the

workload. (DF ¶ 23; Kingston Aff. ¶ 15). He was not assigned as a driver's helper because that position was reserved for new employees or those training to obtain their CDL. (DF ¶ 23; see supra note 3).

On one occasion, in April 2003, after he had been working in the warehouse, Marchant was assigned as a driver when no-one else was available. (DF ¶ 24). He was in another accident when a garage door closed on the truck. (Id.). UL's need for spare drivers decreased in the spring of 2003 when UL hired ten experienced drivers from a competitor, with the assistance of the Union. (Id. ¶ 26).

### Marchant's Request for Religious Accommodation

As noted above, Marchant was assigned to work on the second shift at the warehouse. On March 13, 2003, Marchant submitted a letter requesting that he not have to work on Tuesdays and Thursdays "because it creates a conflict between my work, cultural habits and beliefs" and that he be permitted to stop work at midnight on Friday to avoid working on the Sabbath. (DF ¶ 29; Kingston Aff. Ex. D). This was the first request for any religious accommodation Marchant had made. (Kingston Aff. ¶ 19). Marchant specifically informed Kingston that he needed to leave early on Tuesdays and Thursdays so that he could attend religious classes. (Id. ¶ 20). Apparently Marchant's church holds classes on Tuesdays and Thursdays, while other Jehovah's Witness congregations hold classes on other days.[4] (DF ¶¶ 34-36). Kingston told him that he did

---

[4] There are approximately 10 to 11 Jehovah Witness congregations within a 15 mile radius of Brockton, where Marchant resides. (DF ¶ 36). Marchant's mother and brother, with

not have to accept work on Tuesdays or Thursdays, but he could not leave early. (DF ¶ 30; Kingston Aff. ¶ 21). It is undisputed that according to the CBA any employee who reports for work has to be paid for a minimum of 8 hours of work. Therefore, if Marchant left early, UL would have to pay both Marchant and any employee who filled in for him to complete the shift for 8 hours of work each. (Kingston Aff. ¶ 21; DF ¶ 31). Marchant's request to leave work at midnight on Friday nights was not similarly problematic for the company and Marchant was allowed to leave. (DF ¶ 30). He continued to call in and accept job assignments for second shift positions on Tuesdays and Thursdays although he was not obligated to do so. (Id. ¶ 32).

## Marchant's Claim of Harassment

Marchant raises several instances of harassment in his complaint. (Id. ¶ 37). He claims that Kingston told him "not to talk like that" and claims that Kingston asked him if he wanted to get fired for leaving early. (Id.). He also cites to a receptionist asking him if people needed to speak English to work in the warehouse. (Id.). In his statement of facts, Marchant contends that he was told to drop his MCAD complaint, he was mocked for religious reasons,[5] and he overheard racial slurs, among other general charges of wrongdoing. In general, Marchant contends that he was ridiculed and harassed as a result of either his accent or a speech impediment/stutter. (See Compl. ¶ 2). While his

_____

whom he lives, attend a different congregation which has classes on other days. (Id.).

[5] Marchant contends that Tsickritzis mocked him at his deposition, a charge which counsel strenuously denied at oral argument. (See PF ¶ 3).

pleadings are not clear, it appears that Marchant contends that the transfer to the

warehouse from being a driver or driver's helper was retaliatory and done for harassment

purposes, and that he was paid less as a warehouse worker.  The defendants deny any

claim of wrongdoing with respect to any of the incidents on which Marchant relies.  (See

DF ¶¶ 37-40).  In addition, they have attested that all spare employees are paid the same,

regardless of the work they perform.  (Id. ¶ 15).  Marchant has not submitted any

evidence in support of his claim of pay disparity.

### The End of Marchant's Employment with UL

On June 17, 2003, Marchant was injured at work.  (Id. ¶ 41).  His physician

certified that he could return to work on December 18, 2003.  (Id.; Defs. Ex. F).  In

connection with his workers' compensation claim, Marchant confirmed that he was out of

work and disabled through the end of December.  (DF ¶ 42).  In or about January 2004,

after Marchant reached an agreement on his workers' compensation claim, he met with

Tsickritzis, Kathleen Mansfield (UL's Human Resource Director) and the Union steward.

