UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
CLERKS OFFICE

| Bienvenido I. Lugo Marchant | Civil Action No. 05 11317 NMG |
| Plaintiff | 2007 JUN -8 A 11: 44 |
| v. | |
| Peter Tsickritzis, Kevin Kingston, | U.S. DISTRICT COURT |
| United Liquors Limited et al. | DISTRICT OF MASS. |
| Defendants | |

**PLAINTIFF'S OPPOSITION TO THE REPORT AND RECOMMENDATION,
RULE 72 FED. R. CIV. P.**

The Plaintiff ("Mr. Lugo") respectfully submits this **Plaintiff's Opposition to the Report and Recommendation, Rule 72 Fed. R. Civ. P.** The Report and Recommendation ("RR") ignores many examples that can be seen as direct evidence of genuine reasons of material fact requiring **TRIAL BY JURY** and the Defendants ("ULL") are not entitled to summary judgement.

Mr. Lugo already submitted, following an order of the Honorable USDC, all the documents in his possession, recently produced documents and depositions with an unruly Defendant, Mr. Tsickritzis. Mr. Lugo believes the Defendants' actions are a mere unlawful pretext to justify their defense. Up to this time the Defendants have ignored two direct orders to submit documents authored by the Plaintiff.

**I. INTRODUCTION -DIRECT EVIDENCE**

Mr. Lugo agrees with the introduction but if fails to include language to denote the retaliatory treatment of higher ranks supervisors as in the Civil Rights Act of 1991 ("CRA 1991"); that the Defendants denied him a promotion as he opposed unlawful acts; libel-slander; post employment bad referencing, overtime benefits denied.

**II. STATEMENT OF FACTS**

**1. The Parties**

Mr. Lugo agrees with the RR except that it fails to mention that Mr. Lugo's medical coverage was cancelled as he refused to drop his MCAD claim, and subsequently was denied information regarding his workers' comp' benefits. ULL refused to give light duty work to Mr. Lugo while recovering from said accident as retaliation.

**2. Employment Opportunities at ULL**

Mr. Lugo was considered a Teamster 653 at the time of working for ULL. There was no conflict when offering social leaves to White workers.

**3. Mr. Lugo's employment with ULL**

1

Mr. Lugo could work 4 days weekly, something common for a spare, as ULL had most of the workload between Tuesday and Friday. Between 1999-2003, Mr. Lugo could work 5 days a week for his reliability and ethics. Spares are laid off for weeks (winter season is slow) until work intensifies again. Mr. Lugo could still work. Mr. Lugo was not supported in pursuing a CDL license as the Fleet Manager ("FM") was very elusive to train him, reason for which Mr. Lugo had to take the test even with neighbors or cancel as the FM refused to do his job causing the "no-show" in the MA CDL record. The RR does not comment on when White drivers had numerous accidents or were cited by the Boston, Cambridge, Brookline Police Dept's or MA State Police. A new driver wrecked a brand new truck costing over $40k in repair and he was promoted. The RR does not mention that ULL called Mr. Lugo, for work, after the shift had begun, and gave him no equipment to work causing delays. The RR ignores that Mr. Kingston, mocked Mr. Lugo for his speech and said that customers complained of his speech.

### 4. Mr. Lugo's Request for Religious Accommodation

That is not the first time Mr. Lugo requested an accommodation however the RR does refer to a formal written petition that Mr. Kingston threw back to Mr. Lugo asking *"do you want to get fired so you can go and pray?"* This RR shall not include language to tell Mr. Lugo when to exercise his rights as the pharisaical defense mounted by Jackson Lewis pretends. Jackson Lewis shall not decide, as a Sanhedrin, civil and ecclesiastical issues. Mr. Lugo has had that same schedule for a longer time than Mr. Tsickritzis worked for ULL. Wilson, a co-worker who requested a religious accommodation and commented he was going to sue, was segregated from others and eventually terminated.