(Id. ¶¶ 42-43; Tsickritzis Aff. ¶ 7).  At the meeting, an offer was made for Marchant to

return to work in the position he had worked prior to his injury.  (DF ¶ 43; Tsickritzis

Aff. ¶ 8).  Marchant indicated that he wanted to return to work as a driver — he did not

want to return to the warehouse.  (Tsickritzis Aff. ¶ 9).  Marchant also did not believe

that the offer was "sincere or truthful" and, therefore, did not return to work.  (DF ¶¶ 43-

44).

Meanwhile, shortly after his injury, on or about June 27, 2003, Marchant had filed a charge of religious discrimination and discrimination based on race and national origin against UL with the MCAD. (Id. ¶ 45; Defs. Ex. D). The charge did not name the individual defendants and did not assert a claim of disability discrimination. (DF ¶ 45). Marchant subsequently filed an "Amendment" to his charge relating to an alleged incident on August 26, 2003. (Id. ¶ 46). At that time, Marchant contended, when he went to UL to submit medical papers, Tsickritzis confronted him and "looked erratic and kept mumbling" about Marchant. (Id.; Defs. Ex. E). Marchant also complained that a substitute receptionist asked if people needed to speak English to work for UL. (DF ¶ 46). In or about September 2004, the MCAD dismissed the charges for lack of probable cause. (DF ¶ 47; Tsickritzis Ex. F). The report indicated that the MCAD had investigated whether Marchant was discriminated against on the basis of race, color (Hispanic), national origin and religious creed (Jehovah's Witness). (DF ¶ 47). The MCAD did not investigate or apparently understand Marchant to be making a claim of disability discrimination.

Marchant filed a pro se Complaint in this court on June 17, 2005. While not entirely clear, Marchant is apparently contending the defendants (1) denied his request for a religious accommodation; (2) discriminated against him based upon his race/color; (3) harassed him based upon his race/color, national origin, and religion; and (4)

discriminated against him on the basis of an alleged disability by refusing to give him light work after he was injured.[6]

Additional facts will be provided below when appropriate.

## III.  ANALYSIS

### A.    Summary Judgment Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (citations omitted).  A material fact is one which has the "potential to affect the outcome of the suit under the applicable law."  Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996) (citations and quotation omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).  If that burden is met, the opposing party can avoid

---

[6]  The complaint itself does not have any specific counts.  The defendants have characterized the complaint as containing these four types of claims, and the plaintiff has not disputed their characterization.  (See Defs. Mem. (Docket No. 70) at 2, 16).

summary judgment only by providing properly supported evidence of disputed material facts that would require trial.  See id. at 324, 106 S. Ct. at 2553.  In evaluating motions for summary judgment, however, the court will not consider "conclusory allegations, improbable inferences, and unsupported speculation."  Galloza v. Foy, 389 F.3d 26, 28 (1st Cir. 2004) (citation omitted).  Such unsubstantiated allegations are insufficient "[e]ven in employment discrimination cases where elusive concepts such as motive or intent are at issue."  Feliciano do la Cruz v. El Conquistador Resort and Country Club, 218 F.3d 1, 5 (1st Cir. 2000) (quotation omitted).  Moreover, "a bare assertion that the opposing party's uncontroverted evidence might be disbelieved is insufficient."  Favorito v. Pannell, 27 F.3d 716, 721 (1st Cir. 1994) (emphasis omitted).

Applying these standards to the instant case compels the conclusion that the defendants' motion for summary judgment should be allowed.

## B.    Marchant's Claim of Religious Discrimination

Marchant contends that UL discriminated against him by failing to accommodate his request to be able to leave early on Tuesdays and Thursdays.  "[T]he First Circuit applies a two-part framework to religious discrimination claims under Title VII.  First, the plaintiff must make [his] *prima facie* case that a bona fide religious practice conflicts with an employment requirement and was the reason for the adverse employment action."  Cloutier v. Costco Wholesale Corp., 390 F.3d 126, 133 (1st Cir. 2004).[7]  In the instant

---

[7]  To make out a prima facie case Marchant must show that "(1) a bona fide religious practice conflicts with an employment requirement, (2) he brought the practice to the employer's

case it is very questionable that Marchant satisfied his burden of establishing a prima facie case. However, as detailed below, that issue does not need to be resolved since UL has established that even if Marchant met his initial burden, either UL offered an appropriate accommodation or it did not need to do so, as any accommodation would cause it undue burden.