### 5. Mr. Lugo's Claim of Harassment

The RR's footnote only means that Ms. Ackerstein Esq., is willing to lie. Mr. Lugo asserts that Mr. Kingston, made a constant joke to reply Mr. Lugo with *"do you want to get fired so you can go and pray?"* as Mr. Lugo asked him to explain the reasons for sustaining the demotion and his tirades. Also, his assistants asked Mr. Lugo if he was going to work the whole shift or to go and pray. The incident with the receptionist was witnessed by a man who brought a MCAD and in response to his allegations mentioned that Mr. Tsickritzis warned Mr. Lugo of *"never being a regular employee for having a lawsuit against the company"*. Mr. Tsickritzis's assistant (Ms. Linley) made clear to Mr. Lugo that he *"would be promoted if dropping the MCAD claim"*. Mr. Lugo's medical coverage was cancelled for not abiding. Mr. Lugo's pleading are very clear in that they refer to the Defendants' unlawful acts and demotion preceding a retaliatory new shift. Furthermore, the Defendants cannot claim all the spares are paid the same as Mr. Lugo's pay stubs include a greater pay on times when he was paid the rate and others when he was

shortchanged. The corporate memo with a higher rate contradicts the RR and the Defendants as his duties included driving and moving trucks for the next shift as well as for new employees who were promised a promotion after passing the CDL test.

### 6. The End of Mr. Lugo's Employment with ULL

On or about June 17, 2003 was injured at work and was denied medical information to take therapy/treatment, had his medical coverage cancelled after not dropping his MCAD claim, was denied light duty work, was harassed by Mr. Tsickritzis, libeled/slandered at the MCAD through Hale & Dorr, required a medical note to work with no limitations. On or about Jan' 2004 Mr. Lugo was offered a retaliatory shift as Mr. Tsickritzis was assisted in it by Ms. Mansfield, a Vice President of the United Group dictating policies for ULL. Mr. Lugo was offered less desirable work with a lower rate as retaliation. The RR does not condemn Mr. Tsickritzis for having warned Mr. Lugo of "never being a regular employee for having a lawsuit against the company", his violent behavior toward employees/applicants nor does it comment on the unethical contact with MCAD through Hale & Dorr.

Mr. Lugo is entirely clear in the four points the RR mentions, the vicarious liability, and post employment bad referencing.

### III. ANALYSIS

#### A. Summary Judgement

In fact, Mr. Lugo does not need to initiate a claim every time the Defendants interfere with his possibilities of working and will not hesitate in starting over something so obvious witnessed by many, supported by hundreds of pages of evidence, and case law. Work related accidents are valid reasons to claim these protections and remedies as ULL handled them dishonestly. Mr. Lugo intends to vigorously prove his case.

#### B. Mr. Lugo's claim of religious discrimination

Mr. Lugo believes the religious discrimination is valid in that the supervisors had conflicting views in whether to allow Mr. Lugo go and exercise his rights raising the suspicion of mendacity. There were conflicting views in allowing Mr. Lugo to leave earlier on some days. Also, whites workers were allowed leave for social activities with no retribution, even if that slowed down the production lines. Undoubtedly, Mr. Lugo met the burden of establishing a prima facie case though the RR does not comment on the persistent comments and unlawful actions of ULL. ULL offers a faulty reasoning where they prescribe when/how to practice one's faith but cannot be told how to follow US laws. The Plaintiff though respectful of whatever they can claim to believe in considers that the US Constitution and Laws, not foreign constitutions that favor some people, shall be followed.

Mr. Lugo is not attending religious activities as personal preference as ULL falsely stated. In fact, many times Mr. Lugo took days off without saying without specifying they were Bible-mandated and they were granted with no retribution. There shall be no mentioning of 'compromising a seniority system' since Mr. Lugo began working for ULL on 1999 and people who began on 2003 were given a free ride. ULL is not sincere when they talk of an accommodation since with a similar worker he was fired for asking for his rights. The take over mentioned was not in that fashion but as 1. new drivers from Whitehall as ULL bought Whitehall (promoted in a few weeks); 2. ULL taking drivers from Martignetti (promoted in a heartbeat with the Union), and 3. ULL being bought they went down as Mr. Kingston and Tsickritzis did not heed Mr. Lugo's suggestion to gain market.

### C. Mr. Lugo's claim of disability discrimination

Mr. Lugo believes his claim of discriminatory conduct is valid in that he suffered an adverse employment. Specifically, for Mr. Lugo asking for an apology from Mr. Kingston and Mr. Tsickritzis they singled him out for jokes, mocking, and harassment at the hands of co-workers creating a hostile work environment. Mr. Tsickritzis commented to Mr. Lugo that he should not be writing to Mr. Keimach, his supervisor and Mr. Tye, son of the owner, for solutions. Mr. Kingston said that *"one was enough"* when explaining to Mr. Lugo why they had only one non-white as a driver. The familiar McDonnell analysis should be substituted for the Ellerth-Faragerth in evaluating Mr. Tsickritzis violent harassment and M. Kingston's constant irreverent joke; *"do you want to get fired so you can go and pray?"* Frankly, Mel Gibson was vilified more for similar rantings as when Mr. Tsickritzis misbehaved at two depositions.