UL raises a persuasive argument, based on the undisputed evidence that comparable religious classes were available at different locales and at different times, that Marchant's desire to leave early two days a week to attend classes was based on a personal preference and was not necessary to carry out a bona fide religious practice. See Tiano v. Dillard Dept. Stores, Inc., 139 F.3d 679, 682-83 (9th Cir. 1998) (where the selection of which pilgrimage plaintiff had to attend was a matter of personal preference and not part of a bona fide religious belief, employer not liable for religious discrimination by terminating employee for going on pilgrimage during the company's busiest season); Lewis v. Area II Homecare for Senior Citizens, 397 Mass. 761, 772-73, 493 N.E.2d 867, 874-75 (1986) (plaintiff failed to establish that taking an eight-week leave of absence at a specific time to perform missionary work was required by her religion, although some missionary work was required). Absent proof of interference with a bona fide religious practice, Marchant's claim of religious discrimination must fail.

---

attention, and (3) the religious practice was the basis for the adverse employment decision." Brown v. F.L. Roberts & Co., Inc., 419 F. Supp. 2d 7, 12 (D. Mass. 2006) (internal quotation and punctuation omitted).

Similarly, UL argues persuasively that since Marchant was not required to work on Tuesdays and Thursdays, and could choose to work any other days he desired, his inability to work a full shift on Tuesdays and Thursdays did not conflict with an employment requirement. See Fox v. Lear Corp., 327 F. Supp. 2d 946, 953 (S.D. Ind. 2004) (since employee's "ability to decline voluntary weekend work without retribution eliminates the conflict between employment requirements and religious practices," employee did not make a prima facie case of religious discrimination when employer refused to schedule him so that he could earn voluntary overtime on weekends without working on his Sabbath) (internal quotation omitted).[8]  This, too, would preclude Marchant from establishing his prima facie case.

Even assuming that Marchant has met his initial burden, UL is still entitled to summary judgment on Marchant's claim of religious discrimination.  "If the plaintiff establishes [his] *prima facie* case, the burden then shifts to the employer to show that it offered a reasonable accommodation or, if it did not offer an accommodation, that doing so would have resulted in undue hardship."  Cloutier, 390 F.3d at 133.  "An accommodation constitutes an 'undue hardship' if it would impose more than a *de minimis* cost on the employer.  This calculus applies both to economic costs, such as lost business or having to hire additional employees to accommodate a [religious] observer,

---

[8]  The ability to decline to work at a specific time without retribution may also be considered a reasonable accommodation in the event Marchant is found to have established a prima facie case.  See Fox, 327 F. Supp. 2d at 953.

and to non-economic costs, such as compromising the integrity of a seniority system." Id. at 134 (internal citations omitted).  It is undisputed that, in the instant case, UL would have had to pay both Marchant and another employee for the same work under the CBA. Requiring such a double payment would constitute an undue hardship as a matter of law. See Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 84, 97 S. Ct. 2264, 2277, 53 L. Ed. 2d 113 (1977) (TWA could not be required to pay another employee premium pay to cover a shift of employee who was absent on Saturdays due to his religious beliefs). Since UL has established either that it offered a reasonable accommodation, see note 8, supra, or that offering such an accommodation would result in undue hardship to the company, Marchant's claim of religious discrimination must fail, and UL's motion for summary judgment should be allowed.

### C.    Marchant's Claim of Discriminatory Conduct

Marchant claims that UL discriminated against him on the basis of race/color by not letting him work as a driver and assigning him to the warehouse.  UL is entitled to summary judgment on this claim because Marchant has not established that he suffered an adverse employment action or that UL was motivated by discriminatory animus.

The familiar McDonnell Douglas burden-shifting framework applies to the plaintiff's discrimination claims.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824, 36 L. Ed. 2d 668 (1973).  Thus, "[w]hen a plaintiff alleges discrimination resulting in a Title VII violation, the plaintiff must first prove a prima facie case by showing:

> "(1) he is a member of a protected class; (2) his employer took an
> adverse employment action against him; (3) he was qualified for the
> employment he held; and (4) his position remained open or was
> filled by a person whose qualifications were similar to his."