The RR (page 14) ignores clear examples of intentionally discrimination against Mr. Lugo. In fact, Mr. Tsickritzis and the substitute receptionist not only conform with the continual harassment doctrine but also include Mr. Tsickritzis loud comment *"you'll never be a regular employee for having a lawsuit against the company!"* On the adverse employment action, Mr. Lugo was demoted to a position where he earned not even half of what he used to before opposing unlawful acts as well as being closely monitored by supervisors of other areas and the main defendants' assistants. Mr. Lugo was paid less than stipulated, denied overtime benefits, exposed to a hostile work environment as when William Nagle ("WN", a supervisor) used derogatory words to refer to Blacks and Haitians and then asked Mr. Lugo to give them rides back to Brockton. Mr. Lugo was also required to operate equipment he was not trained to operate as OSHA mandates.

The RR (page 15) misstates a footnote (#9) that contradicts a corporate memo establishing a higher rate and when Mr. Lugo should have been paid more as his pay stubs reveal.

4

Mr. Lugo will not hesitate in, if needed, asking the US Supreme Court for a redress. Mr. Lugo is not asking this Honorable USDC to substitute his judgement for others' but to analyze this issues in comparison with the evidence and that White workers could wreck a brand new truck for driving by a lower bridge, among many accidents, and still be promoted.

On the issue of being a driver's assistant (helper), Mr. Lugo was always (except once or twice) called to work as such from 1999-2003 when he got his CDL license. In that time he did work in the warehouse once if not twice. The Fleet Manager (FM) was reluctant to train Mr. Lugo and refused to go with him for the road test as the record show the many "no-shows" and failures for not being properly trained. After being demoted to a warehouse position, Mr. Lugo asked to be trained for a CDL A so he could operate bigger trucks, as he had to drive everyday. FM discouraged many Blacks and Haitians who wanted to be trained saying he had to train others.

The RR (page 16) is not clear in that it firstly refers to when ULL took some new drivers from a company (Whitehall Co') they had bought, and secondly to getting new drivers from a rival (Martignetti Co'). The latter company, Martignetti, took over ULL. Mr. Lugo was not officially working for ULL at that season making that mentioning unnecessary. Mr. Lugo had warned Mr. Kingston and Mr. Tsickritzis of that predictable possibility but they opted for their poor business judgement in complacence waiting for the fall.

### D. Mr. Lugo's claim of harassment

There is plenty of evidence that Mr. Lugo can claim harassment (page 17). To establish his prima facie case Mr. Lugo met the burden associated with it. The RR wants to portray the plaintiff as perfect, if being completely White meant perfection. For example, regular drivers who finished their deliveries came back to the warehouse where Mr. Lugo worked and mocked Mr. Lugo telling him he *"looked like the foreman of the Haitians"*, *"the foreman of the Blacks"* and loudly asked him *"how were the boys working"*. WN, supervisor, was present there and did not correct anything. WN himself used to ask Mr. Lugo how the Haitians were working, thus assigning him a supervisory extra duty that caused many headaches. Specifically, on many occasions he commented Mr. Lugo *"who'd be next Black/Haitian (using a racial expletive) to get fired"*. In some of these times Haitians/Blacks overheard the conversation and that almost caused a fight that the Plaintiff prevented with diplomacy. Right after that argument, WN berated Mr. Lugo asking him *"why do you f*** with these n******, huh? I told you to stay away from them! We didn't have these problems at Bridgewater (previous location), one of these days they'll come here with their guns and shoot us all, like in their hoods' "*).

Interestingly, WN asked at the end of the shift Mr. Lugo if he could *"give them a ride home when going back to Brockton"*. This RR pretends to say that working under such

conditions is rather pleasant and safe for Mr. Lugo. Before claiming anything Mr. Lugo was respected some more by the supervisors, including Mr. Kingston, who after demoting Mr. Lugo to a warehouse position told Mr. Lugo that WN complained of Mr. Lugo working too slow and to stay in the warehouse. Other times, co-workers joked about Mr. Lugo for "after working for ULL for close to 5 years not being promoted while White drivers were promoted in a few weeks, others were promised a promotion once passing the CDL road test (with no trial test as driving-delivering), and others were promoted in a heartbeat as some Union representatives who could not help the Plaintiff in the road test joined the moral debacle of ULL. At a second deposition, Ms. Ackerstein, Esq. asked Mr. Lugo for confidential communication with Michael Clark and Michael Sullivan, identified as union representatives of Mr. Lugo.