Douglas v. J.C. Penney Co., Inc., 474 F.3d 10, 13-14 (1st Cir. 2007) (quoting Straughn v.

Delta Air Lines, Inc., 250 F.3d 23, 33 (1st Cir. 2001) (internal punctuation omitted;

additional citations omitted)).  "After the plaintiff establishes a *prima facie* case, the

burden shifts to the employer to establish a legitimate, non-discriminatory reason for its

adverse employment action."  Id. (citation omitted).  "If the employer demonstrates such

a reason, the burden returns to the employee to show that the proffered reason was mere

pretext, and that the true reason was prohibited discrimination."  Id.  At all times, the

plaintiff has the ultimate burden of showing "that the defendant intentionally discrimi-

nated against [him]."  Rodriguez-Torres v. Caribbean Forms Mfr., 399 F.3d 52, 58 (1st

Cir. 2005).

     In the instant case, Marchant has not met his burden of proving that he suffered an

adverse employment action.  "In order to be redressable, an alleged adverse employment

decision must result in conditions unreasonably inferior to the norm for that position."

Torres-Martinez v. P.R. Dept. of Corr., __ F.3d ___, No. 06-1881, 2007 WL 1191149, at

*2 (1st Cir. Apr. 24, 2007) (quoting Rosario-Urdaz v. Velazco, 433 F.3d 174, 178 (1st

Cir. 2006)) (internal punctuation omitted).  In the instant case, it is undisputed that spare

employees were assigned to fit the needs of UL.  Marchant was regularly hired to work

during an established shift at the warehouse.  Other employees worked there as well

under the same conditions as Marchant. The company has established that all spare employees were paid the same whether they worked as drivers or in the warehouse.[9] Even discounting the stated reasons why UL did not let Marchant continue as a driver, Marchant has not established that his employment conditions were so substantially inferior as to constitute an adverse employment action. See Jorge v. Rumsfeld, 404 F.3d 556, 562 (1st Cir. 2005) (where employee refused to accept a transfer that involved "no loss of pay, benefits, status, or the like," no constructive discharge).

Assuming, arguendo, that Marchant has established a prima facie case of discrimination, UL has met its burden of establishing a legitimate, non-discriminatory reason for its actions. Marchant admits that he was in two accidents while he was working as a driver. It is undisputed that the company received customer complaints, although Marchant challenges the legitimacy of such complaints. "In essence, he asks [the court] to excuse his performance by replacing [UL's] business judgment with his own, an untenable position." Velazquez-Fernandez v. NCE Foods, Inc., 476 F.3d 6, 12 (1st Cir. 2007) (fact that employee disagreed with employer's assessment of his performance did not defeat employer's establishment of a legitimate business reason for termination), and cases cited.

The record also shows that as a matter of company policy, driver's assistants were limited to those who were learning to be drivers, and that the assistant's position was not

---

[9] Marchant's unsubstantiated claims of disparate pay cannot be credited in light of the specific attestations of UL by persons with knowledge of the pay scale. (See DF ¶ 15).

given to those who had not succeeded as drivers.  Thus, the evidence demonstrates that by limiting Marchant's employment to the warehouse, UL was acting consistent with its own policies.

"Where, as here, the employer proffers a nondiscriminatory reason for its action, the burden shifts back to the plaintiff to show that the reason was a coverup for a discriminatory decision."  Benoit v. Tech. Manuf. Corp., 331 F.3d 166, 174 (1st Cir. 2003) (quotations and citations omitted).  Marchant has not met this burden.  Here the evidence is that UL encouraged Marchant to obtain his CDL and helped him obtain the license.  It was only after an accident and customer complaints that UL did not let him work as a driver or driver's assistant.  There is nothing in the record that would explain the change in UL's position from encouraging him to be a driver to taking him out of the driver's role other than the company's view of Marchant's work performance.  The same personnel were involved in all of the decisions concerning Marchant's work assignments, and there is no incident which would explain any sudden discriminatory animus.