### E. Mr. Lugo's claim of disability discrimination

The RR is not accurate in the disability discrimination, in fact, Mr. Lugo asked the MCAD for said work accommodation as well as sending medical notes to prove he could work but requesting "light duty work"; PT 's assistant rejected that asking for a note with no restrictions while associating the dropping of the MCAD claim to a promotion. ULL, though their counselor Hale & Dorr, libeled-slandered Mr. Lugo saying he was already collecting benefits when it was not true. In fact, the MCAD dismissed other two claims as ULL said they were related to Mr. Lugo. The record is very clear that Mr. Lugo claimed the speech as a disability, work related accident, and the FMLA duties as one associated with a disabled one. In fact, Ms. Ackerstein, Esq., after inviting Mr. Lugo to visit her office, after a FMLA duty in her neighborhood, appeared to have someone called security to dismiss Mr. Lugo from a state allowed parking for disabled ones.

### F. Mr. Lugo's claim against the individual defendants

Mr. Lugo believes the individual claims, shall be allowed under the Civil Rights Act of 1991 as Mr. Kingston and Mr. Tsickritzis engaged in a corporate moral debacle supported by their supervisors. Mr. Kingston recurrent joke and berating Mr. Lugo with *"do you want to get fired so you can go and pray?"* shall be condemned as Mr. Tsickritzis ungentlemanly behavior at two depositions (countless at work) and when Mr. Lugo applied for work as a salesman with his *"you'll never be a regular employee for having a lawsuit against the company"* in front of others clearly portray xenophobia. Ms. Ackerstein, Esq., denying it only show that she is willing to lie at the USDC for monetary gain regardless of the consequences.

### IV. CONCLUSION

The RR does not address the issues of the FMLA, libel-slander, Civil Rights Act of 1991, shortchanging, post employment bad referencing, retaliatory cancellation of medical coverage

(Blue Cross Blue Shield), deposition issues, ULL calling Mr. Lugo to work after work had began with no equipment to work and the vicarious liability of higher ranks supervisors (Ms. Mansfield, Mr. Keimach, Mr. Tye of the United Group, the policy makers who Mr. Lugo called to solve problems and returned the "hot potato' issue to their subordinates) who directed the main defendants in their unlawful acts.

### REASONING FOR DENYING SUMMARY JUDGEMENT

Until now, the Defendants ignore an order to produce documents authored by the Plaintiff. This record manipulation has been significant in narrowing issues. The Plaintiff still waits for them. Their motion to delay trial is nothing but backpedaling as they have more resources than the Plaintiff. It shall be DENIED.

The US Supreme Court had a case where a Plaintiff submitted 62 pages of direct evidence (Burton); this Plaintiff has over 200 pages of direct evidence, irrefutable facts and numerous citations from higher authority denying the Defendants a summary judgement. The Plaintiff is entitled to a denial for summary judgement in light of the US Supreme Court's ruling in *Desert Palace* and *Reeves V. Sanderson Plumbing Products, Inc.*, and the 29 C.F.R. s. 825.220(c). The Plaintiff would like this Honorable USDC to see this document along with the citations already cited in previous motions (such as the ones filed on Feb'23-2007). They are not included here to comply with the Expense Act to the best of the intentions and understanding of the Plaintiff.

**WHEREFORE,** the Plaintiff respectfully prays this **Honorable US Court** agrees with his **PLAINTIFF'S OPPOSITION TO THE REPORT AND RECOMMENDATION, RULE 72 FED. R. CIV. P.** The Plaintiff would like this **Honorable US Court** ordering the Defendants to submit a copy of the documents authored by the Plaintiff and to deny the Defendants Motion for Summary Judgement for not being sincere. The Plaintiff also would like to receive a statement of the Defendants' wealth, as this is necessary to determine punitive damages and others awards not specified at this time.

Very respectfully the Plaintiff demands **TRIAL BY JURY**.

Respectfully submitted,

Bienvenido I Lugo-Marchant

*Pro se, in forma pauperis*

### CERTIFICATE OF SERVICE

I hereby certify that on June, 6 2007, this document was served upon the defendant's counsel, JACKSON LEWIS, by first class mail, postage paid.

7