Finally, Marchant contends that white drivers were hired while he was not.  Even ignoring Marchant's driving record, the evidence is that the new drivers were hired as part of a takeover from another company, and that the hiring was accomplished with the help of the Union and consistent with Union policies.  Title VII does not prevent an employer from acting unfairly, or even from making poor business judgments, so long as the company's decision "does not stem from a protected characteristic, here, race or ethnicity."  Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 22 (1st Cir. 1999).

A careful review of the record in this case establishes that Marchant "failed to present sufficient evidence with respect to the ultimate issue in this case:" whether UL's proffered reasons for its actions "[were] actually a pretext for unlawful discrimination." Id. For all these reasons, UL is entitled to summary judgment on Marchant's claim of discrimination based upon his race/color.

### D.    Marchant's Claim of Harassment

Marchant contends that he was harassed based upon his race/color, national origin, and religion. UL disputes Marchant's characterization of various events that allegedly took place, but this court concludes that there are no material facts in dispute. Accepting as true Marchant's version of events, he has failed to establish an actionable claim of harassment.

"To establish a *prima face* case for a hostile work environment claim, a plaintiff must prove:

> (1) that he is a member of a protected class; (2) that he was subjected to unwelcome [racial] harassment; (3) that the harassment was based upon [race]; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that [racially] objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be se so; and (6) that some basis for employer liability has been established."

Douglas, 474 F.3d at 15 (quoting O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001)) (internal punctuation and references to sexual harassment omitted).

"[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at

-17-

all the circumstances.  These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 371, 126 L. Ed. 2d 295 (1993).  In the instant case, there is no evidence that the conduct about which Marchant complains was severe, or that it interfered with his work in any way or caused him any undue distress.  There is no evidence of physically threatening or humiliating conduct.  At most, the case presents "offhand comments" or "isolated incidents" which do not amount to a hostile work environment.  See Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S. Ct. 2275, 2283, 141 L. Ed. 2d 662 (1998).  Marchant "may have experienced discomfort as a result of [UL's] behavior, but [he] has not presented adequate evidence of harassment to allow a reasonable jury to find that [he] was subjected to a hostile work environment."  Rivera-Martinez v. Commonwealth of P.R., No. 05-2605, 2007 WL 16069, at *4 (1st Cir. Jan. 4, 2007) (unpub. op.).

### E.  Marchant's Claims of Disability Discrimination

Marchant seems to be making a claim that he was denied light work after being injured at work, and that UL violated the Americans with Disabilities Act.  See Compl. ¶ 5 and conclusion.  It is well established that Marchant's failure to raise this claim before the MCAD or EEOC precludes its consideration by this court.  See Bonilla v. Muebles J.J. Alvarez, Inc., 194 F.3d 275, 277 (1st Cir. 1999) ("the ADA mandates compliance with the administrative procedures specified in Title VII of the Civil Rights Act of 1964"

and plaintiff must comply with such procedures "before a federal court may entertain a suit that seeks recovery for an alleged violation of Title I of the ADA"). The record is clear that Marchant did not assert a disability discrimination claim before filing suit. As a result, UL's motion for summary judgment on any disability discrimination claim should be allowed.

### F.    Marchant's Claims Against The Individual Defendants

Finally, Marchant has brought claims of discrimination against the individual defendants, Tsickritzis and Kingston. While the First Circuit has not decided the issue, "each of the other eleven circuits have held that an individual, even acting as an agent for [his] employer, is not liable under Title VII" based on an interpretation of the statutory language. Fantini v. Salem State College, ___ F. Supp.3d ____, No. 05-12348-RWZ. 2007 WL 922883, at *3 (March 26, 2007) (citing Healy v. Henderson, 275 F. Supp. 2d 40, 45 n.39 (D. Mass. 2003) (collecting cases)). For the reasons detailed in those cases, this court recommends that the claims against the individual defendants be dismissed for failure to state a claim.

## IV.  CONCLUSION

For the reasons detailed herein, this court recommends to the District Judge to whom this case is assigned that the Defendants' Motion for Summary Judgment (Docket No. 69) be ALLOWED.[10]

---

[10]  The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto

        / s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge

---

with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-605 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985).  Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).